UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| MOISES SANDOVAL MENDOZA | ) | |
| Petitioner | ) | |
| | ) | **5:09-CV-86** |
| v. | ) | **ECF** |
| | ) | |
| RICK THALER, Director | ) | |
| Texas Department of Criminal Justice, | ) | **(Death Penalty Case)** |
| Correctional Institutions Division, | ) | |
| Respondent | ) | |

AMENDED PETITION
FOR A WRIT OF HABEAS CORPUS
and
*Exhibits*

(with separately filed
Motion for Evidentiary Hearing, Doc #7
and
Motion for Sanctions/Alternative Motion to Compel)

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR PETITIONER

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................... ii

TABLE OF ABBREVIATIONS.................................................. xi

INTRODUCTION................................................................ 1
    1.    Basis of Confinement.................................................. 1
    2.    Overview of Procedural History...................................... 2
        A.    Indictment...................................................... 2
        B.    Jury Trial....................................................... 2
        C.    Direct Appeal................................................... 2
        D.    U.S. Supreme Court............................................. 3
        E.    State Habeas.................................................... 3
        F.    Federal Habeas................................................. 3
    3.    Standard of Review.................................................. 3

REASONS TO ISSUE THE WRIT OF HABEAS CORPUS........................... 7
    As to all Grounds:  There is clear and Convincing evidence that Fact Findings are not entitled to a presumption of correctness. ................................. 8
    As to Grounds 1 - 5:  Interrogatories Propounded In Federal Habeas ........ 13
        A.    Fed. R. Civ. Proc. 37(b)(2)(A) now prohibits Respondent from supporting or defending Grounds 1 through and including 5 on the basis that the mitigation investigation was adequate.  This is because of the consistent intransigence of Mr. Gonzalez(s), who despite a court order, refused to provide records, and answers to the interrogatories................. 13
            1.    In state habeas, trial counsel Sanchez and Ivory/Tucker, and mitigation investigator, Gonzalez(s), gave affidavits in favor of the Respondent............................................. 13
            2.    Federal court ordered interrogatories........................ 15
            3.    Gonzalez(s)' refusal to comply with the federal court ordered interrogatories. ......................................... 16
        B.    Trial counsel could not have made "strategic" decisions because the investigation was not adequate.  they lacked the necessary facts relevant to making reasonable choices among plausible options. ............... 18
            1.    The list of documents identified by Dr. Vigen, as having been given to him by Mr. Gonzalez(s), proves that that mitigation investigation was *not* adequate. ................................... 20
            2.    The trial attorneys failed to respond to the written request by Dr. Vigen to locate 7 witnesses he wanted, but never interviewed ... 25
            3.    The answers to interrogatories reflect an *in*adequate investigation that adversely impacted all phases of the trial.  The following topics were left unexplored and unexplained: ........................ 26
                a.    The connection between Mendoza's binge drinking and

adverse childhood experiences........................ 26
  b. The connection between Mendoza's binge drinking and brain damage........................................ 28
  c. The connection between Mendoza's adverse childhood experiences (attachment disorder) and violence against women............................................ 29
 C. Conclusion: The interrogatories prove that the performance of trial counsel was deficient because the mitigation investigation was inadequate, there is a reasonable probability the outcome would have been different....... 32

GROUND ONE (IAC & NO EFFECTIVE THEORY OF THE CASE FOR LIFE: 6TH & 14TH AMENDMENT VIOLATION – STATE HABEAS CLAIM 1): Trial counsel was constitutionally ineffective; absent a comprehensive psycho-social history, they lacked the necessary facts to formulate a defense theory that was effective in all phases of the trial............................................... 35
 A. Statement of Facts.......................................... 35
 B. No Presumption of Correctness for Fact Findings.................. 38
 C. Argument & Authorities...................................... 38
  1. Standard of Review.................................... 38
  2. The ABA Guidelines – A Standard of Care................. 39
  3. Trial counsel was constitutionally ineffective............... 40
   a. Performance was deficient because.................. 40
    (1) An effective theory of the case for life ( which is predicated on a thorough and comprehensive mitigation investigation) is a national standard in capital cases............................... 40
    (2) Findings of Fact Nos. 13-32 – no presumption of correctness.............................. 41
    (3) The mitigation investigation was superficial..... 44
     (a) They failed to conduct a multi-generational investigation, process the information, and construct a comprehensive psycho-social history of Moises.................... 44
     (b) They failed to establish the rapport and trust necessary to elicit sensitive mitigating evidence.......................... 45
     ( c ) They failed to identify themes and experts, whose testimony would be specifically tailored to the Mendoza case........... 45
     (d) Moises acts were left unexplained despite the availability of mitigation factors that would have placed them in context........... 46
     (e) They failed to rebut the prosecutor's theory that Moises made a "choice" to commit violence against women.............. 48
    (4) Because of the superficial mitigation investigation,

the defense theory was not integrated. . . . . . . . . . 48
    (a)    Voir Dire: The defense asserted that mitigation was whatever the juror wanted it to be. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
    (b)    Guilt/Innocence: The defense theory was a superficial assertion that the prosecution failed to carry its burden of proof beyond a reasonable doubt. . . . . . . . . . . . . . . . . . . . . 50
    ( c )    Punishment: The defense theory pivoted on a conclusory assertion that Moises was an unremorseful, adolescent-like man. . . . . . 51
    (5)    An adequate mitigation investigation revealed Moises' attachment disorder, the platform for an effective theory to:. . . . . . . . . . . . . . . . . . . . . . . . 53
        (a)    Voir Dire Argument: Educate the jury about "choices". . . . . . . . . . . . . . . . . . . . . . . . . 55
        (b)    Guilt/Innocence Argument: Negate *mens rea* with evidence of attachment disorder, brain damage, inadequate brain development, and the relationship between adverse childhood experiences and alcohol abuse. . . . . . . . . . 56
        ( c )    Punishment Argument: Explain attachment disorder and ACEs, and their relationship to Moises' alcohol abuse and association with a depraved peer group . . . . . . . . . . . . . . . . 59
    b.    Prejudice is presumed. . . . . . . . . . . . . . . . . . . . . . . . . . 61
    c.    Alternatively, but for trial counsel's deficient performance, there is a reasonable probability that the outcome would have been different. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    D.    The Conclusions of Law Nos. 276-300 are contrary to, and an unreasonable application of federal law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
GROUND TWO (IAC & Duty to Assert Legal Claims 6th & 14th Amendment Violations – State Habeas Claim 2): Mr. Mendoza was denied his Sixth Amendment right to effective counsel, when his trial attorneys failed to consider, adequately investigate, and present condition-of-the-mind evidence to negate the *mens rea* element in the guilt/innocence phase of the trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
A.    Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
B.    No Presumption of Correctness for Fact Findings. . . . . . . . . . . . . . . . . . 65
C.    Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
    1.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
    2.    The ABA Guidelines – A Standard of Care. . . . . . . . . . . . . . . 66
    3.    FF Nos. 33-127 – no presumption of correctness. . . . . . . . . . . . 67
    4.    Trial counsel was constitutionally ineffective. . . . . . . . . . . . . . . 68
        a.    Conclusions of Law 301-327 are contrary to and an unreasonable application of federal law.. . . . . . . . . . . . . . 68

iv

b.     Performance was deficient because. . . . . . . . . . . . . . . . . 68

(1)     Texas statutory and common law permit a defendant to negate *mens rea* with condition-of-the-mind evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

(2)     Despite the prosecution's direct evidence, the defense merely asserted there was no proof  beyond a reasonable doubt. . . . . . . . . . . . . . . . . . . . . . . . . . 69

(3)     The defense failed to consider, investigate and forcefully present the facts and circumstances of Moises "condition-of-the-mind" to negate the *mens rea* element of capital murder. . . . . . . . . . . . . . . . 70

(a)     <u>CATATHYMIC HOMICIDE</u>  Findings of Fact 39-66  –  No Presumption of Correctness: Moises had severe deficits in his capacity to monitor his thoughts and emotions in relation to external reality. . . . . . . . . . . 71

(b)     Moises had brain damage, which adversely affected his higher cognitive functioning and reasoning skills.. . . . . . . . . . . . . . . . . . . . . . 74

(4)     The attestations of Drs. Kessner, Lundberg-Love and Martin negated *mens rea*. . . . . . . . . . . . . . . . . . . . 76

c.     But for trial counsel's deficient performance, there is a reasonable probability that the outcome would have been different. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

(1)     The absence of condition-of-the-mind evidence in guilt/innocence made the prosecution's case uncontestable as a matter of law. . . . . . . . . . . . . . 77

(2)     FF No. 60-66 – No Presumption of Correctness. The jurors deliberated a short time, because the prosecution's uncontested evidence made them sure Mendoza was guilty of capital murder. . . . . . . . . . 78

D.     The Conclusions of Law Nos. 301-327 are contrary to, and an unreasonable application of federal law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

GROUND THREE (14TH AMENDMENT DUE PROCESS – ACTUAL INNOCENCE OF CAPITAL MURDER).  Mr. Mendoza's conviction for capital murder and sentence of death violates his Fourteenth Amendment due process rights;  he lacked the necessary mens rea for conviction of the crime of capital murder.. . . . . . . . . . . . . . . . . . . . 81

A.     Standard of Review: Actual Innocence under *Herrera*. . . . . . . . . . . . . . 81

B.     No Presumption of Correctness for Fact Findings.. . . . . . . . . . . . . . . . . 82

C.     Mr. Mendoza is actually innocent of capital murder. . . . . . . . . . . . . . . . 83

1.     *Mens rea* is an essential element of capital murder. . . . . . . . . . . . 83

2.     FF Nos. 33-127 – no presumption of correctness. . . . . . . . . . . . 84

3.     The prosecution did not prove specific intent. . . . . . . . . . . . . . . . 85

4.     There is clear and convincing evidence introduced in habeas that the cognitive deficits of Mr. Mendoza  – and *<u>not</u>* reason and intention  –

v

mediated his acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    a.    Dr. Kessner opines that Mr. Mendoza suffered from "restricted reality testing," and had "severe deficits in his capacity to monitor his thoughts and emotions in relation to external reality". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    b.    Dr. Martin opines that at the time of the offense, Moises Mendoza had brain damage and frontal lobe dysfunction, which increased his impulsivity and reduced his ability to fully consider the consequences of his actions . . . . . . . . . 89

    c.    The attestations from Dr. Kessner and Dr. Martin negate *mens rea*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

  5.    Because Mr. Mendoza did not have the necessary *mens rea*, his conviction of capital murder, and sentence of death, are unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

GROUND FOUR (IAC & FAILURE TO ADEQUATELY INVESTIGATE MITIGATING EVIDENCE): Mr. Mendoza was denied his federal 6th and 14th amendment rights to individualized sentencing;  trial counsel failed to adequately investigate and develop crucial mitigating evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

A.    Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

B.    Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

  1.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

  2.    The ABA Guidelines – A Standard of Care. . . . . . . . . . . . . . . . 96

  3.    FF Nos. 126-248 – no presumption of correctness. . . . . . . . . . . 98

  4.    Trial counsel's performance was deficient. . . . . . . . . . . . . . . . . 98

    a.    Defense counsel hired Vince Gonzales, who did not provide quality mitigation support service. . . . . . . . . . . . . . . . . . . 99

    (1)    Vince Gonzales, the "mitigation specialist," did not have the education or skills to undertake this assignment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

    (2)    Mr. Gonzalez failed to:. . . . . . . . . . . . . . . . . . . . 103

      (i)    conduct a multi-generational investigation, process the information, and construct an adequate psycho-social history.. . . . . . . . 103

      (ii)    establish the rapport necessary to elicit sensitive mitigating evidence. . . . . . . . . . 104

      (iii)    adequately investigate and develop the pivotal role that the dysfunction of Concepcion Mendoza played in Moises Mendoza's development. . . . . . . . . . . . . . . . . . . . . . . 106

      (iv)    adequately investigate and develop the adverse effect of familial mental illness in Petitioner's development. . . . . . . . . . . . 107

    (3)    The inadequate mitigation investigation had adverse consequences:. . . . . . . . . . . . . . . . . . . . . . . . . . 108

      (i)    Expert roles were ambiguous. . . . . . . . . . 109

(ii)     The forensic expert was not prepared leaving Moises' acts unexplained, and allowing the prosecution to discredit the defense. . . . . 110

(iii)    Absent a time line, trial counsel failed to recognize the significance of the dysfunction of Petitioner's father, Concepcion Mendoza . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

(iv)     The mitigation presentation painted a false portrayal of the Mendoza-family-life, and demonized Moises. . . . . . . . . . . . . . . . 112

(v)      The defense failed to rebut the prosecution's theory that Mendoza kidnaped and raped Amy Lodhi. . . . . . . . . . . . . . . . . . . . . . . . . 114

(vi)     The testimony of the defense expert aided the prosecution. . . . . . . . . . . . . . . . . . . . . . 115

b.    An adequate investigation would have revealed several mitigating themes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

(1)    Attachment disorder, the catathymic homicide of Rachelle Tolleson, and Moises' association with a depraved peer group. . . . . . . . . . . . . . . . . . . . . . 117

(2)    Adverse childhood experiences (ACEs), alcohol abuse & brain damage. . . . . . . . . . . . . . . . . . . 119

(3)    The biological nexus between brain development & offense conduct. . . . . . . . . . . . . . . . . . . . . . . . . 122

(4)    Future Dangerousness Special Issue. . . . . . . . . . 124

(5)    Presentation of Prison Life. . . . . . . . . . . . . . . . . 124

c.    Defense counsel failed to effectively select, guide, and prepare its experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

(1)    The defense failed to clearly identify the role of the experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

(2)    The defense failed to prepare Dr. Vigen. . . . . . . 125

(3)    Because Dr. Vigen acted as the mitigation expert, the future dangerousness expert, and the prison life expert, all the mitigation notes became available to the prosecutor. . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

5.    There is a reasonable probability that the outcome would have been different. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

a.    Left unchallenged:  Moises "chose" this dark path and the answers to the two special issues. . . . . . . . . . . . . . . . . . . 127

b.    The testimony of Dr. Vigen (the defense trial-expert) – that Moises was not remorseful and he found no mitigation to explain Moises' acts – aided the prosecution. . . . . . . . 127

c.    The jurors were clear that "choice" was the key to their life or death vote. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

d.    Because the defense failed to explain Moises' acts, the jurors

attested they had only one choice:   a vote for death. . . . 130

e. The Conclusions of Law Nos. 276-280, 341-405 are contrary to and an unreasonable application of federal law, which has held that defense counsel, who have performed as deficiently as Mendoza's defense team, to be ineffective. . . . . . . . . 131

GROUND FIVE (IAC & FAILURE TO ADEQUATELY DEVELOP AND PRESENT MITIGATING EVIDENCE):  Mr. Mendoza was denied his federal Sixth and Fourteenth amendment rights to individualized sentencing because trial counsel failed to adequately develop and present crucial mitigating evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

A. Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

B. Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

 1. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

 2. The ABA Guidelines  –  A Standard of Care. . . . . . . . . . . . . . . 135

C. FF Nos. 126-248  –  There is no presumption of correctness. . . . . . . . . . 135

D. Trial counsel's performance was deficient because they failed to adequately develop and present. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

 1. the dysfunction of Concepcion Mendoza.. . . . . . . . . . . . . . . . . 136

 2. the role of Concepcion's dysfunction as the genesis of Moises' attachment disorder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

 3. Mosies' attachment disorder to  explain his association with a "depraved" peer group. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

 4. Mosies' attachment disorder to explain the "catathymic homicide" of Rachelle Tolleson.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

 5. Mosies' attachment disorder & alcohol abuse. . . . . . . . . . . . . . 152

 6. Mosies' alcohol abuse & brain damage. . . . . . . . . . . . . . . . . . . 153

 7. Mosies' brain dysfunction & offense conduct. . . . . . . . . . . . . . 155

E. Conclusions of Law Nos. 276-280, 341–405 are contrary to and an unreasonable application of federal law, specifically *Strickland* and its progeny.  There is a reasonable probability that the outcome would have been different. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

GROUND SIX (DR. SORENSEN & *LOCKETT*): The trial court's ruling that "Dr. Sorensen is not going to be found to be a qualified expert," violated Mr. Mendoza's federal 8th amendment right to individualized sentencing under *Lockette*. . . . . . . . . . . . . . 158

A. Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

B. Findings of Fact Nos. 249-264  –  No presumption of correctness.. . . . . 161

C. There is no procedural default  because the direct appeal claim and state habeas claim are different, and extra-record evidence was introduced in state habeas, which was not contained in the trial record. . . . . . . . . . . . . . . . 161

D. Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

 1. Standard of Review: *De Novo* Review. . . . . . . . . . . . . . . . . . . . 162

 2. Dr. Sorensen is a qualified expert. . . . . . . . . . . . . . . . . . . . . . . . 164

  a. Dr. Sorensen's research methodology is highly regarded and the associated findings considered sound. . . . . . . . . . . . 164

  b. Dr. Sorensen's methodology is an exemplar of research that provides a reliable and scientifically based approach to

          violence risk assessment at capital sentencing.. . . . . . . . 170

3.     Research published after state habeas ended. . . . . . . . . . . . . . . 179

4.     Conclusion: The trial court violated Mr. Mendoza's right to have a jury consider and give effect to his mitigating evidence that he had only a "23.8 percent chance of committing a serious violent act while incarcerated in TDCJ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

GROUND SEVEN  (IAC & UNGUIDED JUROR RESPONSE TO FUTURE DANGEROUSNESS): Trial counsel was ineffective for failing to present testimony to support a sentence less than death, and give a favorable opinion concerning the risk assessment of Mr. Mendoza.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

A.     Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

B.     FF Nos. 265-275  – There is no presumption of correctness. . . . . . . . . . 183

C.     Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

1.     Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

2.     The ABA Guidelines  –  A Standard of Care. . . . . . . . . . . . . . . 184

3.     Trial counsel was constitutionally ineffective. . . . . . . . . . . . . . 185

a.     Counsel's performance was deficient. . . . . . . . . . . . . . 185

(1)     Trial counsel hired Dr. Cunningham as a consultant, and lead him to believe that he would testify as to risk assessment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

(2)     Dr. Cunningham not only reviewed records, he had also interviewed Mendoza. . . . . . . . . . . . . . . . . . 185

(3)     Dr. Vigen was not qualified to provide a risk assessment opinion.. . . . . . . . . . . . . . . . . . . . . . . 186

(4)     Dr. Cunningham had specialized qualifications regarding violence risk assessment in Texas, as well as multiple other jurisdictions. . . . . . . . . . . . . . . . 189

(5)     Defense counsel failed to call Dr. Cunningham to testify  that Mr. Mendoza's risk of serious violence *was well below* "more likely than not". . . . . . . . 191

b.     Counsel's deficient performance was prejudicial:  The absence of detailed testimony regarding group statistic methodology and data, particularized to Mr. Mendoza, created the risk of an unguided emotional response by the jury in its determination about the special issues on future dangerousness and mitigation. . . . . . . . . . . . . . . . . . . . . . 193

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

FEDERAL HABEAS EXHIBITS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Exhibit 1:     Cunningham,  Ph.D.  & Sorensen, Ph.D., *Improbable Predictions at Capital Sentencing: Contrasting Prison*

ix

*Violence Outcomes*, 38 J. AM. ACAD. PSYCHIATRY LAW 61-72 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199
Exhibit 2:        Email of Toni Knox to Dr. Vigen, dated 11/12/10. . . . . 199
Exhibit 3A:       Vince Gonzalez(s) Signed Return Receipt. . . . . . . . . . . 199
Exhibit 3B:       Vince Gonzalez(s) Interrogatories. . . . . . . . . . . . . . . . . 199
Exhibit 4A:       Sanchez Answers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199
Exhibit 4B:       Sanchez Interrogatories. . . . . . . . . . . . . . . . . . . . . . . . . 199
Exhibit 5A & B:   Ivory/Tucker Interrogatories/Answers. . . . . . . . . . . . . 199
Exhibit 6A:       Vigen Answers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199
Exhibit 6B:       Vigen Interrogatories. . . . . . . . . . . . . . . . . . . . . . . . . . . 199
Exhibit 7A:       Cover email from Toni Knox to Brandt re Mitigation Folder, dated 12/30/2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . 199
Exhibit 7B:       Trial Mitigation Folder. . . . . . . . . . . . . . . . . . . . . . . . . 199
Exhibit 8:        Trial Counsel and Mitigation Expert affidavits. . . . . . . . 199
STATE HABEAS EXHIBITS: Although contained in the original record, these select exhibits are reproduced for the convenience of the reader. . . . . . . . . . . . . . . . . . . . . . . . 199
Exhibit A:        Affidavit of Gilda Kessner, Psy.D.. . . . . . . . . . . . . . . . . 199
Exhibit B:        Affidavit of Paula Lundberg-Love, Ph.D.. . . . . . . . . . . . 199
Exhibit C:        Affidavit of Stephen K. Martin, Ph.D.. . . . . . . . . . . . . . . 199
Exhibit I:        Affidavit of Toni Knox, L.C.S.W.. . . . . . . . . . . . . . . . . . 199
Exhibit J:        Affidavit of Mark Cunningham, Ph.D.. . . . . . . . . . . . . . 199

## **TABLE OF ABBREVIATIONS**

The following are a list of abbreviations used within the pleading:

CR __:__               CR is the abbreviation for Clerk's Record, as required by TEX. R. APP. PROC. 34.1.  It is followed by the volume number before the colon, and the page numbers after the colon.

RR __:__               RR is the abbreviation for Reporter's Record, pursuant to TEX. R. APP. PROC. 34.1,which is the trial transcript testimony recorded by the court reporter. The abbreviation RR is followed by the volume number before the colon, and the page numbers after the colon.

Exhibits               Exhibits refer to those listed in, and are attached to the state  application for writ of habeas corpus  –  found in the state record that is part of this appeal

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| MOISES SANDOVAL MENDOZA | ) | |
| Petitioner | ) | |
| | ) | 5:09-CV-86 |
| v. | ) | ECF |
| | ) | |
| RICK THALER, Director | ) | |
| Texas Department of Criminal Justice, | ) | (Death Penalty Case) |
| Correctional Institutions Division, | ) | |
| Respondent | ) | |

MOISES MENDOZA (hereinafter also referred to as Petitioner, Applicant, or MENDOZA) petitions pursuant to 28 U.S.C. § 2241 & 28 U.S.C. § 2254 for a writ of habeas corpus because he is confined by the State of Texas under a sentence of death, in violation of the laws and Constitution of the United States.

MOISES SANDOVAL MENDOZA has never sought federal habeas corpus relief for this conviction and sentence before.  This is his first appearance in federal district court for any purpose.

INTRODUCTION

1.     BASIS OF CONFINEMENT.

MOISES SANDOVAL MENDOZA, inmate number #999-498, is confined by the Texas Department of Criminal Justice, Correctional Institutions Division, Rick Thaler, Director,  TDCJ-ID.  Petitioner is being denied his liberty and also faces execution under an unconstitutional conviction for capital murder and the concomitant sentence of death.

1

2.     OVERVIEW OF PROCEDURAL HISTORY.

A.     **Indictment.**  By an indictment filed on the 18th day of March, 2004, Mendoza was charged in trial court cause number 401-80728-04 with one count of capital murder. (CR 1:20) The indictment alleged that Mendoza intentionally or knowingly caused the death of Rachelle Tolleson by strangling deceased with his hands and stabbing deceased with a knife, while said defendant was in the course of committing or attempting to commit the offense of burglary, kidnaping and aggravated sexual assault of the deceased.

B.     **Jury Trial.**  On April 22, 2004, Juan Sanchez was appointed as first chair to represent Mr. Mendoza in his capital trial.  (CR 1:22).

On May 4, 2005, individual voir dire began, and concluded on June 8, 2005, with the completion of the selection of jurors and alternates.  (CR 1:3).

On June 21, 2005, the trial on the merits began.  Before testimony began, one juror, Mrs. Broach, was excused for health reasons over defense objections.  (RR 20:22).

On June 23, 2005, the jury returned a verdict of guilty of the offense of capital murder. (RR 21:196).

On June 29, 2005, the jury answered the special issues such that a death sentence was imposed.

On July 9, 2005, a motion for new trial was filed; it was denied.  (CR 5:1868).

C.     **Direct Appeal.**   On June 29, 2005, John Tatum and Pam Lakatos were appointed as direct appeal counsel to the Texas Court of Criminal Appeals.  (CR 1:5).

On November 28, 2006, Mendoza filed his direct appeal brief.  The brief raised eighty-one (81)

2

issues.

In an unpublished opinion, the Texas Court of Criminal Appeals denied relief on all issues. *Mendoza v. State*,  No.  AP-75,213, 2008 WL 4803471 (Tex. Crim. App. Nov 05, 2008).  On July 9, 2005, a motion for new trial was filed; it was denied.  (CR 5:1868).

**D.     U.S. Supreme Court.**   The U.S. Supreme Court denied the petition for writ of certiorari on June 1, 2009.  *Mendoza v. Texas*, No. 08-9577, 129 S.Ct. 2742 (U.S. Tex. Jun 01, 2009).

**E.     State Habeas.**   On July 28, 2005, undersigned counsel, Lydia Brandt, was appointed to represent Mr. Mendoza in this state habeas.  (CR 5:1876).  The Application for Writ of Habeas Corpus was timely filed.  In an unreported decision, the Texas Court of Criminal Appeals adopted the trial court's findings of fact and conclusions of law and denied habeas relief.  *Ex parte Mendoza*, No. WR-70,211-01, 2009 WL 1617814 (Tex. Crim. App. Jun 10, 2009).

**F.     Federal Habeas.**   Pursuant to 18 U.S.C. § 3599(a), and within the fifteen (15) day time period required by TEX. CODE CRIM. PROC. 11.071, sec. 2(e), undersigned counsel, Lydia Brandt, was appointed to represent Mr. Mendoza in this federal habeas proceeding.

**3.     STANDARD OF REVIEW.**

Title 28, section 2254(d) of the United States Code provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was ***adjudicated on the merits*** in State court proceedings unless the adjudication of the claim –

(1)     resulted in a decision that was ***contrary to, or involved an unreasonable application of***, clearly established Federal law, as

3

determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an ***unreasonable determination of the facts*** in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis supplied).

The threshold question the court must answer under 28 U.S.C. § 2254(d) is whether the claim "was adjudicated on the merits in State court proceedings."  "An 'adjudication on the merits' occurs when the state court resolves the case on substantive grounds, rather than procedural grounds." *Valdez v. Cockrell*, 274 F.3d 941, 946-947 (5th Cir. 2001), *citing Mercadel v. Cain,* 179 F.3d 271, 273 (5th Cir.1999) (holding that whether an adjudication on the merits has occurred is whether the state court disposed of the case on substantive or procedural grounds).

### Adjudication on the Merits

When the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under the contrary to, or unreasonable application prong of § 2254(d)(1), *Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001); *Martin v. Cain*, 246 F.3d 471, 475 (5th cir. 2001).

***Contrary to federal law  –  § 2254(d)(1):***  "[A] state-court decision is contrary to [U.S. Supreme] Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.   Second, a state-court decision is also contrary to [U.S. Supreme] Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the U.S. Supreme Court]...."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

4

***Unreasonable application of federal law  –  § 2254(d)(1):***  "[A] state-court decision involves an unreasonable application of  [U.S. Supreme] Court's precedent if the state court identifies the correct governing legal rule from  [U.S. Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.   Second, a state-court decision also involves an unreasonable application of  [U.S. Supreme] Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000).  "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410.  "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411.

***Unreasonable determination of facts  –  §2254(d)(2):*** When the state court adjudicated the claim on the merits, questions of fact are reviewed under § 2254(d)(2).  *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  "Under [28 U.S.C. § 2254](d)(2), a state court decision may be overturned on factual grounds if its determinations of fact are "objectively unreasonable in the light of the evidence presented in the state-court proceeding". *Guidry v. Dretke*, 397 F.3d 306, 316-317 (5th Cir. 2005) *citing  Miller-El,* 537 U.S. 322, 340 (2003).

***Presumption of correctness of fact issue  –  § 2254(e)(1)***:  A determination of a factual issue made by a State court shall be presumed to be correct.  *Gardner v. Johnson*, 247 F.3d 551, 557 (5th Cir. 2001).  The "presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed

law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).   The presumption of correctness can be rebutted by clear and convincing evidence. *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998), *quoting* 28 U.S.C. § 2254(e)(1).


### No Adjudication on the Merits

*<u>De Novo Review</u>*:   Where there is <u>no</u> adjudication on the merits, the court is to review the claim *de novo. See  Fisher v. Texas,* 169 F.3d 295, 300 (5th Cir.1999) (finding that where a state habeas court decided the habeas applicant's claim on procedural grounds, there had not been an "adjudication on the merits").

### Evidentiary Hearing

Section 2254(e)(2), Title 28, U.S.C., prescribes the circumstances under which a district court can conduct a hearing.    "Not withstanding AEDPA's requiring substantial deference for state court determinations . . . "deference does not imply abandonment or abdication of judicial review." *Guidry* at 326 (quoting *Miller El* at 540 (2005).  So long as a hearing is not barred under 28 U.S.C. § 2254(e)(2), a district court may conduct a hearing on whether the presumption of correctness is rebutted by clear and convincing evidence and to aid its determination under 2254(d)(2).  *Guidry.* Under § 2254(e)(2), the district court may not conduct a hearing if the petitioner "failed to develop the factual basis" for his claim in state court.  28 U.S.C. § 2254(e)(2). However,

> a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel. *Michael Williams,* 529 U.S. at 432, 120 S.Ct. 1479; *see also Dowthitt v. Johnson,* 230 F.3d 733, 758 (5th Cir.2000). Restated, if a petitioner develops a factual basis for a claim in state court (or sufficiently attempts to do so), subpart (e)(2) does *not* bar an evidentiary hearing in district court.

*Guidry* at 323.

6

**REASONS TO ISSUE THE WRIT OF HABEAS CORPUS**

Petitioner's conviction and death sentence were obtained in violation of his rights under the Sixth, Eighth, and Fourteenth amendments to the United States Constitution. V U.S. CONST. amend. VI; U.S. CONST. amend. VIII; U.S. CONST. amend. XIV.

Set out below are the grounds that warrant the issuance of the writ of habeas corpus.  All factual and legal allegations presented in any claim in this petition are fully incorporated into each and every other claim in this petition.

**As to all Grounds:  There is clear and Convincing evidence that Fact Findings are not entitled to a presumption of correctness**

Because there are Findings of Fact that are common to all claims, rather than repeat the objection in each claim, Mr. Mendoza sets out his objections below, and incorporates those objections as to each and every claim in this petition.

In *Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007), which involved a *Ford* execution-competency-claim, the Supreme Court held:

> Under AEDPA, a federal court may grant habeas relief, as relevant, only if the state court's "adjudication of [a claim on the merits] . . . resulted in a decision that . . . involved an unreasonable application" of the relevant law.  When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied.  A federal court must then resolve the claim without the deference AEDPA otherwise requires. . . . Here, due to the state court's unreasonable application of Ford, ***the factfinding procedures upon which the court relied were "not adequate for reaching reasonably correct results" or, at a minimum, resulted in a process that appeared to be "seriously inadequate for the ascertainment of the truth."***  477 U.S., at 423-424, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (Powell, J., concurring in part and concurring in judgment) (internal quotation marks omitted).  We therefore consider petitioner's claim on the merits and without deferring to the state court's finding of competency.

(Emphasis supplied).

In the specific context of developing evidence of incompetency for execution, *Panetti* found that "these basic requirements include an opportunity to submit evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination."  *Id.* at 2856  (internal quotation marks omitted).  After making the requisite threshold showing of incompetency, Panetti filed motions for appointment of counsel and funds to hire a mental health expert, along with a request for an evidentiary hearing in an attempt to develop the facts of his Ford claim.  *Id.* at 2857.  Because the state court denied these motions,

and refused Panetti even the "rudimentary process" of "an opportunity to submit psychiatric evidence as a counterweight to the report filed by the court-appointed experts," the Supreme Court concluded that Texas deprived Panetti of "a constitutionally adequate opportunity to be heard." *Id*. at 2858.

Likewise, in *Jefferson v. Upton*, 130 S.Ct. 2217 (2010), the U.S. Supreme Court criticized the practice where findings of fact are "adopted verbatim by the [state] court." *Jefferson*, 130. S.Ct. at 2219-2220,  *quoting Anderson v. Bessemer* City, 470 U.S. 564, 572 (1985)).

As in *Panetti*, and as criticized in *Jefferson*,  the factfinding procedures in Mr. Mendoza's case are "not adequate for reaching reasonably correct results" or, at a minimum, resulted in a process that appeared to be "seriously inadequate for the ascertainment of the truth."  This is because the Findings of Fact were drafted by the State of Texas, and signed verbatim by the trial judge, who denied Petitioner's request for discovery and/or evidentiary hearing.

Thus, Mr. Mendoza was denied federal procedural due process in state habeas court because the state factual determination is not fairly supported by the record as a whole; nor was the fact-finding procedure employed by the state court adequate to afford a full and fair hearing.  The Fact Findings are not entitled to a presumption of correctness.  1 R.HERTZ & J. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE §20.2c, pp. 915–918 (5th ed. 2005).  *See Jefferson v. Upton*, __ S.Ct. __, 2010 WL 2025209 (May 24, 2010) ("Although we have stated that a court's "verbatim adoption of findings of fact prepared by prevailing parties" should be treated as findings of the court, we have also criticized that practice.") *citing  Anderson v. City of Bessemer City, N.C.*, 470 U. S., 564, 572 (1985) ("We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record. [citations omitted]  ....  We are also

aware of the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor.")

In particular, Mr. Mendoza objects to Findings of Fact (FF) Nos. 5-10.   FF Nos. 5-10, are labeled "This court's experience with trial counsel and their credibility," and are irrelevant.  The issue(s) in this federal habeas petition pertain(s) to claims of ineffective assistance of counsel – not allegations of deception or fraud.  An attorney, who is "forthright and credible," *see* FF No. 10, may nonetheless be ineffective because of an act or omission in the representation of his/her client, which does not rise to the level of performance recited in the ABA and Texas capital guidelines.  Such is the case at bar.

Mr. Mendoza objects to Findings of Fact No. 9.  FF No. 9 is similarly irrelevant.  Although the trial judge may have complemented Sanchez and Ivory, "for their 'professionalism' and preparedness,"  his role was limited to determining matters of law', and the jury to determining the facts.  In the absence of a state evidentiary hearing, the trial judge did not have the benefit of the necessary factual basis on which to make an objective determination as to defense trial strategy or the thoroughness (or lack thereof) of the fact and mitigation investigations.

Mr. Mendoza objects to each and every Finding of Fact (*see e.g.*, FF Nos.  127, 130, 138) that asserts that he is required to submit "affidavits of other attorneys qualified and experienced in the defense of death penalty cases," in order to satisfy his burden of proof in showing trial counsel was constitutionally deficient.  The courts have never mandated such a requirement.  Indeed, in various ineffective assistance of counsel cases, the habeas petitioner satisfied his burden of proof in other ways.  *See Rompilla v. Beard*, 545 U.S. 374,  390 (2005) ("If the defense lawyers had looked in the file on Rompilla's prior conviction, it is uncontested they would have found a range of mitigation leads that no other source had opened up. In the same file with the transcript of the

10

prior trial were the records of Rompilla's imprisonment on the earlier conviction, App. 508, 571, 631, which defense counsel testified she had never seen."). Mr. Mendoza objects to each Finding of Fact, whose sum and substance pivots on testimony or affidavit from his own defense counsel concerning their acts and omissions that give rise of each of the ineffective assistance of counsel claims. *See e.g.,* FF 33, 38,178-179, 190-192, 199-200, 248, 267. The objection is predicated on TEX. CODE CRIM. PROC. 26.052, which provides that if counsel are found to be ineffective, they are not eligible for appointment in the trial or direct appeal of a capital case. To make his showing of ineffectiveness and circumvent trial counsel inherent conflict of interest in voluntarily providing proof of their own constitutionally deficient representation, Mr. Mendoza had requested discovery and an evidentiary hearing, which were denied. Accordingly, without the power of the court, and given the conflict of interest defense counsel would find itself in addressing the IAC claims, there were – and continue to be – obstacles external to Mr. Mendoza, which prevented him from offering the proof that the fact findings recite he failed to make. For these reasons, Mr. Mendoza once again requests discovery and an evidentiary hearing to make the requisite showing.

Finally, Mr. Mendoza objects to each Finding of Fact, that impugns the credibility of his affiants, by way of example but not limitation: experts Drs. Kessner, Lundberg-Love, and Martin, as well as his mitigation expert, Toni Knox. The Findings of Fact were drafted by the State of Texas, and signed verbatim by the trial judge. The evidentiary hearing requested by Mr. Mendoza was denied by the state court. Without a hearing, the trial judge had no basis to judge credibility. A credibility as to these individuals can not be made solely by review of paper.

In sum, and although the Texas Court of Criminal Appeals adopted the FFCL and denied relief, the aforementioned findings are not entitled to a presumption of correctness. They are "'objectively unreasonable in the light of the evidence presented in the state-court proceeding,'"

*Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).  They also were not the product of a full and fair hearing in state court.  *Jefferson v. Upton*, __ S.Ct. __, 2010 WL 2025209 (May 24, 2010);  1 R.Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure §20.2c, pp. 915–918 (5th ed. 2005).

The conflict in the evidence gives rise to the need for an evidentiary hearing.  28 U.S.C. § 2254(e).  Further, habeas relief should be granted because the state court adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(2).

AS TO GROUNDS 1 - 5:  INTERROGATORIES PROPOUNDED IN FEDERAL HABEAS

A.  **FED. R. CIV. PROC. 37(b)(2)(A) now prohibits Respondent from supporting or defending Grounds 1 through and including 5 on the basis that the mitigation investigation was adequate.  This is because of the consistent intransigence of Mr. Gonzalez(s), who despite a court order, refused to provide records, and answers to the interrogatories**

The following is incorporated by reference into the arguments in Grounds One through and including Five.  It is separately argued in this section for the ease of the reader to discern the information resulting from the interrogatories.

1.  **In state habeas, trial counsel Sanchez and Ivory/Tucker, and mitigation investigator, Gonzalez(s), gave affidavits in favor of the Respondent**

In the state habeas proceeding, *Ex parte Mendoza*, No. WR-70,211-01, 2009 WL 1617814 (Tex. Crim. App. June 10, 2009), Juan Sanchez, Angela Ivory Tucker, and Vince Gonzalez(s),[1] gave affidavits in support of the State of Texas (Respondent).  Those affidavits are attached as Exhibit 8, and were appended to the interrogatories.  With respect to the hiring and performance of Mr. Gonzalez(s), the joint affidavit of Sanchez and Ivory/Tucker recited among other things:

> *"Mr. Vince Gonzalez was appointed as a mitigation expert and the defense team was satisfied with his credentials." ....  "Mr. Gonzalez, in my presence, constantly reminded the entire family of what information was necessary in order to develop a mitigation case."*  (Joint Response of Sanchez and Ivory, pp. 1-2).

> *Mr. Gonzalez found information (such as the father's suicide attempts and Mr. Mendoza's possible sexual abuse by an older cousin), which the family was unwilling to voluntarily disclose."* (Joint Response of Sanchez and Ivory, p. 2).

> *We had Mr. Gonzalez investigate the defendant's background, family, and all*

---

[1]    The name of the mitigation investigator had been spelled two different ways:  Gonzale<u>z</u> and Gonzale<u>s</u>.   In his affidavit given in state habeas, Mr. Vince Gonzales spells his last name with an "s", but in their affidavits, trial counsel Sanchez and Ivory/Tucker spelled the last name with a "z."

*possible mitigation issues.  Mr. Gonzalez has the experience and credentials to handle such a task.  As Mr. Gonzalez would gather and receive information, we would funnel it to our experts, as we felt appropriate.*  (Joint Response of Sanchez and Ivory, p. 5).

In state habeas, Mr. Gonzales attested, among other things:

*"I have read the April 10, 2008 affidavit submitted by Juan Sanchez and Angela Ivory Tucker, and I agree with the statements contained in their affidavit."* ....

*"I was appointed as a mitigation expert to assist in the preparation of defense theories in the punishment case"* in the *State of Texas vs. Moises Mendoza* ....

*"I investigated the defendant's background, family, and possible mitigation issues, and I have the experience and credentials to handle such a task....."* ....

"*Although I did not do all the aspects of the Mitigation investigation as the Petitioner alleges in his Writ, other members of the defense team, and in particular Dr. Vigen,[2] performed those aspects I did not personally perform.  It is my understanding of the opinion in Wiggins and the Texas and ABA Guidelines that there is no requirement that these functions be performed by only one person.*" (Response of Vince Gonzalez, p. 1).

*"I have had training, as well as experience, in working with the issues of mental health and mental retardation, as well as mitigation issues."* [which is followed by a three page recital of attendance at various seminars, but no educational or licensing credentials]  (Response of Vince Gonzalez, p. 2).

*"Additionally, I have had experience in working with mentally retarded, mentally ill and autistic clients on numerous occasions, including as a consulting expert in the State of Texas vs. Johnny Paul Penry."*  (Response of Vince Gonzalez, p. 4).

---

[2]     The trial attorneys, Sanchez and Ivory/Tucker, as well as Dr. Vigen point to Mr. Gonzalez(s) as the designated mitigation investigator at trial, contradicting Mr. Gonzalez(s) statement that Dr. Vigen performed those aspects of the mitigation investigation that he did not perform.

Dr. Vigen  denied in his answer to question 3 that he performs both functions (as mitigation investigator and testifying expert) in the same case, notwithstanding that he and his assistant did some limited family interviews and a timeline in Mr. Mendoza's case.  Exhibit 6: Mark Vigen, Ph.D., Answers to Interrogatories, questions 1, 3.

### 2.      Federal court ordered interrogatories

On July 9, 2010, the federal district court entered an order "that Mendoza may submit written interrogatories to his trial counsel and trial mitigation expert ...." [Doc 10].   Mr. Mendoza propounded interrogatories to Juan Sanchez, Angela Ivory/Tucker, Vince Gonzalez(s), and Mark Vigen, Ph.D,[3] which all four individuals were required to answer.   FED. R. CIV. PROC. 33(b).   In addition, at the request of Dr. Vigen a transcript of his trial testimony was provided to him in electronic format.   Exhibit 2: Email of Toni Knox to Dr. Vigen, dated 11/12/10.   Apparently, Dr. Vigen either was unaware of this transmission, or did not review the documentation. as reflected in his answer to interrogatory 22.   In it, Dr. Vigen states he "would need to review the trial transcript of my testimony to answer this question at this time."

The interrogatories and the answers given by Juan Sanchez, Angela Ivory/Tucker, and Mark Vigen, Ph.D are attached as Exhibit 4: Sanchez Interrogatory Answers; Exhibit 5: Ivory/Tucker Interrogatory Answers; Exhibit 6: Vigen Interrogatory Answers.   Also attached is the trial "Mitigation Folder" and its content received from Juan Sanchez ("JS") in state habeas, bate stamped JS 006625-JS 006642.   Exhibit 7: Trial Mitigation Folder, with cover email from Toni Knox to Brandt, dated 12/30/2010.

Mr. Gonzalez(s) failed to answer or respond in any way to the interrogatories propounded to him, despite having signed a certified mail receipt.   Exhibit 3: Signed Certified Mail Return Receipt, Cover Letter & Interrogatories.   In addition to Mr. Mendoza's assertion that Respondent should now be sanctioned, this matter is the subject of a separately filed Motion to Compel/Alternative Motion for Sanctions.

---

[3]     On October 18, 2010, the federal district court denied the Respondent's Motion to Quash the Interrogatories propounded to Dr. Vigen. [Doc 21].

### 3.   Gonzalez(s)' refusal to comply with the federal court ordered interrogatories

In state habeas, Mr. Mendoza had made repeated requests for documents and information through his state habeas mitigation investigator, Toni Knox, who attests:

> Several requests were submitted to Mr. Gonzales for any mitigation files, social history, and/or notes, but none were furnished.  I spoke with Mr. Gonzales by phone and he could not remember any information.  He told me he would check his notes and call me back.  He did not return any later phone calls.  Mr. Gonzales was informed that Moises had signed a release.

Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 7.

Despite his memory loss, together with his refusal to provide any information to Mr. Mendoza in the state habeas proceedings,  Mr. Gonzalez(s)  readily provided the State of Texas with an affidavit in support of Respondent's position.

Mr. Gonzalez(s) has been as intransigent in these federal habeas proceedings, as he had been in state habeas.  Despite the July 9, 2010 of the federal district judge, Mr. Gonzalez(s) failed to answer the interrogatories even though there is proof of receipt of them by Mr.Gonzalez(s), as reflected by the dual mailing (one by certified mail and other regular mail).  *See* Exhibit 3: Signed Certified Mail Return Receipt, Cover Letter & Interrogatories.

Mr. Mendoza contented in state habeas, and now again in federal habeas, that Mr. Gonzalez(s) was not qualified to perform the mitigation investigation, and that the trial mitigation investigation was ***in***adequately investigated, developed, and presented.  This inadequate mitigation investigation is the foundation for Grounds 1 through and including 5.  Given the intransigence of Mr. Gonzalez(s) to produce any records or answer interrogatories, Mr. Mendoza requests that this court find that his contention be held to be proven as true, and prohibit the Respondent from "supporting or opposing designated claims or defenses, or from introducing designated matters in

evidence" with respect to Grounds One through and including Five.  *See*  FED. R. CIV. PROC. 37(b)(2)(A)(ii) (sanctions for failure to obey a discovery order, include "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.").   Mr. Mendoza has filed a separate Motion to Compel/Alternative Motion for Sanctions to further address this issue.

B.    TRIAL COUNSEL COULD NOT HAVE MADE "STRATEGIC" DECISIONS BECAUSE THE INVESTIGATION WAS NOT ADEQUATE.  THEY LACKED THE NECESSARY FACTS RELEVANT TO MAKING REASONABLE CHOICES AMONG PLAUSIBLE OPTIONS

Other attestations in the joint affidavit of Sanchez and Ivory/Tucker pertain to assertions of "strategy," as for example:

> *"Our strategy [was] based on an in-depth investigation of Mr. Mendoza's background, ...."* (Joint Response of Sanchez and Ivory, p. 3)

Within other paragraphs of the joint affidavit, Mr. Sanchez and Ms. Ivory/Tucker, attempt on the one hand to validate their performance because "all strategies were discussed with Mr. Mendoza," while at the same time casting blame on Mr. Mendoza and his family[4] for any deficient performance:

> **Mr. Mendoza had created a defense maze** for our team because he had confessed to the police and to the press.  Mr. **Mendoza had even gone 'behind our backs'** to give a videotaped statement to the police in which he now claimed that he was only a party to a murder planned by the victims estranged husband.  Faced with the different accounts given by the defendant, the Defense team decided to pursue those defense strategies best supported by the physical evidence and witnesses.....  Our [punishment] strategy based on an in-depth investigation of Mr. Mendoza's background, was that ... this new group of friends indulged in depraved behavior, and this became his new value system .... [which] led him to where he is today. ....  **All strategies and developments had to be weighed against the credible evidence that existed and by the facts relayed to us by Mr. Mendoza.**  (Emphasis supplied) (Joint Response of Sanchez and Ivory, pp. 1, 2, 3).

In  *Rompilla v. Beard*, 545 U.S. 374, 377, 381 (2005), the Supreme Court made clear that even where a client is "actively obstructive by sending counsel off on false leads," and "when a

---

[4]    Answer to Interrogatory 25 by Sanchez:  "Mercedes Mendoza was not initially forthcoming...."

Answer to Interrogatory 24 by Ivory/Tucker: "Mercedes Mendoza (mother)was instructing the other family members NOT to give us personal family information" (emphasis in original).

capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."   And in *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000), the U.S. Supreme Court stated that "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable."

As will be further detailed below, the "strategy" of trial counsel in their representation of Mr. Mendoza was not reasonable because they lacked the necessary facts relevant to selecting among plausible options  –  a direct and proximate result of the ***in***adequate mitigation investigation.  The deficient performance of trial counsel adversely impacted all aspects of the trial, from the selection of jurors, to the inadequate development of theories of the case in both phases of the trial, to the deficient presentation in the punishment phase, and culminated in the imposition of a sentence of death.

**1.    The list of documents identified by Dr. Vigen, as having been given to him by Mr. Gonzalez(s), proves that that mitigation investigation was _not_ adequate**

The answers of Dr. Vigen to questions 4, 9 and 10,[5] contradict the attestation of Sanchez and Ivory/Tucker that there was "*an in-depth investigation of Mr. Mendoza's background*, .... [and trial counsel] *had Mr. Gonzalez investigate the defendant's background, family, and all possible mitigation issues*."  (Joint Response of Sanchez and Ivory, pp. 3, 5).

Dr. Vigen's answers reflect that the "time-line" and "collateral telephone interviews," which are listed, were done by Dr. Vigen or his assistant, Fran Dezendorf, RN, MSN.  This is confirmed in the email of Ms. Knox, L.C.S.W., the state habeas mitigation investigator:

> "As you can see [from the attached Mitigation Folder], it is just sort of random stuff. There was no mitigation information from Vince other than the records he requested. All interviews, timelines, etc. were created by Fran D. And Dr. Vigen."

Exhibit 7:  Trial Mitigation Folder, with cover email from Toni Knox to Brandt, dated 12/30/2010.

The answers of Dr. Vigen make it apparent that although Mr. Gonzalez(s) was identified as the mitigation expert, the tasks undertaken by Mr. Gonzalez(s) were primarily limited to record-collection.  The documents which Gonzalez(s) gathered include:

---

[5]    Questions 4 and 5 asks:  [4] Other than the work product of Vince Gonzalez, identify the work product (by way of example, but not limitation: social history, time line, theme identification, memorandums of interviews), and [5] the Person(s), who produced that work product.

Question 9 asks:  List the work product of Mr. Gonzalez (including but not limited to social history, time line, theme identification, memoranda of interviews) that was provided to you as an expert testifying about mitigation and future dangerousness in the punishment phase of the trial.

Question 10 asks:  Identify all Document(s) that were the work product identified in interrogatory 9, above.

20

Farmersville Police records
Collin County Sheriff records
FBI records
Texas Rangers Investigation Reports
Mr. Mendoza's letter to parents
Mr. Mendoza's letters (2) to Angela Invory
Collin County Detention Center records
Arrest Warrant
Dallas County Community Supervision and Corrections Department records
Mr. Mendoza's work history (based on wage inquiry)
School Records: Tatum Elementary, Farmersville High, State & national academic tests)
LifePath Medical Records
State's Motion regarding future dangerousness
State's Motion regarding defense experts
State's Motion regarding notice of defendant's intent to introduce future dangerousness
       testimony or an alternative, Motion to exclude results of defendants [sic]
       psychological exam
Juror Questionnaire
 Voluntary Witness Statement

Even if Mr. Gonzalez(s) had spoken with Mr. Mendoza and members of his family as trial counsel attested, the list confirms the attestation of Ms. Knox that the primary undertaken of Mr. Gonzalez(s) was records-collection, with some superficial client/family interviews, and no processing of the information gathered, no documentation of interviews with the family and client, and no generation of notes and reports.  Ms. Knox attests:

In the few seminars focused on mitigation listed by Mr. Gonzales, the mitigation specialist (and/or their associates) tasks are described as:

> *Fact gatherers harvest the raw data from which the penalty-phase presentation of mitigation evidence is developed.  They gather records, they process information, they identify and locate witnesses; they interview witnesses; they generate notes and reports; they identify more of a cyclical process.  Their assignment is open-ended. Testifying experts address particular referral questions.*

> ***In earlier years in capital cases, much of the focus was on "future dangerousness" and presentation/education of prison life for the jury***.  This is still an important part of the mitigation presentation; however it is only one portion.  In this capacity, Mr. Gonzales could have performed a valuable service in consultation for an expert in

this area of the mitigation. ***It appears from meeting notes provided by Moises' defense attorneys; this was the primary focus of Mr. Gonzales. There is documentation indicating that Mr. Gonzales did perform one of the important functions of the mitigation specialist – gathering documents***. He obtained psychiatric records of the client and his father and other important records, such as school records. ***However, there is no evidence that he processed the information, no documentation of interviews with the family and client and no generation of notes and reports***.     ....

***As a result of the limited mitigation investigation, mostly superficial type of information was obtained from the family, which included much of the family's "usual script" concerning their father's illness and how he was affected by the system***.

***There was a limited investigation of the family's mental health history and criminal behavior***. Moises' father has an extensive history of mental illness and lawsuits that revealed valuable information about the family. Some mental health information was obtained, but other important documents were not obtained or used. ***Due to the lack of a thorough social history investigation, the jury did not hear facts about the family that probably affected Moises***. Although Concepcion's depression and frequent hospitalizations were discussed, it was not explored further regarding the effect this had on the family and Moises. ***The presentation of Moises' family dynamics were somewhat distorted giving the appearance his parents were hard working, religious, honest people that tried to manage an "out of control" Moises. Little information was presented to show what factors may have contributed to Moises becoming "out of control".***

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W.

The list from Dr. Vigen also reflects that neither Mr. Gonzalez(s) nor Dr. Vigen and his assistant, Fran Dezendorf, RN, MSN, created a thorough and well-documented psychosocial-history of the client. *Compare* State Habeas Exhibit I: Affidavit of Toni Knox, L.C.S.W., – A. Psycho-Social History of Moises Mendoza. The absence of a thorough and well-documented, psychosocial-history is an admission that a multi-generational investigation had not been done, and as a result, neither trial counsel nor their experts could identify significant patterns of family dysfunction or construct a credible and consistent narrative, effective in all phases of the trial.

22

A "multi-generational investigation extends as far as possible vertically and horizontally [because when it does so, it] frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment."[6]  "[A]n understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present."

Dr. Kessner, the state habeas mental health expert, confirmed:

> ***Because the mitigation investigation was inadequate, Dr. Vigen did not understand the genesis and evolution of Moises' attachment disorder, and its magnification during his relationship with Amy Lohdi.  As a result, Dr. Vigen could not provide the jury with a cogent explanation of how those psychological factors culminated in the catathymic homicide of Rachelle Tolleson***

Exhibit A: Affidavit of Gilda Kessner, Psy.D., p.11.

The list provided by Dr. Vigen, and the content of the trial Mitigation Folder, also refute trial counsel's assertion that state writ counsel had a distorted interpretation of the "something missing."[7] The "something missing" was an adequate, multi-generational investigation, and its concomitant work product, a throughly documented  psycho-social history.[8]  The absence of this crucial

---

[6]     ABA GUIDELINE 10.7 – *Investigation, Commentary*  (rev. ed. Feb. 2003).

[7]     *"... writ counsel has taken out of context,* [the statement of] *Dr. Vigen* [who] *said there was something missing.  The 'something missing' was the fact that the family always followed the 'script' and didn't fully disclose the problems in the family. The defense team knew of the father's lawsuit and employment problems, but the family would minimize it and not testify about it, as we would have liked."* (Joint Response of Sanchez and Ivory, p. 5).

[8]     Dr. Vigen testified:

A.     If I understand your question, in cases – ***people just don't stand up one day and say,  ... I'm going to murder somebody today.  The roots of this***

information is the very reason that the prosecutor argued in the punishment phase to the jurors that Mendoza "had a good childhood, [and] parents who loved him, [and] provided moral and spiritual guidance...."  (RR 25:24), and thereby concluding: "There's no mitigating circumstances here whatsoever, none. The answer to Number 2 is no, overwhelmingly no, beyond any doubt no." (RR 25:48).

Its absence is a direct result of the deficient performance of trial counsel, who hired Mr. Gonzalez(s), who was not qualified to, and did not, undertake the role and tasks incumbent on a trial mitigation investigator.  Mr. Gonzalez(s) failed to investigate, develop and process the information in such a way as to reveal significant patterns of family dysfunction, information which was readily available to be found, and was in fact presented in state habeas.    ABA GUIDELINE 10.7 – *Investigation, Commentary* (rev. ed. Feb. 2003).

In summary, the answers of Dr. Vigen to questions 4, 9, and 10, together with the Mitigation Folder, are sufficient in and of themselves to refute the attestations of the trial attorneys that their "strategy [was] based on an in-depth investigation of Mr. Mendoza's background,....." (Joint Response of Sanchez and Ivory, p. 3).   These answers prove that the mitigation investigation was not adequate, and there was an absence of a concomitant work product, a throughly documented psycho-social history.  Without an adequate mitigation investigation into facts relevant to plausible options, the trial attorneys could *not* have made reasonable strategic decisions with respect to the defense of Mr. Mendoza in any phase of the trial.

---

*type of behavior generally go back a long ways in people's lives*, ....

*There's something missing in this case for me as a psychologist.  There is none of that there.  There's something I don't know*.  I can't tell you. From a –  my intuition.  (RR 24:187).

24

**2.      The trial attorneys failed to respond to the written request by Dr. Vigen to locate 7 witnesses he wanted, but never interviewed**

In a conclusory response to Question 25,[9] Dr. Vigen said: "I gained adequate information from the interviews and documents."  But his conclusion that the information was "adequate" is contradicted by his answers to questions 23 and 24, which asked:

23.    Were you, or anyone acting at your direction, equipped to locate witnesses through database searches, and to do person-to-person visits with those individuals who could provide you with contact information to locate the witnesses, who you wanted to interview in the Mendoza case?

24.    If you were not so equipped and because your office was in Shreveport, Louisiana, who provided you with contact information to locate the witnesses that you wanted to interview in the Mendoza case?

Dr. Vigen answered: [23]  "My assistant and I identified seven witnesses we wanted to interview.  We were unable to locate them.  A letter was sent to the attorneys asking for the opportunity to interview them on the same day we personally interviewed the Mendoza family.  That was not accomplished.  [24] We found some telephone numbers [sic, but (?)] were not able to reach the individuals.  We reviewed the witness statements in detail."

Dr. Vigen did not, and could not, have gained "adequate information" given that he had identified at least seven (7) witnesses, who he never had the opportunity to interview because the trial attorneys failed to respond to his request.

_____

[9]    Question 25 asked:  How did you ensure that you interviewed all the persons who would have provided you with information necessary to adequately explore "*all avenues of defense and all plausible theories of mitigation*" that the defense team attested that they explored and discussed.

25

**3.     The answers to interrogatories reflect an _in_adequate investigation that adversely impacted all phases of the trial.  The following topics were left unexplored and unexplained:**

Given the limitation in the number of interrogatories that can be propounded to any one individual pursuant to the FED. R. CIV. PROC. 33(a), the inquiry focused on the pre-trial mitigation investigation into three topics: adverse childhood experiences (attachment disorder), binge drinking, and brain damage.

**a.     The connection between Mendoza's binge drinking and adverse childhood experiences**

Because the mitigation investigation was inadequate,[10] trial counsel failed to connect Mendoza's adverse childhood experiences with his binge drinking.[11]  They treated his binge drinking as purely "voluntary" in nature.[12]  Neither the trial attorneys, nor any one acting as their agent, did a search in the mental health literature or in the legal literature on adverse childhood experiences

---

[10]     Mr. Sanchez answered that, other than family members, only four persons were interviewed about Mr. Mendoza's alcohol consumption.  *See* Exhibit 4:  Question 1 answer of Sanchez.

[11]     Sanchez and Ivory/Tucker attested in their state habeas affidavit:

"*we were reluctant to put on an alcohol expert to say Moises was a very heavy drinker when the family who saw him every day (although they suspected he had started drinking) would deny that he was a binge drinker.  His alcohol binges were addressed in the context that he was leading a self-destructive lifestyle at the time of the offense.  We took great care in the manner in which his drug and alcohol use was presented because Jurors in voir dire had indicted that they did not put such stock in voluntary intoxication as a defense or mitigating factor.*"  (Joint Response of Sanchez and Ivory, p. 4.).

[12]     In answer to question 9, Mr. Sanchez stated that legal research was performed for "cases that dealt with Texas Penal Code § 8.04 (Voluntary Intoxication), and Tex. Code Crim. Proc. § 38.36 (Evidence in Prosecutions for Murder)

26

(ACE's) and concomitant alcohol abuse/addiction.   In answer to questions 7 and 8,[13] Mr. Sanchez responded in conclusory fashion: "since involuntary intoxication was not an issue, no research was done."[14]   And in a non-responsive answer to interrogatory 17, Dr. Vigen merely stated that he engages in current awareness review.  ("I review current literature regarding numerous professional matters on a regular [sic] and refer to known profession references in my library as needed.").

Yet, studies were available, which would have explained the correlation between adverse childhood experiences (ACE) of Mr. Mendoza, and his concomitant alcohol abuse/addiction prior to the age of majority.

Dr. Lundberg-Love, a psycho-pharmacologist, concluded in state habeas:

Moises Mendoza ... had experienced at least two adverse childhood events, including a father who was depressed, hospitalized, and attempted suicide, and a mother who was physically victimized by her husband on at least one occasion, as documented in MHMR records.  Even though Moises minimizes and/or denies the impact of these events, the results of the ACEs study shows that such events can increase one's risk for drug and alcohol abuse or addiction.

.... ***both the alcohol abuse of Moises Mendoza as well as the ACEs experienced by [Moises] during childhood, played a significant role in understanding the mitigation issues inherent in this case***."[15]

---

[13]   Question 7 asked:  Identify what, if any, research into the medical/mental health literature, you or any member of the defense team did regarding whether the alcohol consumption of Mr. Mendoza was voluntary.

Question 8 asked:  Identify what, if any, legal research you or any member of the defense team did regarding whether the alcohol consumption of Mr. Mendoza was voluntary.

[14]   In response to question 10, Ms. Ivory/Tucker answers: "Affect that .... alcohol; drugs ... had on him," a possible mitigation theory.  There is nothing in the answers to interrogatories 7 (guilt/innocence theories) and 10 (mitigation theories) that reflect any investigation into involuntary intoxication and his adverse childhood experiences, and concomitant alcohol abuse and brain damage.  Exhibit 5:  Ivory/Tucker Interrogatories/Answers.

[15]   (Emphasis supplied) Exhibit B:  Affidavit of Paula Lundberg-Love, Ph.D., *VIII. Conclusions*

27

### b.     The connection between Mendoza's binge drinking and brain damage

Questions 11 through and including 15 propounded to Mr. Sanchez asked:

Identify all of the mental health experts, who had specialized training and knowledge in alcohol addiction and the psychopharmacology of alcohol and its effects on the brain, that you consulted with about Mr. Mendoza's alcohol consumption (even if you ultimately chose not to call that mental health expert(s) at trial).[16]

In answer to question 11, Mr. Sanchez identified "Dr. Vigen."  Mr. Sanchez also answered "no testing was done to determine brain damage."

The credentials of Dr. Vigen do not qualify him as an expert "who had specialized training and knowledge  in alcohol addiction and the psychopharmacology of alcohol and its effects on the brain."  Further, Dr. Vigen concluded there was no brain damage based on a mere observational interview with Mr. Mendoza as reflected in his answer to question 14: "[Mendoza's] alcohol consumption was discussed during the interviews.  Brain damage was not identified."

Hence, not only was Dr. Vigen not qualified by training to render that conclusion; the trial attorneys did nothing to seek out a person qualified in neuropsychological testing to determine the validity of Dr. Vigen's visual observation.  In contrast, Dr. Martin, a neuropsychologist,  attested in state habeas:

19.     Mr. Mendoza's brain-related impairment appears to be long-standing in nature, and would have been present at the time of the alleged offense.  In fact, it is reasonable to assume that Mr. Mendoza would have demonstrated even greater impairment in these (and possibly other) cognitive areas if he had been administered neuropsychological tests closer to the time frame that he was actively abusing alcohol.

---

[16]   This interrogatory was propounded in respond the trial attorneys state habeas attestation:

 "*The defense team found nothing to suggest* [that Mr. Mendoza was brain damaged] *(based on his speech, thinking, etc.).*" (Joint Response of Sanchez and Ivory, p. 4.).

....

22.   ***A neuropsychological examination was warranted for Moises Mendoza during the preparation by his defense team for his capital murder trial.*** Mr. Mendoza has been incarcerated since 2005 and by that time, Neuropsychology research had clearly determined that chronic alcohol abuse produces cognitive decline in a variety of domains.  In fact, as early as the 1960's, research had been produced which reflected that alcohol produced impaired scores on several components of the Halstead-Reitan Battery, the most commonly administered neuropsychological test battery in the United States.  ***By retaining an expert and administering a battery of neuropsychological tests, Mr. Mendoza's attorneys could have conclusively proved the existence of neuropsychological damage. Such tests would have provided defense counsel with the means to demonstrate for Mr. Mendoza's jury how the quality of his brain and the specific damage sustained to it adversely affected his higher cognitive functioning and reasoning skills.*** As has been previously discussed, impaired cognitive abilities due to alcohol abuse tend to recover with abstinence.  Therefore, a neuropsychological exam conducted close in time to the date of his arrest would have detected the present areas of impairment as well as any other indications of alcohol-induced brain damage that Mr. Mendoza may have been experiencing.[17]

c.   **The connection between Mendoza's adverse childhood experiences (attachment disorder) and violence against women**

Prior to trial, the prosecution put the defense on notice of extraneous offense evidence by which they would prove that Mr. Mendoza had a history of violence against women.[18]  In state

---

[17]   Exhibit C:  Affidavit of Stephen K. Martin, Ph.D.

[18]   The theory of the prosecution was that Mr. Mendoza made a choice to commit crimes of violence against women.  (RR 6:67-68; RR 6:225-226; RR 6:238; RR 7:190; RR 9:102; RR 10:135; RR 25:26-27).

In support of its theory that Mr. Mendoza was a future danger, the prosecution introduced extraneous offense evidence, in the form of  crimes of violence against women, (RR 6:67-68; RR 6:225-226; RR 6:238; RR 7:190; RR 9:102; RR 10:135; RR 25:26-27), including by way of example: Laura Decker [videotaped rape of a 14 year old with a 40-oz beer bottle and pen] (RR 22:225); Ruthie Mendoza [physical altercation with his sister] (RR 23:126); Sarah Benedict [tried to strangle her with his hands]; attempted kidnaping of two young women at Richland College (RR 25:46); and Amy Lodhi [kidnapping, rape and sexual assault of girlfriend] (RR 23:109; 23:205).

habeas, Mr. Mendoza contended that defense counsel failed to explain and rebut the extraneous offense evidence.  In response, Mr. Sanchez and Ms. Ivory/Tucker attested that their response was to tell the jury, through Dr. Vigen, that Mr. Mendoza joined a "new group of friends [who] indulged in depraved behavior, and this became his new value system."  This defense assertion fails to provide a credible explanation as to why Mr. Mendoza would choose a group of "depraved" friends, particularly given the prosecution's contention that he "had a good childhood, [and] parents who loved him, [and] provided moral and spiritual guidance...."  (RR 25:24).

Once again the culprit is the **_in_**adequate mitigation investigation, with no thorough psycho-social history and time line,[19] by which they would have recognized the availability of an effective theory in all phases of the trial, specifically:

> The killing of Rachelle Tolleson, "a catathymic homicide," was the culmination of an **_attachment disorder_** that arose in Moises' early formative years because the Mendoza family was experiencing catastrophic stress  – and not as the prosecution asserted, a 'choice' made by Mr. Mendoza to perpetrate crimes of violence against women."[20]

Dr. Kessner explains the concept of attachment, and how Moises' attachment disorder had its genesis in the life of the Mendoza family:

**ATTACHMENT**

**38.     _If one is to understand Moises and how the defense could have rebutted the prosecution's theory that Moises was involved in "crimes of violence against women" which culminated in the death of Rachelle Tolleson, it is important to understand the concept of attachment.  Moises' obnoxious and often hostile_**

---

[19]     Exhibit A:  Affidavit of Gilda Kessner, Psy.D., _Mendoza Family History Chronology_, para. 11-34; Exhibit I:  Affidavit of Toni Knox, L.C.S.W., with accompanying Exhibit A – Psycho-social History of Moises Mendoza; Exhibit B  – Time Line for Moises Mendoza; Exhibit C – Genogram for Moises Mendoza.

[20]     Exhibit A:     Affidavit of Gilda Kessner, Psy.D.

*treatment of women was a psychological defense against his attachment insecurities and fears*.   Early relational influences have lasting effects on psychological growth and development and eventually on adult relationships.  *Dr. Vigen briefly identified the lack of attachment in the case of Moises.  He did not offer an explanation to the jury to help them understand the importance of how this complex psychological concept relates to Moises development and ultimately to his involvement in the death of Rachelle Tolleson*.   The events described in paragraphs 11 through 34 provide a thumbnail sketch of the trials and tribulations in the Mendoza family's history.  The appended time line provides even greater detail if the reader wishes to review more fully the family life that was the foundation for the critical developmental periods in Moises' life.

39.     A brief definition of attachment would have been helpful to the jury.  Attachment is one of the most complex concepts in psychology.  At its simplest, attachment refers to the relationship between the infant and caregiver, generally the mother.  The nature of the attachment relationship provides the basis for personality development.  The security of an attachment relationship promotes independence in the child and by extension throughout the lifespan.  The child develops internal working models or representations of the relationships and expectations of his internal working models.  The psychological representations of these relationships carry forward into new relationships as the child develops.   Crittenden writes "attachment is not a theory about happiness; it is about protection and … successful reproduction" (pp. 86-87).  *Thompson (1999, p. 265) describes that attachment security may have "long-term implications for later intimate relationships, self-understanding and even psychopathology."  An explanation of the process of attachment in a young person's life is not the same as blaming parents or others for the specific behaviors of an adult in later life.  It is a way to explain how Moises Mendoza got from point A to the death of Rachelle Tolleson; <u>there is a thematic thread that runs through the story</u>*. ....[21]

The response of trial counsel was to place blame on Mr. Mendoza for "*going behind our backs,* "and giving "*different accounts*" of the events.[22]   They also blamed  "*Mercedes* (mother)

---

[21]     Exhibit A:  Affidavit of Gilda Kessner, Psy.D.

[22]     In answer to question 17, Ms. Ivory/Tucker blames Mr. Mendoza "who repeatedly denied that he had a problem with women .... that he was not angry with [the victim] that night... [and that although his] family described his relationship with Amy as being toxic, [Mr. Mendoza] did not describe the relationship that way."

[who] *sought to control how the family was portrayed*."  (Joint Response of Sanchez and Ivory, p. 2).

This position is unsupportable in the law.  *Rompilla v. Beard*, 545 U.S. 374, 377, 381 (2005) made clear that even where a client is "actively obstructive by sending counsel off on false leads," and "when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."

The culprit was not Moises Mendoza or Mercedes Mendoza.  The culprit was an inadequate, multi-generational investigation, and the absence of its concomitant work product, a throughly documented  psycho-social history, which had adverse effects on all phases of the trial and culminated in a sentence of death.

### C.   CONCLUSION: THE INTERROGATORIES PROVE THAT THE PERFORMANCE OF TRIAL COUNSEL WAS DEFICIENT BECAUSE THE MITIGATION INVESTIGATION WAS INADEQUATE, THERE IS A REASONABLE PROBABILITY THE OUTCOME WOULD HAVE BEEN DIFFERENT

As the aforementioned reflects, trial counsel was constitutionally ineffective with respect to Ground One (IAC and no effective theory of the case), Ground Two (IAC and duty to assert legal claims), Ground Three (due process and actual innocence,  failure to negate mens rea), and Grounds Four and Five (IAC and failure to adequately investigate, develop and present mitigating evidence), each of which hinge on an adequate mitigation investigation having been performed.

The list of documents enumerated by Dr. Vigen proves the mitigation investigation was inadequate.  Even if, as trial counsel attested, they knew about the frequent mental health

hospitalizations and suicide attempts of Concepion Mendoza (father), his law suit and employment problems,[23] and Moises Mendoza's history of violence against women, no qualified mitigation specialist had ever connected-the-dots, "analyz[ing] the significance of the information in terms of impact on development, including effect on personality and behavior.... to develop a comprehensive and cohesive case in mitigation."[24]

Trial counsel was stuck with "the family script," not because of Mr. Mendoza or his family. Rather, the inadequate mitigation investigation adversely impacted the ability of trial counsel to construct a persuasive narrative in support of the case for life using the information related to the dysfunction of Moises' father, who played a pivotal role in Moises development, and the affect of his dysfunction on Moises.

As a result, trial counsel had no context for challenging the *mens rea* element of capital murder in the guilt/innocence phase.  They could not provide an explanation to the jurors connecting Moises' adverse childhood experiences, alcohol abuse and possible brain damage.  They did not explain or refute why someone –  who according to the prosecutor  –  had "a good childhood," whose father was "a hard working man," and whose family provided him "with moral and spiritual guidance,"[25] would associate with a depraved peer group, and often engaged in obnoxious and

---

[23]     (Joint Response of Sanchez and Ivory, p. 5).

[24]     ABA GUIDELINE 4.1 – *The Defense Team and Supporting Services, Commentary*  (rev. ed. Feb. 2003); ABA GUIDELINE 10.7 ("counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty") ABA GUIDELINE 10.11 ("counsel at every stage have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation").

[25]     Closing argument of prosecutor in punishment phase. (RR 25:48)

hostile treatment of women, culminating in the death of Rachelle Tolleson.

Accordingly, the answers to the interrogatories refute trial counsel's attestation that "all avenues of defense were explored and all plausible theories of mitigation were discussed by the defense team." (Joint Response of Sanchez and Ivory, p. 1).  Absent an adequate mitigation investigation, trial counsel could ***not*** have made one or more "strategic" decisions "*weighed against the credible evidence that existed and by the facts relayed to us by Mr. Mendoza*" – contrary to their assertions in state habeas. This is because they lacked the necessary investigation into facts relevant to plausible options. (Joint Response of Sanchez and Ivory, p. 3.).

The result is that there is a reasonable probability that the outcome – a verdict of capital murder in guilt/innocence, and/or a sentence of death – would have been different had the mitigation investigation been adequately investigated, developed and presented. *Strickland v. Washington*, 466 U.S. 668, 695 (1984).

Mr. Mendoza urges this court to find in his favor as to grounds 1-5, prohibit the Respondent from "supporting or opposing designated claims or defenses, or from introducing designated matters in evidence" with respect to Grounds One through and including Five, pursuant to FED. R. CIV. PROC. 37(b)(2)(A)(ii), and if this court finds the answers to interrogatories insufficient to warrant relief, then grant him an evidentiary hearing pursuant to his request. *See* Doc #7.

34

**GROUND ONE (IAC & NO EFFECTIVE THEORY OF THE CASE FOR LIFE: 6ᵀᴴ & 14ᵀᴴ AMENDMENT VIOLATION – STATE HABEAS CLAIM 1): Trial counsel was constitutionally ineffective; absent a comprehensive psycho-social history, they lacked the necessary facts to formulate a defense theory that was effective in all phases of the trial**

### A.      Statement of Facts

The prosecutor's theory of the case was that the killing of Rachelle Tolleson was a "crime of violence against a woman."  The prosecutor also put the defense on notice that in the punishment phase, it would offer extraneous offense evidence of additional "crimes of violence against women" perpetrated by Mr. Mendoza.  (CR 2:800-803).

During the voir dire, the prosecutor discussed with the jurors their perspectives on crimes of violence against women.  The answers of the jurors, as well as the juror questionnaires, put the defense on notice that the jurors had strong feelings about this type of offense conduct.  (RR 7:191; RR 6:239).  The jurors also expressed their beliefs that personal responsibility, choice, and free will were paramount in their consideration of whether to vote for life or death:

Schmoll:       "... if they're in their 20s, they're old enough to take responsibility for what they did," (RR 6:67);  "A. I think once you get to a certain age you need to be responsible,"  (RR 6:68).  She did not belief that because someone used drugs or alcohol, that that is an illness or condition out of their control, (RR 6:68).

Stockdell:      "... being a father and having a 19-year-old and seeing the way he acts a lot during the day, ... maybe it should be a little higher than 18," but he later agreed that there might be some 18-year-olds who should be subject to the death penalty; (RR 6:225-226); "A. ... I think each individual should be accountable for their actions and – but there could be something in the past that makes them the way they are;" (RR 6:226); "... if you drink – you're still accountable for what you do regardless of if you're sober or not...", (RR 6:238).

Comer:         "... punishment has to fit the crime... there's accountability for our actions," (RR 7:169), or his opinion that the use of drugs or alcohol is not mitigating because the person "chose to put that into their body," (RR 7:190).

35

| K. Jones: | "We maybe born underprivileged.  We may be born with a handicap.  We may be born to abusive parents....  But it's the choices I've made.  I think we're given free will and free choice.  And it's those choices we make that decides our destiny in life."  (RR 9:102). |
|---|---|
| Johnson: | "I have been exposed to enough [about the use of alcohol as an illness] that I think there's always a choice in the end."  (RR 10:135). |

Yet, the defense wholly failed to rebut the prosecution's case that Moises made a "knowing" and "intentional" _choice_ to commit "crimes of violence against women." The thrust of the defense theory appears to have been to show a consensual, relationship between Tolleson and Mendoza, rather than a kidnaping and sexual assault of her by Mr. Mendoza.  *See e.g.,* testimony of Andrew Tolleson, (RR 21:96-100).  But even if Ms. Tolleson had left voluntarily with Mr. Mendoza and had engaged in consensual sexual intercourse with him, the defense theory – to the extent there was one – failed to explain the killing of Ms. Tolleson, or lay the groundwork for the mitigation presentation in the punishment phase of the trial.[26]

Absent an explanation for Moises' actions, the jurors had no choice but to vote for death. Juror John Comer, attests:

5. In the punishment phase *the defense called a psychiatrist who* did not really help their case, and in fact only *helped the DA because he could not explain why the defendant did what he did, in terms of mental factors*.  ....

7. Overall it was pretty clear that the defendant was guilty and the only issue is whether there was any circumstance to make us not vote for death.  But he had come from a good family, his siblings were successful and *__there was very little else to explain why he did what he did.__*  ....

---

[26]   *See* ABA GUIDELINE 10.11 –  *Commentary, The Importance of an Integrated Defense* ("During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial.  Ideally, 'the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation.").

8.        .... ***I feel like we made the right decision because the case was pretty much clear with all the evidence***.

(Emphasis supplied);  Exhibit D: Affidavit of John Comer, Juror, para. 5.

Likewise, Juror Marsha Schmoll attests:

8.        We heard from the defendant's family in the punishment part of the trial. They did not affect me much because he had been a mean teenager.  ***The defense expert said that the defendant was a "victim of circumstance" but I was not convinced.  His family was a strong Catholic family, and were smart.***  I felt bad for them.

(Emphasis supplied);  Exhibit E:  Affidavit of Marsha Schmoll, Juror, dated 7-23-06.

Had the defense team done a comprehensive mitigation investigation, and prepared a thorough psycho-social history and time line, they would have recognized the need to further investigate the critical role of Concepcion Mendoza's dysfunction in Moises' development.  From it, they could have formulated a theory based on the theme of attachment disorder, which ran throughout the life of Moises.[27]  As more fully argued below, Moises attachment disorder would have provided the context for challenging the *mens rea* element of capital murder in the guilt/innocence phase.  It would have provided a explanation to the jurors about Moises' alcohol abuse, association with a depraved peer group, and often obnoxious and hostile treatment of women in the punishment phase of the trial.

---

[27]    *See* Exhibit I:  Affidavit of Toni Knox, L.C.S.W., with accompanying Exhibit A – Psycho-social History of Moises Mendoza; Exhibit B  – Time Line for Moises Mendoza; Exhibit C – Genogram for Moises Mendoza

**B.       No Presumption of Correctness for Fact Findings**

Findings of Fact Nos. 13-32, labeled: Counsel's Theory of the Case, are not entitled to a

presumption of correctness, as will be more fully discussed below. *Guidry v. Dretke*, 397 F.3d 306,

326 (5th Cir. 2005), *citing  Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).

Further, habeas relief should be granted because the state court adjudication resulted in a decision

that was based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding. 28 U.S.C. § 2254(d)(2).

**C.       Argument & Authorities**

**1.       Standard of Review**

The Supreme Court in *Strickland* stated a two-pronged test for judging claims of ineffective

assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were
> outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact
> finder would have had a reasonable doubt respecting guilt"

*Strickland v. Washington*, 466 U.S. 668, 695 (1984).

However, the prejudice standard is different when trial counsel's deficient performance

results in a complete failure to subject the prosecution's case to meaningful adversarial testing. *Bell*

*v. Cone*, 535 U.S. 685, 697 (2002).  In such cases, prejudice is presumed.

2.      **The ABA Guidelines  –  A Standard of Care**

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court has looked for guidance to the ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES.  *Wiggins v. Smith*, 539 U.S. 510,  522 (2003) (In which the U.S. Supreme Court *citing Strickland*, 466 U.S. at 690-691, for the proposition that "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).

ABA GUIDELINE 10.10.1 –   Trial Preparation Overall (rev. ed. Feb. 2003) provides:

As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory.  ***Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies***.

*Commentary*

Formulation of and adherence to a persuasive and understandable defense theory are vital in any criminal case.  In a capital trial, the task of constructing a viable strategy is complicated by the fact that the proceedings are bifurcated.  The client is entitled to have counsel insist that the state prove guilt beyond a reasonable doubt.  At the same time, if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced.   Accordingly, ***it is critical that, well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages***.  ***Counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument***.

Likewise, ABA GUIDELINE 10.11  – The Defense Case Concerning Penalty, *Commentary*

– *The Importance of an Integrated Defense* (rev. ed. Feb. 2003) provides in pertinent part:

39

> ***During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial.*** Ideally, "the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation." ***Consistency is crucial because, ... counsel risks losing credibility by making an unconvincing argument in the first phase.... First phase defenses that seek to reduce the client's culpability for the crime (e.g., by negating intent) rather than to deny involvement altogether are more likely to be consistent with mitigating evidence*** of mental illness, retardation, domination by a co-defendant, substance abuse, or trauma. But whether or not the guilt phase defense will be that the defendant did not commit the crime, counsel must be prepared from the outset to make the transition to the penalty phase.

(Emphasis supplied).

**3.      Trial counsel was constitutionally ineffective**

      **a.      Performance was deficient because**

            **(1)      An effective theory of the case for life ( which is predicated on a thorough and comprehensive mitigation investigation) is a national standard in capital cases**

Having an effective theory of the case for life is a national standard of practice when representing persons accused of capital crimes.[28]   An effective theory of the case satisfies the following essential elements:

- It is logical. A winning theory has internal logical force. It is based upon a foundation of undisputed or otherwise provable facts, all of which lead in a single direction. The facts upon which the theory is based should reinforce (and never contradict) each other. Indeed, they should lead to each other, each fact or premise implying the next in an orderly and inevitable fashion.

- It speaks to the legal elements of the case. All of the trial persuasion must be in aid of a 'legal' conclusion. The theory must not only

---

[28]   NATIONAL LEGAL AID AND DEFENDER ASSOCIATION, *Guidelines for Criminal Defense Representation* (1995);  ABA GUIDELINE 10.10.1 (rev. ed. Feb. 2003) ("Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.").

establish that the client is good or worthy (or that the other side is bad and unworthy), but also that the law entitles him to relief.  The theory therefore must be directed to prove every legal element that is necessary to both justify a verdict on his behalf and to preserve it on appeal.

•   It is simple.  A good theory makes maximum use of undisputed facts. It relies as little as possible on evidence that may be hotly controverted, implausible, inadmissible, or otherwise difficult to prove.

•   It is easy to believe.  Even "true" theories may be difficult to believe because they contradict everyday experience, or because they require harsh judgments.   The attorney must strive to eliminate all implausible elements from the theory.  Similarly, the attorney should attempt to avoid arguments that depend upon proof of deception, falsification, ill motive, or personal attack.  An airtight theory is able to encompass the entirety of the other side's case and still result in victory by sheer logical force.

Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 8-9  (NITA 2nd ed. 1999).  *See also* STEPHEN C. RENCH, *Building the Powerfully Persuasive Criminal Defense*, 42 MERCER L. REV. 569, 570 (1991) ("The story allows the jury to understand and organize the myriad of facts and to judge plausibility.  Studies show that in order to be plausible, a story or case must be: 1) consistent; 2) complete; 3) in context; 4) organized; 5) believable; and 6) positive and persuasive.").


### (2)   Findings of Fact Nos. 13-32  – no presumption of correctness

Among other things, the findings of fact recite that Mr. Mendoza  "alleged that trial counsel had no theory of the case at the guilt phase ...."  FF No. 13.  Mr. Mendoza never claimed that trial counsel lacked a theory of the case.  He alleged – and proved  –  that trial counsel lacked an **_integrated_ theory, "presented consistently through both the first and second phases of the trial**. ... [with] the theory of the trial ... complement[ing], support[ing], and lay[ing] the groundwork for the theory of mitigation." (Emphasis supplied). ABA GUIDELINE 10.11  – The Defense Case

41

Concerning Penalty, *Commentary – The Importance of an Integrated Defense* (rev. ed. Feb. 2003);

Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 8-9   (NITA 2nd ed. 1999);

STEPHEN C. RENCH, *Building the Powerfully Persuasive Criminal Defense*, 42 MERCER L. REV. 569,

570 (1991).

Indeed, the Findings of Fact Nos. 13-32 themselves prove by clear and convincing evidence

that the theory was neither integrated, nor consistently presented through both phases of the trial.

Defense counsel asserted a distinct "simple murder theory" in guilt/innocence.  FF No. 17, 21.  This

"simple murder theory" failed altogether to "complement, support, and lay the groundwork for the

theory of mitigation."  Indeed, the Findings of Fact confirm a total absence of evidence which was

consistent with mitigating evidence.  In fact, the so-called "simple murder theory" was based on

DNA evidence, confession evidence, witness statements, and evidence of the victim's blood on Mr.

Mendoza's clothing.  FF Nos. 18(a-d), 22(a-e).

Likewise, the findings of fact reflect that the punishment phase theory was wholly unrelated

to the theory in guilt/innocence.  The theory of the case at punishment  was that Applicant came

from a strict family; had an emotionally absent father who suffered from severe depression; and

associated with a depraved peer group.  The "underlying theme [was] that the jury should spare the

defendant's life for the sake of his family."  FF No. 32.

Moreover, a comparison of FF No. 32 with the trial evidence demonstrates by clear and convincing evidence that the "simple murder theory" was incredulous to begin with, and that the fact findings are objectively unreasonable in the light of the evidence presented in the state-court:

*Compare*

Fact Finding:

32.    Trial counsel's theory that applicant and Rachelle had an on-going sexual relationship, which made it consensual for applicant to enter her home, for Rachelle to leave with applicant, and for them to have sexual intercourse, is logical simple, and there was potential for jury to believe it. NFF, p.6

*with*

According to appellant, Tolleson left with him to get a pack of cigarettes. ***Appellant*** drove "for a little" and then "for no reason" ***started to choke Tolleson. Tolleson passed out***, and appellant drove to a field behind his home, where he had sexual intercourse with Tolleson and ***"choked her again." Appellant then dragged Tolleson out of the truck and into the field, where he choked her until he thought she was dead***. To "make sure," he "poked her throat" with a knife.

*State v. Mendoza,* No. AP-75213, 2008 WL 4803471, *2 (Tex. Crim. App. Nov. 5, 2008) (not designated for pub.).

In summary, there was **_no_** single, integrated theory presented consistently in both phases. Instead, trial counsel presented two separate distinct theories, with the guilt/innocence theory of "simple murder" failing to logically transition into the punishment phase, whose theory was that the jury should spare Mr. Mendoza's life "for the sake of the family."    The lack of an effective theory of the case for life  – as more fully discussed below  – pivots on a superficial mitigation investigation.

Accordingly, FF 13-32 are not entitled to a presumption of correctness.   They are "'objectively unreasonable in the light of the evidence presented in the state-court proceeding,'" *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing Miller-El v. Cockrell,* 537 U.S. 322, 340

(2003); 28 U.S.C. § 2254(d)(2).

### (3)    The mitigation investigation was superficial

A comprehensive mitigation investigation is a prerequisite to an effective theory of the case for life. "Since an understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present."[29]

Although trial counsel had a duty to conduct a thorough and independent investigation relating to the issues of both guilt and penalty,[30] the defense team's mitigation investigation was superficial.  The superficial mitigation investigation is fully detailed in Claim Four, Claim Five, and Exhibit I: Affidavit of Toni Knox, mitigation specialist, incorporated by reference herein.  To avoid redundancy and needlessly lengthening this petition, Mr. Mendoza summarizes the errors and omissions and adverse consequences of the superficial mitigation investigation at the trial stage in order to show how and why the defense failed to formulate an effective theory of the case.

### (a)    They failed to conduct a multi-generational investigation, process the information, and construct a comprehensive psycho-social history of Moises

Vince Gonzales, did not have the education or skills to undertake the role of "mitigation

---

[29]    ABA GUIDELINE 10.11 – THE DEFENSE CASE CONCERNING PENALTY, *Commentary, The Defense Presentation at the Penalty Phase* (rev. ed. Feb. 2003).

[30]    ABA GUIDELINE 10.7 – *Investigation* (rev. ed. Feb. 2003) ("Counsel ... have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty").

44

specialist."    As a result, Mr. Gonzalez failed to conduct an adequate multi-generational investigation, process the information, and construct a complete and comprehensive psycho-social history and time line.  No other defense team member did either.   Without a comprehensive and thorough psycho-social history and time line, the defense team failed to recognize the pivotal role that the dysfunction of Concepcion Mendoza played in the origins of Moises' attachment disorder, and employ it in rebuttal to the prosecution's theory that Moises' _chose_ to commit "violence against women."[31]

### (b)    They failed to establish the rapport and trust necessary to elicit sensitive mitigating evidence

Neither Mr. Gonzalez, nor any other member of the defense team, established the rapport and trust necessary to elicit sensitive mitigating evidence.   The prosecutor dwelled on the "wonderful" life of the Mendoza household because the defense sponsored the Mendoza "family script" in the punishment phase.[32]

### ( c )    They failed to identify themes and experts, whose testimony would be specifically tailored to the Mendoza case

Without an adequate psycho-social history, the defense could not identify themes and experts tailored specifically to the needs of the Mendoza case.  One adverse consequence was that the roles of the defense team became confused and overlapping.   Vince Gonzalez had been hired

---

[31]    Exhibit A:  Affidavit of Gilda Kessner, Psy.D., *Attachment*, para. 38-59.

[32]    Exhibit I:  Affidavit of Toni Knox, L.C.S.W., *(a) Lack of Thorough Mitigation Investigation  – Wonderful Family*, p. 16.

as the "mitigation specialist," but he failed to provide Dr. Vigen "with adequate records (which should have included a [comprehensive] social history) or direction for his evaluation to be useful."[33]   With little to guide him, Dr. Vigen and his nurse attempted unsuccessfully to do a mitigation investigation as well.   While "it is customary for an expert to speak with some corroborating family members to maintain the accuracy of the family history, [it is not the role of the expert to] conduct the complete family history investigation."[34]      Another adverse consequence was that the defense failed to give its experts a clear understanding of what they were to evaluate.   Dr. Cunningham attests that he had been "retained in this case in March 2005 as a consultant to the defense to assist in the development of mental health perspectives for capital sentencing."[35] But "[e]ventually [he] was led to believe that [he] might be called to testify regarding violence risk assessment (*i.e.,* whether there is a probability that the defendant will commit criminal acts of violence that constitute a continuing threat to society), though this remained ambiguous. For reasons that [were] not clear to [him], communications from defense counsel were quite limited after the 6-2-05 joint conference."[36]   Dr. Cunningham was never called to testify at all.

> **(d)** **Moises acts were left unexplained despite the availability of mitigation factors that would have placed them in context**

Contrary to professional standards of practice, the defense called Dr. Vigen as an "all

---

[33]   Exhibit G:  Affidavit of Toni Knox, L.C.S.W., *(d) Problems with Defense's Expert Witness.*

[34]   Exhibit G:  Affidavit of Toni Knox, L.C.S.W., *(d) Problems with Defense's Expert Witness.*

[35]   Exhibit H:  Affidavit of Mark Cunningham, Ph.D., para. 4 (Fact witness).

[36]   Exhibit H:  Affidavit of Mark Cunningham, Ph.D., para. 4 (Fact witness).

purpose" expert.[37]    But Dr. Vigen had insufficient knowledge and/or experience to testify persuasively in any of the areas about which he opined.   Dr. Vigen himself recognized his own deficiencies.

As to mitigation, Dr. Vigen disclaimed:

A.    If I understand your question, in cases – *people just don't stand up one day and say, ... I'm going to murder somebody today.  The roots of this type of behavior generally go back a long ways in people's lives*, ....

*There's something missing in this case for me as a psychologist.  There is none of that there.  There's something I don't know*.  I can't tell you.  From a – my intuition.

(RR 24:187).

As to risk assessment, Dr. Vigen disclaimed:

Prosecutor:    Have you ever worked for the Texas Department of Corrections Institutional Division?

Dr. Vigen:    No, sir. ....

Prosecutor:    Have you ever been inside the Institutional Division of the Texas Department of Corrections?

Dr. Vigen:    No.  No, sir, I have not.  ....

Prosecutor:    Have you ever done any studies in future dangerousness?

Dr. Vigen:    No.   ....

(RR 24:62-63).

---

[37]    ABA GUIDELINE 10.11  – THE DEFENSE CASE CONCERNING PENALTY, *Commentary, The Defense Presentation at the Penalty Phase* (rev. ed. Feb. 2003) ("Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an 'all-purpose' expert who may have insufficient knowledge ... to testify persuasively.")

47

**(e)      They failed to rebut the prosecutor's theory that Moises made a "choice" to commit violence against women**

Absent a  robust development and presentation of the theme of attachment disorder, the defense could not rebut the prosecution's theory that Moises made a "choice" to commit "crimes of violence against women."  Dr. Vigen's lack of preparation allowed the prosecution to discredit the defense.  His dual role as expert and mitigation investigator made all of the mitigation notes available to the prosecutor.

**(4)      Because of the superficial mitigation investigation, the defense theory was not integrated**

Because of the superficial mitigation investigation, the defense failed to develop themes that would have allowed them to formulate an integrated, persuasive narrative.  As reflected below, the defense "theory" – if there was one  –  did not segue naturally from the guilt/innocence phase into the punishment phase.  It was not based on a foundation of facts that lead in a single direction.  It did not encompass the entirety of the prosecution's case, and still result in victory by sheer logical force.[38]

---

[38]    Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 8-9  (NITA 2nd ed. 1999).  *See also* STEPHEN C. RENCH, *Building the Powerfully Persuasive Criminal Defense*, 42 MERCER L. REV. 569, 570 (1991) ("The story allows the jury to understand and organize the myriad of facts and to judge plausibility.  Studies show that in order to be plausible, a story or case must be: 1) consistent; 2) complete; 3) in context; 4) organized; 5) believable; and 6) positive and persuasive.").

(a)     **Voir Dire: The defense asserted that mitigation was whatever the juror wanted it to be**

The prosecution was up front with the jurors about its theory of the case beginning in voir dire, continuing in the guilt/innocence, and concluding in punishment.  Its theory was that Moises Mendoza chose to commit crimes of violence against women.  (RR 6:67-68; RR 6:225-226; RR 6:238; RR 7:190; RR 9:102; RR 10:135; RR 25:26-27).

Although defense counsel has a duty to present an integrated defense with a consistent theme in all phases of the trial,[39] there is a singular lack of any identifiable, consistent defense theory readily apparent from the questioning during voir dire that carried over into guilt/innocence and then punishment.

The thrust of the colloquy between defense counsel and the venire focused on defense counsel

    a.    telling the potential jurors that:

        1.    mitigation was anything a juror wanted it to be,[40]

        2.    it takes only 10 jurors to find that there are mitigating circumstances, but 12 jurors to find that there are none,[41] and

    b.    asking the potential jurors:

        1.    if each could answer the special issues in such a way as to result in a life

---

[39]    ABA GUIDELINE 10.11 – The Defense Case Concerning Penalty, *Commentary – The Importance of an Integrated Defense* (rev. ed. Feb. 2003) ("During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").

[40]    *See e.g.,* Juror Schmoll, (RR 6:74); Juror Stockdell (RR 6:250-252), Karen Jones (RR 9:116); Geri Johnson (RR 10:152); Theresa Nass (RR 18:204)

[41]    *See e.g.,* Karen Jones (RR 9:114-115); Geri Johnson (RR 10:150); Dollie Jones (RR 13:73); Devesh Singh (RR 18:58); Theresa Nass (RR 18:204-206).

sentence, even after they returned a verdict of guilty of capital murder,[42] and

    2.      if each of them could hold his or her ground in voting.[43]

        **(b)      Guilt/Innocence: The defense theory was a superficial assertion that the prosecution failed to carry its burden of proof beyond a reasonable doubt**

Although defense counsel has a duty to present an integrated defense,[44] the theory in guilt/innocence – like that in voir dire – lacked a rigorous, single approach that organized the case from beginning to end.  It was not consistent and did not segue naturally into the punishment phase of trial.

The defense was on notice that in the guilt/innocence phase the prosecutor would, and did, rely on DNA evidence and confession evidence.[45]  Yet despite the direct evidence, and based on the closing argument,[46] it appears that the defense theory was merely that the prosecution failed to prove

---

[42]   *See e.g.,*  Stockdell (RR 6:248);  Comer (RR 7:198);  Becky Garrett (RR 9:150); Geri Johnson (RR 10:147); Stacey Allen (RR 10:185);  Dollie Jones (RR 13:75); Michael Lee (RR 14:30); Devesh Singh (RR 18:58); Richard Froebe (RR 18:109); Theresa Nass (RR 18:198, 200).

[43]   *See e.g.,*  Karen Jones (RR 9:111); Dollie Jones (RR 13:74); Devesh Singh (RR 18:58).

[44]   ABA GUIDELINE 10.11 – The Defense Case Concerning Penalty, *Commentary – The Importance of an Integrated Defense* (rev. ed. Feb. 2003) ("During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").

[45]   CR 3:1000 –  State's 6th Supplemental Production of Documents; RR 21:52-65 – Robert Hilbig DNA testimony, Prosecution Trial Exhibits 115 & 116;  CR 1:316 – Defendant's Voluntary Statements dated 3-18-04 and 3-24-04; RR 20:235-247  – Mitch Selman, Prosecution Trial Exhibits 109, 112, 113 voluntary statement and drawing/map made by Mendoza).

[46]   The defense did not make an opening statement either prior to the presentation of the prosecution's case, (RR 19:33), or to its case-in-chief (RR 21:85).  Given the disjointed themes in voir dire, guilt/innocence and punishment, the jury had no roadmap to a theory of the case for life.

its case:

- "... ask yourself, has the case been proven to me beyond a reasonable doubt?" (RR 21:169).

- "... as jurors you have to look at the evidence and say, is that credible?"  (RR 21:170).

- "... it is reasonable to infer and believe, that they were having some type of relationship?"  (RR 21:172).

- "Officer Collins couldn't – didn't know ... when he was taking these pictures that the scene had been compromised."  (RR 21:175).

- "... say to yourself, is it reasonable to believe that this night stand was moved in a struggle?"  (RR 21:176).

- "... they're relying on also in trying to prove this case to you is the statement, the statement of Moises Mendoza.  Now, statements that are the result of police and State interrogation don't just happen in a vacuum."  (RR 21:178).

- "You have to be convinced today. And if you're not, you would just be doing your job when you find him not guilty of capital murder."  (RR 21:180).

### ( c )   Punishment:  The defense theory pivoted on a conclusory assertion that Moises was an unremorseful, adolescent-like man

And finally, in the punishment phase the defense failed in its duty to construct a persuasive narrative in support of the case for life.   Instead they called Dr. Vigen to testify to a catalog of seemingly unrelated mitigating factors.[47]

---

[47]   *See*  ABA GUIDELINE  10.11 – The Defense Case Concerning Penalty, *Commentary*:

"...  areas of mitigation are extremely broad and encompass any evidence that tends to lessen the defendant's moral culpability for the offense or otherwise supports a sentence less than death.  Often, a mitigation presentation is offered not to justify or excuse the crime "but to help explain it.".... ***[I]t is critically important to construct a persuasive narrative in support of the case for life, rather than to simply present a catalog of seemingly unrelated mitigating factors***."

51

In opening statement, Mr. Sanchez promised the jury:

"***We will present evidence to you that will explain why Moises Mendoza acted the way he did***.  They're not excuses, but ***they're explanations that you need to take into consideration in deciding whether he's so far beyond redemption that the only last resort is to terminate him from this earth***. (RR 23:10)

"We're going to ask you to look at his family.  ***We're going to ask you to look at the events in his family that shaped him***.  And we believe that at the end of the evidence on both sides that you're going to find many reason to make a finding and to punish him with a life sentence in [TDCJ]."  (RR 23:10)

(Emphasis supplied).

Yet in the punishment phase, the defense called Dr. Vigen, who failed to provide any explanation whatsoever.  Dr. Vigen merely opined in a conclusory fashion that:

1.    Moises was an immature, psychologically under-developed, adolescent-like man who has no internal sense of himself, (RR 24:117);

2.    Moises came from a dysfunctional family, (RR 24:121);

3.    Moises changed for the worse when he began to smoke marijuana, drink, and associated with a set of friends who drank, used drugs and had parties, (RR 24:123);

4.    Moises and his new friends lived a depraved, disrespectful, aggressive and drug and alcohol lifestyle, and would engage in sexual behavior without any emotional connection, (RR 24:126);

5.    TDCJ has the capability to house Moises in a manner that he would be a minimum risk for future violence, (RR 24:127); and

6.    Moises has the potential to develop a sense of self and spiritual conversion as he ages, (RR 24:129-120).

These six opinions "touched broadly on the family and Moises.  However, [Dr. Vigen] did

_____

*citing Simmons v. Luebbers*, 299 F.3d 929, 938-39 (8th Cir. 2002) ("Mitigating evidence was essential to provide some sort of explanation for Simmon's abhorrent behavior.  Despite the availability of such evidence, however, none was presented.  Simmons's attorneys' presentation was ineffective").

not provide the context or facts to demonstrate the background of the child growing up and his 'psychologically dysfunctional family'....  Without contextual elaboration, Dr. Vigen did not help the jury develop sufficient understanding of Moises' life experiences." [48]

Without an integrated defense theory, Mr. Sanchez made the implausible argument that the jurors should vote for life because:

> "You have to look at his family.  Yes, he did come from a good family.  They may have failed him on a few points, but you have to look at, in context, how that affected him as he was growing up...."

(RR 25:32).

### (5)    An adequate mitigation investigation revealed Moises' attachment disorder, the platform for an effective theory to:

In contrast, 'had the defense performed an adequate mitigation investigation, and developed and prepared a thorough psycho-social history and time line,[49] they would have recognized the availability of an effective theory in all phases of the trial, specifically:

> The killing of Rachelle Tolleson, "a catathymic homicide," was the culmination of an attachment disorder that arose in Moises' early formative years because the Mendoza family was experiencing catastrophic stress  – and not as the prosecution asserted, a 'choice' made by Mr. Mendoza to perpetrate crimes of violence against women."

---

[48]    Exhibit A: Affidavit of Gilda Kessner, Psy.D., para. 35.

[49]     Exhibit A:  Affidavit of Gilda Kessner, Psy.D., *Mendoza Family History Chronology*, para. 11-34; Exhibit I:  Affidavit of Toni Knox, L.C.S.W., with accompanying Exhibit A – Psycho-social History of Moises Mendoza; Exhibit B  – Time Line for Moises Mendoza; Exhibit C – Genogram for Moises Mendoza.

Dr. Kessner attests:

38.     If one is to understand Moises and how the defense could have rebutted the prosecution's theory that Moises was involved in "crimes of violence against women" which culminated in the death of Rachelle Tolleson, it is important to understand the concept of attachment. ***Moises' obnoxious and often hostile treatment of women was a psychological defense against his attachment insecurities and fears....***

45.     Insecure attachments across infancy are associated with later behavior problems of an externalizing nature, especially for boys who…experience chaotic life event changes and hostile or neglectful parenting in the post-infancy year" (Greenberg et al., 1997, p. 199). ***Attachment behavior is behavior by the child with the goal of engaging the attachment figure*** (generally the parent). .... The parents [of Moises Mendoza] were essentially incapacitated by physical injury, mental illness (severe depression in the father and anxiety and depression in the mother) and the stress that came from the financial problems related to not working and medical bills.

47.     With puberty comes the issue of reproduction and the development of romantic relationships. ***The physical closeness in the adolescent sexual relationship recalls the physical closeness experienced by the infant and young child with adult attachment figures***.... The negative emotions, fear of abandonment, anger, depression, and anxiety from his childhood environment were being replayed in this new relationship with Amy.

        ....

50.     ***This pattern of obsession with Amy in the face of all warning flags that the relationship was not a safe one indicates it was rooted in the attachment insecurity from Moises' early learning and development.  This was not a part of Moises conscious awareness***.  He was drawn to Amy despite any warnings by others or the game of seduction and rejection she played with him.  Moises had fixed on a relational object that was tension and anxiety inducing.  Tension and anxiety were common emotions in his parents' home and therefore were familiar to him.

        ....

53.     ***Mendoza family has said that Rachelle Tolleson looked a lot like Amy Lodhi.   As an Amy-substitute, the catathymic killing of Rachelle had nothing to do with Rachelle and everything to do with Moises' deep rage against Amy, which had its origins in his early childhood attachment disorder***.   The attack against Rachelle was significant for intense overwhelming violence that could be termed "overkill."   The medical

54

examiner, Dr. Rohr testified that some of the violence occurred after death.[50]

### (a)        Voir Dire Argument: Educate the jury about  "choices"

During voir dire, the jurors expressed their belief that ultimately personal responsibility, choice, and free will were paramount in their consideration of whether to vote for life or death.[51] However, many "choices" are made for a client long before he is capable of making choices for himself.  "It is essential that the jury understand how these previous choices, such as mental health or chemical dependency in the family history (genes), poverty, family criminality and other outside influences can affect what later 'choices' are made by the defendant."[52]

Had Moises attachment disorder been fully investigated and developed, it would have provided a platform to counter the prosecution's theory that "[t]his case is about choices."[53]   It would have allowed the defense to have educated jurors that Moises' "choice" to maltreat women,

---

[50]    Exhibit A:  Affidavit of Gilda Kessner, Psy.D., *Attachment*, para. 45.

[51]    Schmoll:  "A. I think once you get to a certain age you need to be responsible,"  (RR 6:68);  Stockdell: "... if you drink – you're still accountable for what you do regardless of if you're sober or not...", (RR 6:238);  Comer:  "... punishment has to fit the crime... there's accountability for our actions," (RR 7:169); K. Jones: "We maybe born underprivileged.  We may be born with a handicap.  We may be born to abusive parents....  But it's the choices I've made.  I think we're given free will and free choice.  And it's those choices we make that decides our destiny in life."  (RR 9:102); Johnson:"I have been exposed to enough [about the use of alcohol as an illness] that I think there's always a choice in the end."  (RR 10:135).

[52]    Exhibit G:  Affidavit of Toni Knox, L.C.S.W., *Presentation of Choices that were made for Moises*, p. 32.

[53]    The neuro-research suggests that "many more people involved in the justice system may have gotten there operating with faulty neural mechanisms," and that  "there is likely to be a continuum of impairment in the exercise of willpower rather than a black-or-white state of dysfunction or health." Exhibit F:  KELLY BURNS, J.D. AND ANTOINE BECHARA, PH.D., *Decision Making and Free Will: A Neuroscience Perspective*, 25 BEHAV. SCI. LAW 263-280, 273 (2007).

"choice" to binge drink alcohol, and "choice" to associate with a peer group that lived a depraved life style had its origins in the attachment disorder "choice" that had been made for him long before he was capable of making choices for himself.

> **(b)** **Guilt/Innocence Argument:  Negate *mens rea* with evidence of attachment disorder, brain damage, inadequate brain development, and the relationship between adverse childhood experiences and alcohol abuse**

TEX. CODE CRIM. PROC. art. 38.36 (a) permits a defendant to negate mens rea with "all relevant facts and circumstances going to show *the condition of the mind* of the accused at the time of the offense."  *See also Jackson v. State*, 160 S.W.3d 568, 574 (Tex. Crim. App. 2006) (citing to the Texas statute, the state court wrote:  "As with the other elements of the offense, relevant evidence may be presented which the jury may consider to negate the *mens rea* element.   And, this evidence may sometimes include evidence of a defendant's history of mental illness.").

Given the DNA and confession evidence, among other things, the Mendoza case was ripe for a first phase defense theory predicated on negating specific intent, and requesting a lesser-included, subjective offense instruction.  As the ABA GUIDELINE 10.11 (rev. ed. Feb. 2003), *Commentary*, explains:  "First phase defenses that seek to reduce the client's culpability for the crime (*e.g.,* by negating intent) rather than to deny involvement altogether are more likely to be consistent with mitigating evidence of mental illness, ...."

An adequate investigation into the attachment disorder of Moises Mendoza reveals that  the murder of Rachelle Tolleson was a "catathymic homicide."  Moises' "severe deficits in his capacity to monitor his thoughts and emotions in relation to external reality," and on his "restricted reality

testing"[54] provided the basis for a challenge to the *mens rea* element of capital murder.

As Dr. Kessner explains:

> 64.    ***Moises Mendoza's actions at the time of the murder were a disorganized outburst of overwhelming aggression seemingly unrelated to any aspect of the victim. The violence was propelled by a deep underlying psychological disorder conveying abandonment rage with its origins in early learning and subsequent development***.   The triggering event tapped into the untreated attachment disorder issues of Moises Mendoza.  Moises was psychologically reacting to Amy Lodhi and the threat she posed to his fragile identity and personality organization even though she was not physically present.  Rachelle Tolleson spoke words in a near quote to a message that Amy had spoken in a similar context.  Moises responded in a flashback triggered by stimuli reminiscent of his experience with Amy.    In this situation the context of the sexual encounter, the visual similarity between Amy and Rachelle, and Rachelle's comment combined to trigger Moises' intense emotional arousal and aggression.   Rachelle was not the object of his abandonment rage; she was an innocent person who was in the wrong place at the wrong time.[55]

Additionally, "[e]xcessive drinking has been associated with children whose attachment relationships (parents' marital) are broken."   Dr. Kessner attests that in Moises' case, "[a]lcohol provided an anesthetic that allowed him to engage with peers without risk that his fragile self would be damaged."[56]

It also resulted in brain damage that was present at the time of the offense conduct.  Dr. Martin attests:

> 19.    Mr. Mendoza's brain-related impairment appears to be long-standing in nature, and would have been present at the time of the alleged offense.  In fact, it is reasonable to assume that Mr. Mendoza would have demonstrated even greater

---

[54]   Exhibit A:  Affidavit of Gilda Kessner, Psy.D., *Attachment*, para. 65, *citing Violent Attachments,* by J. Reid Meloy in the chapter entitled, Catathymic Homicide. (1997, p.39).

[55]   Exhibit A:  Affidavit of Gilda Kessner, Psy.D., *Attachment*, para. 64.

[56]   Exhibit A:  Affidavit of Gilda Kessner, Psy.D., *Attachment*, para. 48.

impairment in these (and possibly other) cognitive areas if he had been administered neuropsychological tests closer to the time frame that he was actively abusing alcohol.

....

21.     When the behavioral effects of his brain impairment are considered, a broader and more accurate explanation for why Mr. Mendoza could have engaged in a violent crime emerges.  Based upon this information, *it is my opinion that Mr. Mendoza's violent actions at the time of the offense could have been mediated by emotional factors as opposed to reason due to the aforementioned damage to his brain.  Intoxication would have enhanced the negative effects of brain impairment by increasing his impulsivity and reducing his ability to fully consider the consequences of his actions.*  In particular, Mr. Mendoza having ingested more than 20 beers within a few hours time would have greatly reduced his reasoning skills as well as his ability to inhibit behaviors due to the aforementioned frontal lobe dysfunction.  *The likelihood that frontal-lobe dysfunction had a negative affect on his behavior during the course of this offense is enhanced even more when consideration is given to the fact that at age 20, his frontal lobes were still in a developmental stage.*

22.     *A neuropsychological examination was warranted for Moises Mendoza during the preparation by his defense team for his capital murder trial.*  Mr. Mendoza has been incarcerated since 2005 and by that time, Neuropsychology research had clearly determined that chronic alcohol abuse produces cognitive decline in a variety of domains.  In fact, as early as the 1960's, research had been produced which reflected that alcohol produced impaired scores on several components of the Halstead-Reitan Battery, the most commonly administered neuropsychological test battery in the United States.  *By retaining an expert and administering a battery of neuropsychological tests, Mr. Mendoza's attorneys could have conclusively proved the existence of neuropsychological damage.  Such tests would have provided defense counsel with the means to demonstrate for Mr. Mendoza's jury how the quality of his brain and the specific damage sustained to it adversely affected his higher cognitive functioning and reasoning skills.*  As has been previously discussed, impaired cognitive abilities due to alcohol abuse tend to recover with abstinence.  Therefore, a neuropsychological exam conducted close in time to the date of his arrest would have detected the present areas of impairment as well as any other indications of alcohol-induced brain damage that Mr. Mendoza may have been experiencing.[57]

---

[57]     Exhibit C:  Affidavit of Stephen K. Martin, Ph.D.

58

**( c )   Punishment Argument: Explain attachment disorder and ACEs, and their relationship to Moises' alcohol abuse and association with a depraved peer group**

The attachment disorder theme in guilt/innocence naturally segued into the punishment phase providing the jury with the promised explanation for Moises' acts.  In addition to negating *mens rea*, it also provided a credible narrative for his association with a group of peers, who Dr. Vigen described as living a depraved and disrespectful lifestyle.

Dr Kessner attests:

Regarding his Moises' peer relationships, Dr. Vigen testified in his opinion number 4:

> Dr. Vigen:     I think Moises' new friends, from what I can glean, lived a  –  sort of a depraved and disrespectful, aggressive and drug and alcohol lifestyle in which –  what I call empty sexuality was involved.  It was where people could or would engage in sexual behavior without any real connection or emotional –  without respect and without care and just casually.  (Vol. 24: p. 126: 2-8).

....

Dr. Vigen did not provide the jury with the context of the "depraved sexuality" that characterized the relationship of Moises and his peer group.

Crittenden (1997) describes, "defended *adolescents who are uncomfortable with intimacy may find that promiscuity … eases their loneliness, enabling them to "dance" the dance of intimacy (even if only through physical reflexes)"* (p. 71).

Crittenden further explains,

> most adolescents at some time respond to the initiatives of a seductive peer.  Once in such relationships, however, many are hurt and puzzled by the partner's self-interest, lack of reciprocity, and inability to share intimacy.  The promise of the seductive behavior is unfulfilled. ***In more extreme cases, the partner's vulnerability and expectation of deceit can lead to obsessive desire for contact and unfounded jealousy; similarly, underlying anger can lead to violence, particularly when there is a perceived threat to the relationship*** (p. 71).[58]

---

[58]   Exhibit A: Affidavit of Gilda Kessner, Psy.D., para. 47, p.16.

Research has also shown a relationship between adverse childhood experiences and alcohol abuse, which further rebuts the prosecution's theory of "choice."   Dr. Lundberg-Love explains:

A.    In a detailed study of over 17,000 middle-class American adults of diverse ethnicity, it was found that the *compulsive use of nicotine, alcohol and injected street drugs increased proportionately in a strong, graded, dose response manner, that closely paralleled the intensity of adverse life experiences encountered during childhood. These adverse childhood experiences [ACE] included*:

1)    recurrent and severe physical abuse,
2)    recurrent and severe emotional abuse,
3)    contact sexual abuse,
4)    *neglect;* and/or growing up in a household with:

1)    an alcoholic or drug user,
2)    a family member who was imprisoned,
3)    a mentally ill, *chronically depressed*, or institutionalized family member,
4)    a mother who was treated violently, or
5)    the absence of both biological parents.[59]

Dr. Lundberg-Love concludes:

Moises Mendoza ... had experienced at least two adverse childhood events, including a father who was depressed, hospitalized, and attempted suicide, and a mother who was physically victimized by her husband on at least one occasion, as documented in MHMR records.  Even though Moises minimizes and/or denies the impact of these events, the results of the ACEs study shows that such events can increase one's risk for drug and alcohol abuse or addiction.

.... *both the alcohol abuse of Moises Mendoza as well as the ACEs experienced by [Moises] during childhood, played a significant role in understanding the mitigation issues inherent in this case*."[60]

---

[59]    Exhibit B:  Affidavit of Paula Lundberg-Love, Ph.D., *VII.  Adverse Childhood Experiences*

[60]    (Emphasis supplied) Exhibit B:  Affidavit of Paula Lundberg-Love, Ph.D., *VIII. Conclusions*

### b.    Prejudice is presumed

Trial counsel's deficient performance was complete; prejudiced is presumed.  This is because in the case at bar, the absence of a theory that was effective in all phases of the trial made it improbable –  if not impossible – for counsel to have been effective at any stage of the trial proceedings.  Without an effective theory, counsel had no roadmap to guide them in their efforts to persuade the jury to sentence to life.

The United States Supreme Court has made clear that "[i]f no actual 'Assistance' 'for' the accused's 'defense' is provided, then the constitutional guarantee [to effective counsel] has been violated." *United States v. Cronic*, 466 U.S. 648, 654 (1984).  Echoing *Cronic*, the Fifth Circuit held: "The right to the assistance of counsel for one's defense . . . encompasses the right to have an advocate for one's cause." *Childress v. Johnson*, 103 F.3d 1221, 1226, 1228 (5th Cir.1997).  The lack of an effective theory of the case for life deprived Mr. Mendoza of a fair trial and resulted in a complete failure to subject the prosecution's case to meaningful adversarial testing. *Bell v. Cone*, 535 U.S. 685, 697 (2002).  Hence, prejudice is presumed.  Habeas relief must be granted.

### c.    Alternatively, but for trial counsel's deficient performance, there is a reasonable probability that the outcome would have been different

Alternatively, the deficient performance of trial counsel gives rise to a reasonable probability that the outcome would have been different.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

Because the defense failed to explain Moises actions, the jurors were left with but one choice: a vote for death.

Juror John Comer, attests:

> 5.    In the punishment phase **the defense called a psychiatrist who** did not really help their case, and in fact only **helped the DA because he could not explain why the defendant did what he did, in terms of mental factors**.  ....

> 7.    Overall it was pretty clear that the defendant was guilty and the only issue is whether there was any circumstance to make us not vote for death.  But he had come from a good family, his siblings were successful and **_there was very little else to explain why he did what he did._**  ....

> 8.    ....  **I feel like we made the right decision because the case was pretty much clear with all the evidence**.

(Emphasis supplied);  Exhibit D: Affidavit of John Comer, Juror, para. 5.

Likewise, Juror Marsha Schmoll attests:

> 8.    We heard from the defendant's family in the punishment part of the trial.  They did not affect me much because he had been a mean teenager.  **The defense expert said that the defendant was a "victim of circumstance" but I was not convinced.  His family was a strong Catholic family, and were smart.**  I felt bad for them.

(Emphasis supplied);  Exhibit E:  Affidavit of Marsha Schmoll, Juror, dated 7-23-06.

But for the lack of an effective theory of the case there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Habeas relief must be granted.

**D.     The Conclusions of Law Nos. 276-300 are contrary to, and an unreasonable application of federal law**

In light of the aforementioned arguments and authorities, habeas relief is in order because the State court decision denying relief on the basis that trial counsel was not ineffective, and specifically Conclusions of Law Nos. 276-300 are ***contrary to, and an unreasonable application of***, *Strickland* and its progeny.  28 U.S.C. § 2254(d)(1)(2).

Mr. Mendoza did make the requisite showing that reasonable counsel would have pursued the theories that he has alleged trial counsel should have raised.  *Compare* CL No. 286.  The theory of simple murder was not integrated into both phases as is required by the applicable capital guidelines.   *Compare* CL No. 283.   Theories of catathymic homicide, brain impairment and underdevelopment, the adverse childhood experience study, and attachment disorder *would* have been admissible to contest *mens rea* at the guilt phase of trial.  *Jackson v. State*, 160 S.W.3d 568 (Tex. Crim. App. 2005) ("As with the other elements of the offense, relevant evidence may be presented which the jury may consider to negate the *mens rea* element. And, this evidence may sometimes include evidence of a defendant's history of mental illness." *quoting* TEX. CODE CRIM. PROC. Art. 38.36(a): "In all prosecutions for murder, the ... the defendant shall be permitted to offer testimony as to all relevant facts and circumstances ...  going to show the condition of the mind of the accused at the time of the offense.");   *Ruffin v. State*, 270 S.W.3d 586, 596 (Tex. Crim. App. 2008) ("We repeat and reaffirm our holding in *Jackson* that "relevant evidence may be presented which the jury may consider to negate the *mens rea* element. And this evidence may sometimes include evidence of a defendant's history of mental illness."  We quoted article 38.36 in *Jackson* for the unremarkable proposition that both the State and defendant may offer testimony as to "all relevant facts and circumstances going to show the condition of the mind of the accused at the time

63

of the offense."  This is one of the few Texas statutes that explicitly states the obvious: evidence offered by either the defense or prosecution is relevant (and presumptively admissible) to prove or disprove the pertinent *mens rea* at the time of the offense.")

The adjudication of the claim by the state court resulted both in:  a decision that was based on an ***unreasonable determination of the facts*** in light of the evidence presented in the State court proceeding; and a decision that was ***contrary to, or involved an unreasonable application of***, Strickland and its progeny.  28 U.S.C. § 2254(d)(1)(2). (emphasis supplied).

**GROUND TWO (IAC & Duty to Assert Legal  Claims 6th & 14th Amendment Violations –
State Habeas Claim 2):  Mr. Mendoza was denied his Sixth Amendment right to effective
counsel, when his trial attorneys failed to consider, adequately investigate, and present
condition-of-the-mind evidence to negate the *mens rea* element in the guilt/innocence phase of
the trial**

**A.      Statement of Facts.**

The defense was on notice that in the guilt/innocence phase the prosecutor would, and did,

rely on DNA evidence and confession evidence.  Yet despite the direct evidence, and based on the

closing argument, it appears that the defense theory was merely that the prosecution failed to prove

its case beyond a reasonable doubt.

**B.      No Presumption of Correctness for Fact Findings**

Mr. Mendoza objects to Findings of Fact Nos. 33-127, as more fully discussed below.

*Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing  Miller-El v. Cockrell,* 537 U.S. 322, 340

(2003); 28 U.S.C. § 2254(d)(2).  Further, habeas relief should be granted because the state court

adjudication resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(2).

**C.      Argument and Authorities**

**1.      Standard of Review**

The Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 695 (1984), stated a two-

pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were
> outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact
> finder would have had a reasonable doubt respecting guilt"

2.      **The ABA Guidelines  –  A Standard of Care**

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court has looked for guidance to the ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES.  *Wiggins v. Smith*, 539 U.S. 510,  522 (2003) (In which the U.S. Supreme Court *citing Strickland*, 466 U.S. at 690-691, for the proposition that "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).

ABA GUIDELINE 10.8  – The Duty to Assert Legal Claims (rev. ed. Feb. 2003) provides, in pertinent part:

A.      **Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should**:

    1.      **consider all legal claims potentially available**; and

    2.      **thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted**; and

    3.      evaluate each potential claim in light of:

        a.      the unique characteristics of death penalty law and practice; and

        **b.      the near certainty that all available avenues of post-conviction relief will be pursued in the event of conviction and imposition of death sentence; and**

        **c.      the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited**; and

        d.      any other professionally appropriate costs and benefits to the assertion of the claim.
           ....

### 3.   FF Nos. 33-127 – no presumption of correctness

Among other things, the findings of fact 33-127 lack support for the unsubstantiated speculation and assumption that "it is credible that counsel considered and rejected presenting evidence of a lesser *mens rea*."   The affidavit of trial counsel recites:  "All aspects of the defense were explored.  The possibility of a lesser mens rea defense was explored."   But, in fact, there is no evidence in the files of trial counsel or in their affidavits as to what mental impairment evidence was developed and rejected pre-trial, or that reflects they considered a challenge to *mens rea* at all.

Moreover, during the state habeas proceeding – and despite Mr. Mendoza's requests for both discovery and evidentiary hearing  –  there was no opportunity to cross-examine defense counsel as to the lack of inquiry into the *mens rea* element  because the state court denied his requests.  It appears that at best, the so-called exploration of a lesser *mens rea* defense was restricted to defense counsel, taking at face value, the statement from their client that "he knew what he was doing."

The capital guidelines are clear that even when a client affirmatively instructs defense not to investigate, defense counsel still has an obligation to do so.  Defense counsel can not shift the blame for their ineffectiveness onto the defendant.  *Compare* FF 34-36 (defense counsel "can point to a specific reason for rejecting such a strategy: applicant 'conveyed to the defense team that he knew what he was doing.'") *with  Rompilla v. Beard*, 545 U.S. 374, 377 (2005) ("This case calls for specific application of the standard of reasonable competence required on the part of defense counsel by the Sixth Amendment. We hold that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial.").

Accordingly, FF 33-127 are not entitled to a presumption of correctness.   They are

"'objectively unreasonable in the light of the evidence presented in the state-court proceeding,'" *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).

**4.      Trial counsel was constitutionally ineffective**

**a.      Conclusions of Law 301-327 are contrary to and an unreasonable application of federal law**

As will be more fully discussed below, Conclusions of Law 301-327 are contrary to and unreasonable application of *Strickland* and its progeny.  *Mens rea* is an essential element of capital murder and was left unchallenged by defense counsel, resulting in a directed verdict for the State of Texas, as to this matter.

**b.      Performance was deficient because**

**(1)      Texas statutory and common law permit a defendant to negate *mens rea* with condition-of-the-mind evidence**

In its current form, TEX. CODE CRIM. PROC. art. 38.36 provides:

(a)      In all prosecutions for murder, ***the state or the defendant shall be permitted to offer*** testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with ***all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense***.

(Emphasis supplied).  This provision has been part of Texas statutory law since 1925.[61]

In *Jackson,* the Texas Court of Criminal Appeals cited TEX. CODE CRIM. PROC. art. 38.36 with approval.  *See Jackson v. State*, 160 S.W.3d 568, 574 (Tex. App. 2005) (""relevant

---

[61]      VERNON'S PENAL CODE art. 1257a (Vernon 1925).

68

evidence may be presented which the jury may consider to negate the *mens rea* element. And this evidence may sometimes include evidence of a defendant's history of mental illness.").

In the years following, the Texas Court of Criminal Appeals reaffirmed the admissibility of this evidence.  *See Ruffin v. State*, 270 S.W.3d 586, 593, 596 ("... both physical and mental diseases or defects may affect a person's perception of the world just as much as they may affect his rational understanding of his conduct or his capacity to make moral judgments.  ... We repeat and reaffirm our holding in *Jackson* that "relevant evidence may be presented which the jury may consider to negate the *mens rea* element. And this evidence may sometimes include evidence of a defendant's history of mental illness.").

> **(2)     Despite the prosecution's direct evidence, the defense merely asserted there was no proof  beyond a reasonable doubt**

The defense was on notice that in the guilt/innocence phase the prosecutor would, and did, rely on DNA evidence and confession evidence.[62]  Yet despite the direct evidence, and based on the closing argument,[63] it appears that the defense theory was merely that the prosecution failed to prove its case beyond a reasonable doubt:

- "... ask yourself, has the case been proven to me beyond a reasonable doubt?" (RR 21:169).

- "... as jurors you have to look at the evidence and say, is that credible?"  (RR

---

[62]   CR 3:1000 –   State's 6th Supplemental Production of Documents; RR 21:52-65 – Robert Hilbig DNA testimony, Prosecution Trial Exhibits 115 & 116;  CR 1:316 – Defendant's Voluntary Statements dated 3-18-04 and 3-24-04; RR 20:235-247  – Mitch Selman, Prosecution Trial Exhibits 109, 112, 113 voluntary statement and drawing/map made by Mendoza).

[63]   The defense did not make an opening statement either prior to the presentation of the prosecution's case, (RR 19:33), or to its case-in-chief (RR 21:85).  Given the disjointed themes in voir dire, guilt/innocence and punishment, the jury had no roadmap to a theory of the case for life.

21:170).

- "... it is reasonable to infer and believe, that they were having some type of relationship?" (RR 21:172).

- "Officer Collins couldn't – didn't know ... when he was taking these pictures that the scene had been compromised." (RR 21:175).

- "... say to yourself, is it reasonable to believe that this night stand was moved in a struggle?" (RR 21:176).

- "... they're relying on also in trying to prove this case to you is the statement, the statement of Moises Mendoza.  Now, statements that are the result of police and State interrogation don't just happen in a vacuum." (RR 21:178).

- "You have to be convinced today. And if you're not, you would just be doing your job when you find him not guilty of capital murder." (RR 21:180).

> **(3)**   **The defense failed to consider, investigate and forcefully present the facts and circumstances of Moises "condition-of-the-mind" to negate the *mens rea* element of capital murder**

The conclusions of law are not entitled to a presumption of correctness because they pivot on the idea that the condition-of-mind evidence brought forward by Mr. Mendoza in state habeas did not negate *mens rea*, but only provided motive.  *See e.g.* Conclusions 308-320.  As will be more fully discussed below, these findings are refuted by clear and convincing evidence to the contrary.

The defense performance was constitutionally deficient because they failed to consider, investigate and forcefully present[64] the facts and circumstances of Moises "condition-of-the-mind"

---

[64]   ABA GUIDELINE 10.8 – The Duty to Assert Legal Claims (rev. ed. Feb. 2003):

A.   Counsel ... should: 1. ***consider all legal claims potentially available***; and 2. ***thoroughly investigate the basis for each potential claim*** before reaching a conclusion as to whether it should be asserted,...

B.   ... ***present the claim as forcefully as possible***, tailoring the presentation to

70

evidence (*e.g.,* attachment disorder, brain damage) that in fact negated the *mens rea* element of capital murder.[65]

> **(a)** **CATATHYMIC HOMICIDE** **Findings of Fact 39-66 – No Presumption of Correctness:  Moises had severe deficits in his capacity to monitor his thoughts and emotions in relation to external reality**

Among other things, Conclusion of Law No. 305 recites that "counsel would have been required to present testimony about what applicant was thinking at the time of trial, ... [and] [g]iven [his] statement that he knew what he was doing when he murdered Rachelle, counsel cannot be deficient for failing to marshal a defense that depended on testimony that could knew applicant could not truthfully provide."

Conclusion of Law No. 305 hinges on incorrect Fact Findings Nos. 39-66 that are not entitled to a presumption of correctness.  Mr. Mendoza was uneducated in the realm of mental health and psychology, lacking in self-awareness, and unable to identify his mental impairments, and their effect on his judgment and impulse control.  Indeed, this is the very reason that the capital guidelines instruct that the "defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments," and are capable of using this information to "construct a persuasive narrative in support of the case for life," and "assist the jury in understanding the significance of the

---

the particular facts and circumstances in the client's case and the applicable law in the particular jurisdiction."

[65] ABA Guideline 10.11 – The Defense Case Concerning Penalty, *Commentary – The Importance of an Integrated Defense* (rev. ed. Feb. 2003) ("***First phase defenses that seek to reduce the client's culpability for the crime (e.g., by negating intent) rather than to deny involvement altogether are more likely to be consistent with mitigating evidence of mental illness, ....***")

71

observations, ... and *the effects of these impairments on the client's judgment and impulse control.*"[66]  (Emphasis supplied).

FF 39-66 are a vehicle for impermissibly shifting the blame from the failure of defense counsel to adequately investigate and develop a "catathymic homicide theory" onto Mr. Mendoza alleging that he "never mentioned that the killing was in any way connected to Amy Lodhi."  *See* FF 43-47, 52.  No capital client has professional mental health insight into his own behavior, such that he would be responsible for suggesting psychological explanations for his actions.  And contrary to the Fact Findings, it IS plausible and credible that Mr. Mendoza's various accounts contained inconsistencies and inaccuracies because that is the nature of memory.  *See e.g.,* FF 42, 46, 47, 48, 49, 50.

Indeed, a catathymic homicide, is perpetrated by an individual with "severe deficits in his capacity to monitor his thoughts and emotions in relation to external reality."   The homicide of Rachelle Tolleson was a catathymic homicide.

Dr. Kessner explains:

> 57.    *Moises' thought processes were clearly disturbed during the assault on Rachelle*.  His thought that he was fearful of "looking crazy" for strangling Rachelle so he stabbed her suggests restricted reality testing.  *Psychologically it suggests the lack of an integrated identity or self and consequent reality testing failure under the extreme emotional intensity of the aggression*.  Moises' overwhelming fear of mental disintegration, of being "crazy" in the way people who go to psychiatric hospitals are crazy, was a terrifying possibility, given his father's psychiatric history.  *The post-mortem overkill violence suggests a deficit in his capacity to monitor his thoughts and emotions in relation to external reality*.

> 58.    In his book *Violent Attachments,* J. Reid Meloy has a chapter entitled, Catathymic Homicide.  Meloy (1997, p. 39) cites Maier (1912) who characterized catathymia as a "psychological process in which an intense affect-idea complex

---

[66]    ABA Guideline 4.1  – The Defense Team and Supporting Services (rev. ed. Feb. 2003); ABA Guideline 10.11  – The Defense Case Concerning Penalty, Commentary (rev. ed. Feb. 2003).

temporarily overwhelm[s] internal equilibrium and disrupt[s] secondary process thought." *Acute catathymic homicide is "triggered by a sudden, overwhelming affect having certain ideational and symbolic significance that is unconscious at the time of the violence"* (Meloy, p. 47). *What differentiates [this form of violence] from other forms of affective violence is the unconscious motivation for the act and the symbolic significance of the victim"* (p. 47). Meloy further elaborates citing Revitch and Schlesinger (1978, 1981), "catathymic crisis manifests within an ego-threatening relationship and may activate (1) unresolved and conflicted sexual feelings, (2) displacement of emotion onto the victim from another subject with certain symbolic significance, and (3) helpless and confused feelings" (p. 46).

59.     *In his study of the phenomena, Wertham (1937) concluded, "the violent act … is an expression of the fight on the part of the patient for the safeguarding of his personality"* (as cited in Meloy, p. 40). *Meloy reports that Weiss et al. (1960) described '"sudden murder" [as] a "single, isolated unexpected episode of violence, impulsive acting-out behavior-behavior which is never well thought out, behavior which has no obvious purpose or hope for personal advantage or profit foreseeable as a result"* (p. 43). Weiss also found *"[t]he sudden murderers came from large families where the mother dominated and emphasized conformity to social rules*. Father was consistently a negative figure, either hostile or rejecting. *Attachment between mother and child was ambivalent, and was characterized by an underlying hostility that had to be repressed or split off* …. Controlled anger and unmet dependency needs dominated their [the murderer's] emotional development" (p. 44). *Weiss identified "a precipitating insult, such as a belittling rejection*, the withholding of a paycheck, criticism of alcohol intake, or ejection from a building" (Meloy, p. 44).

....

64.     Moises Mendoza's actions at the time of the murder were a disorganized outburst of overwhelming aggression seemingly unrelated to any aspect of the victim. *The violence was propelled by a deep underlying psychological disorder conveying abandonment rage with its origins in early learning and subsequent development. The triggering event tapped into the untreated attachment disorder issues of Moises Mendoza*. Moises was psychologically reacting to Amy Lodhi and the threat she posed to his fragile identity and personality organization even though she was not physically present. Rachelle Tolleson spoke words in a near quote to a message that Amy had spoken in a similar context. Moises responded in a flashback triggered by stimuli reminiscent of his experience with Amy.   In this situation the context of the sexual encounter, *the visual similarity between Amy and Rachelle, and Rachelle's comment combined to trigger Moises' intense emotional arousal and aggression. Rachelle was not the object of his abandonment rage*; she was an innocent person who was in the wrong place at the wrong time.[67]

_____

[67]    Exhibit A: Affidavit of Gilda Kessner, Psy.D.

Dr. Kessner concludes:

> 65.     ...  It is my conclusion that on the date of the charged offense, Mr. Moises **_Mendoza did not have the necessary mental states of "knowing" or "intentional" for capital murder of Rachelle Tolleson_**.
>
> Because of his severe and untreated attachment disorder, Moises did not make a "choice" to perpetrate crimes of violence against women.
>
> The post-mortem overkill violence suggests that **_he had restricted reality testing_**.
>
> **_He had severe deficits in his capacity to monitor his thoughts and emotions in relation to external reality_**. *See Violent Attachments,* by J. Reid Meloy in the chapter entitled, Catathymic Homicide. (1997, p.39)[68]

### (b)     Moises had brain damage, which adversely affected his higher cognitive functioning and reasoning skills

"Excessive drinking has been associated with children whose attachment relationships... are broken."[69]   Dr. Lundberg-Love, Ph.D., a psychopharmacologist, who specializes in the effects of drugs and alcohol on the brain further explains:

> C.       ..., Moises Mendoza also had experienced at least two adverse childhood events, including a father who was depressed, hospitalized, and attempted suicide, and a mother who was physically victimized by her husband on at least one occasion, as documented in MHMR records. Even though Moises minimizes and/or denies the impact of these events, the results of the ACEs study shows that such events can increase one's risk for drug and  alcohol abuse or addiction.[70]

Moises' binge drinking resulted in brain damage that was present at the time of the offense

---

[68]    Exhibit A: Affidavit of Gilda Kessner, Psy.D.

[69]    Exhibit A: Affidavit of Gilda Kessner, Psy.D., para. 48.

[70]    (Emphasis supplied); Exhibit B:  Affidavit of Paula Lundberg-Love, Ph.D., *VII.  Adverse Childhood Experiences*

conduct.  Dr. Martin attests:

> 19.  ***Mr.  Mendoza's brain-related impairment appears to be long-standing in nature, and would have been present at the time of the alleged offense***.  In fact, it is reasonable to assume that Mr. Mendoza would have demonstrated even greater impairment in these (and possibly other) cognitive areas if he had been administered neuropsychological tests closer to the time frame that he was actively abusing alcohol.
> ....

> 21.  When the behavioral effects of his brain impairment are considered, a broader and more accurate explanation for why Mr. Mendoza could have engaged in a violent crime emerges.  Based upon this information, ***it is my opinion that Mr. Mendoza's violent actions at the time of the offense could have been mediated by emotional factors as opposed to reason due to the aforementioned damage to his brain.  Intoxication would have enhanced the negative effects of brain impairment by increasing his impulsivity and reducing his ability to fully consider the consequences of his actions.***  In particular, Mr. Mendoza having ingested more than 20 beers within a few hours time would have greatly reduced his reasoning skills as well as his ability to inhibit behaviors due to the aforementioned frontal lobe dysfunction.  ***The likelihood that frontal-lobe dysfunction had a negative affect on his behavior during the course of this offense is enhanced even more when consideration is given to the fact that at age 20, his frontal lobes were still in a developmental stage.***[71]

Dr. Martin concludes that the defense was ineffective in failing to have Moises tested for

brain damage because of the mitigating significance of the test results:

> 22.  ***A neuropsychological examination was warranted for Moises Mendoza during the preparation by his defense team for his capital murder trial.***  Mr. Mendoza has been incarcerated since 2005 and by that time, Neuropsychology research had clearly determined that chronic alcohol abuse produces cognitive decline in a variety of domains.  In fact, as early as the 1960's, research had been produced which reflected that alcohol produced impaired scores on several components of the Halstead-Reitan Battery, the most commonly administered neuropsychological test battery in the United States.  ***By retaining an expert and administering a battery of neuropsychological tests, Mr. Mendoza's attorneys could have conclusively proved the existence of neuropsychological damage.  Such tests would have provided defense counsel with the means to demonstrate for Mr. Mendoza's jury how the quality of his brain and the specific damage sustained to***

---

[71]  Exhibit C:  Affidavit of Stephen K. Martin, Ph.D.

75

*it adversely affected his higher cognitive functioning and reasoning skills.* As has been previously discussed, impaired cognitive abilities due to alcohol abuse tend to recover with abstinence.  Therefore, *a neuropsychological exam conducted close in time to the date of his arrest would have detected the present areas of impairment as well as any other indications of alcohol-induced brain damage that Mr. Mendoza may have been experiencing*.

23.    Furthermore, *a neuropsychological assessment would have been important in order to educate the jury how deficits in cognitive and emotional functioning could have influenced Mr. Mendoza's behavior at the time of the offense*.  An expert with the same or comparable experience and training such as I could have given testimony substantially the same as outlined in my affidavit above at the guilt/innocence phase of the trial to challenge the legal elements of his knowing and intentionality.

24.    *It is also my opinion that this clinical information had mitigating significance and the trial attorneys were ineffective in failing to present it. As a result, the jury was not able to appreciate or give consideration to the mitigating significance of this evidence in making a life/death decision*.[72]

### (4)    The attestations of Drs. Kessner, Lundberg-Love and Martin negated *mens rea*

Contrary to the Conclusions of Law 301-327, the expert opinions of Drs. Kessner, Lundberg-Love and Martin do not provide an "excuse," or mere "motivation" for the act of Mr. Mendoza.  Rather, their attestations are the quintessential demonstration of **"relevant facts and circumstances going to show the condition of the mind of [Mr. Mendoza] at the time of the offense**," that negates the *mens rea* necessary to elevate murder to a capital offense.  TEX. CODE CRIM. PROC. art. 38.36. Additionally, their attestations do exactly what the law requires them to do: to negate the evidence of intent that the State of Texas sought to prove by inference from overt acts. *See* Findings of Fact No. 67-79.

---

[72]    Exhibit C:  Affidavit of Stephen K. Martin, Ph.D.

### c.   But for trial counsel's deficient performance, there is a reasonable probability that the outcome would have been different

The deficient performance of trial counsel gives rise to a reasonable probability that the outcome would have been different.   *Strickland v. Washington*, 466 U.S. 668, 686 (1984).   The absence of available mental impairment evidence (*e.g.,* attachment disorder, catathymic homicide, brain damage) in the guilt/innocence phase of Mr. Mendoza's trial made the prosecution's evidence uncontestable as a matter of law, resulting in a directed verdict for the State of Texas, and a denial to Mendoza of his federal Sixth and Fourteenth amendment rights to reasonable doubt, a fair defense, and to a presumption of innocence.   U.S. CONST. amend. VI; U.S. CONST. amend. XIV.

### (1)   The absence of condition-of-the-mind evidence in guilt/innocence made the prosecution's case uncontestable as a matter of law

The prosecution physically linked Moises to Rachelle through the DNA lab results[73] and his confession.[74]   The prosecution's case, with respect to the *mens rea* element, became uncontestable as a matter of law when the defense failed to introduce readily available mental impairment evidence.   *Cf.  Hendershott v. Colorado*, 653 P.2d 385, 393 (Colo. 1982) ("A rule precluding the defendant from contesting the culpability element of the charge would render the prosecution's evidence on that issue uncontestable as a matter of law, in derogation of the presumption of innocence and the constitutional requirement of prosecutorial proof of guilt beyond a reasonable doubt.").

---

[73]   CR 3:1000 –   State's 6th Supplemental Production of Documents; RR 21:44-45; 51-54; 61-65; 76-77.

[74]   CR 1:316 – Defendant's Voluntary Statements dated 3-18-04 and 3-24-04; RR 20:235-247  – Mitch Selman, Prosecution Trial Exhibits 109, 112, 113 voluntary statement and drawing/map made by Mendoza).

> **(2)    FF No. 60-66 – No Presumption of Correctness.  The jurors deliberated a short time, because the prosecution's uncontested evidence made them sure Mendoza was guilty of capital murder**

The FF 60-66 that the theory of catathymic murder lacked credibility and "would have characterized applicant's conduct as psychopathic violence," are not entitled to a presumption of correctness.  *See e.g.,* FF 60-66.  Absent any challenge to the *mens rea* element, the jurors believed that the evidence "was pretty clear that [Moises Mendoza] was guilty" of capital murder.

Juror Schmoll attests:

> 6.    The prosecution did a good job of proving that the defendant was guilty....

> 7.    ***We were convinced by the evidence that the defendant was guilty and we deliberated for only a short amount of time, because we were sure.***

Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 26, n.42, *citing* Mitigation Documents, Pages (10) 305 Juror Marshal Schmoll Affidavit.

Juror John Comer, likewise, attests:

> 7.    Overall it was pretty clear that the defendant was guilty and the only issue is whether there was any circumstance to make us not vote for death.  But he had come from a good family, his siblings were successful and ***there was very little else to explain why he did what he did***.  ....

> 8.    ....  ***I feel like we made the right decision because the case was pretty much clear with all the evidence***.

(Emphasis supplied);  Exhibit D: Affidavit of John Comer, Juror, para. 5.

Furthermore, catathymic murder is being offered to the jurors as an explanation for the killing of Rachael Tolleson.  The fact findings recite that a catathymic murder  theory would automatically recast Mr. Mendoza's act as psychopathic violence and thus made the jury more likely

to believe he would be a future danger, has no substantiation.   *See e.g.,* FF 60-66.

Assuming for the sake of argument that this evidence is "double-edged"  does not automatically require its exclusion.  The courts have recognized over the years that mitigating evidence can act as both an aggravator and a mitigator.  See *Nelson v. Quarterman*, 472 F.3d 287, 305 (5th Cir. 2006), *citing Penry v. Lynaugh*, 492 U.S. 302, 324 (1989).  But that alone is not significant to exclude such evidence.  At a minimum, defense counsel is obligated to – and in this case did NOT – at least investigate and develop the evidence, and weigh the aggravators against the mitigators before they rejected its presentation out of hand.  *See  Walbey v. Quarterman*, 2009 WL 113778, 309 Fed.Appx. 795, 805-805, n.46 (5th Cir. 2009) (not designated for pub.), *citing Williams v. Taylor*, 529 U.S. 362, 396 (2000) (addressing double-edged evidence in the context of a performance inquiry, but subsequently finding the failure to introduce the mitigating evidence, which contained the doubled-edged evidence, prejudicial).

In the case at bar, defense "counsel ha[d] a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," which they failed to do.  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  As a result, their strategic choices made after  less than complete investigation were not reasonable, particularly given that the lack of any contest to the mens rea element of the capital offense made the prosecution's case uncontestable as a matter of law.

In summary, the deficient performance of trial counsel gives rise to a reasonable probability that the outcome would have been different.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The absence of available mental impairment evidence (*e,g.,* attachment disorder, catathymic homicide, brain damage) in the guilt/innocence phase of Mr. Mendoza's trial made the prosecution's case uncontestable as a matter of law, resulting in a directed verdict for the State of Texas, and a

denial to Mendoza of his federal Sixth and Fourteenth amendment rights to reasonable doubt, a fair defense, and to a presumption of innocence.  U.S. CONST. amend. VI; U.S. CONST. amend. XIV.

### D.    The Conclusions of Law Nos. 301-327 are contrary to, and an unreasonable application of federal law

In light of the aforementioned arguments and authorities, habeas relief is in order because the State court decision denying relief on the basis that trial counsel was not ineffective, and specifically Conclusions of Law Nos. 301-327 are ***contrary to, and an unreasonable application of***, *Strickland* and its progeny.  28 U.S.C. § 2254(d)(1)(2).

Mr. Mendoza did make the requisite showing that reasonable counsel would have pursued the theories that he has alleged trial counsel should have raised.  *Compare* CL No. 286.  The theory of simple murder was not integrated into both phases as is required by the applicable capital guidelines.    *Compare* CL No. 283.  Theories of catathymic homicide, brain impairment and underdevelopment, the adverse childhood experience study, and attachment disorder *would* have been admissible to contest *mens rea* at the guilt phase of trial.  TEX. CODE CRIM. PROC. Art. 38.36(a);  *Jackson v. State*, 160 S.W.3d 568 (Tex. Crim. App. 2005);  *Ruffin v. State*, 270 S.W.3d 586, 596 (Tex. Crim. App. 2008).

**GROUND THREE (14TH AMENDMENT DUE PROCESS – ACTUAL INNOCENCE OF CAPITAL MURDER). Mr. Mendoza's conviction for capital murder and sentence of death violates his Fourteenth Amendment due process rights; he lacked the necessary mens rea for conviction of the crime of capital murder.**

Mr. Mendoza is actually innocent of the offense of capital murder because there is clear and convincing evidence that he lacked the necessary *mens rea* for the commission of the offense. Accordingly, his conviction for capital murder, and concomitant sentence of death, violate his federal due process rights. Habeas relief must be granted.

**A.      Standard of Review: Actual Innocence under *Herrera***

The Texas Court of Criminal Appeals has held:

we accepted the proposition that the execution of an innocent person would constitute a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  Accordingly, we held that a post-conviction application for a writ of habeas corpus was an appropriate vehicle for a convicted defendant sentenced to death to assert a claim of actual innocence.
....

Claims of actual innocence are categorized either as *Herrera*-type claims or *Schlup*-type claims.  *Herrera v. Collins,* 506 U.S. 390 (1993);  *Schlup v. Delo*, 513 U.S. 298 (1995);  *Elizondo,* 947 S.W.2d at 208.   A *Herrera*-type claim involves a substantive claim in which applicant asserts his bare claim of innocence based solely on newly discovered evidence.  *Schlup,* 513 U.S. at 314;  *See also Elizondo,* 947 S.W.2d at 208.[75]
....

As such, we turned to *Schlup* for guidance and modified the standard to be applied in *Herrera*-type claims.   We determined the "unquestionably establish" language as meaning the same thing as "clear and convincing."  *Elizondo,* 947 S.W.2d at 209.[76]

In *Elizondo* we held that an applicant asserting a *Herrera*-type claim must show *by clear and convincing evidence* that no reasonable juror would have convicted him

---

[75]   *Ex parte Franklin*, 72 S.W.3d 671, 675 (Tex. Crim. App. 2002), *citing State ex. rel. Holmes v. Third Court of Appeals,* 885 S.W.2d 389, 397 (Tex. Crim. App.1994).

[76]   *Ex parte Franklin*, 72 S.W.3d at 677.

in light of the newly discovered evidence.  *Id.* Today we take this opportunity to explain the type of evidence that is required by this Court in order to succeed on a *Herrera*-type claim.   Although not explicitly stated in the holding, it is clear that *Elizondo* requires that applicants presenting *Herrera*-type claims offer evidence that goes towards affirmatively proving applicant's innocence.    In *Elizondo* we explained:

> Because, in evaluating a habeas claim that newly discovered evidence or available evidence proves the applicant to be innocent of the crime for which he was convicted, our task is to assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, we must necessarily weigh such *exculpatory* evidence against the evidence of guilt adduced at trial.

> ....

> The actual-innocence inquiry is therefore distinguishable from review for sufficiency of the evidence, where the question is not whether the defendant is actually innocent but whether the government has met its constitutional burden of proving the defendant's guilt beyond a reasonable doubt.   When a defendant seeks to challenge the determination after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence not just raising doubt about his guilt.[77]

## B.    No Presumption of Correctness for Fact Findings

Mr. Mendoza objects to Findings of Fact Nos. 33-127, as more fully discussed below. They

are "'objectively unreasonable in the light of the evidence presented in the state-court proceeding,'"

*Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing  Miller-El v. Cockrell,* 537 U.S. 322, 340

(2003); 28 U.S.C. § 2254(d)(2).  Additionally, the state court adjudication resulted in a decision that

was based on an unreasonable determination of the facts in light of the evidence presented in the

---

[77]    *See also House v. Bell*, __ U.S. __, 126 S.Ct. 2064, 2087-88 (2006), citing *Herrera v. Collins*, 506 U.S. 390 (1993) (the United States Supreme Court "assumed without deciding that 'in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim.'").

State court proceeding. 28 U.S.C. § 2254(d)(2).

**C.     Mr. Mendoza is actually innocent of capital murder**

Mr. Mendoza is actually innocent of the offense of capital murder because he lacked the necessary *mens rea* for the commission of capital murder.

**1.     *Mens rea* is an essential element of capital murder**

The grand jury of the State of Texas indicted Mr. Mendoza for capital murder in its January, 2004 term, alleging that he "did then and there intentionally and knowingly cause the death of Rachelle Tolleson, an individual, hereinafter called deceased, by strangling deceased with his hands and stabbing deceased with a knife while the said defendant was in the course of committing or attempting to commit the offense of burglary and kidnaping and aggravated sexual assault of deceased;...." (CR 1:20).

*Mens rea* is an essential element of capital murder, without which there can be no conviction. The prosecution must prove, by proof beyond a reasonable doubt, the "specific intent" necessary for capital murder. TEX. PENAL CODE § 2.01 (West 2004 ed.); *In re Winship*, 397 U.S. 358, 364 (1970).

The Texas statutory definitions of "intentional" and "knowing," *mens reas* look to the subjective purpose or belief of the defendant as contained in TEX. PENAL CODE § 6.03(a-b) (West 2004 ed.):

> "A person acts ***intentionally, or with intent***, with respect to the nature of his conduct or to a result of his conduct when it is his ***conscious objective or desire*** to engage in the conduct or cause the result."

> "A person acts ***knowingly***, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is ***aware of the nature of his conduct*** or that the circumstances exist. A person acts knowingly, or with

knowledge, with respect to a result of his conduct when **he is aware that his conduct is reasonably certain to cause the result**."

The law reserves the strongest sanctions for those who act with subjective culpability, in keeping with traditional and historical values.  As such, Texas law recognizes the right of a defendant to introduce condition of mind evidence to show that he did not have the requisite intent for a specific intent crime.

In its current form, TEX. CODE CRIM. PROC. art. 38.36 (West 2004 ed.) provides:

(a)    In all prosecutions for murder, **the state or the defendant shall be permitted to offer** testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with **all relevant facts and circumstances going to show <u>the condition of the mind of the accused at the time of the offense</u>**.

## 2.    FF Nos. 33-127 – no presumption of correctness

Among other things, the findings of fact 33-127 lack support for the unsubstantiated speculation and assumption that "it is credible that counsel considered and rejected presenting evidence of a lesser *mens rea*."  The affidavit of trial counsel recites:  "All aspects of the defense were explored.  The possibility of a lesser mens rea defense was explored."  But, in fact, there is no evidence in the files of trial counsel or in their affidavits as to what mental impairment evidence was developed and rejected pre-trial, or that reflects they considered a challenge to *mens rea* at all.

Moreover, during the state habeas proceeding – and despite Mr. Mendoza's requests for both discovery and evidentiary hearing  –  there was no opportunity to cross-examine defense counsel as to the lack of inquiry into the *mens rea* element  because the state court denied his requests.  It appears that at best, the so-called exploration of a lesser *mens rea* defense was restricted to defense counsel, taking at face value, the statement from their client that "he knew what he was doing"  –

84

contrary to the capital guidelines and caselaw.  *Compare* FF 34-36 (defense counsel "can point to a specific reason for rejecting such a strategy: applicant 'conveyed to the defense team that he knew what he was doing.'") *with  Rompilla v. Beard*, 545 U.S. 374, 377 (2005) ("This case calls for specific application of the standard of reasonable competence required on the part of defense counsel by the Sixth Amendment. We hold that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial.").

Accordingly, FF 33-127 are not entitled to a presumption of correctness.  They are "'objectively unreasonable in the light of the evidence presented in the state-court proceeding,'" *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing  Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).


### 3.    The prosecution did not prove specific intent

Even if a culpable, subjective mental state may be inferred from words or conduct, before a jury can render a verdict of guilt, the jury must determine if the State proved beyond a reasonable doubt, enough words and conduct to require an inference of the applicable *mens rea*.  If not, then there can be no conviction of an individual who comes into court clothed with the presumption of innocence.[78]

In the case at bar, while the prosecution may have introduced DNA and confession evidence

---

[78]    TEX. PENAL CODE § 2.01 ("all persons are presumed innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt"); *In re Winship*, 397 U.S. 358, 364  (1970).

into the trial, it failed to prove beyond a reasonable doubt that Moises had the requisite intent of "knowing" and/or "intentional" – an essential element of capital murder.  In fact, the prosecution's evidence proved the contrary:  that Moises did _not_ intentionally and/or knowingly cause the death of Rachelle Tolleson.  The prosecution's evidence demonstrates that "[t]he attack against Rachelle was significant for intense ***overwhelming*** violence that could be termed '***overkill***,'"[79] which is consistent with catathymic homicide.  A catathymic homicide is characterized by severe deficits in the perpetrator's capacity to monitor thoughts and emotions in relation to external reality.   In Moises, these deficits were further magnified by long-standing brain damage, which was present at the time of the offense conduct.[80]

### 4. There is clear and convincing evidence introduced in habeas that the cognitive deficits of Mr. Mendoza  – and _not_ reason and intention  – mediated his acts

As more fully discussed below, the affidavits of Dr. Kessner and Dr. Martin, support the basic proposition that Moises Mendoza's cognitive deficits mediated his acts, rather than reason and intention.  Hence, there is clear and convincing evidence that Mr. Mendoza lacked the necessary *mens rea* of knowing and/or intentional – a fundamental element of the crime of capital murder.

---

[79]   (Emphasis supplied); Exhibit A:  Affidavit of Gilda Kessner, Psy.D., *Attachment*, para. 45.

[80]   *See also* Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 8-9  (NITA 2nd ed. 1999) ("An airtight [defense] theory is able to encompass the entirety of the other side's case and still result in victory by sheer logical force.").

a. **Dr. Kessner opines that Mr. Mendoza suffered from "restricted reality testing," and had "severe deficits in his capacity to monitor his thoughts and emotions in relation to external reality"**

Dr. Kessner attests:

**SUMMARY**

60.     Moises Mendoza never felt in control.   The adults around him had demonstrated and conveyed emotional dyscontrol to him since he was pre-school age.  The emotion-laden climate of his childhood was like a blanket over him.  The older brothers were gone or on the way out of the household at the time of Concepcion's injury and slide into debilitating depression and Mercedes' corresponding anxiety laden efforts at maintaining control of the household. Mercedes had always been a dominant force in the family with her constant watch over the behavior of the children.  The brothers were not in the home to provide the positive reinforcement Moises needed during the dark years of his father's illness. Moises as the youngest male was more vulnerable than his sisters were when the problems came in overwhelming waves over the family.

61.     Moises observed the effects of his father's mental illness.  As an adult Moises is able to articulate the inadequacy he witnessed in his father but as a child, he only experienced the emotion.   The arguments over money and the arguments over marital issues even if not directly in front of Moises, would have penetrated his child world.  Moises entered school with insecurity and began to have behavior problems in school.  The family alerted the school about problems in the home but the negative labels stuck and Moises never received any treatment for his own emotional distress. At home, he was faced with his father hospitalized for depression and suicide attempts, two brothers away in the military and his mother anxious about all of the problems crashing onto the family.  Elizabeth was about 13 at the time of the back injury and she began wetting the bed.  The family physician quickly diagnosed and treated that change in her behavior.  Moises' problems were not so easily addressed.

62.     Attachment security is a complex psychological process that begins with the relationships with the primary caregivers and continues into adult intimate relationships.  Moises' early emotional life was adversely affected by the family discord, disrupted relationships and overwhelming negative emotion in the home. Review of the complete time line provided by Ms. Knox offers a detailed sequence of the events in the family.  The reader can see the events in the life of the family as Moises developed through childhood, adolescence and into young adulthood.  The trauma was not short lived or limited in scope.  It lasted in one form or another for years up until the time of Rachelle Tolleson's murder and beyond.  Because of the disabilities of the adults in his life and the effect on their ability to parent, Moises

87

was never able to gain a positive developmental track.  The adults never seemed strong enough to protect him so that he did not feel safe in confiding his problems and fears, as he got older.

63.     Moises was insecure in his attachment relationships and his behavioral disturbance was an indication of the depression and associated anger and anxiety that began in his preschool years continuing into young adulthood.  Moises Mendoza wished for the type of traditional marriage relationship that he witnessed in his brother's marriages.  The idealized marriage was a wish that addressed his unconscious attachment needs.  His relationship with Amy tapped into those needs without a positive resolution leaving him feeling confused, helpless and angry.

64.     ***Moises Mendoza's actions at the time of the murder were a disorganized outburst of overwhelming aggression seemingly unrelated to any aspect of the victim***.  The violence was propelled by a deep underlying psychological disorder conveying abandonment rage with its origins in early learning and subsequent development.  The triggering event tapped into the untreated attachment disorder issues of Moises Mendoza.  Moises was psychologically reacting to Amy Lodhi and the threat she posed to his fragile identity and personality organization even though she was not physically present.  Rachelle Tolleson spoke words in a near quote to a message that Amy had spoken in a similar context.  Moises responded in a flashback triggered by stimuli reminiscent of his experience with Amy.   ***In this situation the context of the sexual encounter, the visual similarity between Amy and Rachelle, and Rachelle's comment combined to trigger Moises' intense emotional arousal and aggression.  Rachelle was not the object of his abandonment rage;*** she was an innocent person who was in the wrong place at the wrong time.

**CONCLUSIONS**: 65.A.     ***It is my conclusion that on the date of the charged offense, Mr. Moises Mendoza did not have the necessary mental states of "knowing" or "intentional" for capital murder of Rachelle Tolleson.***

> 1.     ***Because of his severe and untreated attachment disorder, Moises did not make a "choice" to perpetrate crimes of violence against women.***
>
> 2.     ***The post-mortem overkill violence suggests that he had restricted reality testing.***
>
> 3.     ***He had severe deficits in his capacity to monitor his thoughts and emotions in relation to external reality.***[81]

---

[81]     Exhibit A: Affidavit of Gilda Kessner, Psy.D.

**b.      Dr. Martin opines that at the time of the offense, Moises Mendoza had brain damage and frontal lobe dysfunction, which increased his impulsivity and reduced his ability to fully consider the consequences of his actions**

Dr. Martin attests to Mendoza's brain damage at the time of the offense:

19.      *Mr. Mendoza's brain-related impairment appears to be long-standing in nature, and would have been present at the time of the alleged offense.* In fact, *it is reasonable to assume that Mr. Mendoza would have demonstrated even greater impairment in these (and possibly other) cognitive areas if he had been administered neuropsychological tests closer to the time frame that he was actively abusing alcohol.*
....

21.      When the behavioral effects of his brain impairment are considered, a broader and more accurate explanation for why Mr. Mendoza could have engaged in a violent crime emerges.  Based upon this information, *it is my opinion that Mr. Mendoza's violent actions at the time of the offense could have been mediated by emotional factors as opposed to reason due to the aforementioned damage to his brain.  Intoxication would have enhanced the negative effects of brain impairment by increasing his impulsivity and reducing his ability to fully consider the consequences of his actions.*  In particular, Mr. Mendoza having ingested more than 20 beers within a few hours time would have greatly reduced his reasoning skills as well as his ability to inhibit behaviors due to the aforementioned frontal lobe dysfunction.  *The likelihood that frontal-lobe dysfunction had a negative affect on his behavior during the course of this offense is enhanced even more when consideration is given to the fact that at age 20, his frontal lobes were still in a developmental stage.*
....

23.      Furthermore, *a neuropsychological assessment would have been important in order to educate the jury how deficits in cognitive and emotional functioning could have influenced Mr. Mendoza's behavior at the time of the offense.*  An expert with the same or comparable experience and training such as I could have given testimony substantially the same as outlined in my affidavit above at the guilt/innocence phase of the trial to challenge the legal elements of his knowing and intentionality.[82]

---

[82]    Exhibit C:  Affidavit of Stephen K. Martin, Ph.D.

> **c.**   **Findings of Fact 106-108 are not entitled to a presumption of correctness because there is scientific evidence of a lack of full frontal lobe development in 20 year olds**

The Findings of Fact Nos. 106-108 recite that there is no scientific evidence that 20-year old individuals have developmental limitations in the frontal lobes, which govern judgment and impulse control.  These are not entitled to a presumption of correctness.  First, both the law and the scientific literature (which were available to trial counsel and their expert at the time of trial), established that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable, and used this information to fashion a challenge to the *mens rea* element of the charged offense, and or to raise affirmative defenses.

This body of literature (cited to in the  Amicus Brief of AMA, APA, *et al.* filed with the U.S. Supreme Court in *Roper v. Simmons*, No. 03-633 includes:

- Elizabeth R.  Sowell et al., *In Vivo Evidence for Post-Adolescent Brain Maturation in Frontal and Striatal Regions*, 2 NATURE NEUROSCIENCE 859, 860-8611 (1999) (subjects of study aged 12 to 16 and 23 to 30 years);

- Jay N. Giedd et al., *Brain Development During Childhood and Adolescence: A Longitudinal MRI Study*, 2 NATURE NEUROSCIENCE 861, 861 (1999) (subjects of study aged 4.2 to 21.6 years);

- Elizabeth R.  Sowell et al., *Mapping Continued Brain Growth and Gray Matter Density Reduction in Dorsal Frontal Cortex: Inverse Relationships During Postadolescent Brain Maturation*, 21 J. NEUROSCIENCE 8819, 8026 (2001) noting pronounced brain maturational processes continuing into post-adolescence; subjects of study aged 7 to 30 years);

- Elizabeth R.  Sowell et al., *Development of Cortical and Subcortical Brain Structures in Childhood and Adolescence: A Structural MRI Study*, 44 DEVELOPMENTAL MED. & CHILD NEUROLOGY 4 (2002);

- Elizabeth R.  Sowell et al., *Mapping Cortical Change Across the Human Life*

*Span*, 6 Nature Neuroscience 309, 309 (2003) (subjects of study aged 7 to 87 years).

Second, the Fact Findings are inherently inconsistent.  In reciting that trial counsel were not ineffective in failing to have Mr. Mendoza tested for neurological damage, FF No. 115 relies on Dr. Vigen's testimony.  Specifically, FF 115 reads:

"Dr. Vigen testified that [Mr. Mendoza's] adolescent, immature behavior indicated to him that he was still in an early adolescent state of brain development."

Hence, fact findings support the very proposition that Dr. Martin attested to: that Mr. Mendoza had frontal lobe developmental limitations, impairing judgment and impulse control, which trial counsel should have raised to negate the *mens rea* element of the charged offense, and or to raise affirmative defenses.

### c.    The attestations from Dr. Kessner and Dr. Martin negate *mens rea*

Given the attestations by Dr. Kessner and Dr. Martin, at best Mr. Mendoza's *mens rea* was something less than the specific intent necessary for a conviction for capital murder and concomitant sentence of death as provided for by Texas law.  Contrary to the Conclusions of Law 328-340, the expert opinions of Drs. Kessner and Martin do not provide an "excuse," or mere "motivation" for the act of Mr. Mendoza.  Rather, their attestations are the quintessential demonstration of *"relevant facts and circumstances going to show <u>the condition of the mind of</u> [Mr. Mendoza] at the time of the offense*," that negates the *mens rea* necessary to elevate murder to a capital offense.  Tex. Code Crim. Proc. art. 38.36.  Additionally, their attestations do exactly what the law requires them to do: to negate the evidence of intent that the State of Texas sought to prove by inference from overt acts.  *See* Findings of Fact No. 67-79.

91

**5.      Because Mr. Mendoza did not have the necessary *mens rea*, his  conviction of capital murder, and sentence of death, are unconstitutional**

As the aforementioned arguments and evidence reflect, Mr. Mendoza has established that he is actually innocent of the offense of capital murder because he lacked the necessary *mens rea*. Accordingly, his conviction of capital murder, and concomitant sentence of death violate fundamental federal constitutional law principles.  Habeas relief must be granted.[83]

---

[83]      *Ex parte Franklin*, 72 S.W.3d 671, 675 (Tex. Crim. App. 2002); *Herrera v. Collins*, 506 U.S. 390, 417 (1993) ("in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim.").

**GROUND FOUR (IAC & Failure to Adequately Investigate Mitigating Evidence):** Mr. Mendoza was denied his federal 6th and 14th amendment rights to individualized sentencing; trial counsel failed to adequately investigate and develop crucial mitigating evidence.

Claims Four and Five, ineffective assistance of defense counsel for failure to investigate, develop, and present mitigating evidence, are plead separately for the ease of the reader.  However, they are incorporated by reference into each other.

**A.    Statement of Facts.**

During the opening statement in the punishment phase of the trial, Mr. Sanchez promised the jury:

> *We will present evidence to you that will explain why Moises Mendoza acted the way he did.  They're not excuses, but they're explanations that you need to take into consideration in deciding whether he's so far beyond redemption that the only last resort is to terminate him from this earth*.
>
> We're going to ask you to look at his family.  We're going to ask you to look at the events in his family that shaped him.  And we believe that at the end of the evidence on both sides that you're going to find many reasons to make a finding and to punish him with a life sentence ....  (Emphasis supplied)  (RR 23:10).

Yet, the punishment-phase testimony of Dr. Vigen makes apparent that trial counsel failed to adequately and thoroughly investigate and develop crucial mitigation evidence  about Mr. Mendoza's mental impairments and his life history, that was relevant to his moral culpability, *Penry v. Lynaugh*, 492 U.S. 302 (1989), and determinative in the jurors decision on a sentence of life or death.

A puzzled Dr. Vigen testified:

> A.    If I understand your question, in cases – *people just don't stand up one day and say, ... I'm going to murder somebody today.  The roots of this type of behavior generally go back a long ways in people's lives*, and in most of the cases that I've seen there are incidents  – there's the criminal history in the

family or there's an alcohol and drug instance in the family or there's a mental health issue in the family and a lot of mental health problems and a lot of alcohol and drug problems are familiar and move from one generation to another.  (RR 24:186).

There are genetic predispositions for this, and these abnormalities cause or contribute to – there's no one cause for anything, but contribute to aberrant behavior like killing another human being.  (RR 24:187).

**There's something missing in this case for me as a psychologist.  There is none of that there.  There's something I don't know.  I can't tell you.  From a – my intuition**.  (RR 24:187).

Further, because the investigation was inadequate,  Dr. Vigen's testimony reveals that even Dr. Cunningham commented on the atypical, mitigation-investigation, work-product:

A.      ... **I think one of the most interesting things that Dr. Cunningham had to say is that Moises was somewhat atypical in that usually if you're looking back into a family's history** – or a Defendant's history, you generally will find, you know, various factors like low intelligence or neurological trauma or abuse or physical/emotional/sexual abuse, chemical dependency, criminal law – or criminality and so on.  **Many of those things that are traditionally seen in defendants such as he were not immediately present in this case**. (RR 24:57).

During voir dire, the jurors put counsel on notice of the pivotal role "choice" would play in their decision for life or death.  But because the defense failed to investigate and develop mitigating evidence, they could not demonstrate to the jury that many "choices" had been made for Moises long before he was capable of making "choices" for himself.  As a result, defense counsel failed to rebut the prosecutor's assertions:

**This case is about choices**.  It's about the choices the 12 of you have to make.  **You have two questions to answer**, and those choices are already determined.  **They were determined with every decision he [Moises] made** that led up to March 17th of 2003 (sic).  (RR 25:26-27).

....

**The truth is that the individual seated before you, the Defendant, from a very early**

94

*age chose a very different and dark path for his life, and that's the truth*. (RR 25:40).

(Emphasis supplied).

In closing, the prosecution capitalized on the lack of mitigation evidence arguing:

I guess if he had had a good childhood, if he had had an education, if he had had parents who loved him and supported him, who provided for him, if he had had moral and spiritual guidance, if he had had a life free of abuse, we wouldn't be here. *But wait a minute. That was his life. He had all of those things handed to him*. (RR 25:24).

....

*"There's no mitigating circumstances here whatsoever, none. The answer to Number 2 is no, overwhelmingly no, beyond any doubt no."* (RR 25:48).

**B.      Argument and Authorities.**

**1.        Standard of Review.**

The Supreme Court in *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland v. Washington*, 466 U.S. 668, 695 (1984). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.    In *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).   The Supreme Court further wrote:   "In assessing the

95

reasonableness of an attorney's investigation ... *a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further*."   *Wiggins,* 539 U.S. at 527.

### 2.    The ABA Guidelines  –  A Standard of Care

In the case at bar, ABA GUIDELINE 10.7, ABA GUIDELINE 10.10.1, and ABA GUIDELINE 10.11 (rev. ed. Feb. 2003) are applicable. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (2003) (In which the U.S. Supreme Court *citing Strickland*, 466 U.S. at 690-691, for the proposition that "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).

ABA GUIDELINE 10.7, ABA GUIDELINE 10.10.1, and ABA GUIDELINE 10.11 (rev. ed. Feb. 2003) provide, in pertinent part, as follows:

ABA GUIDELINE  10.7  –  Investigation

A.    Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

. . . .

*Commentary*

... Between 1976 and 2003 some 110 people were freed from death row in the United States on the grounds of innocence.... *In capital cases, the mental vulnerabilities of a large portion of the client population compound the possibilities for error*.....

....

<u>*Penalty*</u>

96

*Counsel's duty to investigate and present mitigating evidence is now well established*....  Because the sentencer in a capital case must consider in mitigation, "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant," *"penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history*....

Counsel should bear in mind that much of the information that must be elicited for *the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss.... Obtaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression*, as well as other mental or emotional impairments from which the client may suffer....

*It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client*), and virtually everyone else who knew the client and his family....  Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children.   A multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.   The collection of corroborating information from multiple sources – a time consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

(Emphasis supplied).

ABA GUIDELINE  10.11 – The Defense Case Concerning Penalty

A.      As set out in Guideline 10.7(A), *counsel* at every stage of the case *have a continuing duty* to investigate issues bearing upon penalty and *to seek information that supports mitigation or rebuts the prosecution's case in aggravation.*

. . . .

*Commentary*

*... areas of mitigation are extremely broad and encompass any evidence that tends to lessen the defendant's moral culpability for the offense or otherwise supports a sentence less than death.  Often, a mitigation presentation is offered not to justify*

97

*or excuse the crime "but to help explain it."*[84]  .... [I]t is critically important to construct a persuasive narrative in support of the case for life, rather than to simply present a catalog of seemingly unrelated mitigating factors.

### 3.  FF Nos. 126-248  – no presumption of correctness

FF Nos. 126-248 are not entitled to a presumption of correctness, and they are "'objectively unreasonable in the light of the evidence presented in the state-court proceeding,'" *Guidry v. Dretke,* 397 F.3d 306, 326 (5th Cir. 2005), *citing  Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).

### 4.  Trial counsel's performance was deficient

As will be more fully detailed below, defense counsel's performance was deficient because:

"a)     A thorough mitigation investigation was not conducted by the mitigation specialist, which normally includes a complete psychosocial history, time line of family history and genogram.

b)     There was not a clear "mitigation theory" developed by the mitigation specialist. This lack of theory contributed to problems with the choice and strategy of selecting expert(s).

- Substance abuse was identified, but not explored and/or an expert in the field of substance abuse and/or dependency was not retained

- No expert witness was retained to accurately portray life in prison

- Problems with using Dr. Vigen as "future dangerousness" expert witness

---

[84]    *Citing Simmons v. Luebbers*, 299 F.3d 929, 938-39 (8th Cir. 2002) ("Mitigating evidence was essential to provide some sort of explanation for Simmon's abhorrent behavior.  Despite the availability of such evidence, however, none was presented.  Simmons's attorneys' presentation was ineffective").

c)      Due to the lack of a mitigation theory, there was not an effective presentation of the mitigation facts to the jury.

-        Minimal strategy and preparation in the testimony of family members

-        Minimal preparation of mitigation exhibits for the jury to better illustrate information

There were various problems with the defense expert's testimony.

-        Dr. Mark Vigen had to do his own social history investigation for his opinion.

-        Dr. Vigen was vague in his description of the Mendoza family as being dysfunctional.  He was unable to provide examples from the social history as there was not one prepared for him.

-        All notes and reports from Dr. Vigen's interviews were available to the state."[85]

a.      **Defense counsel hired Vince Gonzales, who did not provide quality mitigation support service**

Mr. Mendoza objects to FF 131-134, 135-148, 149-164.   As the fact findings point out, it is the duty of defense counsel to conduct an adequate mitigation investigation.   FF 143-144. Whether defense counsel accomplishes this through a mitigation investigator such as Vince Gonzalez or a psychologist, such as Dr. Vigen, defense counsel has an obligation to hire individuals, who conduct a "comprehensive life history," that allow defense counsel "to integrate all of the facts and circumstances of the defendant's life and the crime and present a persuasive narrative of the

---

[85]    Exhibit I:  Affidavit of Toni Knox, L.C.S.W.

events that encourages values of accountability over retribution, grace over vengeance, and life over death."  RICHARD G. DUDLEY,  *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, Vol. 36, No. 3 HOFSTRA L. REV. at 963, 965 (Spring 2008).

The mitigation specialist, hired by defense counsel, must be one who "possess[es] clinical and information-gathering skills and training,... [who] ha[s] the time and the ability to elicit sensitive, embarrassing and often humiliating evidence ... that the defendant may have never disclosed, [and who] ha[s] the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf."[86]  As more particularly described below, neither Vince Gonzalez, nor Dr. Vigen and his staff, satisfied the guidelines requirements.

### (1)   Vince Gonzales, the "mitigation specialist," did not have the education or skills to undertake this assignment.

Mr. Gonzalez, the "mitigation specialist," hired by the defense did not have the education or skills necessary to conduct an adequate mitigation investigation.  Mitigation specialist, Toni Knox, L.C.S.W., attests:

> "It is recommended by ABA Guideline 4.1 that every capital case requires a qualified mitigation specialist as part of the defense team to compile a comprehensive and well-documented psycho-social history.....

---

[86]   *Commentary*, ABA GUIDELINE 4.1 – *The Defense Team and Supporting Services* (rev. ed. Feb. 2003).

Several requests were submitted to Mr. Gonzales for any mitigation files, social history, and/or notes, but none were furnished.  I spoke with Mr. Gonzales by phone and he could not remember any information.  He told me he would check his notes and call me back.  He did not return any later phone calls.  Mr. Gonzales was informed that Moises had signed a release.

There were resumes from other defense team members and/or experts in the attorney's files, but no resume of Mr. Gonzales indicating his educational background and mental health expertise.    Additionally,  his  web  page (www.dpmitigation.com)  does not reflect his educational background, licensure or expertise in recognizing mental health issues on completing a thorough psycho-social history.   Mr. Gonzales lists seminars which have had "specific training with regard to working with a mentally retarded/mentally ill client".   Many of the seminars were presented by the TCDLA and involve training in issues related to capital cases, but not necessarily specific training in mental health and mitigation investigation.   It appears ***Mr. Gonzales has considerable experience in forensics and "future dangerousness", but this does not qualify him to assess for mental illness and complete a social history to be used to form the mitigation strategy***.  In his website, Mr. Gonzales makes no claim that he is capable or willing to provide a complete mitigation investigation, including the standard mitigation investigation work product.   In his website, Mr. Gonzales describes how his services can be a value to the attorney:

> *I can help you in selecting experts for your case, providing research, documents and exhibits unique to Capital Murder defense, as well as case consulting for your specific cases.*

***In the training seminars listed by Mr. Gonzales on his web page, there were few seminars that focus solely on mitigation investigation and the evolvement of the mitigation process over the years***.  Mr. Gonzales lists one of his seminars as Life in the Balance in 2007.  This seminar, as other later seminars on mitigation, teaches that a complete social history is required and explains how mitigation is evolving over the years since recent rulings by the courts concerning the lack of mitigation. Mr. Gonzales describes years of experience as a mitigation specialist, but the role of the mitigation specialist has dramatically changed over time, particularly since the Wiggins decision in June, 2003.

The following is the list of seminars Mr. Gonzales lists since June 2003.

| August 19-23, 2004 | Federal Habeas Corpus Training,  St. Louis, MO | Little/No focus on Mitigation Training |
|---|---|---|
| January 7-8, 2005 | Lubbock Criminal Defense Lawyers Association | Little/No focus on Mitigation Training |
| September 22-23, 2005 | TDCLA/CDLP Forensic Seminar, Dallas, Texas | Focused on forensics – not mitigation |
| January 26-29, 2005 | Third National Forensic Evidence and the Criminal Law Seminar<br><br>San Antonio, Texas | Focused on forensics – not mitigation |
| January 18-21, 2007 | Fourth National Forensic Evidence and the Criminal Law Seminar<br><br>New Orleans, LA | Focused on forensics – not mitigation |
| March 10-13, 2007 | Life in the Balance 2007 Dallas, Texas | Mitigation Training |
| May 10-12, 2007 | Capital Defense Training Plano | Most of emphasis was from attorney's point of view as to how to use mitigation. |

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 7.

    **(2)**      **Mr. Gonzalez failed to:**

        **(i)**      **conduct a multi-generational investigation, process the information, and construct an adequate psycho-social history**

It is the duty of a qualified mitigation investigator to construct a "multi-generational investigation [which] extends as far as possible vertically and horizontally [because when it does so, it] frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment."[87]  "[A]n understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present."[88]

Although Mr. Gonzalez collected records, "there is no evidence that [Mr. Gonzales] processed the information, [there is] no documentation of interviews with the family and client and [there is] no generation of notes and reports."  Exhibit I: Affidavit of Toni Knox, L.C.S.W.

Mitigation specialist Knox attests:

In the few seminars focused on mitigation listed by Mr. Gonzales, the mitigation specialist (and/or their associates) tasks are described as:

> *Fact gatherers harvest the raw data from which the penalty-phase presentation of mitigation evidence is developed.  They gather records, they process information, they identify and locate witnesses; they interview witnesses; they generate notes and reports; they identify more of a cyclical process.  Their assignment is open-ended.  Testifying experts address particular referral questions.*

> ***In earlier years in capital cases, much of the focus was on "future dangerousness" and presentation/education of prison life for the jury***.  This is still an important part of the mitigation presentation; however it is only one portion.  In this capacity, Mr.

---

[87]    ABA GUIDELINE 10.7 – *Investigation, Commentary*  (rev. ed. Feb. 2003).

[88]    ABA GUIDELINE 10.11 – *The Defense Case Concerning Penalty, Commentary*  (rev. ed. Feb. 2003).

Gonzales could have performed a valuable service in consultation for an expert in this area of the mitigation. *It appears from meeting notes provided by Moises' defense attorneys; this was the primary focus of Mr. Gonzales. There is documentation indicating that Mr. Gonzales did perform one of the important functions of the mitigation specialist – gathering documents.* He obtained psychiatric records of the client and his father and other important records, such as school records. *However, there is no evidence that he processed the information, no documentation of interviews with the family and client and no generation of notes and reports.*

....

*As a result of the limited mitigation investigation, mostly superficial type of information was obtained from the family, which included much of the family's "usual script" concerning their father's illness and how he was affected by the system.*

*There was a limited investigation of the family's mental health history and criminal behavior.* Moises' father has an extensive history of mental illness and lawsuits that revealed valuable information about the family. Some mental health information was obtained, but other important documents were not obtained or used. Due to the lack of a thorough social history investigation, the jury did not hear facts about the family that probably affected Moises. Although Concepcion's depression and frequent hospitalizations were discussed, it was not explored further regarding the effect this had on the family and Moises. The presentation of Moises' family dynamics were somewhat distorted giving the appearance his parents were hard working, religious, honest people that tried to manage an "out of control" Moises. Little information was presented to show what factors may have contributed to Moises becoming "out of control".

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W.

**(ii)    establish the rapport necessary to elicit sensitive mitigating evidence**

Mr. Mendoza objects specifically to Findings of Fact No. 149-164.  They are not entitled

to a presumption of correctness because they incorrectly shift blame to Mr. Mendoza and/or his

family for a lack of rapport, and an inadequate social history. It is the duty of the duty of the defense

team to establish trust:

104

> Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult ... to discuss.    ....   Obtaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments....[89]

To achieve this end, defense counsel has the duty to hire a qualified mitigation specialist, who will "have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence ... that the defendant [and his family] may have never disclosed."[90]

Mr. Gonzales and other members of the defense team failed to establish the necessary rapport and trust that would have allowed the Mendoza family to reveal sensitive information. *Compare* (RR 24:188) (Dr. Vigen: Yes. [the family didn't really want people to know or didn't want me to know about some of these dysfunctions] ...  the mom, Mercedes, wanted the family to not tell us things, to not say anything bad about the family... [and] to minimize") *with* Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 11  ("Paul was hurt because frequently Mr. Gonzales, Mr. Sanchez and the fact investigator would be talking and laughing among themselves which was difficult for Paul to hear.  Their demeanor made him feel they were uninvolved in the case and somewhat insensitive to the family.   The family was still in a state of shock and fragile from all that had happened.  Paul stated that Mr. Gonzales seemed distracted and was talking about the fact he was getting a divorce").

Worse, the defense team alienated the Mendoza family, as mitigation specialist Knox attests:

> Mr. Gonzales, the mitigation specialist did not live in the area (lived in Lubbock) and his investigation was limited to "trips to the area".   Mr. Gonzales does not speak Spanish.  The attorney spoke Spanish and was better able to communicate with the family than Mr. Gonzales.  ***Moises reported he did not spend much time with Mr. Gonzales.  The family reports they spent more time with the attorney and Dr. Vigen than with Mr. Gonzales, the mitigation investigator.  An important function of the***

---

[89]   *Commentary,* ABA GUIDELINE 10.7 – *Investigation* at 1024 (rev. ed. Feb. 2003).

[90]   *Commentary,* ABA GUIDELINE 4.1 – *The Defense Team and Supporting Services* (rev. ed. Feb. 2003).

*mitigation specialist is to form a rapport with the client in order to be able to obtain sensitive and possibly embarrassing information (sexual abuse, other family secrets).  <u>A mental health expert, is well aware of the fact that it is necessary to form an alliance and usually preferable to have one on one interaction with the client to elicit this type of embarrassing, possibly humiliating information</u>.  Mr. Gonzales has worked in the past with students at the SMU law school and it appears used students in Moises case as a "learning experience".  Moises indicated in letters to his attorney that he had not been consulted regarding the use of students in his case.  In two of the visits by Mr. Gonzales, he brought students with him to interview Moises on two different occasions.  This would not create an environment for Moises where he would feel safe in revealing important family information*.  It is important to help involve students and others in learning, but this does not appear to be an appropriate use of the students on Moises behalf.

Moises' attorney, Mr. Sanchez, was very cooperative in furnishing his files which seemed complete.  The mitigation file only contained a few sheets of paper with some letters.   There were various handwritten interview notes throughout the files of family members, but it was unclear who had taken the notes.  It appeared they might have been Mr. Sanchez's notes.

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W.

### (iii)   adequately investigate and develop the pivotal role that the dysfunction of Concepcion Mendoza played in Moises Mendoza's development

Because the mitigation investigation was superficial, the defense team failed to realize the

pivotal role that the dysfunction of Concepcion Mendoza played in Moises Mendoza's development.

Mitigation specialist Knox attests:

### <u>Inaccurate Portrayal of Father (Concepcion Mendoza)</u>

*Because a thorough mitigation investigation was not performed, defense counsel failed to construct a persuasive narrative in support of the case for life using the information related to the dysfunction of Moises' father, who played a pivotal role in Moises development.   The information about frequent mental health hospitalizations and suicide attempts were revealed, but with little connection to their possible affect on Moises.*  The "family script" portrayed the father as a hard working man who had his back injured at work and was no longer able to work and support the family.  Because of this, he became increasingly depressed.  It was portrayed by the family that Concepcion was unable to work because of his hurt back and mental illness which was debilitating.   There was little discussion of

Concepcion's "spells" which occurred whenever there was a problem in the family and he was unhappy.  During these spells, the family focused on Concepcion and tried to make him feel better.  This type of behavior was described in various hospitalizations as a "personality disorder", once as "passive-aggressive" and also as "dependent".

There was no discussion or presentation related to Concepcion losing a lawsuit with Decker Foods related to his back.  The jury found in favor of Decker Foods after watching films taken by a private investigator showing Concepcion doing activities too difficult for someone with a hurt back.  One of these activities took place at a church gathering, where Concepcion picked up a wooden picnic table and moved it by himself.  He was also filmed climbing a tree and jumping out of it.  Concepcion was also diagnosed as "malingering".  The documents from the lawsuit against Decker Foods do not present Concepcion in a very favorable light and the jury did not believe he had sustained an injury to his back that would prevent him from working. ***During this period of time, Concepcion was consumed with building his lawsuit, seeing doctors, gathering records, etc.  Dr. Vigen was unable to consider this information in analyzing the dynamics in the Mendoza family and he did not indicate that he was furnished any documents related to the lawsuit***.

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W.

Dr. Kessner confirms:

***Because the mitigation investigation was inadequate, Dr. Vigen did not understand the genesis and evolution of Moises' attachment disorder, and its magnification during his relationship with Amy Lohdi.  As a result, Dr. Vigen could not provide the jury with a cogent explanation of how those psychological factors culminated in the catathymic homicide of Rachelle Tolleson***

Exhibit A: Affidavit of Gilda Kessner, Psy.D., p.11.

> **(iv)     adequately investigate and develop the adverse effect of familial mental illness in Petitioner's development**

Because the mitigation investigation was superficial, the defense team failed to develop the adverse effect that familial mental illness played in Moises Mendoza's development.

Mitigation specialist Knox attests:

### Family History of Mental Illness

*Little information was presented concerning Moises' paternal uncle Francisco Sandoval, who was had been hospitalized seven to eight times at Wichita Falls State Hospital.   Francisco was diagnosed with Schizophrenia and Alcohol Dependence.  Uncle Francisco was later murdered and his oldest son (Ricky) was charged with the murder.*  Ricky Sandoval's defense attorneys presented evidence that he had killed his father in self defense.  Uncle Francisco was buried in a shallow grave and was not found for several weeks.  *Moises had grown up with these cousins (Uncle Francisco's children) and they were his main friends during school.*  Ricky was found not guilty and all the information concerning the arrest and trial was expunged.   Moises' mother and other family members were very suspicious about the result of the trial.   *The Mendoza family believed that the Sandoval family had pulled off a scam with the law and this could certainly have influenced Moises.  Additionally, there was no presentation of the amount of alcohol abuse and/or dependence within the family, including Uncle Francisco.*

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W.


**(3)     The inadequate mitigation investigation had adverse consequences:**

A qualified mitigation specialist "analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation."[91]

---

[91]    ABA GUIDELINE 4.1 – *The Defense Team and Supporting Services, Commentary* (rev. ed. Feb. 2003); ABA GUIDELINE 10.7 ("counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty") ABA GUIDELINE 10.11 ("counsel at every stage have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation").

Mr. Gonzales and other members of the defense team failed to perform their duties as set out in ABA GUIDELINE 4.1, ABA GUIDELINE 10.7, and ABA GUIDELINE 10.11.   The adverse consequences reverberated in every aspect of the defense of Mr. Mendoza, as demonstrated immediately below.

### (i)        Expert roles were ambiguous

Because Mr. Gonzales failed to investigate and develop an adequate psycho-social history, the defense team was unable to formulate an effective mitigation theory, and thereafter make a strategic decision in selecting experts.

Mitigation specialist Knox attests:

> ***The mitigation specialist is responsible for compiling all the information in order to formulate the "theory" of the mitigation.  After the mitigation theory has been formulated, the defense team can then make strategic decisions concerning what experts are needed.***  The experts are then retained to answer specific questions in their area of expertise.  In best case scenario, the mitigation specialist would gather records, conduct extensive interviews with the client, family and any others associated with the client.  The mitigation specialist would then formulate a social history.  Defense experts would then be retained based on specific testimony needed to support the mitigation theory to be presented to the jury.  It is common for various mental health experts to be retained to explore different areas identified in the mitigation strategy to be presented in the punishment phase of the trial.

> ***A common mistake frequently presented in seminars for attorneys regarding mitigation is hiring a mental health expert to "shrink" the client and inform the defense team on the possible mitigation themes***.  Although, attorneys are frequently warned against this strategy, this is the strategy that was employed in Moises' case.

Russ Stetler, in several of his many articles, concerning mitigation cautions:

> *The solution to the problems posed by mental illness in these cases is not simply to "call a doctor." Contacting a mental health expert is a litigation decision with many grave implications, which vary widely in different litigation environments.*

*It is essential not only for counsel and the defense team to build a foundation of trust with the client before involving experts in the case, but also to develop an independently corroborated multi-generational social history that will highlight the complexity of the client's life and identify multiple risk factors and mitigation themes.*

**Without a complete multi-generational social history, Dr. Vigen was retained without a clear definition of his role.  As a result, he acted as the "mitigation expert" and as the "testifying expert".   <u>If the mitigation specialist had compiled a complete social history and identified mitigation themes, Dr. Vigen would not have been hired to "furnish opinions" with no direction</u>.**

The defense team retained Dr. Mark Cunningham as an expert.  He is a well known and respected mitigation and testifying expert.  However, *as in the case of Dr. Vigen, it was unclear why Dr. Cunningham was retained*.  Dr. Cunningham is frequently used for future dangerousness presentations and has an excellent mitigation presentation showing how various elements in a client's life affect their later decisions.  It was unclear for what purpose Dr. Cunningham was retained (as a consulting expert or testifying expert).  It was Dr. Cunningham's initial understanding that he was to testify concerning future dangerousness, but Dr. Cunningham did not testify in any capacity at the trial.  *Dr. Cunningham was furnished clinical interviews that were done by Dr. Vigen and his nurse assistant, Fran Dezendorf.   Instead of the designated mitigation specialist, Mr. Gonzales, furnishing the necessary social history information to Dr. Cunningham, he was obligated to use interviews done by another expert*.  Since the "family script" was well maintained by the family, neither of the experts received vital information about the negative family dynamics which a complete social history could have furnished. *It is very common and necessary for experts to contact various family members and others to corroborate the information, particularly if they are testifying witnesses.  This is different than formulating the complete social history as Dr. Vigen unsuccessfully attempted to do.*

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W.

        **(ii)**      **The forensic expert was not prepared leaving Moises' acts unexplained, and allowing the prosecution to discredit the defense**

"It appears that the defense had not done a very thorough investigation of their expert witness to prepare for his possible vulnerabilities on the stand.   Much of the defense's expert

witness testimony was more harmful than helpful to the Moises."  Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 31.

For example, in the opening statement in punishment, defense counsel promised the jury that it would "explain why Moises Mendoza acted the way he did," (RR 23:10), to assist the jurors in "decid[ing] whether there's any redeeming value, and whether he's so far gone from redemption that the only alternative is to exterminate him." (RR 23:8).   Yet, as a result of the inadequate mitigation, the expert was unable to explain Moises acts.[92]

One juror attests that the defense forensic witness "did not really help their case, and in fact only helped the DA because he could not explain why the defendant did what he did, in terms of mental factors...."  Exhibit D: Affidavit of John Comer, Juror, para. 5.

Worse, during the cross examination of the defense forensic expert, the prosecutor discredited the defense, and made them appear "not equally matched" to the prosecution, "not very skilled," and "not believable."[93]   This was as a result of Dr. Vigen's inability to furnish specific examples of the dysfunction in the Mendoza home, which hinged on information that was either overlooked or not furnished to Dr. Vigen.[94]

---

[92]   ABA GUIDELINE 10.11 – *The Defense Case Concerning Penalty, Commentary*  (rev. ed. Feb. 2003) ("Often, a mitigation presentation is offered not to justify or excuse the crime "but to help explain it.....  In any event, it is critically important to construct a persuasive narrative in support of the case for life, rather than to simply present a catalog of seemingly unrelated mitigating factors. ").

[93]   Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 27.

[94]   Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 33.

### (iii)   Absent a time line, trial counsel failed to recognize the significance of the dysfunction of Petitioner's father, Concepcion Mendoza

"One strategy used frequently in the mitigation presentation is the use of a chronological time line. [D]efense counsel did not offer any type of chronological presentation (time line) to the jury that might have illustrated the events during specific time periods that affected Moises, such as his brother's leaving the family, father's loss of employment, father's involvement in law suits, father's depression, and mother's physical problems.   In Moises case, it would have been particularly important to show how everything revolved around Concepcion and his frailties."[95]

### (iv)   The mitigation presentation painted a false portrayal of the Mendoza-family-life, and demonized Moises

As a result of the inadequate mitigation and the inability of any member of the defense team to establish a relationship of trust and rapport with the Mendoza family, the jury heard the "family script."   Mitigation specialist Knox attests:

> "***Much of the testimony presented by Moises' parents, Concepcion and Mercedes Mendoza, was not accurate and followed the family "script" that the family colluded to maintain throughout the years.***   The family members were forced into participating in a cover-up of many "family secrets".   Moises' father modeled the behavior to Moises that rules did not apply when the rules did not fit the family's needs.     Moises' father also modeled poor behavior for coping with problems.   Frequently when there were problems in the family or Concepcion was unhappy, he had "spells" where he didn't respond to the family.   The family became worried and guilt ridden often trying to make it up to their father. When Concepcion's "spells" started initially, the family was so worried, they would take him to the emergency room, but no medical problems were found.     Concepcion attempted to use the behavior of  "I will not respond if I am not happy" with the Lavon Police Department, and found them much less receptive to these "spells" than

---

[95]   Exhibit I:  Affidavit of Toni Knox, L.C.S.W., with accompanying Exhibit A –  Psycho-social History of Moises Mendoza; Exhibit B  – Time Line for Moises Mendoza; Exhibit C – Genogram for Moises Mendoza.; *See also* Exhibit A: Affidavit of Gilda Kessner, Psy.D.,  – Mendoza Family History Chronology, paras. 11-34.

his family.  He was arrested and later taken to the emergency room to rule out a medical condition.

Concepcion's spells often consisted of outward anger and at times included physical abuse of Mercedes.  Even when she was being abused, Mercedes continued to attempt to protect the family reputation and made excuses for Concepcion.

The entire family willingly and/or unwillingly participated in Concepcion's fraudulent activities regarding worker's compensation and social security payments and other agencies the family received aid from because of their "unreported" income and Concepcion's inability to work..  *This type of modeling behavior from his father and mother helped to set the example for Moises that under certain circumstances, it is acceptable to do unlawful things*."

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W., pp. 27-28.

Recasting the Mendoza family as a "wonderful family," loving, hardworking, and great role

models, served only to demonize Moises Mendoza and aid the prosecution's case-in-chief.

Mitigation specialist Knox attests:

*The state portrayed the Mendoza family as "wonderful" and having all the advantages*.

Mercedes had to return to Mexico to give birth to Moises because the family could not afford medical care.  For most of his life, Moises had to rely on Medicaid for health care.  To supplement their income, Moises' mother was forced to sell tamales throughout the community.  The Mendoza family's financial problems were well known within that community.  Mario and Paul both worked and contributed their money to help support the family.  There are frequent references in Concepcion's MHMR records about the financial problems of the family – inability to pay their utilities bills, unable to buy eye glasses, help from United Way, and financial help to make home repairs.

Mario and Paul describe considerable use of violence by their father while they were growing up.  Prior to Moises' birth, there was frequent conflict between Concepcion and Mercedes.  Mercedes frequently put Concepcion in a "no win" situation in her requests for him to discipline the children.  She would insist when he came home he discipline the children.  Mario reports that the discipline included severe spankings and Mercedes would then get angry at Concepcion about the severity of the discipline.  If Concepcion didn't discipline the children, Mercedes was angry, but she was also angry when he did.   There is referenced in Concepcion's psychiatric records of physical violence with his wife and frequent angry outbursts.

Mario states his parents argued frequently over money, discipline and other matters prior to Moises' birth.  In fact, he heard them arguing about whether another child would save the marriage.  Mario believes that Moises was conceived in an effort to help save the marriage.  This is the reason for the age disparity between Moises and his older siblings.  Both Mario and Paul left home as soon as possible to join the military in order to get out from under the control of their parents and to be able to afford college.   In the state's closing statement, Mr. Davis describes the Moises' family:

> *The truth is this man came from a wonderful home.  He had wonderful parents.  He had wonderful opportunities and advantages that most kids in this society could only dream of unfortunately.  As the doctor told you, this isn't the way it always is.  This wasn't a one-parent household where you've got a parent trying their best but just couldn't quite control him.  This isn't a home where there's violence, where he's practicing modeling after things he's seen.  Folks, this was a darn good home here.  And if it was dysfunctional, it was because he made it dysfunctional.* [RR 24:47-48]

**Additional investigation would have revealed that Moises was modeling behavior he had seen at home.  His father had modeled fraudulent behavior** in collecting social security disability and maintaining a job at the same time.  In talking with most of the family members, they were anxious to keep the family secret and protect their father, but they genuinely believed and accepted that it was "necessary" that their father commit fraud in reporting his work earnings.  The family also protected the secret of their father's anger and family violence.

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p.17.

 

> (v)    **The defense failed to rebut the prosecution's theory that Mendoza kidnaped and raped Amy Lodhi**

As a result of the inadequate investigation, defense counsel failed to rebut the aggravating

evidence in the punishment phase.[96]

---

[96]  ABA GUIDELINE 10.11 – *The Defense Case Concerning Penalty, Commentary* (rev. ed. Feb. 2003) ("Counsel should prepare for the prosecutor's case at the sentencing phase in much the same way as for the prosecutor's case at the guilt/innocence phase.  **Counsel should** use available discovery mechanism to ascertain the aggravating and rebuttal evidence the

114

Mitigation specialist Knox attests:

There was a limited investigation of Moises' new group of friends.  This group may
have contributed to Moises' change in behavior.  *A thorough investigation would
have included a more extensive investigation of Amy Lodhi and her family
background.  Most of Amy's family is or has been involved in some type of
criminal activity*.  This may have lessened the weight of the allegation of her
kidnaping and rape.  There were considerable records available concerning the
criminal activities of Amy's family.  In fact, Amy's father is currently incarcerated
in federal prison.   There was no clear documentation that Moises' friends refused
to talk with the investigator.  Dr. Vigen was unable to give clear information about
their refusals."  ....

There was limited information in the fact investigator's notes about the attempts
made to locate and talk with Moises' friends."

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 17.

### (vi)  The testimony of the defense expert aided the prosecution

"[T]he defense had not done a very thorough investigation of their expert witness to prepare

for his possible vulnerabilities on the stand.   Much of the defense's expert witness testimony was

more harmful than helpful to the Moises. [Dr. Vigen] believed it was possible that [Moises] might

be remorseful in the future and was showing "some signs" of initial remorse.

Dr. Vigen:  He's expressed some initial and somewhat, I guess, superficial – I don't
mean to be the judge of it or be critical of it, but some beginning remorse to me in
some of his letters.  I think as he develops, you know, throughout, gets through
adolescence and into young adulthood and works in a system where he's controlled
and where he's –  experiences consequences if his behavior is inimical or
antagonistic, and he gets rewards if his behavior is productive, and he has years and
years and years of that, I think the potential is there for him to develop a personality
and for him to recognize the tremendous seriousness of this, that a person's life is

prosecution tends to introduce, and then *thoroughly investigate to determine whether this
evidence can be excluded, rebutted, or undercut*.").

gone because of him.  And that's an awesome –  that's an awesome issue, and I don't think he has a very good understanding of that yet.[97]

Likewise, Dr. Vigen aided the prosecution's case when he concluded that he has not found mitigation that could help provide an understanding of Moises Mendoza.

Dr. Vigen:    So I think the import of the counselor's question is that ***in this case there aren't those traditional things that we often – more often than not see which, you know, are traumatic to an individual which contribute to his aberrant behavior of taking another person's life***.

(RR 24:187-188).

Dr. Kessner attests: "It is clear that Dr. Vigen failed to understand and conceptualize the extensively documented events and problems that took place in the Mendoza family, events and problems that had a profound impact on the development of Moises Mendoza."[98]

### b.    An adequate investigation would have revealed several mitigating themes

As a result of the inadequate mitigation investigation, the presentation at the penalty phase was not integrated into the overall preparation of the case, nor did the defense team construct a persuasive narrative in support of the case for life.[99]

---

[97]    Exhibit I:  Affidavit of Toni Knox, L.C.S.W., *Jury and Remorse*, p. 31.

[98]    Exhibit A:  Affidavit of Gilda Kessner, Psy.D., *Attachment*, para. 37.

[99]    ABA GUIDELINE 4.1 – The Defense Team and Supporting Services, *Commentary* (rev. ed. Feb. 2003).

Instead, defense counsel called Dr. Vigen, who simply presented a catalog[100] of seemingly unrelated, conclusory opinions which shifted blame to Moises for "choices" he made.   Dr. Vigen opined:

1.   Moises was an immature, psychologically under-developed, adolescent-like man who has no internal sense of himself, (RR 24:117);

2.   Moises came from a dysfunctional family, (RR 24:121);

3.   Moises changed for the worse when he began to smoke marijuana, drink, and associated with a set of friends who drank, used drugs and had parties, (RR 24:123);

4.   Moises and his new friends lived a depraved, disrespectful, aggressive and drug and alcohol lifestyle, and would engage in sexual behavior without any emotional connection, (RR 24:126);

5.   TDCJ has the capability to house Moises in a manner that he would be a minimum risk for future violence, (RR 24:127); and

6.   Moises has the potential to develop a sense of self and spiritual conversion as he ages, (RR 24:129-120).

An adequate mitigation investigation would have revealed several mitigating themes that required further investigation and development.

### (1)   Attachment disorder, the catathymic homicide of Rachelle Tolleson, and Moises' association with a depraved peer group

Because the mitigation investigation was superficial, the defense team failed to investigate and develop evidence of Moises' attachment disorder and its origins in the dysfunction of Concepcion Mendoza.   Mitigation specialist Knox attests:

---

[100]   ABA GUIDELINE 10.11 – *The Defense Case Concerning Penalty, Commentary*  (rev. ed. Feb. 2003) ("... it is critically important to construct a persuasive narrative in support of the case for life, rather than to simply present a catalog of seemingly unrelated mitigating factors.").

> ***Because a thorough mitigation investigation was not performed, defense counsel
> failed to construct a persuasive narrative in support of the case for life using the
> information related to the dysfunction of Moises' father, who played a pivotal role
> in Moises development.   The information about frequent mental health
> hospitalizations and suicide attempts were revealed, but with little connection to
> their possible affect on Moises.*** ....  During this period of time, Concepcion was
> consumed with building his lawsuit, seeing doctors, gathering records, etc.   Dr.
> Vigen was unable to consider this information in analyzing the dynamics in the
> Mendoza family and he did not indicate that he was furnished any documents related
> to the lawsuit.

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W.

Dr. Kessner further confirms:

> ***Because the mitigation investigation was inadequate, Dr. Vigen did not understand
> the genesis and evolution of Moises' attachment disorder, and its magnification
> during his relationship with Amy Lohdi***.  As a result, Dr. Vigen could not provide
> the jury with a cogent explanation of how those psychological factors culminated in
> the catathymic homicide of Rachelle Tolleson[101]

Likewise, "Dr. Vigen did not provide the jury with the context of the 'depraved sexuality'

that characterized the relationship of Moises and his peer group.  Explanation of attachment as a

theme that runs through Moises' life provides the content for understanding his behavior."[102]

---

[101]   Exhibit A: Affidavit of Gilda Kessner, Psy.D., p.11.

[102]   Exhibit A: Affidavit of Gilda Kessner, Psy.D., p.48.

118

### (2)     Adverse childhood experiences (ACEs), alcohol abuse & brain damage

Without adequate investigation and development of Moises' attachment disorder, the defense

was unable to explain why and how the adverse childhood experiences ("ACE") of Moises paved

the way to his alcohol abuse[103] and concomitant brain damage.[104]  Mitigation specialist Knox attests:

> "There was little emphasis placed on Moises' use of drugs and alcohol.  A clear
> evaluation of Moises' drug and alcohol usage was not presented to the jury.  ***No
> information was presented by the defense to educate the jury on the effects alcohol
> can have on an individual's judgment and behavior and how this could have
> contributed to Moises' behavior.***  Research has shown that drug and alcohol
> dependence has a strong genetic link.  An expert could have educated the jury about.
> and evaluated Moises for, substance abuse.  This education might have provided a
> partial explanation of what happened the night of Rachelle's murder since there was
> testimony that Moises had been drinking.  The combination of Moises' temper,
> impulsiveness and intoxication could have provided a persuasive narrative of the
> theory for the case for life that was consistent in all phases of the trial, had the
> investigation been adequate.
>
> [D]efense counsel did attempt to establish that the defendant was under the influence
> of alcohol and/or drugs at the time of the offense.  This laid the ground work for an
> expert, such as toxicologist to testify concerning the effects of alcohol on an
> individual, but an expert was not retained.  Dr. Vigen did talk about the problem of
> Moises' chemical dependency in one of his opinions for the defense, but it contained
> no elaboration and/or possible connection to the offense."

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 20.


Dr. Lundberg-Love, Ph.D., a psycho-pharmacologist, explains the relationship between

adverse childhood experiences (ACEs) and substance abuse:

---

[103]   Exhibit A: Affidavit of Gilda Kessner, Psy.D., para. 48 ("Excessive drinking has been
associated with children whose attachment relationships (parents' marital) are broken.").

[104]   Exhibit C:  Affidavit of Stephen K. Martin, Ph.D. ("Mr. Mendoza's brain-related
impairment appears to be long-standing in nature, and would have been present at the time of the
alleged offense.  In fact, it is reasonable to assume that Mr. Mendoza would have demonstrated
even greater impairment in these (and possibly other) cognitive areas if he had been
administered neuropsychological tests closer to the time frame that he was actively abusing
alcohol. ")

A.     In a detailed study of over 17,000 middle-class American adults of diverse ethnicity, it was found that *the compulsive use of nicotine, alcohol and injected street drugs increased proportionately in a strong, graded, dose response manner, that closely paralleled the intensity of adverse life experiences encountered during childhood. These adverse childhood experiences included:*

1)     recurrent and severe physical abuse,
2)     recurrent and severe emotional abuse,
3)     contact sexual abuse,
4)     *neglect; and/or growing up in a household with:*

     1)     an alcoholic or drug user,
     2)     a family member who was imprisoned,
     3)     *a mentally ill, chronically depressed, or institutionalized family member,*
4)     *a mother who was treated violently*, or
5)     the absence of both biological parents.

B.     The overall findings of the ACEs study indicated that:

1)     ACEs were surprisingly common, although typically concealed and unrecognized;
2)     ACEs had a profound effect 50 years later on the presence of physical illness, mental illness, and social malfunction; and
3)     ACEs were the main determinant of the health and social well-being of the nation.

C.     *A strong relationship was found between ACEs and alcohol abuse/addiction*.  In people who had zero ACEs, there was a 3% level of alcoholism. If there was a history of one ACE, the percentage of alcoholism jumped to 6%, with two ACEs the percentage was10%, with three ACEs the percentage was nearly 12%, and when there were four ACEs, the percentage of alcoholism was 16%.   These results indicated that a 500% increase in adult alcoholism was related in a strong, graded manner to the numbers of ACEs to which an individual was exposed.

D.     Felitti (2003) suggests that the concept of addiction needs to be revised to take into account that *ACEs are widespread and typically unrecognized. These experiences produce neurodevelopmental and emotional damage, and impair social and academic performance. By adolescence, children have a sufficient skill and independence to seek relief via drinking alcohol or using other psychoactive substances*. Unfortunately these coping devices are manifestly effective for their users, through their ability to modulate the activity of various neurotransmitters. *Overall, these results suggest that childhood experiences do profoundly and causally shape adult life*. According to Felitti "chemical imbalances," whether

120

genetically or experientially modulated, are the necessary intermediary mechanisms whereby causal life experiences are translated into manifest effect. ACEs do not occur *in vacuuo*. They are part of a complex system failure. ***Based upon the results of this research, one does not grow up in the presence of ACEs without it taking some type of physical and/or mental health toll***. The prevalence of ACEs and their long-term effects are a major determinant of the health and well-being of the nation. This appears to be true whether viewed from the standpoint of social costs, the economics of health care, the quality of human existence, the focus of medical treatment, or the effects of public policy.[105]

Given the ACEs experienced by Moises and his alcohol abuse, Dr. Martin, a neuropsychologists, provides the nexus between Moises' binge drinking and his brain damage:

19. ***Mr. Mendoza's brain-related impairment appears to be long-standing in nature, and would have been present at the time of the alleged offense***. In fact, it is reasonable to assume that Mr. Mendoza would have demonstrated even greater impairment in these (and possibly other) cognitive areas if he had been administered neuropsychological tests closer to the time frame that he was actively abusing alcohol.[106]

....

22. ***A neuropsychological examination was warranted for Moises Mendoza during the preparation by his defense team for his capital murder trial.*** Mr. Mendoza has been incarcerated since 2005 and by that time, Neuropsychology research had clearly determined that chronic alcohol abuse produces cognitive decline in a variety of domains.  In fact, as early as the 1960's, research had been produced which reflected that alcohol produced impaired scores on several components of the Halstead-Reitan Battery, the most commonly administered neuropsychological test battery in the United States.  ***By retaining an expert and administering a battery of neuropsychological tests, Mr. Mendoza's attorneys could have conclusively proved the existence of neuropsychological damage. Such tests would have provided defense counsel with the means to demonstrate for Mr. Mendoza's jury how the quality of his brain and the specific damage sustained to it adversely affected his higher cognitive functioning and reasoning skills.***  As has been previously discussed, impaired cognitive abilities due to alcohol abuse tend to recover with abstinence.  Therefore, ***a neuropsychological exam conducted close in time to the date of his arrest would have detected the present areas of***

---

[105]   (Emphasis supplied); Exhibit B:  Affidavit of Paula Lundberg-Love, Ph.D., *VII.  Adverse Childhood Experiences*

[106]   Exhibit C:  Affidavit of Stephen K. Martin, Ph.D.

*impairment as well as any other indications of alcohol-induced brain damage that Mr. Mendoza may have been experiencing*.

### (3)      The biological nexus between brain development & offense conduct

Dr. Vigen testified merely that Moises was psychologically immature.  Dr. Vigen failed altogether to explain the biological link between lack of frontal lobe development and controls on the executive function of the brain, apparently because Dr. Vigen himself failed to grasp the relationship between Moises' lack of frontal lobe development and his offense conduct, and the mitigating significance of this piece of evidence.

Dr. Vigen testified:

Q.      Now, Doctor, you talked about him being underdeveloped and an adolescent-type man.  Is he past adolescence?

A.      No.  He's still -- there's new research – or not new research.  There's been some research that, you know, the human brain isn't fully developed until, like, 24 and 25.  He's 21.  And that the frontal cortexes are still developing from the neurobiological point of view.  But I see him as just adolescent in his behavior now.  *He's adolescent in his behavior at the jail* and with the lawyers and with me.  So I think he's still in the early adolescent phase of development.

Q.      So even though biologically is one thing, and then psychologically is another way to look at as adolescent?

A.      Yes.  Yeah, that's a good way.  I mean, he's 21 chronologically and biologically, but nowhere -- I don't see him as having that level of maturity.  That's why I said, I think *he's immature psychologically* and underdeveloped.[107]

---

[107]   (RR 24:150-151).

In contrast, mitigation specialist, Toni Knox, L.C.S.W. attests:

"There has been a significant amount of research regarding the formation of the human brain at later ages than originally thought.  This research contributed to the decision by the Supreme Court to stop executions of defendants that committed a crime under the age of eighteen.  Prior to this decision regarding juveniles in 2002 the Supreme Court had banned executions of mentally retarded persons.  *Research has revealed that although a person may appear mature physically, the brain is probably not developed and that teenagers have significant neurological deficiencies that result in limitations of their judgment*.  Research over the past few years has revealed that the adolescent brain is far less developed than previously believed and still in a state of transition.  There is a "pruning process" that is completed in late adolescence that transitions the brain into the adult form. *Research has shown that until the brain is fully developed, adolescents are unable to reason as well as adults.  This does not take away the responsibility of their crimes, but can lessen their culpability.  This research could have been valuable in helping the jury understand Dr. Vigen's opinion regarding Moises' immaturity*. Dr. Vigen made some reference to this research, but it was not developed in his testimony at trial."[108]

Unlike Dr. Vigen, Dr. Martin, a neuropsychologist, attests to a nexus between the biology of brain development and the offense conduct, and the mitigating significance of Moises' impairment:

20.     It is of clinical relevance that Mr. Mendoza was 20 years old at the time of the offense.  Clinical research and advances in neuro-imaging studies (e.g., MRI) have provided evidence that brain development, particularly involving the frontal regions of the brain, continues into the early 20's.  *Given this information it is reasonable to assume that Mr. Mendoza's frontal lobes, which are intricately involved with anger and impulse control, may not have been functioning "at full capacity" at the time of the offense even prior to any alcohol ingestion.  Frontal lobe impairment has been associated with deficits involving regulating emotions including anger control issues, as well as difficulty inhibiting behaviors particularly in emotionally charged situations.*  Individuals with this type of impairment also have a difficult time fully considering the consequences of their behaviors prior to acting on them.  These negative emotional and behavioral effects, whether due to frontal lobe dysfunction or under-development due to age, would become even more enhanced when alcohol or other substances are ingested.  Right

---

[108]   (Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 21.

brain abilities, which also reflected impairment upon testing, are also involved with regulating our perceptions and emotional responses to situations.[109]


### (4)    Future Dangerousness Special Issue

Mitigation specialist, Toni Knox, L.C.S.W. attests:

"The defense set up their expert witness, Dr. Vigen, to be cross examined as an expert related to future dangerousness.  Dr. Vigen lives in the state of Louisiana and did not have the required expertise to speak about the Texas Department of Correction facilities.    There were more qualified experts from Texas that had previously been involved with TDC who could have spoken with more expertise concerning the classification system."

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 23.


### (5)    Presentation of Prison Life

Mitigation specialist, Toni Knox, L.C.S.W. attests:

"Mitigation specialists often recommend that an expert in prison life (former warden or other specialist) testify.  These experts are able to explain the classification system used by TDCJ and/or present a film depicting prison life for the jury.  This ensures that jury members have an accurate and uniform impression of prison life.  Previous interviews with capital murder jurors have reported this type of presentation helped to convince them to vote for life in prison rather than death. ***An important aspect in the punishment phase is for the jury to have a clear understanding of what circumstances the defendant will face in prison.  In this case, no expert was used to present an accurate portrait of prison life for the jury.***  This type of testimony can help establish that the defendant would not be a future danger if incarcerated and could be maintained by the prison system.  ***Instead, the defense attempted to use their psychologist to address this issue and he could not be considered an expert in this area.***  Mr. Sanchez talks about life in prison in his closing statement, but no clear picture was presented to the jury.

(Emphasis supplied);  Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 25.

---

[109]   Exhibit C:  Affidavit of Stephen K. Martin, Ph.D.

### c.     Defense counsel failed to effectively select, guide, and prepare its experts

"One question that needs to be addressed before retaining any mental health expert is what role the expert is going to play."[110]  A prerequisite to the selection of experts "is construction of the narrative ... that sets forth and explains the client's complete social history from before conception to the present."  Only then can counsel "choose experts who are tailored specifically to the needs of the case, rather than relying on an 'all purpose' expert who may have insufficient knowledge or experience to testify persuasively."[111]

### (1)     The defense failed to clearly identify the role of the experts

In the case at bar, "[d]efense counsel retained a psychologist to evaluate the defendant, but gave their own expert no guidance on the direction of his evaluation....   The defense psychologist was not provided with adequate records (which should have included a social history) or direction for his evaluation to be useful.  It is customary for an expert to speak with some corroborating family members to maintain the accuracy of the social history, but not conduct the complete family history investigation."[112]

### (2)     The defense failed to prepare Dr. Vigen

Dr. Vigen did not have adequate records and documentation concerning Moises' mother and father.  As a result, he was unprepared to assess and testify with specificity as to family dysfunction.

---

[110]   STETLER, RUSSELL, THE CHAMPION, *Mental Disabilities and Mitigation* (April 1999).

[111]   ABA GUIDELINE 10.11 – *The Defense Case Concerning Penalty, Commentary* (rev. ed. Feb. 2003).

[112]   Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 33.

Similarly, Dr. Vigen was not given information about Moises peer group, not was he able to interview any of them.   Thus, he was unable to offer any insight into why Moises had started associating with a peer group, who lived depraved, aggressive and drug and alcohol lifestyles, and who engaged in empty sexuality.[113]

> **(3)** **Because Dr. Vigen acted as the mitigation expert, the future dangerousness expert, and the prison life expert, all the mitigation notes became available to the prosecutor**

Because defense counsel failed to clearly identify and select experts (*i.e.,* a mitigation investigator, a future dangerousness expert, a prison life expert, and a mitigation expert), Dr. Vigen assumed multiple roles, including the roles of "mitigation specialist" and "expert witness."[114]  This placed Dr. Vigen in the unfortunate position of having "to interview witnesses in an attempt to develop a mitigation theme.  By utilizing the testifying expert in this manner, the defense opened up all information obtained from the interviewed family and witnesses to the prosecutor."[115]

The combination of prosecutorial access to all of Dr. Vigen's notes from his interview, and Dr. Vigen's lack of adequate preparation made him unable to effectively counter the prosecutor's questions.  Indeed, he was not sure of the meaning of his own assistant's notes, which the prosecutor quizzed him on.[116]

---

[113]   Exhibit I:  Affidavit of Toni Knox, L.C.S.W.,  p. 35.

[114]   Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 36.

[115]   Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 36.

[116]   Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 42; *see also* RR 24: 118, 121; 144-145; 162-163; 179-181.

**5.      There is a reasonable probability that the outcome would have been different**

    **a.      Left unchallenged:  Moises "chose" this dark path and the answers to the two special issues**

The deficient performance of the defense left the prosecutor's theory of the case in punishment unchallenged:

> ***This case is about choices***.  It's about the choices the 12 of you have to make.  ***You have two questions to answer***, and those choices are already determined.  ***They were determined with every decision he [Moises] made*** that led up to March 17th of 2003 (sic).  (RR 25:26-27).
> ....
>
> ***The truth is that the individual seated before you, the Defendant, from a very early age chose a very different and dark path for his life, and that's the truth***. (RR 25:40).

(Emphasis supplied).

    **b.      The testimony of Dr. Vigen (the defense trial-expert) – that Moises was not remorseful and he found no mitigation to explain Moises' acts – aided the prosecution**

In his punishment phase presentation, the defense forensic expert, Dr. Vigen, concludes that he has not found mitigation that could help provide an understanding of Moises Mendoza.

> Dr. Vigen:      So I think the import of the counselor's question is that ***in this case there aren't those traditional things that we often – more often than not see which, you know, are traumatic to an individual which contribute to his aberrant behavior of taking another person's life***.

(RR 24:187-188).

This advantaged the prosecution, who in closing sarcastically asserted:

I guess if he had had a good childhood, if he had had an education, if he had had parents who loved him and supported him, who provided for him, if he had had

moral and spiritual guidance, if he had had a life free of abuse, we wouldn't be here. But wait a minute.  That was his life.  He had all of those things handed to him.

(RR 25:24).

Mr. Davis concluded with a resounding:

*"There's no mitigating circumstances here whatsoever, none. The answer to Number 2 is no, overwhelmingly no, beyond any doubt no."*

(RR 25:48).


### c.      The jurors were clear that "choice" was the key to their life or death vote

Mr. Mendoza objects to FF 126-127.  As aforementioned, there is no obligation that Mr. Mendoza introduce "expert opinion from an attorney with expertise in the defense of capital murder cases to substantiate [the] claim ... that counsel was deficient for failing to 'educate' on choice. There is no case law whatsoever that a petitioner is required to hire expert counsel or fail to prove its case.  Further, to the extent that Mr. Mendoza failed to prove ineffective assistance of trial counsel, it was a result of an impediment, external to him  – to wit:  the denial of the evidentiary hearing at which he would have called trial counsel and inquired into their acts and omissions  – that prevented him from developing such proof.

It is evident that defense counsel was on notice of the pivotal role "choice" would play in the jurors' decision.  Nonetheless, defense failed to investigate and develop the mitigating evidence that would have educated the jury about "choice."  Indeed, "[o]ne of the most important purposes of the mitigation presentation is to show the jury that many 'choices' were made for the client before he was capable of making 'choices' for himself.  It is essential that the jury understand how these previous choices, such as mental health or chemical dependency in the family history (genes),

128

poverty, family criminality and other outside influences can affect what later "choices" are made by the defendant.  The prosecution offered a good platform for the defense to introduce the concept of 'choices,' but the concept had not been developed by the defense...."  Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 32.

The jurors expressed their beliefs that personal responsibility, choice, and free will were paramount in their consideration of whether to vote for life or death:

| | |
|---|---|
| Schmoll: | "A. ... if they're in their 20s, they're old enough to take responsibility for what they did," (RR 6:67);  ***"A. I think once you get to a certain age you need to be responsible,"*** (RR 6:68).  She did not belief that because someone used drugs or alcohol, that that is an illness or condition out of their control, (RR 6:68). |
| Stockdell: | "A. ... being a father and having a 19-year-old and seeing the way he acts a lot during the day, ... maybe it should be a little higher than 18," but he later agreed that there might be some 18-year-olds who should be subject to the death penalty; (RR 6:225-226);  ***"A. ... I think each individual should be accountable for their actions*** and – but there could be something in the past that makes them the way they are;" (RR 6:226);  "... if you drink – you're still accountable for what you do regardless of if you're sober or not...", (RR 6:238). |
| Comer: | "... punishment has to fit the crime... there's accountability for our actions," (RR 7:169), or his opinion that ***the use of drugs or alcohol is not mitigating because the person "chose to put that into their body,"*** (RR 7:190). |
| K. Jones: | ***"We maybe born underprivileged.   We may be born with a handicap.   We may be born to abusive parents*** ....  But it's the choices I've made.  I think we're given free will and free choice.  And ***it's those choices we make that decides our destiny in life***." (RR 9:102). |
| Johnson: | "I have been exposed to enough [about the use of alcohol as an illness] that I think ***there's always a choice in the end.***" (RR 10:135). |

(Emphasis supplied).[117]

> ### d. Because the defense failed to explain Moises' acts, the jurors attested they had only one choice:   a vote for death

There is a reasonable probability that but for trial counsel's deficient performance the outcome would have been different.

Juror John Comer, attests:

> ***5.*** ***In the punishment phase the defense called a psychiatrist who did not really help their case, and in fact only helped the DA because he could not explain why the defendant did what he did, in terms of mental factors.***   ....

> 7. Overall it was pretty clear that the defendant was guilty and ***the only issue is whether there was any circumstance to make us not vote for death.  But he had come from a good family, his siblings were successful and there was very little else to explain why he did what he did***.   ....

> 8. .... I feel like we made the right decision because the case was pretty much clear with all the evidence.

(Emphasis supplied);  Exhibit D: Affidavit of John Comer, Juror, para. 5.

Likewise, Juror Marsha Schmoll attests:

> 8. We heard from the defendant's family in the punishment part of the trial.  They did not affect me much because he had been a mean teenager.  ***The defense expert said that the defendant was a "victim of circumstance" but I was not convinced.  His family was a strong Catholic family, and were smart.***  I felt bad for them.

(Emphasis supplied);  Exhibit E:  Affidavit of Marsha Schmoll, Juror, dated 7-23-06.

---

[117] *But see*  Exhibit F: KELLY BURNS, J.D. AND ANTOINE BECHARA, PH.D., *Decision Making and Free Will: A Neuroscience Perspective*, 25 BEHAV. SCI. LAW 263-280, 273 (2007) ("many more people involved in the justice system may have gotten there operating with faulty neural mechanisms.... there is likely to be a continuum of impairment in the exercise of willpower rather than a black-or-white state of dysfunction or health").

"Another of the jurors found the defense presentation to be ineffective related to the defense attorney's skills:

> **Ms. Garrett reported that the prosecution attorneys were very thorough and the defense attorneys were not equally matched**.  She works as an insurance adjuster for the Plano school district and as a result, she has a lot of experience with personal injury attorneys for workers' compensation cases.  **She described such attorneys as being "low on the food chain," implying that they were not very skilled**.  She said that the male defense attorney, who she thought was named **Sanchez, didn't come across as believable**.  She said that he didn't endear himself to the jury.  Ms. Garrett said the real problem was his delivery."

Exhibit I:  Affidavit of Toni Knox, L.C.S.W., p. 27.

> e.    **The Conclusions of Law Nos. 276-280, 341-405 are contrary to and an unreasonable application of federal law, which has  held that defense counsel, who have performed as deficiently as Mendoza's defense team, to be ineffective**

In other cases similar to that of Mendoza, the courts have found the defense counsel ineffective because but for their deficient performance, there is a reasonable probability that the outcome would have been different.

- In the case at bar because the investigation was inadequate, no comprehensive psycho-social history and/or time line were prepared.  *Compare Tenorio v. State*, 583 S.E.2d 269 (Ga. Ct. App. 2003) (Finding defense counsel ineffective, the court held: "The fact that [the investigator], rather than trial counsel, shirked his assigned duties does not matter. As trial counsel noted . . . , she was ultimately responsible for ensuring a thorough investigation.").
- In the case at bar because the investigation was inadequate, defense counsel failed to explain the actions of Moises Mendoza.  *Compare Smith v. Mullin*, 379 F.3d 919, 943 (10th Cir. 2004) (Finding defense counsel ineffective, the court held:  "What the jury wholly lacked was an *explanation* of how Mr. Smith's organic brain damage caused these outbursts of violence and caused this "kind hearted" person to commit such a shocking crime").

- In the case at bar because the investigation was inadequate, Dr. Vigen testified he had not found mitigation that could help provide an understanding of Moises Mendoza.  *Compare   Hooper v. Mullin*, 314 F.3d 1162 (10th Cir. 2002) (Finding

131

defense counsel ineffective, the court held:  "Neither [psychologist] offered any mitigating evidence and their combined testimony was disastrous for Petitioner's defense. The jury was left with unchallenged expert opinions that Petitioner did not suffer from brain damage, had no particular trouble controlling his temper, and that his learning disability would not have affected his capacity for violence or ability to reason in adverse circumstances.").

- In the case at bar because the investigation was inadequate, the testimony of the forensic expert aided the prosecution's case in chief.  Dr. Vigen testified that he did not think Moises was remorseful. He also concluded that he had not found mitigation that could help provide an understanding of Moises Mendoza.  (RR 24:187-188). *Compare   Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) (Finding defense counsel ineffective, the court held: "Defense counsel called their forensic expert "in an effort 'to establish that Combs could not act purposely and intentionally because of his diminished capacity," and Stidham admitted that he was "surprised" when Fisher testified to the opposite.... Defense counsel should have known Fisher's opinion on this ultimate issue and should have prepared accordingly.  Regardless of whether Combs's counsel should have known or instead actually knew Fisher's opinion regarding Combs's intent, however, counsel's decision to put him on the stand was objectively unreasonable.").

- In the case at bar because  the investigation was inadequate, the jurors were left with the mistaken impression that Moises' acts were the result of an "intentional" and "knowing" "choice," rather than an inability to control his violent behavior was caused by childhood neglect and brain damage.  *Compare   Simmons v. Luebbers,* 299 F.3d 929, 936 (8th Cir.2002) (granting relief from a death sentence and noting: "The jury was already aware of Simmons's anger towards women.  [A psychiatrist's] report would have introduced the possibility that Simmons's inability to control his violent behavior was caused by childhood trauma and abuse.   This information could have been used in his favor at the penalty stage.   Instead, the jury was allowed to conclude that Simmons's violent behavior was simply the result of his wicked and aggressive nature.");  *Williams v. Taylor,* 529 U.S. 362, 398 (2000) (Finding defense counsel ineffective, the Supreme Court noted that evidence of mental impairment and childhood privation and abuse is "consistent with the view that [the petitioner's] behavior was a compulsive reaction rather than the product of cold-blooded premeditation.");  *People v. Morgan*, 719 N.E.2d 681, 708 (Ill. 1999) (Finding defense counsel ineffective, the court held: "Because Levin had failed to investigate and present readily available mitigation evidence, the [sentencer] was unaware not only of defendant's severe life-long brain damage and neurological impairments, but also of defendant's abused childhood.   This evidence would have provided the [sentencer] with a portrait of defendant that may have influenced the choice of sentence.").

All of the aforementioned evidence, pleading and law reflect that the Conclusions of Law Nos. 276-280, 341-405 are contrary to and an unreasonable application of *Strickland*, *Wiggins* and *Rompilla*.   As a result of counsel's deficient performance, there is a reasonable probability the outcome would have been different.   U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor,* 529 U.S. 362 (2000);   *Strickland v. Washington*, 466 U.S. 668 (1984).  Therefore, habeas relief should be granted.

**GROUND FIVE (IAC & FAILURE TO ADEQUATELY DEVELOP AND PRESENT MITIGATING EVIDENCE):   Mr. Mendoza was denied his federal Sixth and Fourteenth amendment rights to individualized sentencing because trial counsel failed to adequately develop and present crucial mitigating evidence.**

Claims Four and Five, ineffective assistance of defense counsel for failure to investigate, develop, and present mitigating evidence, are plead separately for the ease of the reader.  However, they are incorporated by reference into each other.

**A.     Statement of Facts.**

The Statement of Facts recited in Claim Four are incorporated by reference herein.

**B.     Argument and Authorities.**

**1.     Standard of Review.**

The Supreme Court in *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland v. Washington*, 466 U.S. 668, 695 (1984).  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.    In *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).   The Supreme Court further wrote:   "In assessing the reasonableness of an attorney's investigation ... **a court must consider not only the quantum of**

134

*evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further*." *Wiggins,* 539 U.S. at 527.

### 2.      The ABA Guidelines  –  A Standard of Care

In the case at bar, ABA GUIDELINE 10.7,[118] ABA GUIDELINE 10.10.1, and ABA GUIDELINE 10.11 (rev. ed. Feb. 2003) are applicable. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (2003) (In which the U.S. Supreme Court *citing Strickland*, 466 U.S. at 690-691, for the proposition that "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).

### C.      FF Nos. 126-248  –  There is no presumption of correctness

Mr. Mendoza objects to the Findings of Fact Nos. 126-248 for all the reasons argued more particularly below.  FF Nos. 126-248 are not entitled to a presumption of correctness, and they are "'objectively unreasonable in the light of the evidence presented in the state-court proceeding,'" *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing  Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).

---

[118]   ABA GUIDELINE 10.7 provides in pertinent part:  "*Commentary*, <u>*Penalty*</u>  **Counsel's duty to investigate and present mitigating evidence is now well established**..."

**D.      Trial counsel's performance was deficient because they failed to adequately develop and present**

**1.      the dysfunction of Concepcion Mendoza**

An adequate development and presentation of the mitigating evidence in the case reflects the pivotal role that the dysfunction of Concepcion Mendoza played in Moises Mendoza's development. Based on the time line and psycho-social history prepared by mitigation specialist, Toni Knox,[119] Dr. Kessner capsulizes the family history of the Mendoza family:

11.      ....  The interviews and records reviewed provide a portrait of a family overwhelmed with sequential and sometimes simultaneous crises.  These events began in Moises Mendoza's preschool years and continued into his adolescent years.

12.      Concepcion Mendoza (the father) was born in Mexico the second child of his mother.  His parents were not married.  His mother's oldest child, a girl died when Concepcion was preschool age.  Concepcion's father had been married before and his first wife died.  The daughters of his first wife were hostile to Concepcion's mother and she was not able to remain with his father.  She lived separately and Concepcion lived back and forth between his parents.  He spent much of the time at his father's house to help on his father's farm.  He related to me his recollection of sneaking away from his father's house to visit his mother because he missed her. Concepcion's mother eventually had a daughter from another relationship. Concepcion completed the second grade in Mexico.  His attended adult English language classes in the U.S. at the suggestion of his psychiatrist but has no other formal education.

13.      Mercedes Sandoval Mendoza (the mother) was born in Mexico.  She suffered a fall from a horse as a young girl resulting in chronic problems with her hip and gait.  She eventually had hip surgery in the U.S. but continues to have a noticeable limp.

14.      Mario Mendoza (oldest brother) was born in Mexico on 9/15/70 to Concepcion and Mercedes Mendoza.   The parents made the decision to leave him in Mexico with his paternal grandmother when he was about 18 months old and they

---

[119]   Exhibit I:  Affidavit of Toni Knox, L.C.S.W., with accompanying Exhibit A –  Psycho-social History of Moises Mendoza; Exhibit B  – Time Line for Moises Mendoza; Exhibit C – Genogram for Moises Mendoza.

came to the U.S.  Mercedes Mendoza was pregnant with Paul Mendoza (older brother) and wanted to join her husband and have the baby in the U.S.   Paul was born on 2/23/73.  Elizabeth Mendoza (oldest sister) was born on 3/18/76 in the U.S. before the parents returned to Mexico to bring Mario to the U.S.

15.     Moises Mendoza was born in the Mexico on 1/26/84 and the youngest child Mary Ruth "Ruthie" Mendoza was born in the U.S. on 5/21/86.

16.     Mario Mendoza joined the military in June 1987 when Moises was three and a half years old.  Mario was an attentive and responsible oldest brother.  Moises looked up to him as a second father and his absence was the first loss he would experience.  His understanding of Mario's absence was limited by his early childhood stage of life.  Moises' mother was very upset about her son going into the military and related that she reacted by walking in the neighborhood and crying and praying for her son.  The absence of his brother and the related emotional distress of his mother created a climate of uncertainty and insecurity for the child.

17.     When Moises was about four or five Mercedes Mendoza was ill and the family reports that she was seen at St. Paul Hospital in Dallas.  She was given a cancer diagnosis.  She and Concepcion agreed that in addition to seeing the doctors at St. Paul Hospital she would also see a naturopath.  She did not get the prescriptions from St. Paul filled and felt that the naturopath was helping her.  Her doctors at St. Paul later confirmed that she was cancer free.  A cancer diagnosis or the perception of a serious life threatening illness is traumatic for a family.  Knowing that mother is seriously ill is anxiety producing for a young child and other family members.  The stress and fears that the adults feel cannot be hidden from a small child, especially in a close-knit family.

18.     Concepcion Mendoza injured his back in a work related accident in June 1989.  Moises had just completed kindergarten.  The accident and resulting disability began Concepcion's slide into deep depression and three identified suicide attempts.  His identity as a man who provided for his family was shattered.   His mother's teaching that you can only eat when you work to earn your food was embedded in his psyche and his disability was devastating.  Moises was a collateral victim of his father's injury.  The father who played with him and taught him things was not emotionally present and because of hospitalizations, he was not physically present for long periods.   Concepcion related an incident that demonstrates the feelings of rejection the young Moises felt.  The father was no longer playing the game of "horse" with his young son.  The child confronted the father.  Concepcion illustrated that Moises put his hands on his hips and said, "What's the matter you don't want to play with me anymore?  I want to play with my horse."

19.     With the injury begins Concepcion's long journey to doctors for diagnosis and treatment of his back injury, referrals to mental health professionals, suicide attempts, psychiatric hospitalizations, attempts to earn a living for his family and a

137

lawsuit related to his work injury.  Concepcion was transformed from a proud man who worked hard to provide for his family to a man who was demoralized and suicidal.  Concepcion continues to receive medication for his depression and sleep difficulty.

20.    Mario Mendoza married Dianne in April 1991.  There was friction between Mario and his new wife and Mario's parents leading to some measure of estrangement.  Moises again feels the loss of his brother.  Mario and his family are eventually based in Germany and Washington State.  Concepcion and Mercedes related that when Mario was in Germany they would sometimes telephone him but because of the time difference, it would be very late.  Moises would stay up so that he could talk with his brother.  Concepcion cried when he got off the telephone with Mario.  Mercedes said to "don't worry he will be fine."  For days afterward Moises would come to his father and tell him "he's okay, don't worry."

21.    Mercedes Mendoza is not certain of the date but around 1991 she went to the doctor and received medication for depression.  She described that days would pass when she would not do anything.  She was overwhelmed with trying to help her husband.  She described that when he would not take his medication he would "lose it" and she felt anxious and worried.  Her recollection is that she took medication for a couple months.  By the time Moises was seven years old both of his parents were receiving psychiatric care in some form.  The environment was not one of safety and security for the young boy.  The parents were overwhelmed, anxious and depressed compromising their ability to address the problems Moises was having.

22.    In the fall of 1991, Moises was seven years old and beginning the second grade.  This was around the time that his other brother Paul joined the military removing another important person from his young life.  Moises had been experiencing problems in school and by the second grade; the parents were in contact with teachers and the counselor.  The school was informed of the father's illness and Mercedes reports that she requested that Moises see the counselor but she does not believe the school followed through.  The trial transcript addresses this issue in the father's testimony:

> Defense:  Did you know what was going on back home when you were in the hospital?
>
> Concepcion Mendoza:  She told me that the children missed me very badly, very much, and that Moises was not going to school -- or did not want to go to school.  (Vol. 23: p. 144: 23 to 145: 2)

Moises' school behavior problems were reflecting his distress about his father foremost but also the absences of his brothers and his mother's emotional and medical problems.  Irritability, school refusal and conduct problems are commonly seen in young children who are experiencing the types of family upheaval the

Mendoza family was enduring.  Children manifest depression through irritability and crankiness.  Children with mood disorders have problems with poor social skills, pessimism and insomnia.  If untreated, the problems can develop into aggression toward others as the child has immature strategies for discharging negative emotion. Moises' siblings went to the same schools and throughout his educational career; he was faced with teachers who knew his older siblings.  Moises compared unfavorably against the history of his older siblings' positive behavior in school.  With his early behavior problems, he developed a reputation that only seemed to build throughout his educational career.  The parents and Moises have related a story of a teacher who told Moises that he would only be able to get work picking up cans or being a garbage man.  Moises does not understand how some of these early events could have affected him.  Yet it is significant that this event is important to the family and it coincided with the problems at home and Moises' accelerating behavior problems at school.

23.    The records reflect that in the summer and fall of 1992 Concepcion was in a rapid downward spiral.  Highlighted in the records are suicidal ideation, an emergency commitment, placement in the Collin County Jail and eventual transfer to Wichita Falls State Hospital (WFSH) on 10/19/92.   He was discharged from WFSH on 11/12/92 and the record reflects he continued to have significant symptoms of depression.  The MHMR note from 11/18/92 indicates Concepcion related family issues of the kids being depressed, not doing well at school and his wife was depressed.  This clearly explains that Concepcion's depression was affecting the entire family.  Elizabeth has related in our interviews that she began wetting the bed after her father became so ill.  Her parents took her to the doctor and he told them the bedwetting was related to the stress in the family.

24.    On 4/7/93, Mercedes was admitted to Presbyterian Hospital for hip replacement surgery.  She did not want to have the surgery at that time because she was very worried about her husband's ability to function and care for himself and the children.  Her physical disability had become so severe that she had no choice.  Her discharge date was 6/2/93.   She was prescribed Xanax and Elavil during the hospitalization.  The MHMR notes reflect that Concepcion was in frequent contact with his mental health providers during his wife's hospitalization.  A note dated 4/26/93 indicates Concepcion had a court date scheduled for a previous arrest for "public intoxication and resisting arrest."  A later chart note indicates the court date was postponed.

25.    A MHMR chart note dated 5/28/93 describes an incident at Concepcion's chiropractor.  Concepcion went to the chiropractor's office on 5/24/93 carrying a machete but later had no memory for the event.  The MHMR staff spoke with the chiropractor.  Dr. Martin described that Concepcion confided that he was carrying the machete because of the people who were following him because of the back injury lawsuit. Dr. Martin also indicated to the MHMR caseworker, his impression that Concepcion had "deteriorated severely" since his back injury. In July 1993,

139

Concepcion lost his legal battle for worker's compensation.  The family was under the pressure of the legal case for four years.    Moises was nine and a half years old.

26.    The MHMR notes in December 1993 and January 1994 reflect marital problems associated with Concepcion's mental illness and his wife's anxiety about his condition, their relationship and the problems they were having communicating with each other.  There are also notations about Concepcion trying to keep busy by helping to care for a terminally ill neighbor (who died with Concepcion in attendance), financial concerns and the daughter's migraine headaches.  Moises was in the fourth grade.

27.    July 21, 1994 the MHMR caseworker made a home visit.  Concepcion admitted that he had not been taking his medications regularly and that he had brought his elderly mother from Mexico to live with them.

28.    October 20, 1994 Concepcion had an appointment at MHMR.  He had been having headaches but there was some improvement and he was relieved that his court case for public intoxication and resisting arrest had finally come to a favorable conclusion after two years.  The judge found him not guilty.

29.    The MHMR records continue for years with frequent contacts.  The records reveal financial problems, marital stress and Concepcion studying for his citizenship test with the handicap of not being able to read or write very well in English.  As previously stated Concepcion only completed the second grade in Mexico.  When he gave me his journal from his hospitalization, it was written in Spanish.  I contacted a retired Dallas Independent School District high school Spanish teacher to translate the journal for me.  He described the Spanish grammar and writing as being very low and consistent with someone without much formal education.

30.    By the time Moises was in the ninth grade (1998/1999), his father was still having frequent contact with his MHMR providers.  In April 1999, Francisco Sandoval, Moises maternal uncle was killed by his son, Ricky Sandoval.  The trial in April 2000 resulted in a not guilty verdict.

31.    Elizabeth married on 5/15/99 and Paul married on 1/30/01.  Concepcion was reporting to his mental health providers the conflicts with his youngest son.  When Moises was around 16 or almost 17 years old, his mother's nephew, Jorge moved in with the family.  Jorge was reared in Mexico under very abusive and deprived circumstances.  His birth mother (Mercedes' sister) abandoned him to an unrelated family.  Eventually another maternal aunt took Jorge to live with her and her husband.  The uncle was a severe alcoholic and abusive to Jorge.  Jorge came to live with the Mendoza's when he was in his early twenties.  Mercedes and her husband tried to help Jorge but he would not follow family rules.  He left the house before work on Friday and would not return until after work on Monday.  Mercedes believes that he spent his weekends drinking.  Eventually he became involved in an

assault and left Farmersville.  Mercedes believes that he exerted a significant level of negative influence on Moises during the year he lived with them.

32.     Moises graduated from high school in the spring of 2002.  He became involved with friends who socialized around alcohol and sex parties.

33.     Moises attended classes at Lincoln Tech and met Amy Lodhi there in December 2002.  Over the next months, Concepcion's MHMR records reflect his complaints of depression, financial problems and continuing conflict with his son Moises.  By March 2003, Moises was arrested for criminal activity involving aggravated robbery.

34.     Mercedes and Concepcion report that when they visited Moises in jail he was obsessed with talking about Amy.  There had been numerous incidents of Moises violating house rules because of or with Amy and they were very distressed over his obsession with her.  Moises was released 7/22/03 after four months in jail and was placed on electronic monitoring.   He was diagnosed with major depression on 10/9/03 after an initial evaluation at MHMR.  Despite the signs of depression since his early childhood, this is the first recorded diagnosis of a mood disorder for Moises.  Mercedes reports that Moises and Amy continued to see each other despite dual restraining orders.  Mercedes believes that Moises and Amy never really stopped seeing each other or having some contact by telephone up until near the time of his arrest for the capital crime.[120]

### 2.     the role of Concepcion's dysfunction as the genesis of Moises' attachment disorder

Dr. Kessner explains the concept of attachment, and how Moises' attachment disorder had its genesis in the life of the Mendoza family:

**ATTACHMENT**

38.     *If one is to understand Moises and how the defense could have rebutted the prosecution's theory that Moises was involved in "crimes of violence against women" which culminated in the death of Rachelle Tolleson, it is important to understand the concept of attachment.  Moises' obnoxious and often hostile treatment of women was a psychological defense against his attachment insecurities and fears*.   Early relational influences have lasting effects on psychological growth and development and eventually on adult relationships.  Dr.

---

[120]   Exhibit A: Affidavit of Gilda Kessner, Psy.D.

Vigen briefly identified the lack of attachment in the case of Moises. He did not offer an explanation to the jury to help them understand the importance of how this complex psychological concept relates to Moises development and ultimately to his involvement in the death of Rachelle Tolleson. The events described in paragraphs 11 through 34 provide a thumbnail sketch of the trials and tribulations in the Mendoza family's history. The appended time line provides even greater detail if the reader wishes to review more fully the family life that was the foundation for the critical developmental periods in Moises' life.

39.    A brief definition of attachment would have been helpful to the jury. Attachment is one of the most complex concepts in psychology. At its simplest, attachment refers to the relationship between the infant and caregiver, generally the mother. The nature of the attachment relationship provides the basis for personality development. The security of an attachment relationship promotes independence in the child and by extension throughout the lifespan. The child develops internal working models or representations of the relationships and expectations of his internal working models. The psychological representations of these relationships carry forward into new relationships as the child develops. Crittenden writes "attachment is not a theory about happiness; it is about protection and … successful reproduction" (pp. 86-87). Thompson (1999, p. 265) describes that attachment security may have "long-term implications for later intimate relationships, self-understanding and even psychopathology." *An explanation of the process of attachment in a young person's life is not the same as blaming parents or others for the specific behaviors of an adult in later life. It is a way to explain how Moises Mendoza got from point A to the death of Rachelle Tolleson; <u>there is a thematic thread that runs through the story</u>.*

40.    Moises was an insecure child and an insecure adolescent. His insecurity had an all-encompassing effect on his life. In the interviews he described being very self-conscious about his skin color. The family talked about the paternal grandmother who was Inca Indian and very dark. Once when she was visiting she made a comment about how dark Moises was. Even as a youngster, Moises covered his arms to avoid getting darker from the sun. His coloring made him feel unattractive and different from his peers. In family relationships, Moises was fearful of self-disclosure and had problems with the appropriate expression of honest feelings. He recalled (and family members corroborated) that during his adolescence a young pregnant woman came to live with the family. She lived with them until her child was three years old. Moises' father cautioned him against trying to be sexual with her. She was about the same age as his sister Elizabeth and he saw her as a member of the family. A clear example of his difficulty expressing himself was that in order to convey disinterest to the young woman, Moises was "obnoxious" to her. In the interview with Ruthie, she confirmed that for as long as the first year, Moises was obnoxious to the young woman but eventually things settled down and his behavior became more relaxed like a good brother.

41.     Attachment security is fundamental to the quality of relationships throughout life and the presence of a close confiding relationship is a protective factor against stress throughout the lifespan.  Individuals who are "insecurely attached" as adults are found to reflect in their relationships,

> "lack of self-disclosure and indiscriminate, overly intimate, self-disclosure; undue jealousy in close relationships; feelings of loneliness even when involved in relationships; reluctance to commitment in relationships; difficulty in making relationships in a new setting, and a tendency to view partners as insufficiently attentive." (Rutter, 1997, p. 24).

42.     Parents, older siblings, grandparents, aunts and uncles are most likely to serve as attachment figures.  The quality of these attachment relationships has a deep impact on the child's security in relationships throughout the lifespan.  For Moises, his parents and older siblings served as attachment figures.  Testimony highlighted the special role Mario served in the home as the oldest brother.  Loss of, absence from or insecurity with any of these three caregivers brought the risk of disrupted attachment in Moises' relationships to his caregivers.  ***The two most important assaults to the secure early attachment bonds available to Moises were when Mario enlisted in the military and when Concepcion was injured, and fell into a deep depression with suicide attempts***.

43.     When Mario left for the military, he was no longer a readily accessible attachment figure for Moises.  The anxiety created by the separation was made much worse by the anxiety displayed by Mercedes over the enlistment of her oldest son.  The high level of emotion in the home and the separation from his doting brother confronted Moises with the first major blow to his security when he was three years old.  His world had transformed from being relatively secure to being filled with powerful and confusing emotions coming from those who would ordinarily protect him.

44.     Concepcion's injury and his slide into depression and the resulting stress for the family was the second major threat to security for Moises.  No longer did he feel protected by the attachment figures in his life.  They were absent or incapacitated.  The father was physically and emotionally absent when in the hospital and in reality when he was still at home.  The relationship had changed and Moises voiced his sadness at the loss of his father as a beloved companion.  He experienced the change in his father as rejection and loss.  Mercedes became increasingly wrapped up in her fears about her husband and his illness.  This again heightened the emotionality in the home and lessened her ready accessibility to Moises during his early years.  In our interviews, Moises described his mother as the "stronger personality" and his father as "cool and laid back."  Moises also recognizes that after the work accident and inability to provide for the family his father felt inadequate.  As a child, Moises

143

was an observer of his parents and the turmoil in the family but he was unable to control the situation.

45.     Dr. Vigen testified that upon interviewing family members he learned that Moises was hyperactive (Vol. 24: p. 160: 22) and impulsive (Vol. 24: p. 160: 11) as a very young child and this was noted by family members to occur as early as age three (Vol. 24: p. 160: 4).  Dr. Vigen testified that Mario compared Moises' behavior to the behavior of his own sons and observed that Moises was "more of a handful … than [his] two sons" (Vol. 24: p. 162: 10-13).  ***We know from testimony and the family time line Moises' behavior disturbance from age three to eight coincided with the Mario and Paul's entrance in the military and Concepcion's injury and initial hospitalizations for depression.  Clinical and research observations have identified that children who are thought to be primarily disobedient, disruptive and aggressive are actually "extremely needy, dependent and anxious."***  Greenberg, DeKlyen, Speltz and Endriga  found that often behavior that is interpreted as oppositional is actually an attempt to get the parents to interact so the child can maintain attention, proximity and contact with the parent (1997, pp. 198-199). "Insecure attachments across infancy are associated with later behavior problems of an externalizing nature, especially for boys who…experience chaotic life event changes and hostile or neglectful parenting in the postinfancy year" (Greenberg et al., 1997, p. 199). Attachment behavior is behavior by the child with the goal of engaging the attachment figure (generally the parent).  ***Moises' behavior as described by his family members was indicative of a youngster attempting to engage his parents.  The parents were essentially incapacitated by physical injury, mental illness (severe depression in the father and anxiety and depression in the mother) and the stress that came from the financial problems related to not working and medical bills.***

46.     The safety and security of the child is dependent upon the child's appraisal that the attachment figure (i.e., parents) will be physically and emotionally available and responsive.  Attachment security is a key feature of relationships throughout life. The internal working model of relationships allows for continuity between effects of early relationships and expectations of future relationships.   Exposure to discordant or chaotic relationships and family environments can compromise a child's development and increase the risk for insecure attachment and problems in future relationships.   As Fonagy et al. (1997) describe it "[c]hildren whose expectations of others are distorted by early experience may be expected to gradually drift to join the company of other youngsters who share these maladaptive expectations" (p. 232).

47.     With puberty comes the issue of reproduction and the development of romantic relationships.  The physical closeness in the adolescent sexual relationship recalls the physical closeness experienced by the infant and young child with adult attachment figures.  Paul testified that Moises told him he wished for a relationship like Paul and Mario had with their wives and that Moises was happy for them.  Paul

could not understand what role Amy played in Moises' life.  ***Moises did not grasp the meaning of the links between his infant and childhood attachment relationships and later romantic attachment relationships. The negative emotions, fear of abandonment, anger, depression, and anxiety from his childhood environment were being replayed in this new relationship with Amy.***

Defense:              Did you get the feeling at any time that he was looking for a good person to be with or anything like that?

Paul Mendoza:         I did.

Defense:              Why did you think that?

Paul Mendoza:         Because he told me several times that he was really, really happy for me and that he wished that he had the luck that my brother and I had in the people that we've chosen as our partners.

Defense:              Was this around the time that he was dating Amy or was it before?

Paul Mendoza:         Around that time, yes.

Defense:              Okay.  The jury's already heard a lot about Amy and her effect on him.  How did you see that?  What was Amy's effect on Moises?

Paul Mendoza:         I saw a very -- a very sad situation because I tried to understand.  I had a lot of questions why.  I asked myself, what is it about this person that he sees, because I saw and I tried to respect his choice in who he was dating, and I tried not to meddle in that, but I saw her as somebody who was a bad influence.

Defense:              Now, did you blame everything that happened to Moises on Amy, or was that a part of what you saw happening to him?

Paul Mendoza:         No, I wouldn't blame her for everything.  I think it's just part of a big puzzle that a lot of times I personally have struggled to try to figure out why.  I think -- I try to figure out what she -- what role she played because I saw -- I did see a definite change in him, and she was definitely an important part of

145

that change, in my opinion, and I tried to figure out what it was.   (Vol. 23: p. 226: 7 to p. 227: 13).[121]

### 3.     Mosies' attachment disorder to  explain his association with a "depraved" peer group

Dr. Kessner explains the relationship between Moises' attachment disorder and his

association withe a depraved peer group:

> Regarding his Moises' peer relationships, Dr. Vigen testified in his opinion number 4:

> > Dr. Vigen:     I think Moises' new friends, from what I can glean, lived a -- sort of a depraved and disrespectful, aggressive and drug and alcohol lifestyle in which -- what I call empty sexuality was involved.  It was where people could or would engage in sexual behavior without any real connection or emotional -- without respect and without care and just casually.  (Vol. 24: p. 126: 2-8)

Crittenden (1997) describes, "defended adolescents who are uncomfortable with intimacy may find that promiscuity … eases their loneliness, enabling them to "dance" the dance of intimacy (even if only through physical reflexes)" (p. 71).

Crittenden further explains,

> most adolescents at some time respond to the initiatives of a seductive peer.  Once in such relationships, however, many are hurt and puzzled by the partner's self-interest, lack of reciprocity, and inability to share intimacy.  The promise of the seductive behavior is unfulfilled. In more extreme cases, the partner's vulnerability and expectation of deceit can lead to obsessive desire for contact and unfounded jealousy; similarly, underlying anger can lead to violence, particularly when there is a perceived threat to the relationship (p. 71).

48.     Crittenden's description gives an understanding of the relationship between the child's attachment experience and later romantic relationships.  Dr. Vigen did not provide the jury with the context of the "depraved sexuality" that characterized the relationship of Moises and his peer group.  Explanation of attachment as a theme that runs through Moises' life provides the context for understanding his behavior.  Clearly, we know that Moises was not secure in his relationships. ....  Consequently,

---

[121]   Exhibit A: Affidavit of Gilda Kessner, Psy.D.

Moises' selection of Amy as a romantic figure was not a safe selection for him.  We can see by the time line that his problems became worse after he met Amy.  ***His ability to analyze the effects of the relationship with Amy was severely compromised by the underlying attachment history that issued from his childhood.***[122]

**4.      Mosies' attachment disorder to explain the "catathymic homicide" of Rachelle Tolleson**

11.      ....  Had the defense performed an adequate mitigation investigation, and developed and prepared a comprehensive and thorough psychosocial history and time line, they would have recognized the availability of a theory of the case that would have been available in all phases of the trial, specifically:

> The killing of Rachelle Tolleson, "a catathymic homicide," was the culmination of an attachment disorder that arose in Moises' early formative years because the Mendoza family was experiencing catastrophic stress – and not as the prosecution asserted, a *"choice"* made by Mr. Mendoza to perpetrate crimes of violence against women.

....

49.      When Moises was in the Dallas County Jail, visits with Concepcion and Mercedes were marred by his obsession with Amy.  The parents have related in the interviews that Moises was so obsessed with Amy that he did not want to talk about anything else when they visited him.  They finally told Moises if he did not stop, they would have to leave because his behavior was upsetting them.  Moises did not stop and instead he became upset with his parents.  They ended the visit early.

50.      This pattern of obsession with Amy in the face of all warning flags that the relationship was not a safe one indicates it was rooted in the attachment insecurity from Moises' early learning and development.  This was not a part of Moises conscious awareness.  He was drawn to Amy despite any warnings by others or the game of seduction and rejection she played with him.  Moises had fixed on a relational object that was tension and anxiety inducing.  Tension and anxiety were common emotions in his parents' home and therefore were familiar to him.

51.      Drama and the beginning of his contact with police characterized Moises and Amy's brief (eleven-month) relationship.  They met in early December 2002 and

---

[122]   Exhibit A: Affidavit of Gilda Kessner, Psy.D.

their last recorded contact was in November 2003.   Within four months (3/23/03) of their meeting, Moises was involved in aggravated robberies with Amy's brother. Two weeks (4/9/03) later, Moises was in a fight with his sister Ruthie to get the car keys so he could drive to see Amy.  The police were called to the house and Moises was arrested.   Six months (10/9/03) later, Moises was diagnosed with major depression at his initial evaluation with MHMR.  Moises reported to his counselor at Life Path Systems that he was feeling angry, irritable and easily frustrated, all symptoms of depression.   He also had thoughts of wanting to harm others. Apparently, this was an unspecified report or there would have been a contact with law enforcement to ensure the safety of any specific person at risk.   A month (10/29/03-11/2/03) later, Moises and Amy stole money from Paul and then were on their five-day runaway.  Moises was eventually arrested for aggravated kidnaping and sexual assault of Amy.   It is obvious that Moises was emotionally and psychologically captured by his relationship with Amy.  Despite an order of protection by Amy against Moises and an order of protection by Mr. and Mrs. Mendoza against Amy, the two would not stay away from each other or cease contact.

52.     "The loss or absence of a pair-bond relationship [has been] found to be associated with emotional loneliness and feelings of "desperation" and anxiety" (Hazan & Zeifman, 1999, p. 344).  Moises' psychological bond with Amy was apparently lost forever.  He resumed his association with his friends from school with the sex and alcohol parties.  He was reportedly exhibiting more erratic and threatening behavior toward his friends, signs of a fragile and deteriorating mental status.  MHMR cancelled his appointment (12/11/03) because the doctor was not available.  This left Moises without the supervision of a qualified mental health professional.  There was no one to gauge his mental state.  Apparently, he was not picked up by the MHMR system again.

## AMY AND RACHELLE

53.     Mendoza family has said that Rachelle Tolleson looked a lot like Amy Lodhi.  As an Amy-substitute, the catathymic killing of Rachelle had nothing to do with Rachelle and everything to do with Moises' deep rage against Amy, which had its origins in his early childhood attachment disorder.  The attack against Rachelle was significant for intense overwhelming violence that could be termed "overkill."  The medical examiner, Dr. Rohr testified that some of the violence occurred after death. He described a wound in the neck that penetrated to the spinal column that could only have occurred after death.

| State: | State's Exhibit Number 67. |
|---|---|
| Dr. Rohr: | This is a difficult-to-take photograph, obviously, with the digital camera which I had a sum total of two-and-a-half months of experience with at this point.  But -- |

148

and some of the difficulty in focusing is because of this white scale right here.  But this is the neck right here.  And this is the defect to the neck which I saw, which was quite obvious on initial examination, right here, which penetrated down into the neck.

State:          How large a defect are we looking at there?

Dr. Rohr:       Well, this right here is going to be a centimeter.  It's going to be two centimeters.  I think we're looking at something that's about an inch across right here.

State:          What was the depth of that defect?  How far into the neck could you actually track that wound?

Dr. Rohr:       It went all the way down to the spinal column.  It -- first of all, it had no hemorrhage in it, so I -- the impression is that it occurred after death.  The wound track, which I eventually described as being consistent with sharp force injury or made by a sharp object, consistent with it, again, went between the carotid artery, which is that large artery which comes off the aorta and supplies the head and neck with blood, and the trachea, which in the wind pipe which conducts air from the nasal passages and the nose and mouth down into the lungs.  Well, anyway, the track went right between those two critical structures without penetrating them or perforating them.

State:          Doctor, is it possible that this wound was actually inflicted before the death of Ms. Tolleson?

Dr. Rohr:       I don't  –  I don't think so.  There's just no hemorrhage there to indicate any bleeding that the heart was pumping at the time, pumping blood into broken – through broken blood vessels that occurred during death – that occurred before death.  I'm sorry.

State:          This wound that you observe here in State's Exhibit Number 67, would it be consistent with Ms. Tolleson having been stabbed with a knife?

Dr. Rohr:       Yes, it would be.

149

| State: | And, again, just in terms of measurements, how deep a wound are we talking about? |
|---|---|
| Dr. Rohr: | Well, I think essentially from the surface of the skin, typically, to the spinal column would typically in life probably be two inches in length.  I think what I observed was somewhat less than that because there had been shrinking of all these tissues by the time I was able to examine her.  But typically that area would be about two inches in length. (Vol. 20: p. 43: 13 to p. 45: 12) |

There is nothing in Moises' relationship with Rachelle that explains this level of violence.  However, understanding his attachment relationship with Amy illuminates the inexplicable violence against Rachelle.

54.     In my interviews with Moises Mendoza, he stated that he had no reason to kill Rachelle that the act had nothing to do with her.  "I lost control, it wasn't about her."  Moises described his relationship with Amy, as like a "fatal attraction" and that he felt "powerless" with her.  He never felt in control with her.  He "got hooked into" Amy and she was "different."  Moises admitted that many people at school did not like him because of his attitude.  He always felt self-conscious about his skin color and did not like to meet girls face to face until he could spend time with them on the telephone.  He would want girls to like him before they had a chance to see him.  Amy was not from his small town and so he felt he could start fresh with her.  She was from Dallas, had a car and had "a life of her own."  Moises felt "restricted, controlled and [even] humiliated" by his mother especially (as did his older siblings when they reached the post-high school year) and his relationship with Amy gave the illusion of more freedom than he had ever experienced before.  When his parents were out of town for a week, Amy stayed with him and they "played house."  Amy and Moises had "patterns" that included showering together after sex.  One time when he got up and did not shower with her she reportedly said "you treat me like a ho."  He became angry with her and started "flicking" lotion at her.  She responded by spraying the lotion bottle on him.  This was followed by getting in the shower with her where he put oil on her hair and urinating on her leg.

55.     The incident with Amy and Moises described in paragraph 52 is significant in that it parallels the triggering event in the sudden murder of Rachelle.  After the charges against Moises for kidnaping and sexual assault of Amy, there is no additional documentation of their relationship, although Mercedes believes they continued to have some telephone contact.  Moises had returned to his local group of peers and resumed participation in the sex and alcohol parties.  Moises related in our interviews that he met up with Rachelle at the parties and they had sex.  He said they never pre-arranged to meet for sex.  The first time they had sexual relations they talked about her pending divorce and his pending criminal charges.  The night of the

150

murder, Moises had already been to one of the parties and was in a verbal altercation with a girl.  He already disliked the girl because she had previously rejected him.  He left the party, was driving around, and wondered why Rachelle was not at the party.  He went to her house and wanted her to go to the party.  She could not go because of the baby so they stayed at her place and had sex.  Sex with Rachelle had not included the shower ritual Moises had with Amy, but he would always take time to cleanse her after sex.  This time he just got up to leave and she made a remark "like Amy did."  She said, "This is all you want?"  Moises described that he "snapped."  "First thing I did was choke her, I snapped on her.  I had never lost control like that.  It's not her fault.  I thought that would make me look crazy.  She was already dead, lifeless, so I stabbed her in the throat.  I just freaked out.  The baby was in the baby's room.  I freaked out.  I tried to put all the soft stuff around the baby and I took Rachelle and I hid her in a field behind my house.  The next day I woke up and wasn't sure if it was real.  I went out there to see if she was there….I lost control.  It wasn't about her."

56.     The self is a psychological concept that "refers to the total personality growing through the life cycle….the unique psychic organization that creates a person's identity" (Scharff & Scharff, 1992, p. 7).  The self is both conscious and unconscious mental representations of one's own person.  Psychological testing completed at the Polunsky Unit shortly after his arrival supports the presence of traits seen in disorders of identity.  Of particular note are features such as fragmentation of the identity experience, chaotic relationships, overwhelming affective expression and mental disorganization potentially leading to dissociation under conditions of extreme stress.  .

57.     Moises' thought processes were clearly disturbed during the assault on Rachelle.  His thought that he was fearful of "looking crazy" for strangling Rachelle so he stabbed her suggests restricted reality testing.   Psychologically it suggests the lack of an integrated identity or self and consequent reality testing failure under the extreme emotional intensity of the aggression.  Moises' overwhelming fear of mental disintegration, of being "crazy" in the way people who go to psychiatric hospitals are crazy, was a terrifying possibility, given his father's psychiatric history.  The post-mortem overkill violence suggests a deficit in his capacity to monitor his thoughts and emotions in relation to external reality.

58.     In his book *Violent Attachments,* J. Reid Meloy has a chapter entitled, Catathymic Homicide.  Meloy (1997, p. 39) cites Maier (1912) who characterized catathymia as a "psychological process in which an intense affect-idea complex temporarily overwhelm[s] internal equilibrium and disrupt[s] secondary process thought."  Acute catathymic homicide is "triggered by a sudden, overwhelming affect having certain ideational and symbolic significance that is unconscious at the time of the violence" (Meloy, p. 47).  What differentiates [this form of violence] from other forms of affective violence is the unconscious motivation for the act and the symbolic significance of the victim" (p. 47).  Meloy further elaborates citing

151

Revitch and Schlesinger (1978, 1981), "catathymic crisis manifests within an ego-threatening relationship and may activate (1) unresolved and conflicted sexual feelings, (2) displacement of emotion onto the victim from another subject with certain symbolic significance, and (3) helpless and confused feelings" (p. 46).

59.     In his study of the phenomena, Wertham (1937) concluded, "the violent act … is an expression of the fight on the part of the patient for the safeguarding of his personality" (as cited in Meloy, p. 40).  Meloy reports that Weiss et al. (1960) described '"sudden murder" [as] a "single, isolated unexpected episode of violence, impulsive acting-out behavior-behavior which is never well thought out, behavior which has no obvious purpose or hope for personal advantage or profit foreseeable as a result" (p. 43).  Weiss also found "[t]he sudden murderers came from large families where the mother dominated and emphasized conformity to social rules. Father was consistently a negative figure, either hostile or rejecting.  Attachment between mother and child was ambivalent, and was characterized by an underlying hostility that had to be repressed or split off …. Controlled anger and unmet dependency needs dominated their [the murderer's] emotional development" (p. 44). Weiss identified "a precipitating insult, such as a belittling rejection, the withholding of a paycheck, criticism of alcohol intake, or ejection from a building" (Meloy, p. 44).[123]

### 5.     Mosies' attachment disorder & alcohol abuse

Both Dr. Kessner, Psy.D. and Dr. Lundberg-Love, Ph.D. explain that there is a relationship between Moises' dysfunctional family life and his binge drinking.  "Excessive drinking has been associated with children whose attachment relationships ...  are broken (Fonagy et al., 1997, p. 232)."[124]

The research has shown a relationship between adverse childhood experiences and alcohol abuse.  Dr. Lundberg-Love explains:  "Moises Mendoza ... had experienced at least two adverse childhood events, including a father who was depressed, hospitalized, and attempted suicide, and a mother who was physically victimized by her husband on at least one occasion, as documented

---

[123]   Exhibit A: Affidavit of Gilda Kessner, Psy.D.

[124]   Exhibit A: Affidavit of Gilda Kessner, Psy.D.

in MHMR records.  Even though Moises minimizes and/or denies the impact of these events, the results of the ACEs study shows that such events can increase one's risk for drug and alcohol abuse or addiction."[125]

A.    In a detailed study of over 17,000 middle-class American adults of diverse ethnicity, it was found that the ***compulsive use of nicotine, alcohol and injected street drugs increased proportionately in a strong, graded, dose response manner, that closely paralleled the intensity of adverse life experiences encountered during childhood. These adverse childhood experiences [ACE] included***:

1)    recurrent and severe physical abuse,
2)    recurrent and severe emotional abuse,
3)    contact sexual abuse,
4)    ***neglect;*** and/or growing up in a household with:

1)    an alcoholic or drug user,
2)    a family member who was imprisoned,
3)    a mentally ill, ***chronically depressed***, or institutionalized family member,
4)    a mother who was treated violently, or
5)    the absence of both biological parents.[126]

Dr. Lundberg-Love concludes, among other things, that "both the alcohol abuse of Moises Mendoza as well as the ACEs experienced by [Moises] during childhood, played a significant role in understanding the mitigation issues inherent in this case."[127]

### 6.    Mosies' alcohol abuse & brain damage

Dr. Martin attests to the nexus between Moises brain damage and his offense conduct, as well as to the mitigation effect of this evidence:

---

[125]    Exhibit B:  Affidavit of Paula Lundberg-Love, Ph.D., *VIII. Conclusion C*

[126]    Exhibit B:  Affidavit of Paula Lundberg-Love, Ph.D., *VII. Adverse Childhood Experiences*

[127]    Exhibit B:  Affidavit of Paula Lundberg-Love, Ph.D., *VIII. Conclusion A*.

19.   *Mr. Mendoza's brain-related impairment appears to be long-standing in nature, and would have been present at the time of the alleged offense*. In fact, it is reasonable to assume that Mr. Mendoza would have demonstrated even greater impairment in these (and possibly other) cognitive areas if he had been administered neuropsychological tests closer to the time frame that he was actively abusing alcohol.
....

21.   When the behavioral effects of his brain impairment are considered, a broader and more accurate explanation for why Mr. Mendoza could have engaged in a violent crime emerges.  Based upon this information, *it is my opinion that Mr. Mendoza's violent actions at the time of the offense could have been mediated by emotional factors as opposed to reason due to the aforementioned damage to his brain. Intoxication would have enhanced the negative effects of brain impairment by increasing his impulsivity and reducing his ability to fully consider the consequences of his actions.*  In particular, Mr. Mendoza having ingested more than 20 beers within a few hours time would have greatly reduced his reasoning skills as well as his ability to inhibit behaviors due to the aforementioned frontal lobe dysfunction.  *The likelihood that frontal-lobe dysfunction had a negative affect on his behavior during the course of this offense is enhanced even more when consideration is given to the fact that at age 20, his frontal lobes were still in a developmental stage.*[128]

Dr. Martin concludes that the defense was ineffective in failing to have Moises tested for brain damage because of the mitigating significance of the test results:

22.   *A neuropsychological examination was warranted for Moises Mendoza during the preparation by his defense team for his capital murder trial.*  Mr. Mendoza has been incarcerated since 2005 and by that time, Neuropsychology research had clearly determined that chronic alcohol abuse produces cognitive decline in a variety of domains.  In fact, as early as the 1960's, research had been produced which reflected that alcohol produced impaired scores on several components of the Halstead-Reitan Battery, the most commonly administered neuropsychological test battery in the United States.  *By retaining an expert and administering a battery of neuropsychological tests, Mr. Mendoza's attorneys could have conclusively proved the existence of neuropsychological damage. Such tests would have provided defense counsel with the means to demonstrate for Mr. Mendoza's jury how the quality of his brain and the specific damage sustained to it adversely affected his higher cognitive functioning and reasoning skills.*  As has been previously discussed, impaired cognitive abilities due to alcohol abuse tend to recover with abstinence.  Therefore, *a neuropsychological exam conducted close*

---

[128]   Exhibit C:  Affidavit of Stephen K. Martin, Ph.D.

154

*in time to the date of his arrest would have detected the present areas of impairment as well as any other indications of alcohol-induced brain damage that Mr. Mendoza may have been experiencing*.

....

24.       *It is also my opinion that this clinical information had mitigating significance and the trial attorneys were ineffective in failing to present it. As a result, the jury was not able to appreciate or give consideration to the mitigating significance of this evidence in making a life/death decision*.[129]

### 7.       Mosies' brain dysfunction & offense conduct

Dr. Martin, a neuropsychologist, attests to a nexus between the biology of brain development

and the offense conduct, and the mitigating significance of Moises' impairment:

20.       It is of clinical relevance that Mr. Mendoza was 20 years old at the time of the offense.  Clinical research and advances in neuro-imaging studies (e.g., MRI) have provided evidence that brain development, particularly involving the frontal regions of the brain, continues into the early 20's.  *Given this information it is reasonable to assume that Mr. Mendoza's frontal lobes, which are intricately involved with anger and impulse control, may not have been functioning "at full capacity" at the time of the offense <u>even prior to any alcohol ingestion</u>.  Frontal lobe impairment has been associated with deficits involving regulating emotions including anger control issues, as well as difficulty inhibiting behaviors particularly in emotionally charged situations.*  Individuals with this type of impairment also have a difficult time fully considering the consequences of their behaviors prior to acting on them.  These negative emotional and behavioral effects, whether due to frontal lobe dysfunction or under-development due to age, would become even more enhanced when alcohol or other substances are ingested.  Right brain abilities, which also reflected impairment upon testing, are also involved with regulating our perceptions and emotional responses to situations.[130]

### E.       Conclusions of Law Nos. 276-280, 341–405 are contrary to and an unreasonable application of federal law, specifically *Strickland* and its progeny.  There is a reasonable probability that the outcome would have been different

---

[129]   Exhibit C:  Affidavit of Stephen K. Martin, Ph.D.

[130]   Exhibit C:  Affidavit of Stephen K. Martin, Ph.D.

In other cases similar to that of Mendoza, the courts have found the defense counsel ineffective because but for their deficient performance, there is a reasonable probability that the outcome would have been different.

- In the case at bar because  the investigation was inadequate, defense counsel failed to explain the actions of Moises Mendoza. *Smith v. Mullin*, 379 F.3d 919, 943 (10th Cir. 2004) (Finding defense counsel ineffective, the court held:  "What the jury wholly lacked was an *explanation* of how Mr. Smith's organic brain damage caused these outbursts of violence and caused this "kind hearted" person to commit such a shocking crime").

- In the case at bar because the investigation was inadequate, the jurors were left with the mistaken impression that Moises' acts were the result of an "intentional" and "knowing" "choice," rather than an inability to control his violent behavior was caused by childhood neglect and brain damage. *See Simmons v. Luebbers,* 299 F.3d 929, 936 (8th Cir.2002) (granting relief from a death sentence and noting:  "The jury was already aware of Simmons's anger towards women.  [A psychiatrist's] report would have introduced the possibility that Simmons's inability to control his violent behavior was caused by childhood trauma and abuse.   This information could have been used in his favor at the penalty stage.   Instead, the jury was allowed to conclude that Simmons's violent behavior was simply the result of his wicked and aggressive nature."); *Williams v. Taylor,* 529 U.S. 362, 398 (2000) (Finding defense counsel ineffective, the Supreme Court noted that evidence of mental impairment and childhood privation and abuse is "consistent with the view that [the petitioner's] behavior was a compulsive reaction rather than the product of cold-blooded premeditation."); *People v. Morgan*, 719 N.E.2d 681, 708 (Ill. 1999) (Finding defense counsel ineffective, the court held: "Because Levin had failed to investigate and present readily available mitigation evidence, the [sentencer] was unaware not only of defendant's severe life-long brain damage and neurological impairments, but also of defendant's abused childhood.   This evidence would have provided the [sentencer] with a portrait of defendant that may have influenced the choice of sentence.").

The Conclusions of Law Nos. 276-280, 341-405 are contrary to and an unreasonable application of federal law.  As a result of counsel deficient performance, there is a reasonable probability the outcome would have been different.   U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor,* 529 U.S. 362 (2000); *Strickland v. Washington*, 466 U.S. 668 (1984).  For all of the aforementioned reasons, habeas relief should be granted.

**GROUND SIX (D**R**. S**ORENSEN **&** *L*OCKETT**): The trial court's ruling that "Dr. Sorensen is not going to be found to be a qualified expert," violated Mr. Mendoza's federal 8th amendment right to individualized sentencing under** *Lockette*

The trial court ruled that "Dr. Sorensen is not going to be found to be a qualified expert." (RR 24:84).    The state courts rulings excluding this expert testimony violated Mr. Mendoza's Eighth amendment right to present testimony as to "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[131]  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Skipper v. South Carolina*, 476 U.S. 1 (1986).

**A.    Statement of Facts.**

During the punishment phase, and out of the presence of the jury, there was a hearing as to the admissibility of the testimony of Dr. Jonathan Sorensen, the defense forensic expert on the issue of future dangerousness, and his methodology on risk assessment.[132]

Among other things, Dr. Sorensen testified that although he had not interviewed Mr. Mendoza, he had reviewed records specific to Mr. Mendoza, and that he had been hired to "mak[e] an individualized assessment of the risk that the Defendant [Mendoza] presents while incarcerated." (RR 24:13, 15-16).  Dr. Sorensen testified that Mendoza had a "23.8 percent chance of committing a serious violent act while incarcerated in TDCJ," (RR 24:25), which is "average in terms of his likelihood of committing an offense while in prison."  (RR 24:13-14, 16-17).  The court asked about

---

[131]   U.S. C**ONST**. amend. VIII; *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976);  *Green v. Georgia*, 442 U.S. 95 (1979).

[132]   (RR 24:8-9); Exhibit K: Reporter's Record  of T**EX**. R. E**VID**. 702 Hearing on Dr. Sorensen as Qualified Expert (RR 24:1-87).

peer review of Dr. Sorensen's methodology on risk assessment, (RR 24:30), and stated that merely

because "[s]omeone ... cite[d] your statistical study ... doesn't necessarily mean that the

methodology ... was sound ... [or] ... unsound....  Before you testify I have to find, among other

things, that your methodology is reliable.  What I'm looking for is not people who have cited you

for some proposition but people who have critically reviewed your methodology."  (RR 24:32-33).

> Dr. Sorensen responded:
>
> ... the more important thing is that all of these have been peer reviewed by people in the field, and these are the top journals in my field. ... the top four journals in criminal justice have published my stuff on violence prediction.  And experts in the field – the top people in this area have evaluated my work before it was published.

(RR 24:32-33). The defense tendered an article by Dr. Sorensen published in the Journal of Criminal

Law and Criminology entitled: An Actual Risk Assessment of Violence Posed by Capital Murder

Defendants.  (RR 24:78).

    After a recess, the court ruled that Dr. Sorensen "is not going to be found to be a qualified

expert," (RR 24:84), on the following bases:

> THE COURT:  Well, I am loathed to take fact issues away from a jury, but I do have a gate-keeping function.  The Supreme Court of the United States has made that abundantly clear.  The Court of Criminal Appeals has made that abundantly clear. An expert opinion is only admissible if it would be helpful to a jury.  It can't be helpful to a jury if it's not reliable.  His last series of answers to me telling me he's got an excess of 23 percent rate of error is simply just by his own  –  that's not reliable.
>
> The methodology is flawed not only, as the State points out, by the exclusion of capital murderers who have been sentenced to death, but the inclusion of  people who have been convicted of murder, a methodology that does not look  –  or that excludes a veritable cornucopia of acts of violence that the Court of Criminal Appeals has held to be  –  to constitute criminal acts of  violence is a flawed methodology.

> To limit it to the simple analysis of Type 1 violations in the prison system  –  which, by his  own paper, essentially is homicides, aggravated assaults and sexual assaults  –  is to eliminate a broad spectrum of criminal activity that a jury is allowed to consider, that the Court of Criminal Appeals has said things that constitute criminal acts of violence.
>
> It is silly.  It is poor scholarship to come into a criminal courtroom to predict future acts of violence and not to include all of the things or even a majority of the things that a jury could consider.
>
> It doesn't help the jury.
>
> Even if somehow some court were to find that Daubert and it's progeny under the applicable Texas case law were satisfied, it fails under a 403 analysis because of the risk of prejudice.  The risk of confusion to the jury is too great.  The risk of misleading the jury is too great to be outweighed by its probative value with an error rate of more than one in five.  That's not helpful.  It's  –  it flat out fails under a 403 analysis.
>
> Dr. Sorensen is not going to be found to be a qualified expert.  Even if he were somehow found to be a qualified expert, his testimony is not going to be admissible because I don't find that it satisfies requirements of an expert under Rule 702 of the Rules of Evidence.  Even if it somehow satisfies the admissibility of rules of an expert opinion, it fails under a 403 analysis.

(RR 24:82-84).

On the direct appeal, Mendoza raised a state-law based claim [TEX. R. EVID. 702, 705] that "the trial court erred in holding that Dr. John Sorenson [sic] was not qualified to testify as an expert on the topic of future dangerousness. *Mendoza v. State*,  2008 WL 4803471, *20 (Tex. Crim. App. 2008).  In its direct appeal opinion, the Texas Court of Criminal Appeals agreed with the trial court holding among other things that "Sorenson's [sic] testimony was not sufficiently reliable to assist the jury in its decision of whether appellant posed a continuing threat to society...."  The Texas Court of Criminal Appeals also "agree[d] with the trial court's consideration of the absence of peer review...."  *Mendoza v. State*,  2008 WL 4803471, *22, n.62 (Tex. Crim. App. 2008).

160

**B.    Findings of Fact Nos. 249-264  – No presumption of correctness**

Mr. Mendoza objects to the Findings of Fact Nos. 249-264 for all the reasons argued more particularly below.  FF Nos. 249-264 are not entitled to a presumption of correctness, and they are "'objectively unreasonable in the light of the evidence presented in the state-court proceeding,'" *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing  Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).

**C.    There is no procedural default  because the direct appeal claim and state habeas claim are different, and extra-record evidence was introduced in state habeas, which was not contained in the trial record**

Throughout the Conclusions of Law Nos. 406-420, there are recitals that the state habeas claim is defaulted and not cognizable because the claim was addressed on direct appeal.  This is simply not true.  The direct appeal challenged the trial court's ruling exclusively on state law grounds.[133] In contrast, the state habeas claim was premised on a federal constitutional law.  Thus,

---

[133]    The direct appeal opinion reads:

> Appellant argues that the predicate presented for Sorenson's testimony adequately met the requirements of Rule 705 of the Texas Rules of Evidence and that the proffered testimony was relevant to special issues two and three.

Then in footnote 59, it clarifies that:

> While appellant claims that the proffered testimony was relevant to special issues two and three, the charge of the court at punishment lists only two special issues, the future dangerousness special issue and the mitigation special issue.   Further, Appellant states that Sorenson's testimony met Rule 705 requirements, but his argument relates to the trial court's 'gate-keeper function,' which is actually contained in Rule 702.

*Mendoza v. State*, 2008WL 4803471, *20 (Tex. Crim. App. 2008) (not designated for pub.)

these are not the same claims.  *See Ex parte Garcia*, 2008 WL  4573962, *1 (Tex. Crim. App. 2008), *citing Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex. Crim.  App. 1984) ("We need not address applicant's second contention inasmuch as the **_same_** issue was raised and addressed by the Fourth Court of Appeals on applicant's direct appeal.") (emphasis supplied).

Additionally, the state habeas claim was premised on a federal constitutional law violation, and it was supported by extra-record evidence, which could not have been introduced for the first time on direct appeal.  *Compare Ex parte Garcia*, 2008 WL  4573962, *1 (Tex. Crim. App. 2008) ("The following allegations are procedurally defaulted and barred from habeas review because they were available to be raised on direct appeal but were not,  *citing  Ex parte Gardner*, 959 S.W.2d 189, 198-200 (Tex. Crim. App. 1996)") *with Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) ("... the rejection of that claim on direct appeal did not bar re-litigation of the claim on habeas corpus "to the extent that [Torres] seeks to gather and introduce additional evidence not contained in the direct appeal record." ).  Hence, the state habeas claim was not procedurally defaulted and is cognizable in federal habeas.

**D.     Argument and Authorities.**

**1.     Standard of Review:  *De Novo* Review**

Because the Findings of Fact and Conclusions of Law mistakenly ruled that this claim was procedurally defaulted, there was no merits review.  As a result, this federal court entertains the claim *de novo*.  *See  Fisher v. Texas,* 169 F.3d 295, 300 (5th Cir.1999) (finding that where a state habeas court decided the habeas applicant's claim on procedural grounds, there had not been an "adjudication on the merits").

162

Under *Lockett*, the "fundamental respect for humanity underlying the Eighth Amendment. . . . [mandates the] consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett v. Ohio*, 438 U.S. 586, 601 (1978) *citing Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).  *See also  Skipper v. South Carolina*, 476 U.S. 1 (1986).  The U.S. Supreme Court wrote:

> ... it is precisely because the punishment should be directly related to the personal culpability of the defendant that ***the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense***. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a " 'reasoned *moral* response to the defendant's background, character, and crime.'

(Emphasis supplied and in the original).  *Penry v. Lynaugh*, 492 U.S. 302, 327-328 (1989).

Recently the U.S. Supreme Court made clear that the threshold showing for the admissibility of mitigating evidence is a very low one and such evidence can not be barred if the sentencer could reasonably find that it warrants a sentence less than death:

> ***When we addressed directly the relevance standard applicable to mitigating evidence in capital cases*** in  *McKoy v. North Carolina,* 494 U.S. 433, 440-441 (1990), ***we spoke in the most expansive terms***. .... ***'Relevant  mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'*** "  494 U.S. at 440 (quoting *State v. McKoy,* 323 N.C. 1, 55-56, 372 S.E.2d 12, 45 (1988) (opinion of Exum, C. J.)). Thus, ***a State cannot bar "the consideration of ... evidence if the sentencer could reasonably find that it warrants a sentence less than death."*** 494 U.S. at 441.

Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. *Boyde v. California,* 494 U.S. 370, 377-378 (1990) (citing *Lockett v. Ohio,* 438 U.S. 586 (1978); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Penry I,* 492 U.S. 302 (1989)); see also *Payne v. Tennessee,* 501 U.S. 808, 822 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death....

> *[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances"* (quoting *Eddings, supra,* at 114)).

*Tenard v. Dretke*, 542 U.S. 274, 284-285 (2004).


**2.**     **Dr. Sorensen is a qualified expert**

      **a.**     **Dr. Sorensen's research methodology is highly regarded and the associated findings considered sound**

Dr. Cunningham attests to Dr. Sorensen's status as an expert, and the soundness of his work, contradicting the trial court's ruling and the erroneous affirmance by the Texas Court of Criminal Appeals.  Dr. Cunningham attests to the frequent citation to Dr. Sorensen's work "by other scientists in their own scholarly research, and not being the subject of a published critical response or adverse literature review critique is strong evidence that [his] research methodology is highly regarded and the associated findings considered sound.... [Moreover], Dr. Sorensen's extensive peer-reviewed scholarly publications regarding capital offenders and prison misconduct is contrasted with the absence of such scholarship among experts called by the State at capital sentencing to assert future dangerousness, and accepted as experts by various Texas courts, who have authored no peer-reviewed studies regarding rates and correlates of prison violence...."[134]

As Dr. Cunningham more fully attests:

<u>Dr. Sorensen's status as an expert</u>

**10.**     I am well-acquainted with the scholarship and research of Dr. Jon Sorensen. As the above list of my scholarly publications regarding violence risk assessment reflects, Dr. Sorensen is a research colleague and co-investigator with me in a number of peer-reviewed scientific studies regarding rates and correlates of prison violence. I have cited and described his research findings, both those from separate

---

[134]     Exhibit L: Affidavit Mark Cunningham, Ph.D., dated 7-23-07, paras. 17-18.

and joint research, in testimony in numerous state and federal capital cases throughout the United States, and also in my testimony before the Criminal Justice Committee of the Texas Senate as it considered life-without-parole as a sentencing option in capital cases. I have reviewed Dr. Sorensen's curriculum vitae. [Exhibit 6]

**11.**     After a hearing outside the presence of the jury, the Court ruled: "Dr. Sorensen is not going to be found a qualified expert" (Volume 24, Punishment Phase, June 28, 2005, Page 84, Line 7-8). This ruling is inconsistent with a number of factors regarding Dr. Sorensen's stature as a scientist and his associated expertise that is far beyond the ken of a layman.

**12.**     At the time of trial and continuing to date, Dr. Sorensen held the rank of Professor of Criminal Justice at Prairie View A&M University. Such an academic rank is a reflection of both his academic experience and scholarly productivity. Dr. Sorensen had previously held the rank of Associate Professor of Criminal Justice at University of Texas – Pan American, and Assistant Professor of Criminal Justice at Central Missouri State University. He has taught both undergraduate and graduate courses in statistics and research design. Dr. Sorensen has served on and chaired master thesis and doctoral dissertation committees. His academic role has resulted in his being well-prepared to design, statistically analyze, and interpret research.

**13.**     Review of Dr. Sorensen's curriculum vitae reveals that he has served as a peer-reviewer for a number of peer reviewed scientific journals, including: *Justice Quarterly*; *Crime & Delinquency*; *Journal of Research in Crime and Delinquency*; *Journal of Criminal Justice*; *Journal of Quantitative Criminology*; *Journal of Criminal Justice Education*; *Prison Journal*; *Critical Journal of Crime, Law & Society*; and *Assessment*.

**14.**     The procedure of peer review in the sciences involves the editor of a scientific journal, a leading scientist in his/her own right, selecting several nationally recognized experts in the topic or methodology addressed in the submitted manuscript (i.e., research study). These recognized scientists review the manuscript for its scholarly merit and potential contribution to the body of scientific knowledge, the coverage of the literature review, the soundness of the methodology, the appropriateness of the statistical analysis, the rationale of the discussion, and the clarity of the writing. This process of peer review in the sciences, distinct from that of the law review process apparently more familiar to the trial court, has two important implications.

**15.**     First, Dr. Sorensen's selection as a peer-reviewer by numerous scientific journals demonstrates the regard that other leading scientists have for his academic and research expertise. In this sense, it demonstrates his history of being favorably reviewed or regarded by other scientists, an issue that was apparently of interest to the trial court. My own recurrent seeking out of Dr. Sorensen to collaborate on major research initiatives is a similar affirmation of the extraordinary regard that I have for his research design, statistical, and criminal justice knowledge and expertise.

165

**16.**    Second, Dr. Sorensen's history of published research, including studies regarding rates and correlates of prison misconduct, demonstrates that his research has been critically reviewed by leading scientists. That is the nature of peer review. His peer-reviewed scholarship includes the following:

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (Forthcoming). Assertions of "future dangerousness" at federal capital sentencing: Rates and correlates of subsequent prison misconduct and violence. Law and Human Behavior.

Sorensen, J. & Cunningham, M. (R&R). Conviction offense and prison violence: A comparative study of murderers and other offenders. *Crime & Delinquency.*

Kuanliang, A. & Sorensen, J. (Forthcoming). Predictors of self-reported prison misconduct. *Critical Journal of Crime, Law & Society*.

Cunningham, M. & Sorensen, J. (Forthcoming). Capital offenders in Texas prisons: Rates, correlates, and an actuarial analysis of violent misconduct. *Law & Human Behavior.*

Sorensen, J. & Cunningham, M. (Forthcoming). Operationalizing risk: The influence of measurement choice on the prevalence and correlates of prison violence among incarcerated murderers. Journal of Criminal Justice.

Cunningham, M. & Sorensen, J. (Forthcoming). Predictive factors for violent misconduct in close custody. Prison Journal.

Sorensen, J.; Snell, C.; & Rodriguez, J. (2006).  An assessment of criminal justice and criminology journal prestige. *Journal of Criminal Justice Education, 17*, 297-322.

Cunningham, M. & Sorensen, J. (2006).  Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high-security inmates. *Criminal Justice & Behavior, 33*, 683-705.

Cunningham, M. & Sorensen, J. (2006).  Actuarial models for assessing prison violence risk: Revisions and extensions of the Risk Assessment Scale for Prison (RASP). *Assessment, 13*, 253-265.

Cunningham, M.; Reidy, T.; & Sorensen, J.; (2005). Is death row obsolete? A decade of mainstreaming death-sentenced prisoners in Missouri. *Behavioral Sciences & the Law, 23*, 307-320.

Cunningham, M.; Sorensen, J.; & Reidy, T. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. *Assessment, 12*, 40-49.

166

Cunningham, M.; Sorensen, J.; & Reidy, T. (2004).  Revisiting future dangerousness revisited: Response to DeLisi and Munoz. *Criminal Justice Policy Review, 15*, 365-376.

Sorensen, J; Hope, R.; & Stemen, D. (2003) Racial disproportionality in state prison admissions: Can regional variations be explained by differential arrest rates? *Journal of Criminal Justice, 31*, 73-84.

Sorensen, J.; Patterson, A.; & Cohen, N. (2002) Ethnicity, nationality, and criminal case disposition on the border.  *Rio Bravo, 1*(new series), 71-78.

Sorensen, J. & Stemen, D. (2002) The effect of state sentencing policies on incarceration rates. *Crime & Delinquency, 48*, 456-475.

Sorensen, J. & Pilgrim, R. (2002) Institutional affiliation of authors in the top criminal justice journals, 1995-1999. *Journal of Criminal Justice, 30,* 11-18.

Sorensen, J.; Wallace, D.; & Pilgrim, R. (2001) Empirical studies on race and death sentencing: A decade after the GAO Report. *Criminal Law Bulletin, 37*, 395-408.

Reidy, T.J.; Cunningham, M.D.; & Sorensen, J. (2001) From death to life: Prison behavior of former death row inmates in Indiana.  *Criminal Justice and Behavior, 28*, 62-82.

Brock, D.; Cohen, N.; & Sorensen, J. (2000) Arbitrariness in the imposition of death sentences in Texas: an analysis of four counties by offense seriousness, race of victim, and race of offender. *American Journal of Criminal Law, 28*, 43-71.

Sorensen, J. & Pilgrim, R. (2000) An actuarial risk assessment of violence posed by capital murder defendants. *Journal of Criminal Law and Criminology, 90*, 1251-70.

Brock, D.; Sorensen, J.; & Marquart, J. (2000) Tinkering with the machinery of death: An analysis of the impact of legislative reform on the sentencing of capital murderers in Texas. *Journal of Criminal Justice, 28*, 343-349.

Cohn, E.G.; Farrington, D.P.; & Sorensen, J. (2000) Journal publications of PhD graduates from American criminology and criminal justice programs, 1988-1997. *Journal of Criminal Justice Education, 11*, 35-49.

Brock, D.; Sorensen, J.; & Marquart, J. (1999) Racial disparities in capital punishment in Texas after *Penry.  Justice Professional, 12,*159-172.

167

Sorensen, J.; Wrinkle, R.; Brewer, V.; & Marquart, J. (1999) Capital punishment and deterrence: Examining the effect of executions on murder in Texas. *Crime & Delinquency, 45*, 481-493.

Sorensen, J. & Wallace, D.H. (1999) Prosecutorial discretion in seeking death: An analysis of racial disparity in the pretrial stages of case processing in a midwestern county. *Justice Quarterly, 16*, 559-578.

Sorensen, J.; Wrinkle, R.; & Gutierrez, A. (1998) Patterns of rule-violating behaviors and adjustment to incarceration among murderers. *Prison Journal, 78*, 222-231

Wallace, D.H. & Sorensen, J. (1997) Comparative proportionality review: A nationwide examination of reversed death sentences. *American Journal of Criminal Justice, 22*, 13-40.

Ethridge, P.A. & Sorensen, J. (1997) An analysis of attitudinal change and community adjustment among probationers in a county boot camp. *Journal of Contemporary Criminal Justice, 13*, 139-154.

Sorensen, J.R. & Wrinkle, R.D. (1996) No hope for parole: Disciplinary infractions among death-sentenced and life-without-parole inmates. *Criminal Justice and Behavior, 23,* 542-552.

Brock, D.E.; Sorensen, J.R.; & Marquart, J.W. (1995) Social control in Twentieth Century Texas: The influence of ethnicity on prison terms for murder. *Rio Bravo, 4,* 49-60.

Sorensen, J.R. & Wallace, D.H. (1995) Arbitrariness and discrimination in Missouri capital cases: An assessment using the Barnett scale. *Journal of Crime and Justice, 18,* 21-58.

Sorensen, J.R. & Wallace, D.H. (1995) Capital punishment in Missouri: Examining the issue of racial disparity. *Behavioral Sciences & the Law, 11,* 61-80.

Sorensen, J.R.; Burton, V.S.; Marquart, J.W.; & Alarid, L.F. (1995) Expectations and institutional support for research in criminal justice doctoral programs. *Justice Professional, 9,* 31-43.

Sorensen, J.R. (1994) Scholarly productivity in criminal justice: Institutional affiliation of authors in the top ten criminal justice journals. *Journal of Criminal Justice, 22,* 535-547.

Sorensen, J.R.; Widmayer, A.; & Scarpitti, F. (1994) Examining the criminal justice and criminological paradigms: An analysis of ACJS and ASC members. *Journal of Criminal Justice Education, 5,*149-166.

168

Sorensen, J.R.; Marquart, J.W.; & Brock, D.E. (1993) A comparison of factors related to the killings of felons by police and citizens. *Journal of Police and Criminal Psychology, 9*, 20-33.

Sorensen, J.R.; Marquart, J.W.; & Brock, D.E. (1993) Factors related to killings of felons by police officers: A test of the community violence and conflict hypotheses. *Justice Quarterly, 10*, 417-440.

Ethridge, P.A. & Sorensen, J.R. (1993) An evaluation of Citizens Against Auto Theft. *Security Journal, 4*, 13-19.

Ralph, P.H.; Sorensen; J.R.; & Marquart, J.W. (1992) A comparison of death-sentenced and incarcerated murderers in pre-*Furman* Texas. *Justice Quarterly, 9*, 185-209.

Sorensen, J.R.; Patterson, A.L.; & Widmayer, A.L. (1992) Publication productivity of faculty in criminology and criminal justice doctoral programs. *Journal of Criminal Justice Education, 3,* 1-34.

Marquart, J.W.; Ekland-Olson, S.; & Sorensen, J.R. (1989) Gazing into the crystal ball: Can jurors accurately predict future dangerousness in capital cases? *Law and Society Review, 23*, 449-468.

Marquart, J.W. & Sorensen, J.R. (1989) A national study of the *Furman*-commuted inmates: Assessing the threat to society from capital offenders. *Loyola of Los Angeles Law Review, 23*, 5-28.

Marquart, J.W. & Sorensen, J.R. (1988)  Institutional and postrelease behavior of *Furman*-commuted inmates in Texas.  *Criminology, 26*, 677-693.

Del Carmen, R.V. & Sorensen, J.R. (1988)  Legal issues in drug testing probationers and parolees. *Federal Probation, 52,* 19-27.

**17.**    Similarly, when other scientists cite Dr. Sorensen's research findings, it demonstrates their own review of the associated research study and their acceptance of the findings. Only when findings are controversial or reflect methodological problems is a specific critique or response published. Alternatively, a particular study may be critiqued as part of a broader literature review. Though an active student of this arena of research, I am not aware of any adverse critiques of Dr. Sorensen's research.

**18.    *The inquiry and subsequent ruling of the court does not appear to appreciate that successfully passing peer review, having one's research findings frequently cited by other scientists in their own scholarly research, and not being the subject of a published critical response or adverse literature review critique is***

169

*strong evidence that one's research methodology is highly regarded and the associated findings considered sound*.

**19.**    *Dr. Sorensen's extensive peer-reviewed scholarly publications regarding capital offenders and prison misconduct is contrasted with the absence of such scholarship among experts called by the State at capital sentencing to assert future dangerousness, and accepted as experts by various Texas courts, who have authored no peer-reviewed studies regarding rates and correlates of prison violence* (e.g., James Grigson, M.D.; Richard Coons, M.D.; Edward Gripon, M.D.).[135]

> **b.**    **Dr. Sorensen's methodology is an exemplar of research that provides a reliable and scientifically based approach to violence risk assessment at capital sentencing**

In his affidavit, Dr. Cunningham also attests that Dr. Sorensen's methodology is an exemplar of the sort of research that provides a reliable and scientifically based approach to violence risk assessment at capital sentencing, and responds with particularity to each of the trial court's rulings:

> *Dr. Sorensen's study of 6,390 convicted murderers in TDCJ*

**20.**    Dr. Sorensen testified outside the presence of the jury that he was prepared to provide group statistical data regarding projected life-time prevalence rates of serious violence among convicted murderers in TDCJ [J. Sorensen & R. Pilgrim, An actuarial risk assessment of violence posed by capital murder defendants. *Journal of Criminal Law and Criminology, 90*, 1251-70 (2000)] [Exhibit 7]. This group data or base rate would be particularized to Mr. Mendoza by adjusting the group rate with empirically demonstrated correlates of prison violence that emerged from a logistic regression analysis (i.e., utilizing an actuarial methodology). The sample providing these rates and correlates involved 6,390 convicted murderers in TDCJ whose official disciplinary records were retrospectively reviewed. This represented the largest study of the prison behavior of convicted murderers ever reported. I am quite familiar with the findings of this study and the underlying base rate and logistic regression methodology.

---

[135]    (Emphasis supplied);  Exhibit L: Affidavit Mark Cunningham, Ph.D., dated 7-23-07.

**21.**    Regarding this study and Dr. Sorensen's anticipated testimony of utilizing it to provide a particularized, actuarially-derived estimate that there was an average or 23.8% risk of committing serious violence in prison, the trial court opined and ruled:

> … His last series of answers to me telling me he's got an excess of 23 percent rate of error is simply just by his own – that's just not reliable. The methodology is flawed not only, as the State points out, by the exclusion of capital murderers who have been sentenced to death, but the inclusion of people who have been convicted of murder, a methodology that does not look – or excludes a veritable cornucopia of acts of violence that the Court of Criminal Appeals has held to be – to constitute criminal acts of violence is a flawed methodology.
>
> To limit it to the simple analysis of Type I violations in the prison system – which by his own paper, essentially is homicides, aggravated assaults and sexual assaults – is to eliminate a broad spectrum of criminal activity that a jury is allowed to consider, that the Court of Criminal Appeals has said things that constitute criminal acts of violence.
>
> It's silly, It is poor scholarship to come into a criminal courtroom to predict future acts of violence and not to include all of the things or even a majority of things that a jury could consider.
>
> It doesn't help the jury.
>
> Even if somehow some court were to find that Daubert and it's progeny under the applicable Texas case law were satisfied, it fails under a 403 analysis because of the risk of prejudice. The risk of confusion to the jury is too great. The risk of misleading the jury is too great to be outweighed by its probative value with an error rate of more than one in five. That's not helpful. It's – it flat out fails under a 403 analysis.

**22.**    The trial court's characterization of this study as "silly" and "poor scholarship" is inconsistent with the view of the scientific community, which has referenced this study as an exemplar of the sort of research that provides a reliable and scientifically-based approach to violence risk assessment at capital sentencing. More specifically, the *Amicus Curiae* brief regarding violence risk assessment at capital sentencing prepared by the American Psychological Association (*U.S. v. Sherman Lamont Fields* in the United States Court of Appeals for the Fifth Circuit, 2005) [Exhibit 8] described:

171

A large body of research shows that predictions of future violence based on greater structure and incorporating empirically-grounded method such as structured professional judgment techniques and actuarial tools generally produce more accurate results that unstructured clinical approaches similar to that employed by Dr. Coons. [references omitted] (page 15)

Despite these general limitations, certain information recently has been developed regarding the ability to predict future violent behavior by individuals in a secure prison setting. One, it is broadly established that the "base rate" of violence within a secure correctional environment is extremely low. See, e.g., Jonathan R. Sorensen and Rocky L. Pilgrim, An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants, 90 J. Crim. L. & Criminology 1251 (2000) (in a study of Texas inmates convicted of murder, assessing overall likelihood of inmate-on-inmate homicide of only 0.2% during a 40-year capital life sentence). With such a low "base rate" of violence, it is highly unlikely that a scientifically reliable opinion can be offered that any individual is "more likely than not" to commit a serious act of violence in that setting, and the "false positive" error rate for such predictions will be exceedingly high. [references omitted] (page 18-19)

**23.**     The low base rates of serious violence reported by Sorensen and Pilgrim were also cited in the *Amici Curiae* brief of the Texas Psychological Association and Texas Appleseed (*Noah Espada vs. The State of Texas*, in the Court of Criminal Appeals of Texas at Austin, 2007, at 9,10) [Exhibit 9]:

Despite these general limitations, certain information recently has been developed regarding the ability to predict future violent behavior by individuals in a secure prison setting. One, it is broadly established that the "base rate" of violence within a secure correctional environment is extremely low. [Footnote: *See, e.g.,* Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. CRIM. L. & CRIMINOLOGY 1251 (2000) (in study of Texas inmates convicted of murder, assessing overall likelihood of inmate-on-inmate homicide of only 0.2% and of aggravated assault on correctional staff member of 1.0% during a 40-year capital life sentence).]

….Two investigations [i.e., Mark D. Cunningham, et al., *An Actuarial Model for Assessment of Prison Violence Risk Among Maximum Security Inmates*, 12 ASSESSMENT 40, 44-46 (2005); Sorensen & Pilgrim (2000)] recently have been completed which attempt to differentiate those inmates that present an *increased* risk of violence in prison (within the overall low prevalence rate) from those who are at less risk…In another study [Sorensen & Pilgrim, 2000] in which an actuarial approach was employed, researchers estimated the probability of violent prison misconduct for a large sample of Texas capital [sic] defendants (excluding inmates

172

sentenced to death). Only six risk factors emerged as significantly associated with institutional violence, but individuals meeting all six risk factors had a higher likelihood of future violence than individuals with none of the risk factors.

Significantly, however, these and other studies have established certain counterintuitive results. For instance, criminal history variables—including past community violence, prior convictions, severity of current offense and escape history—are established predictors of general and violent recidivism in the community but only weakly or inconsistently correlate with prison violence. [references omitted]

**24.**     In a comprehensive review of risk assessment methodologies and instruments that could potentially be utilized to assess risk of prison violence at capital sentencing (Edens et al., Predictions of future dangerousness in capital murder trials: Is it time to "disinvent the wheel?" *Law and Human Behavior, 29*, February, 2005) [Exhibit 10], an entire page was devoted to summarizing the methodology and findings of the Sorensen and Pilgrim (2000) study [at page 75, 76].

Sorensen and Pilgrim (2000) developed an actuarial risk assessment model on a sample of 6,390 Texas inmates convicted of murder—excluding death row inmates—and followed them over an average of 4.5 years within the prison during the 1990s. With an operational definition of "violence" as any homicide, aggravated assaults against guards, assaults/fights with a weapon against inmates, or "other violence," the base rate for this sample was about 24 violent acts per 1,000 inmates per year, involving approximately 8% of the inmates. Specifically, the base rates were .2 per 1,000 inmates per year for prison homicide and 1.1 assaults per 1,000 inmates per year for aggravated assaults against guards. Using Cox regression, it was found that half of the group that was violent at some point in their incarceration did so within the first 2 years of imprisonment.

Based on aggregate incidence rates of violence committed within the Texas prison system, Sorensen and Pilgrim (2000) estimated the likelihood of violence perpetrated by those convicted of murder across 40 years in prison (the minimum length of imprisonment a nondeath sentenced capital offender in Texas must serve before being eligible for parole) to be .16.  Logistic regression analyses including (a) personal characteristics (e.g., age, marital status, sex, gang membership), (b) criminal history variables (e.g., number of arrests, convictions, juvenile confinement, adult prison confinement), and © offense-related information (e.g., number of victims, contemporaneous perpetration of other types of offenses, involvement of drugs/alcohol) showed only six of these variables to be significantly related to institutional violence. Young age (under 21 years) at the point of entry into prison for the index murder offense was the most influential factor. Other additive variables included in the measure included prison gang membership, additional conviction(s) for robbery or burglary during the commission of the index offense, multiple victims in the offense, additional conviction(s) for attempted murder or assault during the commission of the index offense, and prior prison term(s). Based on the

173

accumulation of risk factors, it was projected that individuals meeting all six factors represented a 54.6% probability of engaging in future acts of institutional violence, compared to a 2.0% probability for those in the lowest risk category (i.e., an offender older than 35 with no other risk factors). Cross-validation showed the actuarial instrument to perform reasonably well on a sample of inmates convicted of manslaughter.

The Sorensen and Pilgrim actuarial scale appears to present some promise in its capacity to identify capital offenders who are at relatively higher risk for engaging in assaultive acts while in prison, particularly in comparison to the other risk measures discussed above. First, it was explicitly developed on a sample "restricted to cases as similar as possible to cases that would be predicted" in capital sentencing (Sorensen & Pilgrim, 2000, p. 1259) for the very purpose of predicting the violence criterion mental health professionals are called on to address in such cases, lending to the apparent generalizability of the results. Moreover, by using the same definition of "violent acts" as Marquart and colleagues (Marquart et al., 1989, 1994; Marquart & Sorensen, 1988, 1989), this study contributes to the accrued literature on institutional violence among former capital defendants. Nevertheless, in the absence of additional published studies examining the Sorensen and Pilgrim model [footnote: We are currently in the process of investigating the utility of the Sorensen and Pilgrim model with the sample of death row inmates described earlier in this article.] we believe it would be premature to place a great deal of weight on the values derived from it, particularly in reference to cases outside of the Texas prison system.

**25.**     The trial court found fault with death-sentenced offenders being excluded from the sample. There are both sound methodological and conceptual rationales for this exclusion. From a methodological standpoint, reliable research findings rely on commonality of experimental conditions (e.g., that the inmate participants are held under similar conditions or are at least eligible for similar conditions, that the participants face a lengthy prison sentence). It is fundamental to sound scientific methodology that the design of the study seek to avoid intervening factors that might inadvertently influence or bias the results. The inclusion of death-sentenced inmates in the Sorensen and Pilgrim study would have been problematic in this respect. More specifically, death-sentenced inmates in Texas have historically been segregated from the inmate general population, with restricted activities and heightened security. Their resulting rates of prison violence would be quite difficult to interpret, particularly in comparison to a larger sample of convicted murderers who were in the general prison population or eligible for placement in the general prison population. Should the death-row inmates be demonstrated to have lower rates of violence, it would be unclear to what extent this was due to the restrictions and security procedures applied to them. Should their rates of violence be higher it would be unclear whether they were subjected to more stringent disciplinary enforcement, or whether contextual factors such as deprivation, frustration, or a looming death sentence were impacting on their rates of violence. This comparability problem has become more acute since 1999 when the Texas death-row was moved to the Polunsky Unit where death-sentenced inmates have been single-celled under super-

174

maximum security. This includes being single-celled, having solitary recreation, and being strip-searched and handcuffed behind the back prior to any movement outside the cell.

26.     From a conceptual standpoint, at capital sentencing the jury is effectively being asked to forecast what violence would occur should the defendant receive a capital life term rather than a death sentence (i.e., what is likely to happen if…?). In addressing this issue, it is most relevant to examine the prison behavior of convicted murderers in the general prison population and not under the heightened security and restrictive conditions of death row.

27.     The trial court found fault with the inclusion of non-capital murderers in the study. Dr. Sorensen, however, testified that the statistical analysis tested for this factor and found that this variable did not influence the rates or actuarial adjustments to this rate.

28.     The trial court found fault with the operational definition of violence utilized by the Sorensen and Pilgrim study (i.e., homicide, attempted homicide, assault with a weapon, fight with a weapon, sexual assault, robbery on inmate, aggravated assault on correctional officer), noting that this definition did not include all of the potential acts that the jury might consider in answering this special issue. Several points are notable in illuminating the trial court's concern.

29.     First, a significant problem in past research on the rates and correlates of prison violence has been operational definitions that were too broad and thus obscured clear measurement and study of the violence of greatest concern to the courts and to prison administrators. The Sorensen and Pilgrim study addressed this problem by both disaggregating violent misconduct into different types (e.g., homicide, aggravated assault on staff, any serious assault) and limiting the definition of violence to the more serious variety. Consistent with this observation, the literature review of Edens et al. (2005) viewed favorably the operational definition of violence specified in the study. In light of the increasing preference in the scientific literature for examining more serious instances of prison violence, Dr. Sorensen's methodology does not demonstrate "poor scholarship."

30.     Second, from a conceptual standpoint a case could be made that the "criminal acts of violence that would constitute a continuing threat to society" envision acts where a preventive intervention of death is a proportionate response. If Dr. Sorensen adopted such a conceptualization in restricting the operational definition of violence to those acts of violence of a more serious nature, this is not "silly," nor is it unsupported in the scholarly literature. To illustrate, Edens et al. (2005) explained in a comprehensive literature review of violence risk assessment techniques and their application to capital sentencing:

        Second, it is unclear whether the institutional criterion measures in
        most of these studies even reflect what would be considered acts of

175

"criminal violence." Noted earlier, in many of the studies reviewed "aggressive" behaviors were operationalized to include acts such as threats, destruction of property, "hostility," and acts of defiance (e.g., refusing to work). Studies restricting their criterion measures to physically aggressive conduct often included acts such as destruction of property or throwing urine or feces. [Footnote: Even in the Sorensen and Pilgrim study, "violent" incidents merely holding the *potential* for injury were included, regardless of whether any actual injury occurred.] Although certainly the sorts of behaviors that most in society would like to prevent from occurring in a prison setting, one suspects that these behaviors would not be considered by most laypersons to be the type of violence that warrants imposing a death sentence. Although ultimately it is the jury's role to determine what exactly constitutes acts of criminal violence, at a minimum it would seem that examiners should clarify the types of outcomes to which they are referring when describing the likelihood of "future violence."

**31.**     Third and more fundamentally, Dr. Sorensen's testimony regarding the application of this study to the violence risk assessment of Mr. Mendoza did not limit what the jury could or should consider in evaluating the special issue. Rather, he explicitly described what his study measured and the associated actuarially-derived risk of Mr. Mendoza committing those acts, and only those acts. Quite obviously, and confirmed by research on prison misconduct, as the operational definition of aggression broadens, the frequency and prevalence rates increase. This point was available to cross examination and argument.

**32.**     The trial court viewed the probability estimate provided by Dr. Sorensen (i.e., 23.8% likelihood of one of the specified violent acts during a capital life sentence) as an error rate. This appears to represent a misunderstanding of the concepts of probability and error rate. The court seems to have interpreted Dr. Sorensen's proposed testimony and the associated probability rate regarding Mr. Mendoza as an either/or prediction with associated error rates of 23.8% if predicting nonviolence and 76.2% if predicting violence. In fact, Dr. Sorensen did not offer a prediction. Rather, he described an actuarial scale that assessed a particular probability. The associated error rate of that scale (and the estimate derived from it) involves the inaccuracy of the specified probability (i.e., the plus-minus range surrounding the probability estimate). Data informing this inaccuracy range of the scale is available from the statistical analysis of the scale and by cross-validation (which Dr. Sorensen accomplished with a separate sample of inmates convicted of manslaughter).

**33.**     To offer a simplified analogy, a prognosis in medicine is not unreliable on its face if it specifies a 23% 10-year death rate from a particular cancer.

**34.**     As the trial court specified a definition of "probability" for purposes of the special issue as "more likely than not" (Pre-trial conference, July 15, 2004, page 57,

176

lines 17-18), Dr. Sorensen's specification of a 23.8% likelihood would seem to well-inform this definition as this percentage is well below 51%, at least regarding the violent acts specified in the study.

**35.**     The trial court opined that Dr. Sorensen's testimony regarding his study and the associated particularized risk assessment of Mr. Mendoza had too great a risk of confusing the jury. Again, several points are notable.

**36.**     Statistical data has the potential of being challenging to a jury to understand. However, such data can be made understandable to a layman – as routinely occurs in criminal courts in the presentation of DNA-related testimony.

**37.**     An advantage of testimony based on group statistical data is that it is completely "transparent" to the jury. To illustrate with the Sorensen and Pilgrim study, the make-up of the sample in including both capital and non-capital murders is explicitly stated, allowing the jury to give informed weight to the findings. Similarly, the definition of the violent acts being forecasted is explicitly stated so that the jury is quite clear about what is and is not included in that probability estimate. From their experience with the insurance industry and from exposure to the concept of prognosis in medicine, the jury has a framework for understanding both a group statistical methodology and a risk "prognosis."

**38.**     As a forensic psychologist and scholar/researcher regarding violence risk assessment at capital sentencing, I am well-aware of the scientific bases and court decisions regarding this arena of practice. Excluded testimony of Dr. Sorensen can be contrasted with expert testimony admitted on this issue by a Government-sponsored mental health expert in *U.S. v Fields*. The *amicus curiae* brief of the American Psychological Association detailed how the testimony of Dr. Richard Coons was without scientific foundation in asserting the future dangerousness of Sherman Lamont Fields at federal capital sentencing. In analyzing the testimony of Dr. Coons, the Brief concluded:

> C. Viewed against the established science regarding predictions of future violence, Dr. Coon's methodology and opinions in this case lacked sufficient indicia of reliability to be offered to the jury as expert testimony. [at page 22]

Specific extracts of the commentary regarding Dr. Coon's testimony illustrate the breadth of unreliability in his methodology:

> Dr. Coons did not base his opinion on scientific methods. [at page 22]

> Dr. Coons gave no consideration to applicable base rates of violence and he concluded without foundation that it was *"significantly more likely than not,"* R.2352-53 (emphasis added), that Fields, even while

177

incarcerated, would present a "continuing and serious threat to *the lives and safety* of others," R.2350 (emphasis added).  [at page 22,23]

Further, Dr. Coons admitted that his opinion did not derive from "statistically analyzed data drawn from valid and reliable research," but rather solely from his personal experience. [at page 23] …Yet he admitted he had testified in about 50 different cases that an individual would be dangerous in the future, and he had never made an attempt to go back and determine how often he had been right. R.2326-28. [at page 24] …and thus the error rate for his method is unknown. [at page 25]

He relied on no empirical data. R.2319. He could not identify any study that had validated a particular method for assessing future dangerousness, much less the "method" he had used. R.2320. [at page 23]

Dr. Coons also did not utilize a formal compilation of risk factors or any standardized assessment tool. He openly admitted that his analysis had "certainly a subjective element to it, considerable subjective element." R.2354. Perhaps most significantly, Dr. Coons relied heavily on the nature of the offense of conviction and that Mr. Fields' history of violence in the community, two factors that specifically have been shown *not* to have a high correlation with prison misconduct or institutional violence [references omitted]. [at page 23]

He dismissed the protective measures provided by a secure correctional facility as, in his opinion, "after the fact" issues. R.2357 [at page 24]

Rather than structuring and presenting his opinion to avoid potential errors and biases, Dr. Coons did little to acknowledge to the jury the limitation of his methodology.

For all of these reasons, Dr. Coons' methodology and opinion in this case did not satisfy any recognized criteria for the reliability of expert testimony. [at page 25]

Although Dr. Coons' opinion in this case added nothing probative on the issue of future dangerousness, there is reason to believe it likely had a severely prejudicial effect. [at page 26, 27]

**39.**   Despite the scholarly consensus regarding the multiple inadequacies of Dr. Coons' methods and the unreliability of his resultant opinions as reflected in the *amicus brief* of the American Psychological Association, the Fifth Circuit Court of

Appeals (U.S. v Sherman Lamont Fields, filed March 29, 2007, revised April 2, 2007, No. 04-50393) ruled that the trial court's admission of this testimony was not error. More specifically, the Fifth Circuit identified that the nature of the *Fields* case and associated issues was similar to *Barefoot v Estelle* (1983):

> Furthermore, the arguments urged today though framed formally in statutory terms are similar in substance to the ones rejected in *Barefoot*. For example, the *amicus* in *Barefoot*, like the *amicus* here, argued that the future dangerousness methods in issue could be in error most of the time. Likewise, both Fields and Barefoot challenged the experts' testimony based upon the failure to personally examine the defendant and the use of hypotheticals. The logic of *Barefoot* meets these challenges. In the instant case, Dr. Coons' testimony was probative because Fields' jury was required to make an assessment of future dangerousness and because the jury could benefit from the opinion of a psychological expert on that matter. Moreover, as *Barefoot* noted, the adversarial system reduces any prejudicial unreliability in future dangerousness expert testimony because it can expose the flaws in such testimony. For these reasons, we reject the claim that Dr. Coons' testimony was so unreliable that the district court abused its discretion by admitting it. [Footnotes omitted] [at page 47]

40.    A distinctly un-level playing field is created when the empirically-based, scholarly anchored, and transparent findings of a defense-retained expert are excluded in future dangerousness testimony at capital sentencing, while the demonstrably unreliable "pig in a poke" testimony of State-sponsored experts are routinely admitted (i.e., Dr. Coons acknowledged in *Fields* that he had testified utilizing a similar methodology in scores of cases).[136]

### 3.    Research published after state habeas ended

After the state habeas litigation in Mr. Mendoza's case had been concluded, research continued on the issue of future dangerousness, In particular, in the year 2010, Mark D. Cunningham, Ph.D. and Jon R. Sorensen, Ph.D., published *Improbable Predictions at Capital*

---

[136]    Exhibit L: Affidavit Mark Cunningham, Ph.D., dated 7-23-07.

*Sentencing: Contrasting Prison Violence Outcomes*, 38 J. AM. ACAD. PSYCHIATRY LAW 61-72 (2010).

> *Improbable Predictions at Capital Sentencing* sets out its objective:
>
> No published study, however, has reported the prison violence outcomes of capital offenders whose sentencing trials included expert testimony utilizing group statistical data on rates and correlates of prison violence, as well as descriptions of correctional security capabilities, in asserting an improbablity of serious prison violence by the respective capital defendants.  Although the group statistical data on rates and correlates of prison violence point to a high accuracy rate for risk findings of improbability, this inference has not been tested in capital cases that were subjected to defense-sponsored violence risk assessment for prion or risk-related testimony. This study was intended to address this void in the current literature.

*Id.* at 63.

After detailing the Method and the Results, the article concluded with a Discussion section, which explored various methodological questions and concerns.  Of significance for purposes of this Claim, within the Discussion is the statement:

> This investigation represents the first report of the accuracy of defense-sponsored mental health expert violence risk assessments for prison, risk assessment for prison testimony, and risk-related testimony at capital sentencing.  These reports and testimony had specified or implied (in the case of teaching witness risk-related testimony) that future serious assaults in prison were improbable.  Retrospective review of the prison disciplinary files of 73 capital offenders who averaged 4.4 years in prison found to date that these assertions of the improbability of future dangerousness were resoundingly supported.

*Id.* at 68.  Fed. Exhibit 1:  Mark D. Cunningham, Ph.D. & Jon R. Sorensen, Ph.D., *Improbable Predictions at Capital Sentencing: Contrasting Prison Violence Outcomes*, 38 J. AM. ACAD. PSYCHIATRY LAW 61-72 (2010).

**4.     Conclusion: The trial court violated Mr. Mendoza's right to have a jury consider and give effect to his mitigating evidence that he had only a "23.8 percent chance of committing a serious violent act while incarcerated in TDCJ"**

The federal constitution prohibits  impediments to the sentencer's full consideration and ability to give effect to mitigating evidence, as by way of example, the use of evidentiary rules, *Green v. Georgia*, 442 U.S. 95 (1979) (State cannot inflexibly apply the hearsay rule to exclude from penalty phase reliable hearsay evidence relevant to capital defendant's relevant culpability); jury instructions, *Hitchcock v. Dugger*, 481 U.S. 393 (1987); or prosecutorial argument, *Penry*, 492 U.S. at 326.

In the case at bar, the testimony of Dr. Sorsensen has been shown to be reliable, peer reviewed, and a scientifically accepted methodology.  Thus, this evidence is admissible, relevant, and probative mitigating evidence.  Its exclusion by the trial court deprived Mr. Mendoza of his fundamental Eighth amendment right that the jury be able to consider and give effect to a capital defendant's mitigating evidence. *Tenard v. Dretke*, 542 U.S. 274, 284-285 (2004) ("[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances"); *Boyde v. California,* 494 U.S. 370, 377-378 (1990) (*citing Lockett v. Ohio,* 438 U.S. 586 (1978); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Penry I,* 492 U.S. 302 (1989)). *See also Payne v. Tennessee,* 501 U.S. 808, 822 (1991); *Skipper v. South Carolina*, 476 U.S. 1 (1986).

For all of the aforementioned reasons, Mr. Mendoza, therefore, requests habeas relief.

**GROUND SEVEN (IAC & UNGUIDED JUROR RESPONSE TO FUTURE DANGEROUSNESS): Trial counsel was ineffective for failing to present testimony to support a sentence less than death, and give a favorable opinion concerning the risk assessment of Mr. Mendoza**

Trial counsel was constitutionally ineffective in failing to call Dr. Cunningham to testify to the particularized violence risk assessment of Mr. Mendoza, after the trial court excluded the testimony of Dr. Sorensen.  Unlike Dr. Sorensen, Dr. Cunningham had interviewed Mr. Mendoza. He had also reviewed records specific to Mr. Mendoza.  Dr. Cunningham was better qualified than Dr. Vigen to testify as to risk assessment, and to Texas prison life.

The absence of detailed testimony regarding group statistic methodology and data, particularized to Mr. Mendoza, created the risk of an unguided emotional response by the jury in its determination about the special issues on future dangerousness and mitigation.   The constitutionally deficient performance of counsel resulted in a deprivation of Mr. Mendoza's right to have the jury consider his "character and record ... [and] the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Tenard v. Dretke*, 542 U.S. 274, 284-285 (2004); *Lockett v. Ohio*, 438 U.S. 586, 601 (1978); *Skipper v. South Carolina*, 476 U.S. 1 (1986);  *Strickland v. Washington*, 466 U.S. 466, 686 (1984);  *Penry v. Lynaugh*, 492 U.S. 302, 327-328 (1989); U.S. CONST. amend. VI; U.S. CONST. amend. VIII; U.S. CONST. amend. XIV.

**A.      Statement of Facts.**

The Statement of Facts in Claim Six are incorporated by reference herein because this claim is based on the same factual scenario.  In addition, Mr. Mendoza adds the following.

After the trial court held that Dr. Sorensen was not a qualified expert, (RR 24:84), the defense called Dr. Vigen, a psychologist as its expert to testify to both mitigation and risk

assessment. (RR 24:40).  During the TEX. R. EVID. 702 hearing, Dr. Vigen sought to opine among

other things that TDCJ "has the expertise and the capability to house and incarcerate Moises in such

a manner that he will be a very low or a minimal risk for further violence in the prison system."  (RR

24:61-62).

**B.**      **FF Nos. 265-275  – There is no presumption of correctness**

Mr. Mendoza objects to the Findings of Fact Nos. 265-275 for all the reasons argued more

particularly below.  FF Nos. 265-275 are not entitled to a presumption of correctness, and they are

"'objectively unreasonable in the light of the evidence presented in the state-court proceeding,'"

*Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing  Miller-El v. Cockrell,* 537 U.S. 322, 340

(2003); 28 U.S.C. § 2254(d)(2).

**C.**      **Argument and Authorities.**

**1.**      **Standard of Review.**

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of

ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland*,

466 U.S. at 686.  *Strickland* stated a two-pronged test for judging claims of ineffective assistance

of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were
> outside the wide range of professionally competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact
> finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 695.

### 2.        The ABA Guidelines  –  A Standard of Care

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court

has looked for guidance to the ABA Guidelines for the Appointment and Performance of Counsel

in Death Penalty Cases  *Wiggins v. Smith*, 539 U.S. 510, 522(2003) (In which the U.S. Supreme

Court *citing Strickland*, 466 U.S. at 690-691, for the proposition that "Prevailing norms of practice

as reflected in American Bar Association standards and the like ... are guides to determining what

is reasonable"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal

Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).

In the case at bar, ABA GUIDELINE 10.11 – *The Defense Case Concerning Penalty* (rev. ed.

Feb. 2003) provides as follows:

> F.        In deciding which witnesses and evidence to prepare concerning penalty, the
> areas counsel should consider including the following:
>
>           ....
>
>           2.        ***Expert*** and lay ***witnesses along with supporting documentation*** ...
>                     to provide medical, psychological, sociological, cultural or other
>                     insights into the client's mental and/or emotional state and life
>                     history that may explain or lessen the client's culpability for the
>                     underlying offense(s); ***to give a favorable opinion as to the client's***
>                     ***capacity for rehabilitation, or adaptation to prison***; to explain
>                     possible treatment programs; or otherwise ***support a sentence less***
>                     ***than death; and/or to rebut or explain evidence presented by the***
>                     ***prosecutor;***....

(emphasis supplied).

184

**3.** **Trial counsel was constitutionally ineffective**

    **a.** **Counsel's performance was deficient**

        **(1)** **Trial counsel hired Dr. Cunningham as a consultant, and lead him to believe that he would testify as to risk assessment**

Trial counsel's performance was deficient.  Trial counsel had hired Dr. Cunningham as an

expert to consult about, and ultimately to testify to a violence risk assessment of Mr. Mendoza.

Dr. Cunningham attests:

**4.** I was retained in this case in March 2005 as a consultant to the defense to assist in the development of mental health perspectives for capital sentencing (see Exhibit 2), but did not anticipate that I would testify in the case. Accordingly, **I conferred with Dr. Vigen and defense counsel (in a single conference) regarding mitigating factors as reflected in the investigation that had been performed by Dr. Vigen and defense counsel, and from perspectives developed during my joint interview of Mr. Mendoza with Dr. Vigen.** However, I was not asked and did not attempt to engage in an independent mitigation evaluation. My billing records reflect an in-person conference with Dr. Vigen on 3-17-05 (associated with our interview of Mr. Mendoza), a joint telephone conference with Dr. Vigen and defense counsel on 3-29-05, a joint in-person conference with Dr. Vigen and defense counsel on 6-2-05, a telephone conference with Dr. Vigen on 6-16-05, and a brief telephone conference with Dr. Jon Sorensen on 6-24-05.  **Eventually I was led to believe that I might be called to testify regarding violence risk assessment (i.e., whether there is a probability that the defendant will commit criminal acts of violence that constitute a continuing threat to society)**, though this remained ambiguous. For reasons that are not clear to me, communications from defense counsel were quite limited after the 6-2-05 joint conference.[137]

        **(2)** **Dr. Cunningham not only reviewed records, he had also interviewed Mendoza**

Unlike Dr. Sorensen, (RR 24:15-16), Dr. Cunningham had interviewed Mr. Mendoza, as well

as reviewed records specific to Mr. Mendoza.   Dr. Cunningham attests:

---

[137] Exhibit J:  Affidavit of Mark Cunningham, Ph.D., dated 7-23-07 (fact witness on trial proceedings).

**5.**     In this consultant and then potential role as an expert witness regarding violence risk assessment, I participated in an extended interview of Mr. Mendoza in the Collin County Jail in conjunction with Dr. Mark Vigen on 3-17-05. I reviewed records, including summaries of interviews of family members and other third parties and other case summary materials prepared by Ms. Fran Desendorf, jail records, medical and psychiatric records regarding Mr. Mendoza's mother, offense investigation reports, and Dallas Police Department records regarding Mr. Mendoza.[138]

### (3)     Dr. Vigen was not qualified to provide a risk assessment opinion

Dr. Vigen was not so qualified, and the opinion #5, which the trial judge allowed him to testify before the jury, showed his inadequate preparation, training and experience.  Dr. Vigen testified to his lack of expertise in the area of risk assessment and the fact that he had not done a risk assessment of Mr. Mendoza.  Dr. Vigen testified in the TEX. R. EVID. 702 hearing:

1.     He had never been inside the Institutional Division of the Texas Department of Corrections (TDCJ);
2.     He had no experience dealing with inmates inside TDCJ;
3.     He had never worked prison security, but only observed prison security in Louisiana and Texas;
4.     He had to rely on S.O. Woods, a retired TDCJ employee;
5.     He had never done any studies on future dangerousness;
6.     He read the literature published by Dr. Cunningham, Dr. Sorensen, and Dr. Marquart; and
7.     He had not done a risk assessment in the Mendoza case.

(RR 24:62-64).

Given the dearth of experience and training in risk assessment, the presentation of Dr. Vigen was limited to his "***belief*** that the Texas Department of Criminal Justice has the expertise, has the capability to house and incarcerate Moises in such a manner that he will be a low or minimum risk for future violence in the  prison system."  (RR 24:127).   Dr. Vigen's "belief" was based on

---

[138]   Exhibit J:  Affidavit of Mark Cunningham, Ph.D., dated 7-23-07 (fact witness on trial proceedings).

assumption ("I assume that Texas is even better than Louisiana"), and riddled with disclaimers ("I've only been in one prison, one unit in Texas;" "I don't have a lot of direct experience with correctional officers in Texas;" and that his experience is with inmates in facilities other than Texas).  Dr. Vigen testified as follows:

> Q.  What do you base that on?
>
> A.  Well, I've only been in one prison, one unit in Texas, so I don't have a lot of direct experience with correctional officers in Texas, but I've read a lot of research having to do with the Texas Department of Corrections.  I've looked at some statistical data regarding assaultive behavior against inmates and assaultive behavior against officers, and those incidents are low, I guess, in comparison to the tremendous number of inmates that the Texas Department of Criminal Justice houses and cares for.  I've talked to S.O. Woods, who is the former assistant director of classifications, about – and he's given me sort of a general idea about the classification system and how inmates are processed and all the information that's taken into account.  So there's an elaborate system of well-trained professional people that run the Texas Department of Criminal Justice.
>
> So I guess, in my opinion -- I mean, I've seen inmates like this young man in my experience, and I've followed some of those inmates over the years in the Louisiana penitentiary that's at Angola.  It's the Louisiana State Penitentiary at Angola where the violent inmates are placed.
>
> I've watched them over time and talked with them over the years, and so I've seen how Louisiana –  the Louisiana prisons are a very safe place to be both for officers and for staff and for inmates.  I'm sure – I mean, I assume that Texas is even better than Louisiana.  But Texas has many, many more inmates, and they have much more resources.  The research that I've read and the literature about the Texas system is very positive.
>
> Q.  So you've dealt with inmates in a prison setting –
>
> A.  Yes.
>
> Q.   – where you've had to evaluate and interview, correct?
>
> A.  Yes.
>
> Q.  Did you also work in the –  for some type of prison system when you first got out of school or did you do any kind of studies up in Michigan at all?

A.     Yes.  When I was a graduate student in Ann Arbor at the University of Michigan, I worked – I was placed – I didn't have a choice.  I was placed in the Myland Federal Penitentiary.  It was a medium-security prison.  I interviewed and evaluated and worked in some treatment settings under two psychiatrists and a psychologist, under their supervision.  A lot of the graduate students in psychology worked there, and we got a lot of our initial training in that setting. I mean, I didn't work for the prison.  I was a student under supervision working with inmates.

Q.     Is there any other experience that you draw from to make that conclusion or that –

A.     Well, I evaluated –  I did custody –  or not custody, but competency evaluations during my graduate school training and saw inmates at the Utah State Penitentiary down near Provo, Utah.  And that, again, was just as a part of training.  And since I've been working in Shreveport, I've had the opportunity to evaluate many men charged with capital or first degree murder in Louisiana.

(RR 24:127-129).

Worse, Dr. Vigen was totally unprepared by experience, training or education, to respond in any meaningful way to the prosecutor's comments about future dangerousness:

Q.     Well, do you need to – let me –  I'm just asking you.  Is there violence that is committed inside the Texas prison systems?

A.     Yes. .....  (RR 24:171).   ....

Q.     And you can't keep a man indefinitely in administrative segregation, either, can you?

A.     In Louisiana there are some inmates –

Q.     This is Texas, sir.  In Texas.

A.     I don't know the answer to that.  (RR 24:172).   ....

Q.     Did S.O. Woods tell you that it got so violent in administrative segregation that the guards were issued body armor to deal with the inmates that they had to deal  with?

A.     He did not tell me that.  I did not know that.  (RR 24:173).

**(4)     Dr. Cunningham had specialized qualifications regarding violence risk assessment in Texas, as well as multiple other jurisdictions**

In contrast, Dr. Cunningham had specialized qualifications regarding violence risk assessment. Dr. Cunningham attests:

*Specialized qualifications regarding violence risk assessment at capital sentencing*

**6.**     I have testified regarding capital sentencing determination issues in approximately 45 federal capital cases and approximately 75 state capital cases in jurisdictions including Texas, Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Puerto Rico, South Carolina, Virginia, and West Virginia. In many of these cases I have testified regarding the methodology and base rate (i.e., group statistical) data relevant to violence risk assessments at capital sentencing, and have detailed relative levels of *improbability* of future serious prison violence by the defendant and/or security measures that could be brought to bear to reduce the likelihood of serious institutional violence by a capital defendant. I have also provided declarations/affidavits and testimony regarding these issues in state postconviction and federal habeas proceedings.

**7.**     The American Academy of Forensic Psychology is an association of psychologists who have been board certified by the American Board of Forensic Psychology.  A primary mission of the Academy is to raise the standard of practice of psychology to the courts.  Accordingly, the Academy conducts continuing education workshops on various forensic psychology applications. At the request of and under the auspices of the Academy I have provided full day workshops on "The role of the forensic psychologist in death penalty litigation" (i.e., March 1998 - Milwaukee, Wisconsin; February 1999 - Austin, Texas; January 2000 - Monterey, California; February 2002 - San Diego, California; September 2003 - Cincinnati, Ohio; January 2005 – LaJolla, California; January 2007 – San Diego, California). These workshops emphasized research literature, statistics, and conceptualizations relevant to violence risk assessments of capital defendants. Under the auspices of the Texas Psychological Association, in November 2003 in Dallas, Texas I provided a similar full day continuing education workshop for psychologists.

**8.**     I am the first author or co-author of approximately 30 scholarly papers regarding forensic psychology published or "in press" in peer reviewed journals, scholarly texts, and professional periodicals. I am the author or co-author of other scholarly papers that are under review. The above scholarly works have primarily addressed capital sentencing considerations and standards, death row inmate capabilities and characteristics, and diagnostic classification issues at sentencing. Papers I have authored or co-authored that specifically address or inform violence

189

risk assessment at capital sentencing include the following [see citations to his numerous publications]....

**9.**     My scholarly activities have resulted in significant recognition by my peers. I am the recipient of the *2006 American Psychological Association Award for Distinguished Contributions to Research in Public Policy*. This award is conferred by the American Psychological Association, a professional organization of over 150,000 members, on one psychologist annually who has made distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work. I was awarded the *2005 Texas Psychological Association Award for Outstanding Contribution to Science*. This is an annual award given to one psychologist in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge. I was also the recipient of the *2004 National Association of Sentencing Advocates John Augustus Award*. In 2006 I was elected as a *Fellow* of the American Psychological Association (Division 41: American Psychology-Law Society) – a peer reviewed distinction reflecting outstanding and uncommon contributions having national impact on the science and practice of psychology.[139]

Dr. Cunningham had the expertise to effectively address the prosecutor's questions on cross-examination.  Dr. Cunningham attests:

> ***I would have testified that serious violence in administrative segregation is quite rare, despite the "worst of the worst" of TDCJ inmates confined there; with a 40-year risk of 2.4% for an assault on a staff member resulting in injury requiring more than first aid treatment***. I would have testified that Mr. Mendoza or any other ***inmate can be confined in administrative segregation preemptively should TDCJ believe that the inmate represents a disproportionate risk of violence*** and/or threat to security, and that the duration of such confinement is dependent on the ongoing evaluation by TDCJ of whether this application of security measures continues to be indicated.[140]

---

[139]   Exhibit L:  Affidavit of Mark Cunningham, Ph.D., dated 7-23-07 (fact witness on trial proceedings).

[140]   Exhibit J:  Affidavit of Mark Cunningham, Ph.D., dated 7-23-07 (fact witness on trial proceedings).

    **(5)**  **Defense counsel failed to call Dr. Cunningham to testify that Mr. Mendoza's risk of serious violence _was well below_ "more likely than not"**

Trial counsel led Dr. Cunningham to believe they would call him to testify "that Mr. Mendoza's risk of serious violence during a capital life term in TDCJ was well below 'more likely than not.'"  Yet, after the trial court excluded the testimony of Dr. Sorensen, they failed to call Dr. Cunningham to address the issue of risk assessment in violation of the basic guidelines for the performance of capital counsel.  Instead, trial counsel called Dr. Vigen, who was not qualified and was not able to inform the jury of scientifically sound methodology and empirical data, accompanied by demonstrative exhibits particularized to Mr. Mendoza, that would have guided the jury's discretion in making their decision as to future dangerousness and mitigation.[141]

Dr. Cunningham attests:

> **6.**  **Had I been called to testify, I would have testified that Mr. Mendoza's risk of serious violence during a capital life term in TDCJ was well below "more likely than not."** This opinion would have been supported by an explanation of the application of group statistical data to particularized violence risk assessments; data on the incidence (base rate) of violence in prison among capital offenders, convicted murderers, inmates serving life-without-parole sentences, and TDCJ inmates; an explanation that these group rates form anchoring points for an individualized assessment; and empirically-derived factors that can be utilized in this individualization. I would have testified that regarding Mr. Mendoza, factors associated with a more favorable (i.e., nonviolent) adjustment to prison relative to these anchoring group rates included his having graduated from high school and the continued involvement of his family in his life. I would have testified that his jail record of weapons possession and a non-weapon assault/fight with another inmate were factors modestly increasing his risk of violence in prison. I would have testified that risk of prison violence is always a function of custody and security, and that highly restrictive and secure confinement is available in TDCJ in administrative segregation (approximately 10,000 inmate capacity). ***I would have testified that***

---

[141] ABA GUIDELINE 10.11 – *The Defense Case Concerning Penalty* (rev. ed. Feb. 2003) (counsel should consider presenting "[e]xpert ...  witnesses along with supporting documentation ... ; to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; ... or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor;....").

*serious violence in administrative segregation is quite rare*, **despite the "worst of the worst" of TDCJ inmates confined there**; with a 40-year risk of 2.4% for an assault on a staff member resulting in injury requiring more than first aid treatment. I would have testified that Mr. Mendoza or any other inmate can be confined in administrative segregation preemptively should TDCJ believe that the inmate represents a disproportionate risk of violence and/or threat to security, and that the duration of such confinement is dependent on the ongoing evaluation by TDCJ of whether this application of security measures continues to be indicated.

7.      ***My testimony would have been accompanied by numerous digital demonstrative exhibits*** (*i.e.,* PowerPoint slides) to facilitate the jury's understanding of these concepts, studies, and group statistical data (Exhibit 3).

8.      ***My violence risk assessment and anticipated testimony differed from that of Dr. Jon Sorensen in relying on and <u>being particularized</u> with interview of Mr. Mendoza and records review, as well as more extensive group statistical data.*** My risk assessment and testimony would have relied on and presented other studies, in addition to Sorensen and Pilgrim (2000), regarding rates of prison misconduct among capital offenders, convicted murderers, life-sentenced inmates, inmates in the general prison population of TDCJ, and inmates in administrative segregation in TDCJ. These studies are broadly consistent in their findings, supporting the reliability of the conclusions as these studies were applied to Mr. Mendoza. ***Further, because these findings and conclusions are counter-intuitive (i.e., not what the jury would be naturally inclined to believe), exposure to multiple studies with similar findings is quite important in dispelling erroneous biases and faulty pre-conceived notions***.

9.      In light of the projected date of my anticipated testimony at capital sentencing, should the case reach this stage for Mr. Mendoza, I scheduled a one-week vacation to Vancouver, British Columbia. ***The trial did not progress at the anticipated pace and the sentencing phase occurred while I was out of town. Defense counsel did not inquire of me whether I could return to Texas on an emergency basis. I had anticipated that defense counsel would advise the trial court and request a delay in the proceedings of 2-3 days to allow my return and was surprised when I learned that the evidence in the case had closed.***[142]

---

[142]   Exhibit J:  Affidavit of Mark Cunningham, Ph.D., dated 7-23-07 (fact witness on trial proceedings).

**b.     Counsel's deficient performance was prejudicial:   The absence of detailed testimony regarding group statistic methodology and data, particularized to Mr. Mendoza, created the risk of an unguided emotional response by the jury in its determination about the special issues on future dangerousness and mitigation**

Trial counsel's deficient performance was prejudicial.  The law is well-established that a jury be allowed to consider and give effect to relevant mitigating evidence in making its sentencing determination.  *Tenard v. Dretke*, 542 U.S. 274, 284-285 (2004); *Lockett v. Ohio*, 438 U.S. 586, 601 (1978); *Skipper v. South Carolina*, 476 U.S. 1 (1986).  The absence of detailed testimony regarding group statistic methodology and data, particularized to Mr. Mendoza, created the risk of an unguided emotional response by the jury in its determination about the special issues on future dangerousness and mitigation.[143]

Dr. Cunningham attested to the harm resulting from the absence of expert testimony to inform the jury of scientifically sound methodology and empirical data that is particularized to Mr. Mendoza:

> 10.     In the absence of detailed testimony regarding group statistic methodology and data, ultimately particularized to Mr. Mendoza, the jury's determination of this issue is subject to grave error for the following reasons:
>
> a.     ***Individuals undertaking violence risk assessment are likely to commit a number of fundamental errors unless guided by reliable scientific methodology and data***. These errors more often result in an overestimation of violence risk. The jury is unlikely to have knowledge of this methodology and research data unless informed by expert testimony.
>
> b.     A capital jury's familiarity with the heinousness of the capital offense and knowledge of other aggravating factors or acts are likely

---

[143]   *Lockett v. Ohio*, 438 U.S. 586, 601 (1978);  *Penry v. Lynaugh*, 492 U.S. 302, 327-328 (1989);  *Strickland v. Washington*, 466 U.S. 466, 686 (1984) U.S. CONST. amend. VIII; U.S. CONST. amend. XIV.

in many instances to result in *a perception of high future violence risk in prison that is not justified by research*.

c.      The combination of these factors is likely to result in a capital sentencing jury that is strongly biased toward *overestimation of violence risk* when scientifically grounded expert testimony is excluded.

d.      *In the absence of expert testimony, a capital jury has no mechanism to understand* or incorporate base rate data, appreciate the importance of context, avoid illusory correlation, maintain skepticism of clinical methods, understand the implications of Antisocial Personality Disorder or related characterizations, incorporate the effects of aging, reliably evaluate patterns of behavior, factor in preventive measures, acquire the broad *information relevant to violence risk considerations*, appreciate the probabilistic nature of their task, *or critically evaluate the arguments of the State or the defense*.

e.      The scientific methodology and data relevant to violence risk assessment of capital offenders is based on multiple independent research studies, has been subjected to peer-review, articulates an error rate through the range of probabilities expressed, and is generally accepted in the violence risk assessment scientific community.

f.      A capital jury is at best almost certain to be ignorant of rates of prison violence, inmate demographics and criminal histories, and TDCJ prison confinement options and security procedures. At worst a capital jury comes to capital sentencing risk assessment *holding assumptions regarding future dangerousness that are false. Such false assumptions spring from intuitive but erroneous beliefs*.  It must be emphasized that much of the research data on the violence risk assessment of prison inmates is counter-intuitive.

**11.**     Avoidance of fundamental errors in violence risk assessment at capital sentencing requires the testimony of an expert to inform the jury of scientifically sound methodology and empirical data. Particularly when accompanied by demonstrative exhibits that assist the jury's understanding and retention, testimony detailing violence risk assessment methodology and empirical data can be presented in a clear, organized, logical fashion that neither confuses nor misleads the jury.[144]

---

[144]   Exhibit J:  Affidavit of Mark Cunningham, Ph.D., dated 7-23-07 (fact witness on trial proceedings).

In summary, the constitutionally deficient performance of counsel resulted in a deprivation of Mr. Mendoza's right to have the jury consider his "character and record ... [and] the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."[145]  The constitutionally deficient performance of counsel prejudiced Mr. Mendoza and resulted in a reasonable probability that but for counsel's errors, the result would have been different.[146]  Hence, habeas relief should be granted.

---

[145] *Lockett v. Ohio*, 438 U.S. 586, 601 (1978); *Penry v. Lynaugh*, 492 U.S. 302, 327-328 (1989); U.S. Const. amend. VI; U.S. Const. amend. VIII; U.S. Const. amend. XIV.

[146] *Strickland v. Washington*, 466 U.S. 466, 686 (1984).

## CONCLUSION

For the reasons set forth above, Mr. Mendoza is entitled to relief from his unconstitutional conviction and sentence.

WHEREFORE, Mr. Mendoza prays that this federal court:

1.      Issue a writ of habeas corpus to him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2.      Grant him one or more hearings (*see* separately filed motion accompanying the original habeas petition and re-affirmed in this amended petition, see Doc #7) at which he may present any evidence in support of his claims, and allow him a reasonable period of time subsequent to any hearing this court determines to brief the issues of fact and of law raised by this Petition or such hearing.

3.      Direct that under Habeas Corpus Rule 7, the record in this case be expanded to include the "additional materials relevant to the determination of the merits of the petition" which are found in exhibits filed with this Petition.

Respectfully submitted,

_____
Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.

196

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | | |
|---|---|---|
| **MOISES SANDOVAL MENDOZA** | ) | |
| **Petitioner** | ) | |
| | ) | **5:09-CV-86** |
| **v.** | ) | **ECF** |
| | ) | |
| **RICK THALER,  Director** | ) | |
| Texas Department of Criminal Justice, | ) | **(Death Penalty Case)** |
| Correctional Institutions Division, | ) | |
| Respondent | ) | |

---

VERIFICATION

I, Lydia M.V. Brandt, pursuant to 28 U.S.C. § 2242, acting on behalf of Petitioner, certify

under penalty of perjury that the foregoing Petition for Writ of Habeas Corpus is true and correct

to the best of my belief.

DATE:  January 5, 2011

_____
Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

197

## CERTIFICATE OF SERVICE

This certifies that on January 5, 2011, I electronically filed the foregoing document with the

clerk of court for the US District Court Northern District Texas using the electronic case filing

system of the court.  The electronic case filing system sent a notice of electronic filing to the

following attorney of record, who has consented in writing to accept this notice as service of this

document by electronic means:

Tomee Morgan Heining,  Assistant Attorney General
Attorney General's Office
Post Conviction Division
P.O. Box 12548
Austin, TX 78711

_____
Lydia M.V. Brandt

cc:     Mr. Moises Sandoval Mendoza
        #999-498
        Polunsky Unit, TDCJ
        3872 FM 350 South
        Livingston, TX 77351-8580

## EXHIBITS

FEDERAL HABEAS EXHIBITS

| | |
|---|---|
| Exhibit 1: | Cunningham, Ph.D. & Sorensen, Ph.D., *Improbable Predictions at Capital Sentencing: Contrasting Prison Violence Outcomes*, 38 J. AM. ACAD. PSYCHIATRY LAW 61-72 (2010) |
| Exhibit 2: | Email of Toni Knox to Dr. Vigen, dated 11/12/10 |
| Exhibit 3A: | Vince Gonzalez(s) Signed Return Receipt |
| Exhibit 3B: | Vince Gonzalez(s) Interrogatories |
| Exhibit 4A: | Sanchez Answers |
| Exhibit 4B: | Sanchez Interrogatories |
| Exhibit 5A & B: | Ivory/Tucker Interrogatories/Answers |
| Exhibit 6A: | Vigen Answers |
| Exhibit 6B: | Vigen Interrogatories |
| Exhibit 7A: | Cover email from Toni Knox to Brandt re Mitigation Folder, dated 12/30/2010 |
| Exhibit 7B: | Trial Mitigation Folder |
| Exhibit 8: | Trial Counsel and Mitigation Expert affidavits |

STATE HABEAS EXHIBITS: Although contained in the original record, these select exhibits are reproduced for the convenience of the reader

| | |
|---|---|
| Exhibit A: | Affidavit of Gilda Kessner, Psy.D. |
| Exhibit B: | Affidavit of Paula Lundberg-Love, Ph.D. |
| Exhibit C: | Affidavit of Stephen K. Martin, Ph.D. |
| Exhibit I: | Affidavit of Toni Knox, L.C.S.W. |
| Exhibit J: | Affidavit of Mark Cunningham, Ph.D. |