# AFFIDAVIT OF TONI KNOX, LCSW

## Assessment of Mitigation Investigation and Presentation

I, Toni Knox, LCSW, declare as follows:

1. I am a Licensed Clinical Social Worker in the State of Texas and specialize in the practice of mitigation in capital cases, both pre-trial and post-conviction. I have received training in mitigation through the National Association of Social Workers (NASW), National Alliance of Sentencing Advocates and Mitigation Specialists (NASAMS), National Association of Criminal Defense Lawyers (NACDL), Texas Criminal Defense Lawyers Association (TCDLA), The Center for American and International Law, and the Texas Defender Services. I have obtained over 150 hours in training in both CLE and CEU approved training seminars. I am also a member in good standing of the NASW, NASAMS, NACDL and TCDLA.

2. I received my Masters Degree in Social Work (MSSW) from the University of Texas at Arlington in 1993. At the time of my graduation in 1993, I obtained my LMSW (Licensed Master of Social Work) from the state of Texas by submitting my graduate transcript and passing the LMSW test administered by the Texas State Board of Social Work Examiners. After obtaining my LMSW, I completed three years of post graduate social work clinical experience with supervision and passed the LCSW (Licensed Clinical Social Worker) exam in 1996. The LCSW license includes the ability for private practice in individual therapy.[1]

3. I have twelve years of experience in preparing psychosocial histories in a clinical setting, assessing family dynamics and recommending interventions, and assessing chemical dependency and mental health symptoms. I am very knowledgeable concerning the administration of psychotropic medications and their applications. I frequently attend presentations concerning current and newly introduced psychotropic medications. Since 2003, I have attended numerous seminars and training sessions concerning the preparation of mitigation, particularly in capital cases.[2] The role of mitigation has continued to expand since the Supreme Court ruling in the Wiggins case in June, 2003[3] and the Fifth Circuit Court of Appeals in the Dallas County Lewis Case in December 2003.[4]

---

[1] Mitigation Documents, Page 000121 - *Title 22 (Examining Boards), Texas Administrative Code, Part 3, Chapter 781*, Rules Relating to the Licensing and Regulation of Social Workers, Adopted by the Texas State Board of Social Worker Examiners Effective on August 24, 2005

[2] Attachment D – Resume – Toni Knox, LCSW

[3] Wiggins v. Smith (123 S.Ct. 2527 (2003)) Maryland case heard by the Supreme Court on Writ of Certiorani from the Fourth Circuit Court of Appeals

[4] Lewis v. Dretke (2003 Wi. 22998819, C.A.5 (Tex.) Dec. 2003) Dallas County Texas case heard by the Fifth

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

4.  I have been appointed by the court as a Mitigation Specialist for the defense in Ex Parte
    Moises Mendoza, Cause No. 401-80728-04 in the 401st Judicial District, Collin County,
    Texas; and Cause No. AP 75,213 in the Texas Court of Criminal Appeals.  I have been asked
    by Mr. Moises Mendoza's attorney, Lydia Brandt, to prepare a complete social history of
    Moises and his family background to determine what possible factors, including genetic,
    cultural, environmental and interpersonal, could have affected his development, behaviors,
    social and psychological functioning.

5.  I also reviewed post-trial interviews with the jurors to help analyze their response to the
    mitigation provided by Moises' defense and other factors in the punishment phase and
    deliberation.

6.  It has been determined by ABA Guideline 4.1[5] that every capital case requires a qualified
    mitigation specialist as part of the defense team to compile a comprehensive and well
    documented psycho-social history.  Additionally, a complete social history would have been
    necessary for any mental health experts to review in order to establish a base line for Moises
    cognitive functioning and provide history for a more accurate mental health diagnosis.   Since
    Moises indicated he had been drinking at the time of the offense, it would have been useful to
    compare his cognitive and behavioral functioning when intoxicated to his base line
    functioning.   It is important to determine if intoxication exacerbated any underlying
    physiological conditions with psychiatric consequences or psychiatric disorders.   The social
    history would have been important to determine the presence and course of Moises' addictive
    disease and/or to identify if he could have had any neurological deficits related to head
    injuries or drug usage.  Any of these psychological or neurological factors could have
    influenced or controlled Moises' thought processes and behavior during, prior to and after the
    offense.

---

Circuit Court of Appeals on appeal from the United States District Court for the Northern District of Texas
5  ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised
Edition, February 2003

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

7. Mental health and medical experts also require social history information to weigh and make accurate assessments of lay witness reports of Moises' behavior surrounding the offense, during interrogation by law enforcement, and during clinical interviews with Moises. A properly documented social history also offers insight into factors and circumstances that affected Moises' behavior over the course of his life and is relevant to the presence, significance, and weight of mitigating factors. Without a complete social history, it was difficult for the defense team to identify what types of experts were needed and identify the themes for the mitigation presentation. As a result, a psychologist, Dr. Mark Vigen, was retained to evaluate Moises without a proper social history. He was requested to provide the defense with "mitigation factors" and conduct his own social history investigation, rather than collaborate what had already been gathered by the mitigation specialist.

8. In reaching my professional opinion, I conducted interviews with the defendant, Moises Mendoza, various members of his family including, but not limited to his mother, father, siblings, and other relatives. I and associates have also interviewed former teachers, neighbors and friends of Moises. I have reviewed interviews with jury members from his trial and the entire trial transcript. Additionally, I have reviewed documentary evidence concerning Moises' education, medical, psychological and psychiatric history and facts relevant to the legal proceedings against him. I have also reviewed extensive psychiatric records of Moises' father, Concepcion Mendoza. The materials I reviewed are listed in the Appendix attached to this declaration. These are the kinds of materials routinely relied upon by social workers to complete a psycho-social assessment.

9. I have been asked to assess the effectiveness of the mitigation presentation during the punishment phase. In my opinion, there were numerous problems in the mitigation presented and "not presented".

3

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

## Assessing the Mitigation Investigation and Presentation

a)  A thorough mitigation investigation was not conducted by the mitigation specialist, which normally includes a complete psychosocial history5, time line of family history[6] and genogram.[7]

b)  There was not a clear "mitigation theory" developed by the mitigation specialist. This lack of theory contributed to problems with the choice and strategy of selecting expert(s).

- Substance abuse was identified, but not explored and/or an expert in the field of substance abuse and/or dependency was not retained

- No expert witness was retained to accurately portray life in prison

- Problems with using Dr. Vigen as "future dangerousness" expert witness

c)  Due to the lack of a mitigation theory, there was not an effective presentation of the mitigation facts to the jury.

- Minimal strategy and preparation in the testimony of family members

- Minimal preparation of mitigation exhibits for the jury to better illustrate information

d)  There were various problems with the defense expert's testimony.

- Dr. Mark Vigen had to do his own social history investigation for his opinion.

- Dr. Vigen was vague in his description of the Mendoza family as being dysfunctional. He was unable to provide examples from the social history as there was not one prepared for him.

- All notes and reports from Dr. Vigen's interviews were available to the state

---

5 Attachment A – Psychosocial History – Moises Mendoza
6 Attachment B – Time Line, Moises Mendoza
7 Attachment C – Genogram, Moises Mendoza

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

### (a) Lack of Thorough Mitigation Investigation

The defense retained a mitigation specialist, Vince Gonzales, but there is no documentation as to the extent of his mitigation investigation. There is no evidence that a thorough social history was obtained by the defense in order to make strategic decisions about the mitigation theme, strategy and presentation. It is recommended by ABA Guideline 4.18 that every capital case requires a qualified mitigation specialist as part of the defense team to compile a comprehensive and well-documented psychosocial history. Additionally, a complete social history is necessary for any mental health experts to review in order to establish a base line for Moises' cognitive functioning and to help with mental health diagnosis. Defense mental health experts also require social history information to weigh and assess lay witness reports of Moises' behavior surrounding the offense, during interrogation by law enforcement, and during clinical interviews with Moises. A properly documented social history also offers insight into factors and circumstances that affected Moises' behavior over the course of his life and is relevant to the presence, significance, and weight of mitigating factors.

Without a complete social history, it was difficult for the defense team to identify what types of experts were needed and identify the themes for the mitigation presentation. Attempting to present mitigation during the punishment phase without a complete social history is similar to a doctor treating a patient without assessing the patient's symptoms, medical history and or family medical history.

Several requests were submitted to Mr. Gonzales for any mitigation files, social history, and/or notes, but none were furnished. I spoke with Mr. Gonzales by phone and he could not remember any information. He told me he would check his notes and call me back. He did not return any later phone calls. Mr. Gonzales was informed that Moises had signed a release.[9]

There were resumes from other defense team members and/or experts in the attorney's

---

8 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, February 2003

5

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

files, but no resume of Mr. Gonzales indicating his educational background and mental health

expertise.  Additionally, his web page (www.dpmitigation.com) [10] does not reflect his

educational background, licensure or expertise in recognizing mental health issues on completing

a thorough psycho-social history.   Mr. Gonzales lists seminars which have had "specific training

with regard to working with a mentally retarded/mentally ill client".   Many of the seminars were

presented by the TCDLA and involve training in issues related to capital cases, but not

necessarily specific training in mental health and mitigation investigation.   It appears Mr.

Gonzales has considerable experience in forensics and "future dangerousness", but this does not

qualify him to assess for mental illness and complete a social history to be used to form the

mitigation strategy.  In his website, Mr. Gonzales makes no claim that he is capable or willing to

provide a complete mitigation investigation, including the standard mitigation investigation work

product.   In his website, Mr. Gonzales describes how his services can be a value to the attorney:

> *I can help you in selecting experts for your case, providing research, documents*
> *and exhibits unique to Capital Murder defense, as well as case consulting for*
> *your specific cases.* [11]

In the training seminars listed by Mr. Gonzales on his web page, there were few seminars

that focus solely on mitigation investigation and the evolvement of the mitigation process

over the years.  Mr. Gonzales lists one of his seminars as Life in the Balance in 2007.

This seminar, as other later seminars on mitigation, teaches that a complete social history

is required and explains how mitigation is evolving over the years since recent rulings by

the courts concerning the lack of mitigation.  Mr. Gonzales describes years of experience

as a mitigation specialist, but the role of the mitigation specialist has dramatically

changed over time, particularly since the Wiggins decision in June, 2003.  The following

---

9 Mitigation Documents, Pages 00267-268 - E-Mail to Vince Gonzales
10 Mitigation Documents, Pages 00262-266 – Vince Gonzales Web Site
11 Mitigation Documents, Pages 00262-266 - Vince Gonzales Web Site

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

is the list of seminars Mr. Gonzales lists since June 2003.[12]

| August 19-23, 2004 | Federal Habeas Corpus Training, St. Louis, MO | Little/No focus on Mitigation Training |
| January 7-8, 2005 | Lubbock Criminal Defense Lawyers Association | Little/No focus on Mitigation Training |
| September 22-23, 2005 | TDCLA/CDLP Forensic Seminar, Dallas, Texas | Focused on forensics – not mitigation |
| January 26-29, 2005 | Third National Forensic Evidence and the Criminal Law Seminar San Antonio, Texas | Focused on forensics – not mitigation |
| January 18-21, 2007 | Fourth National Forensic Evidence and the Criminal Law Seminar New Orleans, LA | Focused on forensics – not mitigation |
| March 10-13, 2007 | Life in the Balance 2007 Dallas, Texas | Mitigation Training |
| May 10-12, 2007 | Capital Defense Training Plano | Most of emphasis was from attorney's point of view as to how to use mitigation. |

In the few seminars focused on mitigation listed by Mr. Gonzales, the mitigation specialist (and/or their associates) tasks are described as:

> *Fact gatherers harvest the raw data from which the penalty-phase presentation of mitigation evidence is developed. They gather records, they process information, they identify and locate witnesses; they interview witnesses; they generate notes and reports; they identify more of a cyclical process. Their assignment is open-ended. Testifying experts address particular referral questions.*[13]

---

12 Mitigation Documents, Pages 00262-266 - Vince Gonzales Web Site
13 Stetler, Russell, Mitigation Evidence in Capital Cases

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

In earlier years in capital cases, much of the focus was on "future dangerousness" and presentation/education of prison life for the jury. This is still an important part of the mitigation presentation; however it is only one portion. In this capacity, Mr. Gonzales could have performed a valuable service in consultation for an expert in this area of the mitigation. It appears from meeting notes provided by Moises' defense attorneys; this was the primary focus of Mr. Gonzales. There is documentation indicating that Mr. Gonzales did perform one of the important functions of the mitigation specialist -- gathering documents. He obtained psychiatric records of the client and his father and other important records, such as school records. However, there is no evidence that he processed the information, no documentation of interviews with the family and client and no generation of notes and reports.

The mitigation specialist is responsible for compiling all the information in order to formulate the "theory" of the mitigation. After the mitigation theory has been formulated, the defense team can then make strategic decisions concerning what experts are needed. The experts are then retained to answer specific questions in their area of expertise. In best case scenario, the mitigation specialist would gather records, conduct extensive interviews with the client, family and any others associated with the client. The mitigation specialist would then formulate a social history. Defense experts would then be retained based on specific testimony needed to support the mitigation theory to be presented to the jury. It is common for various mental health experts to be retained to explore different areas identified in the mitigation strategy to be presented in the punishment phase of the trial.

A common mistake frequently presented in seminars for attorneys regarding mitigation is hiring a mental health expert to "shrink" the client and inform the defense team on the possible mitigation themes. Although, attorneys are frequently warned against this strategy, this is the strategy that was employed in Moises' case. Russ Stetler,

8

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

in several of his many articles, concerning mitigation cautions:

> The solution to the problems posed by mental illness in these cases is not simply to "call a doctor." Contacting a mental health expert is a litigation decision with many grave implications, which vary widely in different litigation environments.[14]

> It is essential not only for counsel and the defense team to build a foundation of trust with the client before involving experts in the case, but also to develop an independently corroborated multi-generational social history that will highlight the complexity of the client's life and identify multiple risk factors and mitigation themes.[15]

Without a complete multi-generational social history, Dr. Vigen was retained without a clear definition of his role. As a result, he acted as the "mitigation expert" and as the "testifying expert". If the mitigation specialist had compiled a complete social history and identified mitigation themes, Dr. Vigen would not have been hired to "furnish opinions" with no direction.

The defense team retained Dr. Mark Cunningham as an expert. He is a well known and respected mitigation and testifying expert. However, as in the case of Dr. Vigen, it was unclear why Dr. Cunningham was retained. Dr. Cunningham is frequently used for future dangerousness presentations and has an excellent mitigation presentation showing how various elements in a client's life affect their later decisions. It was unclear for what purpose Dr. Cunningham was retained (as a consulting expert or testifying expert). It was Dr. Cunningham's initial understanding that he was to testify concerning future dangerousness, but Dr. Cunningham did not testify in any capacity at the trial. Dr. Cunningham was furnished clinical interviews that were done by Dr. Vigen and his nurse assistant, Fran Dezendorf. Instead of the designated mitigation specialist, Mr. Gonzales,

---

14 Stetler, Russell, The National Association of Criminal Defense Lawyers, The Champion, "Mental Disabilities and Mitigation", April 1999.
15 Stetler, Russell, *Mitigation Evidence in Death Penalty Cases*, The Champion, v. xxiii, n. 1 (January-February 1999), pp. 33-38, at 36.

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

furnishing the necessary social history information to Dr. Cunningham, he was obligated to use interviews done by another expert.   Since the "family script" was well maintained by the family, neither of the experts received vital information about the negative family dynamics which a complete social history could have furnished.  It is very common and necessary for experts to contact various family members and others to corroborate the information, particularly if they are testifying witnesses.  This is different than formulating the complete social history as Dr. Vigen unsuccessfully attempted to do.

Since the experts were retained prior to formulating the mitigation strategy, there was confusion about the role of each expert.

> *One question that needs to be addressed before retaining any mental health expert is what role the expert is going to play.*[16]

> *Mental health experts consulted in capital cases are asked to address a wide range of referral questions. They are not simply called upon to "evaluate" the client.*

When expert mental health witnesses are not in clear in their role, it is possible their testimony can serve to harm the client.  Juror John Comer described Dr. Vigen's testimony as more useful for the prosecutor.

> *In the punishment phase the defense called a psychiatrist who did not really help their case, and in fact only helped the DA because he could not explain why the defendant did what he did, in terms of mental factors.*[17]

Mr. Gonzales, the mitigation specialist did not live in the area (lived in Lubbock) and his investigation was limited to "trips to the area".   Mr. Gonzales does not speak Spanish.  The attorney spoke Spanish and was better able to communicate with the family than Mr. Gonzales.  Moises reported he did not spend much time with Mr. Gonzales.  The family reports they spent more time with the attorney and Dr. Vigen than with Mr. Gonzales, the mitigation investigator.

---

16 Stetler, Russell, The National Association of Criminal Defense Lawyers, <u>The Champion</u>, "Mental Disabilities and Mitigation", April 1999.

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

An important function of the mitigation specialist is to form a rapport with the client in order to be able to obtain sensitive and possibly embarrassing information (sexual abuse, other family secrets). A mental health expert, is well aware of the fact that it is necessary to form an alliance and usually preferable to have one on one interaction with the client to elicit this type of embarrassing, possibly humiliating information. Mr. Gonzales has worked in the past with students at the SMU law school and it appears used students in Moises case as a "learning experience". Moises indicated in letters to his attorney that he had not been consulted regarding the use of students in his case.18 In two of the visits by Mr. Gonzales, he brought students with him to interview Moises on two different occasions. This would not create an environment for Moises where he would feel safe in revealing important family information. It is important to help involve students and others in learning, but this does not appear to be an appropriate use of the students on Moises behalf.

Moises' attorney, Mr. Sanchez, was very cooperative in furnishing his files which seemed complete. The mitigation file only contained a few sheets of paper with some letters.[19] There were various handwritten interview notes throughout the files of family members, but it was unclear who had taken the notes. It appeared they might have been Mr. Sanchez's notes.

According to Moises' brother, Paul Mendoza, he did not have a lengthy interview with Mr. Gonzales prior to the trial.[20] The only time Paul talked with Mr. Gonzales was when Mr. Gonzales, the investigator and the attorney, Juan Sanchez, came over to the Mendoza home for dinner and met with the family. Mr. Sanchez spent much of the evening explaining what would be happening and giving his credentials and the types of cases he had handled previously. Paul was hurt because frequently Mr. Gonzales, Mr. Sanchez and the fact investigator would be talking and laughing among themselves which was difficult for Paul to hear. Their demeanor

---

17 Mitigation Documents, Pages (10)317-318 – Juror John Comer Affidavit
18 Mitigatino Document, Pages (10)323-324 -- Letter from Moises to Attorneys
19 Mitigation Documents, Page 00123 - List of Items from Mitigation File
20 Mitigation Documents, Page 00259 - Paul Mendoza Interview

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

made him feel they were uninvolved in the case and somewhat insensitive to the family.  The
family was still in a state of shock and fragile from all that had happened.  Paul stated that Mr.
Gonzales seemed distracted and was talking about the fact he was getting a divorce.  Paul was
also surprised because Mr. Gonzales was unable to speak Spanish.

As a result of the limited mitigation investigation, mostly superficial type of information
was obtained from the family, which included much of the family's "usual script" concerning
their father's illness and how he was affected by the system.

There was a limited investigation of the family's mental health history and criminal
behavior.  Moises' father has an extensive history of mental illness and lawsuits that revealed
valuable information about the family.[21]  Some mental health information was obtained, but
other important documents were not obtained or used.  Due to the lack of a thorough social
history investigation, the jury did not hear facts about the family that probably affected Moises.
Although Concepcion's depression and frequent hospitalizations were discussed, it was not
explored further regarding the effect this had on the family and Moises.  The presentation of
Moises' family dynamics were somewhat distorted giving the appearance his parents were hard
working, religious, honest people that tried to manage an "out of control" Moises.  Little
information was presented to show what factors may have contributed to Moises becoming "out
of control".

**Inaccurate Portrayal of Father (Concepcion Mendoza)**

Because a thorough mitigation investigation was not performed, defense counsel failed to
construct a persuasive narrative in support of the case for life using the information related to the
dysfunction of Moises' father, who played a pivotal role in Moises development.  The
information about frequent mental health hospitalizations and suicide attempts were revealed, but
with little connection to their possible affect on Moises.  The "family script" portrayed the father

---

21  Mitigation Documents, Page 00124-167 – Miscellaneous Documents from Concepcion Mendoza's Lawsuit with

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

as a hard working man who had his back injured at work and was no longer able to work and support the family. Because of this, he became increasingly depressed. It was portrayed by the family that Concepcion was unable to work because of his hurt back and mental illness which was debilitating. There was little discussion of Concepcion's "spells" which occurred whenever there was a problem in the family and he was unhappy.[22] During these spells, the family focused on Concepcion and tried to make him feel better. This type of behavior was described in various hospitalizations as a "personality disorder", once as "passive-aggressive" and also as "dependent".[23]

There was no discussion or presentation related to Concepcion losing a lawsuit with Decker Foods related to his back. The jury found in favor of Decker Foods after watching films taken by a private investigator showing Concepcion doing activities too difficult for someone with a hurt back. One of these activities took place at a church gathering, where Concepcion picked up a wooden picnic table and moved it by himself. He was also filmed climbing a tree and jumping out of it.[24] Concepcion was also diagnosed as "malingering". The documents from the lawsuit against Decker Foods do not present Concepcion in a very favorable light and the jury did not believe he had sustained an injury to his back that would prevent him from working. During this period of time, Concepcion was consumed with building his lawsuit, seeing doctors, gathering records, etc. Dr. Vigen was unable to consider this information in analyzing the dynamics in the Mendoza family and he did not indicate that he was furnished any documents related to the lawsuit.

Because of the inadequate mitigation investigation, Dr. Vigen was unable to furnish specific examples of the dysfunction in the Mendoza home. There was reference in the MHMR records of family violence, but this information was either overlooked or not furnished to Dr.

---

Decker Foods
22 Mitigation Documents, Pages 00252-258 - Mario Mendoza Interview
23 Mitigation Documents, Pages 00684,722,906,922 – Psychiatric Records, Concepcion Mendoza
24 Mitigation Documents, Pages 00415 - Documents from Concepcion Mendoza's Lawsuit with Decker Foods

13

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

Vigen.[25]   The prosecutor was able to use this lack of information in his cross examination of Dr.

Vigen.

The State (Mr. Davis):
*Q.  Doctor, you said just a few moments ago the Mendoza home was a dysfunctional home.  Let me ask you, there's no evidence that there was ever any violence in that home, is there?*
*A.  I think there was an altercation between Moises and his sister one time where they were fighting, but there was never any violence where any first aid or any medical attention beyond first aid was needed, to my knowledge.*
*Q.  In some of these homes, for instance, these young people have to witness violence between their parents, correct?*
*A.  Yes, that happens.*
*Q.  Some of them have to witness violence between a sibling and a parent or other siblings, correct?*
*A.  That's correct.*
*Q.  In a lot of these homes violence is actually used against the young person themselves, correct?*
*A.  Yes.*
*Q.  That never happened to this Defendant, did it?*
*A.  Not to my knowledge.*
*Q.  There was never any alcohol abuse inside that home, was there?*
*A.  Not that I could discover.*
*Q.  There was no drug abuse in that home, either?*
*A.  Not that I could discover.*
*Q.  Would you agree with me that the parents exhibited a good work ethic for all of their children, including the Defendant? (Note 1)*
*A.  Yes.  I think the parents worked very hard to do the very best that they could.*
*Q.  Would you agree with me, too, that the parents exhibited very good values for all of their children?(Note 1)*
*A.  I think, again, parents put forth their very, very best.  But they also put forth their own limitations, and the fact of the matter is that children come up and take what they want.  We, as parents, don't control what our children take and what they learn.  We only control somewhat what we give, and we can't always prevent ourselves from showing our limitations to our children.  But on the surface the import of your question is correct.  I think these parents tried very hard, given who they were and given the depression that they were experiencing.*
*Q.  Appeared to have attempted to teach all the children the difference between right and wrong? **(Note 1)***
*A.  Yes* [26]

25  Mitigation Documents, Pages 00591-593 - MHMR Records, Concepcion Mendoza
26  Moises Mendoza Trial Transcript, Vol. 24, Pages 156-157

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

- - - -
*A. Yes. The absence of the fathers is a significant factor in family dysfunction.* **(Note 2)**
*Q. But in this case the Defendant had at least two very good male role models in that home, didn't he?*
*A. Well, both of those -- those men are significantly older than Moises. Mario is sort of a very strict, upright, this is the way you do things. The problem is he really feels that he left too early and that he wishes he had been more of a role model. Paul is much more like Mercedes. He's very forgiving. Moises even stole money from him, like, $1,000 or $2,000. Paul really minimized that and wasn't angry about it, wasn't upset about it. Never really confronted Moises over that and sort of let him get away with that.*[27]

**Note 1:** No information was introduced about the fraudulent activity which occurred in the Mendoza household. There was no mention of the illegal entry into the country by Mr. and Mercedes and the fact that Mr. Mendoza was deported on several occasions and returned. There was no information about the fact that Mario was left in Mexico for five years because his family could not return to get him.

**Note 2:** Mr. Mendoza was frequently absent from the family initially because of his work, then his involvement with the church and later his withdrawal related to his depression.

## Family History of Mental Illness

Little information was presented concerning Moises' paternal uncle Francisco Sandoval, who was had been hospitalized seven to eight times at Wichita Falls State Hospital. Francisco was diagnosed with Schizophrenia and Alcohol Dependence. Uncle Francisco was later murdered and his oldest son (Ricky) was charged with the murder.[28] Ricky Sandoval's defense attorneys presented evidence that he had killed his father in self defense. Uncle Francisco was buried in a shallow grave and was not found for several weeks. Moises had grown up with these cousins (Uncle Francisco's children) and they were his main friends during school. Ricky was found not guilty and all the information concerning the arrest and trial was expunged. Moises' mother and other family members were very suspicious about the result of the trial. The Mendoza family believed that the Sandoval family had pulled off a scam with the law and this could certainly have influenced Moises. Additionally, there was no presentation of the amount of

27  Moises Mendoza Trial Transcript, Vol. 24, Pages 154-155

15

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

alcohol abuse and/or dependence within the family, including Uncle Francisco.

**Wonderful Family**

The state portrayed the Mendoza family as "wonderful" and having all the advantages. Mercedes had to return to Mexico to give birth to Moises because the family could not afford medical care. For most of his life, Moises had to rely on Medicaid for health care. To supplement their income, Moises' mother was forced to sell tamales throughout the community. The Mendoza family's financial problems were well known within that community. Mario and Paul both worked and contributed their money to help support the family. There are frequent references in Concepcion's MHMR records about the financial problems of the family – inability to pay their utilities bills, unable to buy eye glasses, help from United Way, and financial help to make home repairs.

Mario and Paul describe considerable use of violence by their father while they were growing up. Prior to Moises' birth, there was frequent conflict between Concepcion and Mercedes.[29] Mercedes frequently put Concepcion in a "no win" situation in her requests for him to discipline the children. She would insist when he came home he disciplined the children. Mario reports that the discipline included severe spankings and Mercedes would then get angry at Concepcion about the severity of the discipline. If Concepcion didn't discipline the children, Mercedes was angry, but she was also angry when he did. There is referenced in Concepcion's psychiatric records of physical violence with his wife and frequent angry outbursts.

Mario states his parents argued frequently over money, discipline and other matters prior to Moises' birth. In fact, he heard them arguing about whether another child would save the marriage. Mario believes that Moises was conceived in an effort to help save the marriage. This is the reason for the age disparity between Moises and his older siblings. Both Mario and Paul left home as soon as possible to join the military in order to get out from under the control of

---

28 Mitigation Documents, Page 0168-0171 - Newspaper Articles

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

their parents and to be able to afford college.   In the state's closing statement, Mr. Davis describes the Moises' family:

> *The truth is this man came from a wonderful home.  He had wonderful parents.  He had wonderful opportunities and advantages that most kids in this society could only dream of unfortunately.  As the doctor told you, this isn't the way it always is.  This wasn't a one-parent household where you've got a parent trying their best but just couldn't quite control him.  This isn't a home where there's violence, where he's practicing modeling after things he's seen.  Folks, this was a darn good home here.  And if it was dysfunctional, it was because he made it dysfunctional.*[30]

Additional investigation would have revealed that Moises was modeling behavior he had seen at home.  His father had modeled fraudulent behavior in collecting social security disability and maintaining a job at the same time.  In talking with most of the family members, they were anxious to keep the family secret and protect their father, but they genuinely believed and accepted that it was "necessary" that their father commit fraud in reporting his work earnings.  The family also protected the secret of their father's anger and family violence.

**<u>Interviews with Moises' Friends</u>**

There was a limited investigation of Moises' new group of friends.  This group may have contributed to Moises' change in behavior.  A thorough investigation would have included a more extensive investigation of Amy Lodhi and her family background.  Most of Amy's family is or has been involved in some type of criminal activity.  This may have lessened the weight of the allegation of her kidnapping and rape.  There were considerable records available concerning the criminal activities of Amy's family.  In fact, Amy's father is currently incarcerated in federal prison.[31]   There was no clear documentation that Moises' friends refused to talk with the investigator.  Dr. Vigen was unable to give clear information about their refusals.

---

29 Mitigation Documents, Pages 0252-258 - Mario Mendoza Interviews
30  Mendoza Trial Transcript, Vol. 25, Page 47-48
31 Mitigation Documents, Pages 00269-279 - Criminal Charges Information - Lodhi family

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

Cross examination of Dr. Vigen by the State (Mr. Davis):

*Q. Did you ever speak or try to interview any of the Defendant's neighbors?*

*A. No, I did not.*

*Q. Specifically, did you ever attempt to talk with an individual by the name of Fred Bratton?*

*A. No, sir.*

*Q. As I understand it, you did not interview any of the Defendant's friends.*

*A. No. I wanted to interview some of his friends but was not able to do that.*

*Q. Well, you talked about Amy Lodhi, correct?*

*A. Yes.*

*Q. What other friends did you attempt to interview?*

*A. I wanted to talk with Stacie Garcia and wasn't able to do that. Cody Wilbanks, Travis Rose -- I wanted to talk with Priscilla Silva, Marvin Mervez, James Pierce. These were some of his other friends that we wanted to get in touch with and were not able to do that.*

*Q. Some of those names had been supplied by the Defendant?*

*A. Yes, that's correct.*

*Q. Because you knew that they might have information that may be helpful to you in arriving at your opinions, correct?*

*A. They could have, both helpful -- well, helpful. But positive and negative information, whatever it was.*

*Q. But as you sit there you have no idea what they may have been able to tell you?*

*A. I don't know. I don't know.*

*Q. Doctor, I believe that you testified earlier that it's not uncommon for defendants in cases like this, they have a very strong motive at times to lie, don't they?*

*A. Yes.*

*Q. To exaggerate?*

*A. Either exaggerate or minimize, yes.*

. . .

*Q. He's also beaten up Travis Rose, hasn't he?*

*A. They got in a fight, yes, that's true.*

*Q. He told you that he beat the boy up, correct?*

*A. Can you refer me again to where you're speaking?*

*Q. Doctor, I'm not -- that I believe this will be one of your interviews with the Defendant. And I'm looking at a Page 5. You have -- you have several numbers that have been circled. You have a Number 2, a Number 3, and then down toward the bottom of the page you have a Number 1 and then again a Number 2.*

*A. Yes, I think --*

*Q. Do you see the notation in the bottom left-hand corner that he beat up Travis Rose because he cheated on his sister? On the Defendant's sister?*

*A. I believe Ruthie, yes. Or he thought he cheated on Ruthie. He hit him, and he went down, and they later became good friends.*

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

*Q. So he knocked him down, hit him a couple more times, then they later became friends?*

*A. Those were the words of Moises.*

*Q. He also assaulted Amy Lodhi?*

*A. Yes. Can we refer to the notes on that or --*

*Q. I believe -- I'm not sure that I have that at hand. But you remember that he hit her once when she said that she suspected him of flirting or cheating on her?*

*A. I remember that incident. That's one of the reasons I wanted to talk with Amy Lodhi or Farukh Lodhi to really understand what seems to me to be a very unusual and strange relationship which I don't thoroughly understand with the fake abduction and so on and so forth. I just don't know enough before that.*

*Q. How many women has the Defendant claimed -- when you talked with him, did you ask him how many women he had had sex with?*

*A. Again, I have no idea how many he has, but he claims many.*

*Q. Fifty, isn't it?*

*A. Something like that. You know, just an unbelievable number.*

*Q. Is that what you mean by empty sex?*

*A. Yeah, empty. Just body mechanics without connection, without care, without a relationship. When I asked him how many girlfriends he's had, he mentions two or three. So there were two or three girls with whom he had a relationship, I assume a sexual relationship, where he actually -- you know, which sounded more normal. But having multiple sexual partners like that is just empty.*

*Q. Well, these people that were such an influence on him, how many of those people had committed aggravated robberies?*

*A. Well, all I can say about that is I don't know of anybody else in his peer group who has committed an aggravated robbery.*

*Q. How about --*

*A. All I --*

*Q. How about aggravated rape?*

*A. Again, I don't -- I have no knowledge of their criminal behavior or their criminal histories or their activities. I don't know those.*[32]

Cross examination by Mr. Sanchez:

*Q. Now, the State asked you a lot about the people that you haven't talked to. Not everybody wants to talk to you, correct?*

*A. Right.*

*Q. As a matter of fact, I think our investigator -- you had given us a list of people you wanted to talk to. Our investigator tried to locate some of them. Isn't it true some were located and some weren't. And the ones that were located, hardly any of them were cooperative with us; is that correct?*

---

32 Moises Mendoza Trial Transcript, Vol. 24, Page 168-169

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

A.   *That's true.  That's right.*[33]

There was limited information in the fact investigator's notes about the attempts made to locate
and talk with Moises' friends.[34]

### (b) Lack of Mitigation Theory Strategy

**Substance Abuse**

There was little emphasis placed on Moises' use of drugs and alcohol.   A clear
evaluation of Moises' drug and alcohol usage was not presented to the jury.  No information was
presented by the defense to educate the jury on the effects alcohol can have on an individual's
judgment and behavior and how this could have contributed to Moises' behavior.  Research has
shown that drug and alcohol dependence has a strong genetic link.  An expert could have
educated the jury about. and evaluated Moises for, substance abuse.  This education might have
procided a partial explanation of what happened the night of Rachelle's murder since there was
testimony that Moises had been drinking.  The combination of Moises' temper, impulsiveness
and intoxication could have provided a persuasive narrative of the theory for the case for life that
was consistent in all phases of the trial, had the investigation been adequate.

The defense counsels did attempt to establish that the defendant was under the influence
of alcohol and/or drugs at the time of the offense.  This laid the ground work for an expert, such
as toxicologist to testify concerning the effects of alcohol on an individual, but an expert was not
retained.  Dr. Vigen did talk about the problem of Moises' chemical dependency in one of his
opinions for the defense, but it contained no elaboration and/or possible connection to the
offense.

---

33 Moises Mendoza Trial Transcript, Vol. 24, Page 164
34 Mitigation Documents, Page 00172-174 – Investigation Report – Moises Mendoza

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

Dr. Vigen:
A. *Yes, that was my third opinion.*
*Q. And explain to the jury what that opinion is.*
*A. The opinion is that Moises' behavior changed radically for the worse when he began smoking marijuana and drinking. He told me that that occurred at a senior camp-out, but it's probably earlier than that. And began associating with a new set of friends that themselves were drinking and possibly using drugs and having parties. Moises felt very accepted by this new group of people because he could be funny and he could be the clown, and they accepted him. So his behavior, I think with the introduction of drugs and alcohol, changed in a negative way for him.*
*Q. What other basis did you have for that opinion?*
*A. Well, he -- his drinking and use of marijuana escalated during that time. His life had spiraled when in combination with his depression he started using marijuana, he started drinking alcohol, and he became involved in this culture that you heard about.*[35]

## Brain Development in Adolescents and Young Adults.

There has been a significant amount of research regarding the formation of the human brain at later ages than originally thought. This research contributed to the decision by the Supreme Court to stop executions of defendants that committed a crime under the age of eighteen.[36] Prior to this decision regarding juveniles in 2002 the Supreme Court had banned executions of mentally retarded persons.[37] Research has revealed that although a person may appear mature physically, the brain is probably not developed and that teenagers have significant neurological deficiencies that result in limitations of their judgment. Research over the past few years has revealed that the adolescent brain is far less developed than previously believed and still in a state of transition. There is a "pruning process" that is completed in late adolescence that transitions the brain into the adult form. Research has shown that until the brain is fully developed, adolescents are unable to reason as well as adults. This does not take away

---

35 Moises Mendoza Trial Transcript, Vol. 24, Page 123
36 *Roper vs. Simmons, 543 U.S. 551 (2005)*
37 Akins v. Virginia, 536 U.S. 304 (2002)

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

the responsibility of their crimes, but can lessen their culpability.[38]  This research could
have been valuable in helping the jury understand Dr. Vigen's opinion regarding Moises'
immaturity.  Dr. Vigen made some reference to this research, but it was not developed in
his testimony at trial.

> *Q. Now, Doctor, you talked about him being underdeveloped and an adolescent-type man.  Is he past adolescence?*
> *A.  No.  He's still -- there's new research – or not new research.  There's been some research that, you know, the human brain isn't fully developed until, like, 24 and 25.  He's 21.  And that the frontal cortexes are still developing from the neurobiological point of view.  But I see him as just adolescent in his behavior now.  He's adolescent in his behavior at the jail and with the lawyers and with me.  So I think he's still in the early adolescent phase of development.*
> *Q.  So even though biologically is one thing, and then psychologically is another way to look at as adolescent?*
> *A.  Yes.  Yeah, that's a good way.  I mean, he's 21 chronologically and biologically, but nowhere -- I don't see him as having that level of maturity.  That's why I said, I think he's immature psychologically and underdeveloped.*
> *Q.  You say the Defendant is immature.  You said that -- first of all, let me make sure that I have this from you.  Did you notice any signs of mental retardation during any of the times that you spent with this Defendant?*
> *A.  No, sir.*
> *Q.  Would you say that he's at least average intelligence?*
> *A.  I would estimate certainly -- if the average range is between 90 and 110, he's definitely in that average range. yes.  I would think that he is, yes.*
> *Q.  He's impulsive, isn't he?*
> *A.  Reactive and impulsive.*
> *Q.  He's got a temper?*
> *A.  Yes.*
> *Q.  Which at times in the past has been an explosive temper?*
> *A.  Yes.*
> *Q.  He acts without thinking?*
> *A.  And without -- yes.  Without -- without planning and so on, yes.*
> *Q.  Without considering the consequences of his actions?*
> *A.  Yes.  He has a history of doing that.  He doesn't do it all the time, but he does do that.[39]*

---

38 Mitigation Documents, Page 0023 - Adolescence, Brain Development and Legal Culpability, Juvenile Justice Center Publication, ABA, January 2004
39  Moises Mendoza Trial Transcripts, Vol. 24, Page 150-151

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

## Future Dangerousness Issue

The defense set up their expert witness, Dr. Vigen, to be cross examined as an expert related to future dangerousness. Dr. Vigen lives in the state of Louisiana and did not have the required expertise to speak about the Texas Department of Correction facilities. There were more qualified experts from Texas that had previously been involved with TDC who could have spoken with more expertise concerning the classification system.

*Mr. Davis:*
*Q. Opinion Number 5 -- Number 5, I'm sorry. Can you please tell the jury what that is.*
*A. Well, it's my belief that the Texas Department of Criminal Justice has the expertise, has the capability to house and incarcerate Moises in such a manner that he will be a low or minimum risk for future violence in the prison system.*
*Q. What do you base that on?*
*A. Well, I've only been in one prison, one unit in Texas, so I don't have a lot of direct experience with correctional officers in Texas, but I've read a lot of research having to do with the Texas Department of Corrections. I've looked at some statistical data regarding assaultive behavior against inmates and assaultive behavior against officers, and those incidents are low, I guess, in comparison to the tremendous number of inmates that the Texas Department of Criminal Justice houses and cares for. I've talked to S.O. Woods, who is the former assistant director of classifications, about -- and he's given me sort of a general idea about the classification system and how inmates are processed and all the information that's taken into account. So there's an elaborate system of well-trained professional people that run the Texas Department of Criminal Justice. So I guess, in my opinion -- I mean, I've seen inmates like this young man in my experience, and I've followed some of those inmates over the years in the Louisiana penitentiary that's at Angola. It's the Louisiana State Penitentiary at Angola where the violent inmates are placed. I've watched them over time and talked with them over the years, and so I've seen how Louisiana -- the Louisiana prisons are a very safe place to be both for officers and for staff and for inmates. I'm sure -- I mean, I assume that Texas is even better than Louisiana. But Texas has many, many more inmates, and they have much more resources. The research that I've read and the literature about the Texas system is very positive.*

*MR. SANCHEZ: I'm going to object at this point to the relevancy.*
*THE COURT: Sustained.*
*MR. DAVIS: I'm sorry. It has everything to do with relevancy since he has indicated he's an expert on future dangerousness, how individuals mellow over age and how they have a -- the potential for rehabilitation.*
*By Mr. Davis)*
*Q. Do you recall Patrick Murphy escaped from the Kenedy Unit near San Antonio with*

23

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

*six other inmates?*
*A.   From the Connally --*
*Q.   I'm sorry.  From the Connally Unit in Kenedy, actually.*
*A.   Yes, the Connally.  Yes, he did.  He escaped with seven other inmates.*
*Q.   When they left there, do you remember what they -- do you remember that they*
*committed an aggravated robbery before they got to Dallas County?  You remember that,*
*don't you?*
*A.   Yes.*
*Q.   You recall the capital murder in Dallas County, don't you?*
*A.   Yes.  They killed an officer who was being called to a scene where they were robbing*
*a large store, and they killed the police officer.*
*Q.   Shot him multiple times, didn't they?*
*A.   Yes.*
*Q.   After they shot Officer Hawkins – Aubrey Hawkins was the officer's name, wasn't it?*
*A.   Yes, Aubrey Hawkins.*
*Q.   After they did that they fled to Colorado, didn't they?*
*A.   Yes, they did.*
*Q.   Started attempting to obtain body armor, correct?*
*A.   Yes.  They were -- I believe they were arrested with vests and -- and so on.*
*Q.   You testified as a mitigation expert in that case?*
*A.   Yes.*
*Q.   And as an expert on future dangerousness, as well?*
*A.   I don't remember that I commented on that.  I remember making the diagnosis that he*
*had a sexual disorder not otherwise specified, and I saw him to be a narcissistic*
*personality disorder.*
*(By Mr. Davis) Dr. Vigen, when you expressed some opinions about Texas Department of*
*Corrections, sir, have you ever worked for the Texas Department of Corrections*
*Institutional Division?*
*A.   No, sir, I never have.*
*Q.   Of all of the units here in this state, how many units of the Texas Department of*
*Corrections have you been in?*
*A.   I think there are 114, and I've only been in one.*
*Q.   Texas prisons are violent, aren't they?*
*A.   Can I --*
*Q.   Well, let me ask you.  There are violent people inside the Texas penitentiary system,*
*correct?*
*A.   There are men and women in the system who have committed violent acts outside the*
*prison, yes.*
*Q.   And there is violence that is committed inside the Texas prisons every single month of*
*the year, isn't there?*
*A.   I would assume -- I would assume that.  Let me -- let me just check a note or two.*
*Q.   Well, do you need to -- let me -- I'm just asking you.  Is there violence that is*
*committed inside the Texas prison systems?*

24

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

*A. Yes.*
*Q. Okay. There's violence on administrative segregation units, isn't there?*
*A. Yes, I imagine there is. There are three levels of segregation, and they get more and more strict. So if someone breaks a rule or engages in some kind of aggressive or violent behavior he would lose more and more privileges, more and more time, and be moved into a more and more severe -- more and more secure situation.*
*Q. Dr. Vigen, you know from talking to S.O. Woods that a man convicted of capital murder, when he gets to the prison system, is going to be placed into the general population, isn't he?*
*A. I learned from S.O. Woods that since the escape, the Connally escape of the Texas Seven, that the whole classification system has been revised. There are now, like, five different categories in which a person would fall. Most of the capital offenders are going to go into Section -- into Level III or Level IV, which is not in an open dormitory or not in an open situation. They'll be housed individually or with one individual in a cell block.*[40]

## Presentation of Prison Life

Mitigation specialists often recommend that an expert in prison life (former warden or other specialist) testify. These experts are able to explain the classification system used by TDCJ and/or present a film depicting prison life for the jury. This ensures that jury members have an accurate and uniform impression of prison life. Previous interviews with capital murder jurors have reported this type of presentation helped to convince them to vote for life in prison rather than death. An important aspect in the punishment phase is for the jury to have a clear understanding of what circumstances the defendant will face in prison. In this case, no expert was used to present an accurate portrait of prison life for the jury. This type of testimony can help establish that the defendant would not be a future danger if incarcerated and could be maintained by the prison system. Instead, the defense attempted to use their psychologist to address this issue and he could not be considered an expert in this area. Mr. Sanchez talks about life in prison in his closing statement, but no clear picture was presented to the jury.

Mr. Sanchez closing statement:
*And you have that alternative. The alternative is life in prison for the rest of his life. The State makes it sound like somehow that's a gift, but that's a punishment. When you give somebody a life sentence in prison for the rest of their life, you are punishing them. They're not going to go walk*

---

40 Moises Mendoza Trial Transcript, Vol 24, Page 169-171

25

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

*out in the street. They're not going to be free to do whatever they want. You will be punishing
him. So if you send him to the penitentiary for the rest of his life, he's not going to have access to
the culture that he did before. He's not gonna have access to alcohol. You're going to take him
out of that and put him in this cell for the rest of his life where he'll be able to think about your
verdict every day for the rest of his life, where if he doesn't take his medication or he doesn't
follow any type of rule, life will get impossible for him. And he's smart enough to figure out over
a period of time that if he doesn't do what he gets told to do, if he doesn't change his life, that
those walls are not gonna get any thinner, the steel's not gonna get any lighter, the doors aren't
going to open up for him. The prison's not gonna go anywhere. The guards with guns are not
going to leave him alone.*[41]

### (c) Poor Strategy for Presentation of Mitigation in Punishment Phase

During the punishment phase, most of the mitigation presentation involved calling family

members to talk about Moises. There seemed to be little defense strategy behind the testimony

of family members.   Without a plan, the testimony was somewhat disjointed and it was apparent

from the transcripts that Concepcion and Mercedes frequently gave answers the defense attorneys

did not expect.  One of jurors furnished an affidavit regarding the ineffective presentation by the

defense:

*We heard from the defendant's family in the punishment part of the trial. They did
not affect me much because he had been a mean teenager. The defense expert said
that the defendant was a "victim of circumstance" but I was not convinced. His
family was a strong Catholic family, and was smart. I felt bad for them.*[42]

*The state's attorneys did a very good job with the evidence that they had. The
defense attorneys seemed less prepared and their expert witnesses seemed
unready to testify or be cross-examined. The testimony of the defense's
psychologist was particularly damaging to their case because he said that Mr.
Mendoza felt he had the right to do bad things without being punished.*[43]

The defense presented Moises' father and mother and siblings as religious, law abiding

citizens, which contributed even more to the "demonization" of Moises because of his perceived

---

41  Moises Mendoza Trial Transcript, Vol 24, Page 30,37-38
42  Mitigation Documents, Pages (10) 305 Juror Marsha Schmoll Affidavit
43  Mitigation Documents, Pages (10) 303 Juror Dollie Jones Affidavait

26

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

departure from the family norm.  One of the juror comments on this in an interview:

> Mr. Stockdell explained that in Texas the victim's family can address the defendant.
> The jury wasn't aloud to see this.  What was amazing about the Mendozas, Mr.
> Stockdell explains, was that they were all great, industrious people, except "that
> guy."

> Mr. Stockdell tells us that the defense tried to show that family problems made
> Moises the way he is.  His father lost his job and was disabled, so he got depressed.
> Mr. Stockdell explained that since this was a Mexican family, the dad was macho and
> so because he couldn't provide for his family, he got depressed.  That was the only
> thing that the defense had. [44]

Another of the jurors found the defense presentation to be ineffective related to the
defense attorney's skills:

> Ms. Garrett reported that the prosecution attorneys were very thorough and the
> defense attorneys were not equally matched.  She works as an insurance adjuster
> for the Plano school district and as a result, she has a lot of experience with
> personal injury attorneys for workers' compensation cases.  She described such
> attorneys as being "low on the food chain," implying that they were not very
> skilled.  She said that the male defense attorney, who she thought was named
> Sanchez, didn't come across as believable.  She said that he didn't endear
> himself to the jury.  Ms. Garrett said the real problem was his delivery. [45]

Much of the testimony presented by Moises' parents, Concepcion and Mercedes Mendoza, was

not accurate and followed the family "script" that the family colluded to maintain throughout the

years.   The family members were forced into participating in a cover-up of many "family

secrets".  Moises' father modeled the behavior to Moises that rules did not apply when the rules

did not fit the family's needs.   Moises' father also modeled poor behavior for coping with

problems.   Frequently when there were problems in the family or Concepcion was unhappy, he

had "spells" where he didn't respond to the family.  The family became worried and guilt ridden

often trying to make it up to their father. When Concepcion's "spells" started initially, the family

---

44  Mitigation Documents, Pages (10) 312-316 - Juror John Stockdell Interview
45  Mitigation Documents, Pages (10) 307-311 - Juror Becky Garrett Interview

27

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

was so worried, they would take him to the emergency room, but no medical problems were found.   Concepcion attempted to use the behavior of  "I will not respond if I am not happy" with the Lavon Police Department, and found them much less receptive to these "spells" than his family.  He was arrested and later taken to the emergency room to rule out a medical condition.

Concepcion's spells often consisted of outward anger and at times included physical abuse of Mercedes.  Even when she was being abused, Mercedes continued to attempt to protect the family reputation and made excuses for Concepcion.

The entire family willingly and/or unwillingly participated in Concepcion's fraudulent activities regarding worker's compensation and social security payments and other agencies the family received aid from because of their "unreported" income and Concepcion's inability to work..   This type of modeling behavior from his father and mother helped to set the example for Moises that under certain circumstances, it is acceptable to do unlawful things.

Each case is different with relation to the mitigation theme(s).  In some cases there is more emphasis on the guilt/innocence phase, but the preparation for the punishment phase is essential.  It was important that as many resources as possible be dedicated to the punishment phase and available mitigation resources.

One strategy used frequently in the mitigation presentation is the use of a chronological timeline   The defense counsels did not offer any type of chronological presentation (time line) to the jury that might have illustrated the events during specific time periods that affected Moises, such as his brother's leaving the family, father's loss of employment, father's involvement in law suits, father's depression, and mother's physical problems.   In Moises case, it would have been particularly important to show how everything revolved around Concepcion and his frailties. Particularly, the frequent treatments he received for his many perceived maladies.  Moises' complete time line is attached,[46] but the following is a brief sample:

---

46  Attachment A – Time line, Moises Mendoza

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

## Moises Mendoza & Family Time Line

| Date | Event | Source | Bate # |
|------|-------|--------|--------|
| 12/48/1948 | Concepcion Mendoza is born in Mexico. | Interview | |
| 02/02/1948 | Mercedes Sandoval is born in Mexico. | Interview | |
| 05/15/1969 | Mercedes and Concepcion Mendoza get married in Mexico. | Interview | |
| 09/15/1970 | Mercedes gives birth to Mario Mendoza in Mexico. | Interview | |
| 02/23/1973 | Mercedes gives birth to Paul Mendoza in the U.S. | Interview | |
| 03/18/1976 | Mercedes gives birth to Elizabeth Mendoza in the U.S. | Interview | |
| 01/26/1984 | Mercedes gives birth to Moises Sandoval Mendoza in Mexico. | BC | 00087 |
| 01/26/1985 | Moises is one year old. | BC | 00087 |
| 02/11/1985 | Moises' maternal uncle, Francisco Sandoval, is committed under a court order from Collin County to Wichita State Hospital. This is the 6th admission for Francisco. Francisco was committed because he "created a disturbance, damaged property at the Wiley Hospital and had also been claiming visual and auditory hallucinations. | WFSH | 01486 |
| 02/12/1985 | Wichita Falls State Hospital (WFSH) documents the reason for Francisco Sandoval's admission as not taking medications because of his inability to afford to pay for them. The hospital history indicates that Francisco is an illegal alien, who has been in the country for 17 years, is having financial problems, his wife is pregnant with fifth child and the family has been receiving food stamps. Francisco's diagnosis is Schizophrenia, Undifferentiated, Chronic, 295.92. The attending physician in Rashmi Mankodi. | WFSH | 01490 |
| 02/15/1985 | WFSH obtains a social history from Francisco. Francisco had been going to out patient treatment, but stopped taking his medication two weeks ago because he could not afford it. After stopping his medications, he began having auditory and visual hallucinations and reported he wanted to "hit his wife all the time". Francisco and his wife have been having extreme marital conflict. Discharge plans are difficult because Francisco and his family are in the country illegally. | WFSH | 01491 |
| 01/26/1986 | Moises is two years old. | BC | 00087 |
| 05/21/1986 | Mercedes gives birth to Mary Ruth (Ruthie) Mendoza in the U.S. | Family | |
| 01/26/1987 | Moises is three years old. | BC | 00087 |
| 06/01/1987 | Moises' brother, Mario, joins the military and leaves the family. | Family | |
| 01/26/1988 | Moises is four years old. | BC | 00087 |
| 09/08/1988 | Moises is attended Pre-K at Tatum Elementary and he is identified as limited in English | FISD | 00051 |
| 01/26/1989 | Moises is five years old and attending Pre-K at Tatum, Farmersville | BC | 00087 |
| 01/27/1989 | Letter from school recommending that Moises be enrolled in English as a second language | FISD | 00052 |
| 01/27/1989 | Moises is assessed as needing to take the English as a Second Language course. | FISD | 00053 |
| 06/23/1989 | Concepcion is injured in an accident at Decker Foods and hurts his back. | Dist Court | 00123 |
| 08/25/1989 | Moises begins Kindergarten at Tatum in Farmersville. His teacher is Ms. Wisdom. | FISD | 00027-00080 |
| 09/07/1989 | Mercedes Mendoza obtains her US citizenship. | Interview | |
| 09/08/1989 | Moises is assessed for his proficiency in English as a second language. He is | FISD | 00027- |

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

| Date | Event | Source | Bate # |
|---|---|---|---|
| | identified as limited in English.  Letter is sent to Moises' parents to indicate that he qualifies for a special class. | | 00080 |
| 10/04/1989 | Concepcion sees Dr. Scott Blumenthal related to his 6/23 injury. | Dist Court | |
| 01/26/1990 | Moises is six years old and is in Kindergarten, Farmersville | | 00087 |
| 06/15/1990 | Concepcion first sees Dr. Pedro Nosnik related to his 6/23 injury at Decker. | Dist Court | |
| 07/11/1990 | Concepcion is admitted to RHD Memorial Medical Center. | Dist Court | |
| 07/13/1990 | Concepcion is admitted to Garland Community Hospital. | Dist Court | |
| 08/22/1990 | Moises' uncle Francisco Sandoval is committed for the seventh admission to Wichita Falls State Hospital.  Previous admissions have been on a psychiatric diagnosis, but the primary admission diagnosis is Alcohol Abuse as primary on Axis I and secondary on Axis I is Schizophrenia, paranoid type, chronic | WFSH | 01494-01509 |
| 08/24/1990 | Dr. Kmetz is Francisco's physician and Richard Crislip is the associate psychologist.  Francisco has been drinking from a six pack of beer to a case daily.  He has been working in temporary work (selling cantaloupes).  Francisco is living with his wife, four sons and daughter.  He received a DWI in 1989 and is on probation.  Francisco is unable to sit still during the assessments and is moving around throughout the interview.  Francisco reports he has been having visual hallucinations (see snakes on the floor).   Francisco stated he had recently been in a physical fight because "someone had stolen his shoes".  Francisco had a black eye from the fight.  Francisco had been hearing voices telling him to buy liquor.  Francisco reported he "felt that other people are going to kill him". | WFSH | 01494-01509 |
| 08/25/1990 | Moises begins 1st grade at Tatum Elementary.  His teacher is Ms. Spurgin. | FISD | 00027-00080 |
| 08/25/1990 | Francisco furnished social history information to the social worker at WFSH.  Francisco has not worked for eleven years and receives social security disability for his psychiatric illness.  The family receives food stamps and his children are on welfare.  Francisco reports his father is 91 years old and lives in Mexico with his brother.  Francisco reports a large number of personal debt.  Francisco's son, Frankie, is the same age as Moises and is in the same grade at FISD. | WFSH | 01494-01509 |
| 09/21/1990 | Francisco Sandoval is discharged from WFSH with an appointment with Collin County MHMR on Sept. 28, 1990.  Francisco completed the 28 day drug treatment program. | WFSH | 01494-01509 |
| 09/14/1990 | Letter from school recommending that Moises be enrolled in English as a second language | FISD | 00027-00080 |
| 01/10/1991 | Psychological testing performed on Concepcion by Dr. Hopewell in consultation with the Head and Spine Institute of Dallas.  The test reveals that Concepcion is emotionally labile and generally discontented.  Indicates that even under mild stress, Concepcion is likely to become sulky and disgruntled and voicing discontent and criticism to any and all.  The tests show an unusually high level of fear concerning bodily functioning and health.  The prediction for Concepcion's prognosis is guarded.  Recommends trial of anti-depressant. | Dr. Nosnik | 00018 00418 |

Toni Knox Affidavit, Moises Mendoza
October 13, 2007


### Jury and Remorse

Dr. Vigen, the defense expert witness, testified that he did not think that Moises was remorseful. He believed it was possible that he might be remorseful in the future and was showing "some signs" of initial remorse.

> *Dr. Vigen: He's expressed some initial and somewhat, I guess, superficial -- I don't mean to be the judge of it or be critical of it, but some beginning remorse to me in some of his letters. I think as he develops, you know, throughout, gets through adolescence and into young adulthood and works in a system where he's controlled and where he's -- experiences consequences if his behavior is inimical or antagonistic, and he gets rewards if his behavior is productive, and he has years and years and years of that, I think the potential is there for him to develop a personality and for him to recognize the tremendous seriousness of this, that a person's life is gone because of him. And that's an awesome -- that's an awesome issue, and I don't think he has a very good understanding of that yet.*[47]

It appears that the defense had not done a very thorough investigation of their expert witness to prepare for his possible vulnerabilities on the stand. Much of the defense's expert witness testimony was more harmful than helpful to the Moises.

> Cross examination of Dr. Vigen by Mr. Davis
> *A. Yes. It's Brandon Haynes, H-A-Y-N-E-S. And, yes, I know him very well.*
> *Q. You testified as a mitigation expert in that case? Do you recall an individual by the name of Nathaniel Code?*
> *A. Very, very well, yes.*
> *Q. He was a serial killer, wasn't he?*
> *A. He was.*
> *Q. On three separate occasions he killed a total of eight people, didn't he?*
> *A. I believe -- I believe he killed eight people. He was convicted, I believe, on five killings, five murders.*
> *Q. Do you recall the first instance where he stabbed a 25-year-old woman, stabbed her nine times in the chest. Then he slashed her throat?*
> *A. Yes, I believe that's right. He had a signature for his killings. He would bind the victims with cords from lamps and so on.*
> *Q. Then about a year later he killed four people, including a 15-year-old girl, her mother and two male friends. Do you recall that?*

---

[47] Moises Mendoza Trial Transcript, Vol 24, Pages 130-131

31

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

> *A. Yes. I think he's killed about eight people.*
> *Q. In that crime do you remember that with the little girl that he never -- that he nearly severed her head from her body?*
> *A. I don't remember that directly, but he was -- he's -- he is a serial killer.*
> *Q. The last three that he killed, do you remember that he took a grandfather and two young nephews, ages 8 and 12, and he strangled the two boys, then he stabbed the grandfather five times in the chest and seven times in the back. Does that sound familiar to you?*
> *A. Familiar, yes.*
> *Q. You testified as a mitigation expert in that case?*
> *A. I testified as a mitigation expert in the case, having advised the defense lawyers that they should not call me because I did not think I could help them. Nonetheless, they called me anyway, and I testified to my findings about Nathaniel Code. I just told what I had found.*[48]

## Presentation of Choices that were made for Moises:

One of the most important purposes of the mitigation presentation is to show the jury that many "choices" were made for the client before he was capable of making "choices" for himself. It is essential that the jury understand how these previous choices, such as mental health or chemical dependency in the family history (genes), poverty, family criminality and other outside influences can affect what later "choices" are made by the defendant. The prosecution offered a good platform for the defense to introduce the concept of "choices", but the concept had not been developed by the defense. One of the defense experts, Dr. Mark Cunningham, has various power point presentations illustrating how initial choices made by others can affect the client's later choices. Dr. Cunningham, although, retained by the defense team, did not testify at the trial.

Closing statement by prosecution, Mr. Davis:

> *This case is about choices. It's about the choices the 12 of you have to make. You have two questions to answer, and those choices are already determined. They were determined with every decision he made that led up to March 17th of 2003 (sic).*[49]

---

48  Moises Mendoza Trial Transcript, Vol 24, Pages 140-141
49  Moises Mendoza Trial Transcript, Vol 25, Pages 26-27

32

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

# (d) Problems with Defense's Expert Witnesses

The Defense counsel retained a psychologist to evaluate the defendant, but gave their own expert no guidance on the direction of his evaluation. For an expert to be effective, they must have a clear understanding of what they are to evaluate. The defense psychologist was not provided with adequate records (which should have included a social history) or direction for his evaluation to be useful. It is customary for an expert to speak with some corroborating family members to maintain the accuracy of the social history, but not conduct the complete family history investigation.

## Expert Witness Conducting Interviews

The following illustrates the lack of direction furnished to the expert witness. The expert witness was expected to interview witnesses and develop the mitigation strategy.

> Q.  Now, Doctor, with what's at hand, I mean, you also do capital evaluations, right?
> A.  Yes.
> Q.  Are capital evaluations any different than what do you in the other portions of your practice?
> A.  Yes.
> Q.  How are they different?
> A.  Well, essentially, when I'm doing a capital evaluation I'm assuming that the individual who's been accused of a particular killing of an individual is guilty of murder, so I come with that assumption. Then my task is to follow the lawyers' directions and try to, you know, do -- answer their questions.[50]

## Family Dysfunction

Dr. Vigen did not have adequate records and documentation concerning Moises' mother and father to be able to determine dysfunction. For example, there were additional psychological records available for Concepcion related to his worker's compensation lawsuit (including a psychological evaluation)[51] that were not obtained and given to Dr. Vigen.

> Q.  Now, Doctor, you also came up with a second opinion. Does your first opinion

---

50 Moises Mendoza Trial Transcript, Vol 24, Pages 110-111
51 Mitigation Documents, Pages 00009 -- Concepcion Mendoza Psychological Evaluation – Dr. Lynn Price

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

*somehow play into your second opinion?*

*A. Yes. The second opinion is that Moises come from a psychologically dysfunctional family.*

*Q. And can you explain to the jury why you think that?*

*A. Yes. And I want to be careful. I'm not trying to be critical of the family. It's a good family. But no family is perfect, and families offer their children a smorgasbord of their good behaviors and their not-so-good behaviors. Parents don't control what children come and take from them. You can have two good parents, and a child turns out poorly. You can have two lousy parents, and a child turns out well. It's difficult to explain that. Sometimes the kids listen. Sometimes they don't. Sometimes they should listen. Sometimes they shouldn't listen. Mr. Mendoza was depressed early and – had an injury and was depressed early in Moises' life, and I think his – he had a major affective disorder, a major depression, which was recurrent. That really took him somewhat outside the family and pulled him away from the role of being the strong father. Apparently the rules that applied to the older three children no longer applied to Moises. So Moises saw that there were these strict rules that had been there and that were talked about, but he didn't really live by them or have to abide by them. The mother, I think, in many ways is good-hearted and hard working and doing all that she can. Moises said and -- that, you know, she really taught me to be sneaky. He was amazed at how she would know things, and she covered for him in a lot of ways and minimized the problems he had and took away the negative consequences. So Moises, while respecting his father, was respecting a man who was a fragile man, who really didn't have the power to be the dad. The mom was sort of covering in some ways, and I think she continually rescued him. My theory about it is that, you know, he really didn't experience the negative behavior. He didn't have the same rules that the older three had had and got away with more and saw the discrepancy between what the rules were and that he could break the rules and that they didn't apply to him. He could get away with that. I thought that was bad learning. I thought it taught him things that -- a sense of entitlement and so on that he shouldn't have.*

*Q. Now, you said that the family was dysfunctional, and Mr. Davis gave you certain classic dysfunctional scenarios. Explain to the jury -- and, like, you already have. But do you mean that they were dysfunctional in that the father was never there and that there were beatings in the family all the time? Were you explaining that in a psychological dysfunction, the fact that the family was dysfunctional?*

*A. If I understand your question, in cases -- people just don't stand up one day and say, I'm going to molest a child or I'm going to murder somebody today. The roots of this type of behavior generally go back a long ways in people's lives, and in most of the cases that I've seen there are incidents -- there's the criminal history in the family or there's an alcohol and drug instance in the family or there's a mental health issue in the family and a lot of mental health problems and a lot of alcohol and drug problems are familiar and move from one generation to another. There are genetic predispositions for this, and these abnormalities cause or contribute to -- there's no one cause for anything, but contribute to aberrant behavior like killing another human being. There's something*

34

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

*missing in this case for me as a psychologist. There is none of that there. There's something I don't know. I can't tell you. From a -- my intuition. So in this case, those general factors that Mr. Davis was talking about are just not present, and the family is really on one level trying to work very hard and do their very, very best. On the other level, there is some dysfunction in terms of attachment. Moises didn't attach to his dad. He worked with him all the time, but he never could talk to him. They could never connect. He credits his mother with teaching him to be sneaky, you know, with all of that. He sees all of that. But there was never any attachments. By that I mean really attaching and connecting emotionally with another human being and taking in values, etcetera, and using those values and developing his own moral compass. That has not happened for him yet. Or if it is happening, it's in a very immature stage. It will happen. So I think the import of the counselor's question is that in this case there aren't those traditional things that we often -- more often than not see which, you know, are traumatic to an individual which contribute to his aberrant behavior of taking another person's life.*

*Q. And you were asked about his other friends, whether they had committed other crimes. You're just not aware of those. You're not saying they haven't committed any other crimes, right, his other friends?*

*A. The friends, I don't know them. I don't know their histories. I would predict that if their drug and alcohol behavior continues that they will -- some of them will engage in criminal behavior. We know that there's a correlation. Drug and alcohol abuse don't cause violence, but there's a high correlation. The more drug and alcohol that is used, the more chronic it becomes, the greater the risk of violent behavior.[52]*

One of the opinions that Dr. Vigen offered for mitigation was that Moises had started associating with a peer group that was a bad influence. He was unable to interview any of these "friends" and had little to no information from the mitigation investigator regarding Moises' friends.

*Q. Opinion Number 4, why don't you tell the jury what that is.*
*A. I think Moises' new friends, from what I can glean, lived a -- sort of a depraved and disrespectful, aggressive and drug and alcohol lifestyle in which -- what I call empty sexuality was involved. It was where people could or would engage in sexual behavior without any real connection or emotional -- without respect and without care and just casually. There was open use of marijuana, apparently, in this group, and alcohol. There was some incidences I saw of threats of violence and, you know, attacking each other and so on. There was a video of sexual behavior in which Moises was involved engaging with a young woman, an underaged woman, in sexual behavior. I didn't see a video. I mean, there's not a video, but I'm told that a video was made, and there were multiple people involved in this. So that kind of peer group is what Moises was involved*

---

52  Moises Mendoza Trial Transcript, Vol. 24, Pages 121-122

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

> *in after he graduated from high school and after he had completed some nine months of*
> *air-conditioning and heating training.* [53]

Defense was unprepared for cross-examination of previous cases of Dr. Vigen.

> *Mr. Davis:*
> *Q.  But in that case you do remember testifying as a mitigation expert?*
> *A.  Yes.*
> *Q.  Dr. Vigen, would you agree with me that when you're rendering opinions as*
> *important as you are in this court that it's important to have as much information*
> *available as possible?*
> *A.  Yes, I would agree.  And seldom do we have all the information.  It's very*
> *hard to get all the information.*
> *Q.  In this case, sir, were there any limitations placed on you by Defense*
> *counsel?*
> *A.  Not directly.  I would have liked to have been able to interview more of the*
> *witnesses and more of the people that knew him, but we were not able to do that.*
> *Like, for example, Farukh -- or Amy Lodhi, the girlfriend.  For example, I wanted*
> *to interview her, and she was not willing.  Several other witnesses were not*
> *willing.  So it would have been good to be able to get their view of him, but I was*
> *not able to do that.* [54]

## Problem of Expert Witnesses' Notes

In this case, Dr. Vigen acted as both the "mitigation specialist" and "expert witness", as it was necessary for him to interview witnesses in an attempt to develop a mitigation theme.  By utilizing the testifying expert in this manner, the defense opened up all information obtained from the interviewed family and witnesses to the prosecutor.   It appears the defense attorneys did not instruct Dr. Vigen or his nurse assistant, Fran Dezendorf, regarding notes from interviews and reports.  During one of the interviews by Dr. Vigen and Fran Dezendorf, Dr. Vigen was interacting with Moises through the telephone in the interview room and Ms. Dezendorf was taking notes, but she was handicapped in her ability to hear everything that was being said.  As a result, Dr. Vigen and Moises discussed a "dream" that Moises had and Ms. Dezendorf wrote in her notes that it was a "fantasy" of Moises.  As Dr. Vigen was the testifying expert witness, the

---

[53]  Moises Mendoza Trial Transcript, Vol 24, Pages 186-187

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

DA requested to see all his notes, which included the notes taken by Ms. Dezendorf. [55]

These problems were apparent in the initial testimony and later in the prosecutor's closing statement.   In Dr. Vigen's initial testimony in questioning by the defense attorney, Mr. Sanchez:

> *Q.  Can you please tell the jury what you did in order to -- to examine him and to get to the opinions that you're about to talk about?*
> *A.   Yes.  I interviewed Moises on December 16th for five-and-a-half hours.  Then I interviewed him again for three-and-a-half hours on January 31st of this year, and then five hours on March 17th of this year for a total of 13 hours.*
> *Q.  Is that all you did?*
> *A.   That's all I did with him.*
> *Q.  Okay.  What else did you do?*
> *A.   I read some letters from him; I was going to add that, that he had written to me.   I interviewed -- both I and -- I have a nurse that helps me, Fran Dezendorf.  She and I – she participated in one of the interviews with him.  But we interviewed, as well, the family members; his mother, Mercedes; his father, Concepcion; Mario, the oldest son; Paul, the second son; Elizabeth, the third daughter; then Ruthie, who is the youngest sister.  So we interviewed them.*
> *Q.   Now, you've said today that you looked at some records, that you looked at police reports and other documentation from law enforcement.  Did you also look at medical records?*
> *A.   Yes.*
> *Q.   What type of medical record did you look at?*
> *A.   I looked at the medical records from the jail where Moises is incarcerated right now, and I also reviewed the medical records from his father.  His father had been -- had been in the hospital and treated for depression and suicidal behavior.  I reviewed those medical records.*
> *Q.   And did you also -- did you also look at witness statements that were taken by law enforcement?*
> *A.   Yes, I did.*
> *Q.   Did you also look at disciplinary records from the jail?*
> *A.   Yes, I did.*
> *Q.   Is there anything we've left out that you can think of right now that you've done?*
> *A.   I viewed his -- the sheriff's department has two tapes where he had made confessions, and I viewed those.*
> *Q.   Did you look at LifePath records, also?  Is that what you -- you said that already, haven't you?*
> *A.   Well, he -- he went -- both his father and Moises himself was seen at that mental health clinic, yes, and there's some records from there that we looked at.*

---

54 Moises Mendoza Trial Transcript, Vol 24, Pages 144-145
55 Mitigation Documents, Pages 000227-244 - Dr. Vigen/Dezendorf Interview Notes

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

Q. Did you also look at school records and work records?

A. Yes.

Q. You developed a total of six opinions that you would like to share with the jury, and then we'll go -- we'll go through those one by one, and then ask your basis for those and explain those. Okay. Can you please tell us your first opinion?

**A. Yes. My first opinion about Moises is that he is an immature, psychologically under-developed adolescent-like man who has no internal sense of himself. He has no inner -- inner self, no clear inner identity that I can detect.**

Q. Is that something that's developed over time or how does that work?

A. Yes. There are developmental psychologists -- names that you may have heard of are Peashay (phonetic) or Eric Erikson. But psychologists have studied development through human -- through the human life span, and there are certain developmental tasks that children master from zero to one-year-old. Then there are other developmental tasks from 2 to 5 and 5 to 13. Then the period of adolescence begins, 13 -- and it generally ends legally at 18 or 21. Sometimes for men it's generally longer, and then for women it's generally shorter. But the period of adolescence is a time of coalescing and solidifying and knowing what that identity is. So identity versus role diffusion is the task of the adolescent, to come out of adolescence with an identity of this is who I am and have a clear sense of that himself. So it develops over time.

Q. Now, you've told us that you feel that he's an immature, psychologically undeveloped, adolescent-like man who has no internal sense of himself. What do you base that on in your examinations with Moises?

A. Well, I base it on my observations of him and his responses to issues. He's immature. He was immature in my interviews with him. His reactions to things are immature. And, I mean, I could give you a whole host of examples if you want me to do that at this point. I'd be glad to.

Q. Yeah. Tell us what you based that on, things that you've seen.

A. Well, for example, he was very proud of himself. And you'll excuse me, but, you know, there -- we all know what the finger is or flipping somebody off. And, you know, he told me, for example, that he was very proud of himself because when he was six years old he was able to explain that to his father. That is so -- and he was so excited about that at this point in his life. It's just an immaturity that that's an important issue in his life, that he taught his father this very simple thing. He boasts about getting away with things, about being sneaky, about not getting caught. And bad behavior persists now even in the jail. You know, it's just adolescent behavior, being sneaky and being caught by people and not getting caught. It's sort of a cat-and-mouse game. It's what adolescents might do. Attention-seeking behavior in jail is -- his jail behavior, in my opinion, is sort of -- he's a nuisance. He causes trouble. He tries to seek attention. He gets himself into trouble. Negative attention, if you will. He often reacts to criticisms or -- you know, or -- with anger when he perceives that somebody is criticizing him. And -- you know, or if he doesn't get what he wants. It's sort of like an automatic reactivity. He's just reacting and reacting and reacting. There's no -- He doesn't yet have the developmental skills to say, well, this is so-and-so's opinion of me. I have a different opinion of me. We differ. But

38

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

*he's just emotionally reactive.*[56]

The prosecutor had access to all of Dr. Vigen's notes from his interview and was able to interpret in possibly incorrect ways. Using the notes, the prosecutor cross-examined Dr. Vigen:

*Q.  You said that based upon your interviews with the family, your review of the records, that you feel that the Defendant went through a dramatic or drastic change after he started using marijuana during his senior year; is that right?*
*A.  Yes, sir.*
*Q.  Well, Dr. Vigen, isn't it true, according to your interviews, the Defendant had been engaging in violent behavior for some time before that, hadn't he?*
*A.  Um, what are you speaking about particularly?*
*Q.  Well, do you remember when you interviewed Mario that Mario provided a history for you?  Do you remember that?*
*A.  I have it.  Just refer me to where you're speaking.*
*Q.  Doctor, I'm looking -- I believe it's Page 3 of Mario's interview.  It's in handwritten form.  It says "Moises" at the top.*
*A.  Yes.*
*Q.  Mario told you the Defendant got into trouble early in life, didn't he?*
*A.  Yes.*
*Q.  As a child he would hurt other kids, wouldn't he?*
*A.  He was stronger.  The import of that is that he was a big kid and that when he would play with other kids he would hurt them.  The idea is not that he would intentionally try to hurt them, but he would accidentally try to hurt them because he was bigger.  I didn't get the idea that he was trying to hurt other kids.*
*Q.  Well, your notation says stronger and hurt other kids, correct?*
*A.  Yes, that's what it says, hurt other kids.*
*Q.  As a matter of fact, he hurt his sisters, too, didn't he?*
*A.  Yes.*
*Q.  Ruthie and Elizabeth?*
*A.  He would pick on them and do this immature behavior, picking on them and hitting them.  Yes, that's what Mario's report was.*
*Q.  It says pick on and hit them.*
*A.  Yes.*
*Q.  Those were his two sisters?*
*A.  Right.*
*Q.  Mario told you by the age of 3 or 4 he knew there was something strange about the Defendant then.*
*A.  No.  It says at 3 or 4 years old he realized he was stronger.*
*Q.  Okay.*

---

56 Moises Mendoza Trial Transcript, Vol 24 Pages 118-121

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

A.   It doesn't mean -- it wasn't "strange."  I'm sorry.  It's not written well.

Q.   Okay.  He knew that the Defendant was impulsive?

A.   Um-hum.  Yes.  He says -- Mario said he never learned consequences.  He would just impulsively do something and think about it later.  He -- he said he was an impulsive kid.

Q.   Right.  That's not behavior that he started to show during his senior year in high school, is it?

A.   Oh, no.

Q.   I mean, that -- he's been exhibiting that since an early age, hasn't he?

A.   Yes.

Q.   He's been getting into trouble at school since an early age?

A.   He described him as sort of a hyperactive kid.  He said that he would have been a good fit for Ritalin,  that he was bouncing off the walls.

Q.   Do you remember him saying Moises, always in trouble, talking back, overactive.  And this seemed to increase in middle school, didn't it?

A.   Right.

Q.   So that by the time he got to middle school he was already exhibiting these types of behaviors, wasn't he, Doctor?

A.   Actually, he began, I think, in the -- if you looked at my notes, in the 2nd/3rd grade he took on the
 role of class clown which is --

Q.   Doctor, right now I'm trying to focus in on talking back, overactive.  My question was:  By the time middle school rolled around, this activity was already increasing with the Defendant, wasn't it?

A.   Yes, that's right.  That's what Mario said, yes.

Q.   And by the time he got out of -- to middle school Mario says he's out-of-hand in middle school.

A.   Yes.  Um-hum.

Q.   I did understand -- and I've only had just a few moments during the lunch hour to review these records.  But the next line appears to say that when the subject was confronted with drugs, school, stealing -- I mean, that's activity that was occurring during school, wasn't it?

A.   During high school, yes.  Later -- later than middle school, or high school.

Q.   And the notation is he just couldn't resist impulsive options, could he?

A.   That's what -- yes.  That's what he's saying is impulsive and couldn't resist being impulsive.

Q.   I mean, he has a history of violence towards several people, doesn't he?

A.   Well, in terms of fighting with or hitting his sisters and doing that kind of impulsive behavior, if that's what you mean by violence.  He was -- he was doing that.  That's -- Mario said he was much more impulsive, much more active than Mario's two sons at 6 and 8.  Moises was much more of a handful to handle than Mario's two sons.

Q.   Do you remember when the Defendant assaulted his own mother in their home?

A.   I knew about that, and Mario came and had to control him.

Q.   Yeah.  As a matter of fact, the Defendant at that time was only 15 or 16 years old,

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

*wasn't he?*
*A.  Yes.  He was 15 -- 16 at the time.*
*Q.  Struck his own mother, correct?*
*A.  Can you point me to that so I can review --*
*Q.  Yes, sir.  This appears to be on Page 7.  It says 15-16, harder to control.*
*Q.  I mean, he has a history of violence towards several people, doesn't he?  Harder to control, and one time he hit his mother.  It was the year before graduation, so he would have been 17.*
*Q.  It says here the mother was so afraid -- she was afraid to go back into her own home because her son had assaulted her in her home.*
*A.  And Mario said that he --*
*Q.  I'm sorry.  Is that what Mario told you?*
*A.  Yes.  He said that his mother was afraid to go back into the house.  He came over and confronted him, and he -- Mario restrained him, and it says hit him, and he thought that that was one of the times when Mario (sic) was high perhaps on marijuana.*
*Q.  Now, the Defendant was not arrested on that, was he?*
*A.  No.*
*Q.  His reaction was that he left the house angry and bitter, correct?*
*A.  Let's see.  It says that he, Mario, felt terrible about the incident.*
*Q.  But do you see down there?  It says left house angry, bitter, hostile.*
*A.  Against -- for Mario for intervening.  It says that the police came.  They didn't arrest him.  The parents stopped the arrest, and he did not know why he was not arrested.  But he did leave angry, bitter and hostile toward Mario and began spending more time with his friends.*[57]

Another example of the problem caused by Dr. Vigen and his assistant's notes:

Cross Examination from Mr. Davis:
*Q.  Do you remember the incidents in high school where he started stealing?*
*A.  I remember several, yes.  One -- do you want me to speak about one?*
*Q.  Was he the football team manager?*
*A.  I think he was.*
*Q.  I understood one of the thefts to be one of the footballs from the high school.  Do you remember that?  Or was that just a notation that he stole from some of the players up there?*
*A.  My thought about it, as I remember the notes, are that he was some kind of manager, and there was, like, $60 or $50.  Sneakily, very proud of himself, again, he stole only $30 rather than steal all of the money which would make it more obvious that money was gone.  He stole just some of the money and very clever -- very proud of himself for that kind of clever maneuver, which I think is pretty adolescent.*
*Q.  Well, it was pretty calculating, wasn't it?*

---

[57] Moises Mendoza Trial Transcript, Vol 24, Pages 162-163

41

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

A.  Yeah.
Q.  He gave it a lot of thought.  Stole from his mother, as well, didn't he?
A.  He admitted to me stealing from his mother and stealing from his football team.
Q.  Stole from his own sisters, Ruthie and Elizabeth, too, didn't he?
A.  And also he stole money from Paul when he --after he broke the electronic monitor and went on – went traveling with Amy Lodhi.
Q.  Doctor, do you remember on January 31st, 2005, speaking with the Defendant about a certain fantasy that he had?
A.  Yes, I remember.  But can you refer me to my notes if you're going to question me about it?
Q.  Yes, sir.  It looks to be -- this is a typewritten piece of paper.  It's Page 2.
MR. DAVIS:  May I approach the witness, Your Honor?
THE COURT:  Yes, sir, you may.
MR. DAVIS:  That might speed things up.
Q.  (By Mr. Davis) Do you recall that, Doctor?
A.  I haven't reviewed it in a long time.  May I read it?
Q.  Yes, sir.  If you wouldn't mind, if you would just read that to the jury, please.
A.  He got up about 4:00 a.m. the next --
Q.  I'm sorry.  I'm referring to what is labeled as a fantasy at the bottom of the page.  If you would, read that to the members of the jury.  I take it this is something that the Defendant related to you?
A.  I didn't talk with him about it.
Q.  This was in your notes, correct?
A.  Yes.
Q.  From your -- I guess, was your nurse conducting the interview at that time?
A.  Yes.
Q.  Would you read that to the members of the jury, please?
A.  He gathers ten women and seven guys and keeps three people in each four-by-four-by-four cell.  He names some of the people; Farukh, Stacie Garcia, Amy's mom.  All of the girl's that lied on him in this case, Stephanie Tucker and his cousin Alex and Amy's two brothers.  He hires an Asian woman to feed the people.  She had electrolysis because of facial hair.  She lives in his house.  Two Chinese people abused her, but they are now in prison.  The people he is keeping do not know where they are or why.  He wears a black mask, and he is very muscular.  He never lets them out.  He turns the lights on at night so to disorient them.  He only harms them if they grab the Chinese woman, and he breaks their arms.  His wife and children know about this.  He's married to Priscilla.[58]

The Defense attempts to lessen the damage of the notes, but Dr. Vigen is unable to answer effectively because he is reading from his nurse's notes and cannot be sure of the meaning.

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

BY MR. SANCHEZ:
Q. *Doctor, was that a fantasy or a dream? Can you tell?*
A. *I don't know.*
Q. *You couldn't tell by those notes?*
A. *No.*[59]

The prosecutor also referred to the "fantasy" (which was probably a dream) from Dr.

Vigen's notes in his closing statement:

> *If you've got any doubts about the total depravity of this individual's mind, he tells you himself what's in his mind, besides the fantasy of capturing and torturing individuals who have lied and testified in this case.*

Mr. Davis stated in his closing argument:

> *I guess if he had had a good childhood, if he had had an education, if he had had parents who loved him and supported him, who provided for him, if he had had moral and spiritual guidance, if he had had a life free of abuse, we wouldn't be here. But wait a minute. That was his life. He had all of those things handed to him*

Mr. Davis, in his closing statement: "There's no mitigating circumstances here whatsoever, none. The answer to Number 2 is no, overwhelmingly no, beyond any doubt no."

## Conclusion

Mitigation strategies for capital cases have been developing and changing over the past years. However, it is imperative in each and every case to conduct a thorough mitigation investigation and prepare a social history for experts. There are a large number of social workers, psychologist and sociologists in this field as much of their educational background focuses on the skills needed to develop the mitigation. As a social worker, the focus in graduate school was learning about human behavior and various environmental effects. Mr. Gonzales seemed to be effective in collecting records for the attorney and attempting to arrange interviews,

---

[58] Moises Mendoza Trial Transcript, Vol 24, Pages 179 -181
[53] Moises Mendoza Trial Transcript, Vol 24, Pages 180-181

43

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

but it does not appear that Mr. Gonzales had the educational background and expertise to prepare a complete psychosocial history in preparation for expert witnesses. From the attorney's records, there was very little work product furnished by Mr. Gonzalez, other than records. Consequently, because the defense had inadequately investigated the family history, a proper mitigation strategy was not in place or presented. This lack of preparation allowed the prosecutor to discredit the defense's mitigation witness in the eyes of the jury.

It is critical for the punishment phase that any and all areas of mitigation are explored. Any evidence discovered in the mitigation investigation could be developed and presented to the jury in order to help explain the crime. The jury must be continually educated that mitigation is not an "excuse", as there can never be an "excuse" for murder, but only as a means to help the jury understand based on Moises' life how it might have happened. Rather than present a persuasive narrative in the support of the case for life for Moises, Dr. Vigen presented a list of "opinions". These opinions were not a comprehensive narrative to help the jury understand Moises. The major goal of mitigation was to help humanize Moises to the jury and Dr. Vigen's opinions in many ways alienated Moises from the jury.

From the post juror interviews, there were several jurors that wanted to give Moises a life sentence. If a convincing and well prepared mitigation presentation with clear themes had been presented, it is likely they would have stuck to their desire to give Moises life rather than death. The mitigation investigation was not done prior to retaining the witnesses and there was considerable confusion about the role of the experts. The primary social history interview conducted by the defense consisted of interviews by the defense counsel and the expert testifying witness, Dr. Mark Vigen. As a result, in his cross examination in the trial, Dr. Vigen indicated he was somewhat confused by this case as something seemed to be missing. He indicated the usual mental illness and family violence just wasn't there. Dr. Vigen indicated in his testimony:

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

> *There's something missing in this case for me as a psychologist.  There is none of that there.  There's something I don't know.  I can't tell you.  From a -- my intuition.*[61]

Dr. Vigen was correct because he had not been given a complete social history.  The initial information Dr. Vigen received from the family and did not receive from the mitigation specialist did not reveal Concepcion's personality disorder, prior psychological testing and anger episodes that included domestic violence.  These secrets were well kept by the family and with only a few interviews with family members who were intent on maintaining the family secrets, it does not appear that he was aware of the problems.  He makes no reference to having the information about Moises' father's almost constant anger and "acting out" behavior.   Moises' father was constantly the source of attention by the family, which left no attention for Moises.  However, after years of modeling, Moises did learn inappropriate ways to get the family's attention.  In reviewing Moises' chronological history, everyone in the family and their problems are consistently overshadowed by Concepcion's depression, mental health treatment, his "mistreatment" by various groups and his lawsuits.

I declare under the penalty of perjury under the law of the state of Texas that the foregoing is true and correct to the best of my knowledge, and was executed the ___16___ day of October, 2007.


_____
Toni Knox, LCSW

Subscribed and sworn to before me this _16th_ day of _October_, 2007.


_____
Notary Public, State of Texas

THERESA MANGAN
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-10-2009

45

Toni Knox Affidavit, Moises Mendoza
October 13, 2007

# **Appendix**

The following is a list of reviewed documents and interviews used in preparing the Declarations of Toni Knox, LCSW:

- Green Oaks Hospital Psychiatric Records – Concepcion Mendoza
- Wichita Falls State Hospital Psychiatric Records – Concepcion Mendoza
- Collin County Mental Health Records (MHMR, LifePath, Northstar) – Concepcion Mendoza
- Legal records from Concepcion Mendoza lawsuit against Decker Foods
- Psychological Testing and Evaluation, Dr. Lynn Price – Concepcion Mendoza
- Lavon Police Department records -- Concepcion Mendoza
- Collin County Mental Health Records (MHMR, LifePath, Northstar) – Moises Mendoza
- Family Interviews (Paul Mendoza, Mario Mendoza, Mercedes Mendoza, Concepcion Mendoza, Elizabeth Mendoza, Maria Ruth "Ruthie" Mendoza)
- Telephone interviews with maternal aunts in California
- Interview with friends of Moises (Cody Wilbanks, Chris Gamez, Rodney Godfrey, Stacie)
- Interviews for collateral information related to the Mendoza family (Lynn McCrary, Mr. Blevins)
- Interviews with Moises teachers
- Interviews with Moises neighbors
- Two interviews with Moises Mendoza at Livingston
- Interview with Amy Lodhi's mother and brothers (Amy could not be located for an interview).   Messages were left for Amy with her mother, but she did not return the calls
- Telephone contact with Amy Lodhi.
- Farmersville Library Research – Newspaper Articles, High School Annuals
- Interviews with jurors from Concepcion's lawsuit against Decker food
- Juror interviews and affidavits from Moises capital trial.
- TDCJ UTMB Psychiatric Records – Moises
- Psychiatric records – Francisco Sandoval – Wichita Falls State Hospital
- Complete trial transcript
- Attorney Juan Sanchez and Angela Ivory trail notes and files

46