IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION


| | | |
|---|---|---|
| **MOISES SANDOVAL MENDOZA,** | § | |
| **Petitioner,** | | |
| | § | |
| **v.** | | |
| | § | **CIVIL ACTION NO. 5:09cv86** |
| **DIRECTOR, TDCJ-CID** | | |
| **Respondent,** | § | |
| | § | |


## FIRST AMENDED PETITION FOR A WRIT OF HABEAS CORPUS


Petitioner, Moises Sandoval Mendoza, ("Mr. Mendoza"), by and through Counsel, and

respectfully files this Amended Petition for Writ of Habeas Corpus pursuant to this Court's

order generated May 7, 2015,  appointing undersigned Counsel and directing him "to investigate

and file any additional claims in accordance with " *Martinez v. Ryan* 132 S. Ct. 1309 (2012).

Counsel for Petitioner has filed two unopposed motions for extension of time to file this

Amended Writ.  This Amended Writ is timely filed.   Petitioner's original Petition for Writ of

Habeas Corpus (Docket No. 6 ) was prepared and submitted by the same attorney who

represented him in a state post-conviction proceedings pursuant to T.C.C. P. Article 11.071.

This Amended Petition is not intended to supplant or supersede the original Petition, and the

original Petition is hereby incorporated by reference to this Amendment.

At this time Petitioner has identified five supplemental  claims for relief.

Claim Number One:  Petitioner alleges,  pursuant to Martinez, that Trial Counsel

rendered Ineffective Assistance of Counsel (IAC) in violation of the 6th Amendment of the United States Constitution by presenting the testimony of Dr. Vigen at the punishment stage of this trial.

Claim Number Two: Petitioner alleges that initial post conviction counsel, pursuant to *Martinez* , rendered Ineffective Assistance of Counsel for failing to raise this issue of Trial Counsel's Ineffectiveness by presenting testimony of Dr. Vigen,   on collateral review.

Claim Number Three: Petitioner claims that the State of Texas used potentially false testimony at the punishment stage of his trial in violation of the Due Process Clause of the 14th Amendment of the United States constitution and Trial Counsel was Ineffective in violation of the 6th Amendment of the United States Constitution  for failing to discover the State's use of false evidence.

Claim Number Four: Petitioner alleges, pursuant to *Maritnez*, that Trial Counsel s rendered Ineffective Assistance of Counsel in violation of the 6th Amendment of the United States Constitution  by failing to interview Melvin Johnson and presenting his testimony at the trial of this cause.

Claim Number Five: Petitioner alleges, pursuant to *Martinez,* that post conviction counsel rendered Ineffective Assistance of Counsel in violation of the 6th Amendment of the United States Constitution by failing to interview Melvin Johnson and by consequently failing to raise the issue of Ineffective Assistance of Trial Counsel on collateral review by Trial Counsels failure  to interview, investigate and present Melvin Johnson's testimony at trial or discover the use of the State's false evidence.

## SUPPLEMENTAL PROCEDURAL HISTORY

Petitioner amends his Petition for Writ of Habeas Corpus to include the following procedural history relevant to claims contained herein.  Additional facts and procedural details are addressed in the individual claims.

Petitioner filed his original Petition for Writ of Habeas Corpus in the Court on June 2, 2010,  ( Docket No. 6  ) .

On April 24, 2015,  Petitioner,  himself, filed a Motion to Appoint Counsel under *Martinez* (Docket No.  74)    In *Martinez*, the United States Supreme Court established an equitable rule that the procedural default of poisoner's claim of Ineffective Assistance of Counsel will be excused in federal habeas proceedings if appointed collateral counsel in initial state collateral review proceedings were also ineffective in failing to raise the claim, and the trial ineffectiveness claim was substantial.  *Martinez* 132 S. Ct. At 1320.  A subsequent decision by the United States Supreme Court in *Trevino v. Thaler*   (Docket No. ) held that the holding in *Martinez* applies to Texas and the 5th Circuit.

Consequently, upon Motion, by Petitioner, for appointment of counsel, this Court appointed undersigned counsel pursuant to *Maritnez/Trevin*o on May 7, 2015.


## ADDITIONAL CLAIMS FOR RELIEF INEFFECTIVE ASSISTANCE OF COUNSEL

## TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE 6TH AMENDMENT OF THE UNITED STATES CONSTITUTION BY PRESENTING THE  TESTIMONY OF DR. VIGEN AT THE PUNISHMENT STAGE OF PETITIONER'S TRIAL.

## **TRIAL TESTIMONY**

Prior to the defense calling Dr. Vigen as a  defense witness at the sentencing stage of the trial, the Court heard a Daubert/Nanno Hearing pursuant to TRE 702, 705  regarding the admissibility of Dr. Vigen's testimony.   During this hearing, Dr. Vigen, testified that he had a report regarding interviews that he had had with the Petitioner and pursuant to Texas Law if Dr. Vigen was going to testify,   that report would be turned over to the prosecution, which indeed it was. .  The Court overruled the State's TRE  702, 705 objections, and allowed Dr. Vigen to testify.  Dr. Vigen testified at  the punishment stage of the trial.   It is Petitioner' s contention that by proffering the testimony of  Dr. Vigen, Petitioner received Ineffective Assistance of Counsel in violation of the 6th Amendment of the United States Constitution and *Strickland v. Washington* 466 U.S.

Pertinent portion of Dr. Vigen's testimony is set forth:

## **ON DIRECT EXAMINATION**

During trial Dr. Vigen testified as follows: (RR V25  P101-191)

Q.      So you don't always find - - or your findings are not always - - is there pressure on you to always find what the attorneys want you to find, or are you going to find whatever you want - - whatever- - not what you want, but whatever you're going to find.  And you're going to report that to the attorneys, and then they're going to decide whether to use you or not as a witness, correct?

A.      Yes, your question is correct. I mean, there are excellent attorneys and there are poor attorneys.  I don't mean to be critical. There are excellent psychologists and poor psychologists, too, so I'm not picking on you.
Poor attorneys will tell you they want this. Excellent attorneys will say what did you find, and they never tell you what they want in terms of, you know, whatever.

Q.      Can you please tell the jury what you did in order to - - to examine him and to get to the opinions that you're about to talk about?

A.      Yes. I interviewed Moises on December 16th for five-and-half hours. Then I

4

interviewed him again for three-and-half hours on January 31st of this year, and then five hours on March 17th of this year for a total of 13 hours.

Q.　　You developed a total of six opinions that you would like to share with the jury, and then we'll go - - we'll go through those one by one, and then ask your basis for those and explain those. Okay.

Can you please tell us your first opinion?

**A.　Yes. My first opinion about Moises is that he is an immature, psychologically under-developed adolescent-like man who has no internal sense of himself. He has no inner- - inner self, no clear inner identity that I can detect.**

Q.　　Now, you've told us that you feel that he's an immature, psychologically undeveloped, adolescent-like man who has no internal sense of himself. What do you base that on in your examinations with Moises?

A.　　Well, I base it on my observations of him and his responses to issues. He's immature. He was immature in my interviews with him.  His reactions to things are immature. And, I mean, I could give you a whole host of examples if you want me to do that at this point. I'd be glad to.

**Q.　Yeah. Tell us what you based that on, things that you've seen.**

**A.　Well, for example, he was very proud of himself. And you'll excuse me, but, you know, there - - we all know what the finger is or flipping somebody off. And, you know, he told me, for example, that he was very proud of himself because when he was six years old he was able to explain that to his father. That is so - - and he was so excited about that at this point in his life.  It's just an immaturity that that's an important issue in his life, that he taught his father this very simple thing.**

He boosts about getting away with things, about being sneaky, about not getting caught. And bad behavior persists now even in the jail. You know, it's just adolescent behavior, being sneak and being caught by people and not getting caught. It's sort of a cat-and-mouse game. It's what adolescents might do. Attention-seeking behavior in jail is - - his jail behavior, in my opinion, is sort of - - he's a nuisance. He causes trouble. He tries to seek attention. He gets himself into trouble. Negative attention, if you will.

He often reacts to criticisms or - - you know, or - - with anger when he perceives that somebody is criticizing him. And - - you know, or if he doesn't get what he wants. It's sort of like an automatic reactivity. He's just reacting and reacting and reacting. There's no - -

Q.　　Now, Doctor, you also came up with a second opinion. Does your first opinion somehow play into your second opinion?

A.　　Yes. The second opinion is that Moises comes from a psychologically dysfunctional family.

Q.　　Okay. So now as he got older, you - - when - - you looked at his life and you came up with another view of his life after he got to a certain age, correct?

A.　　Yes, that was my third opinion.

**Q.　And explain to the jury what that opinion is.**

5

**A.** **The opinion is that Moises' behavior changed radically for the worse when he began smoking marijuana and drinking. He told me that that occurred at a senior camp-out, but it's probably earlier than that.**

Q. Opinion Number 5- - Number 5, I'm sorry. Can you please tell the jury what that is.

A. Well, it's my belief that the Texas Department of Criminal Justice has the expertise, has the capability to house and incarcerate Moises in such a manner that he will be a low or minimum risk for future violence in the prison system.

Q. What did you base that on?

A. Well, I've only been in one prison, one unit in Texas, so I don't have a lot of direct experience with correctional officers in Texas, but I've read a lot of research having to do with the Texas Department of Corrections. I've looked at some statistical data regarding assaultive behavior against inmates and assaultive behavior against officers, and those incidents are low, I guess, in comparison to the tremendous number of inmates that the Texas Department of Criminal Justice houses and cares for.

Q. Now, let's talk about your sixth opinion. Could you please tell the jury what that is?

A. It's my opinion that Moises has the potential to develop a sense of self and the potential for rehabilitation and some type of spiritual conversion,

Q. Why do you think that ? What do you base that on?

A. Well, Moises is a high school graduate. He did fairly well in high school. He completed some post high school training, about nine months of heating and air-conditioning. He even received a scholarship to the school.
He was raised in a devoted Catholic family. He went to confession, apparently to one of the Catholic priests in the area, I think a Father Paul at St. Williams. Or is it Father Williams at St. Paul? I'm not sure.
I see in him, in my connections with him - - contact with him, and some letters that he's written, some initial - - very initial beginning recognition that - - you know, that there's depression inside of him, that there's an emptiness inside of him. He's beginning to see that he reacts - - he's reactive. He's angry, one minute sad, and he's reactive. He's not centered, and I think he's beginning to see that. He's expressed some initial and somewhat, I guess, **superficial** - - I don't mean to be the judge of it or be critical of it, but some **beginning remorse** of me in some of his letters.

## ON CROSS EXAMINATION DR. VIGEN TESTIFIED AS FOLLOWS

Q. Dr. Vigen, who contacted you about working on this case?

A. Mr. Juan Sanchez.

Q. Are you donating your services?

A. No. He's paying my hourly rate for the time that I spend.

Q.  What is your hourly rate?

A. $200 an hour.

6

Q.    How many hours have you devoted to this case?

A.    I don't know the hours. I don't know the number of hours. I think we've been paid - - our office - - myself and my staff about $16,000 to do the evaluation.

Q.    Do you anticipate billing for additional hours?

A.    That's correct sir.

Q.    Approximately how many capital murder cases have you testified in ?

A.    I think it's somewhere between - - or somewhere around fifty or so. I've been involved in - - my secretaries are working on my data, the data that I handed you earlier, is up to 2003. But she thinks it's probably over a hundred cases that I've evaluated and worked on.

Q.    How many cases have you testified as a mitigation expert?

A.    In many of those. I don't know the answer.

**Q.    In those cases, the capital murder cases where you've been called as a mitigation expert, you've always been called by the Defense?**

**A.    Yes.**

Q.    You've also testified in Texas before?

A.    On two occasions, yes.

Q.    Do you remember Brandon Hays?

A.    Yes, I remember him very well.

Q.    Do you remember Brandon Hays was an individual who raped - -

MR. SANCHEZ: Your Honor, at this time I'm going to object to the relevancy of this other case.

THE COURT: Mr. Davis

MR. DAVIS:   It goes to the credibility. It goes to the jury's opportunity to judge his credibility and his bias in these types of matters, and they're entitled to hear that other types of cases in which he has testified to judge his credibility. That's simply what I'm doing.

THE COURT: Your objection is overruled.

Q.    Do you remember that Brandon Hays raped and stabbed a Chinese exchange student and then threw her off the roof of LSU Medical Center?

A.    Yes. It's Brandon Hays, H-A-Y-N-E-S. And, yes, I know him very well.

Q.    You testified as a mitigation expert?

A.    Yes.

Q.    Do you remember Percy Davis?

A.    Yes. Very well.

Q.    That was a crime that occurred in Shreveport, correct?

A.    Yes.

Q.    Do you remember that Percy Davis walked into a convenience store there in Shreveport, and he shot and killed both the store clerks that were on duty?

A.    Yes, I know he did.

Q.    And you testified as a mitigation expert?

A.      Yes, I did. Can I explain a little bit about that case?

Q.      Mr. Sanchez can ask you if he'd like.

A.      Okay.

Q.      Dr. Vigen, do you remember a man by the name of Michael Cooks?

A.      Yes.

Q.      Do you remember that he also went by street name of Mad Monster Crip?

A.      Mad Monster Crips, yes.

Q.      Do you remember that Michael Cooks led a band of men into a Shreveport apartment? Do you recall that?

A.      Tell me a little bit more.

Q.      This was where they went in, and they shot three people. One of them died and two of them, although they'd been shot in the head, they survived.

A.      Right.

Q.       Do you remember that case?

A.      Yes, I remember that case now.

Q.       Do you remember before trial the Defendant ordered the two survivors to be killed so they couldn't testify against him?

A.      Yes, execution.

Q.      Do you remember Mr. Cooks had a prior aggravated battery case?

A.      Yes, he did.

Q.      You testified as a mitigation expert?

A.      Yes.

Q.      Where is Michael Cooks?

A.      He's on death row at Angola, Louisiana State Penitentiary. He is currently on death row.

Q.      Do you remember Cedric Edwards?

A.      I remember him. I have his picture. I think I testified in that case, as well.

Q.      Maybe you remember his street name, Gun Slinger?

A.      Yes.

Q.      Do you remember that?

A.      Yes.

Q.      Do you remember, Cedric Edwards followed the Kennedy family. I think the Kennedy family- - do you remember, they were returning from a revival that night. Do you remember that?

A.      Yes.

Q.      The victims.

A.      Okay.

Q.      Do you remember the Defendant was outside of their apartment, confronted the husband, shot him in the arm?

A.      I don't remember that specifically, but I believe you if you're saying that that's what happened.

Q.      Do you remember after he did that, the husband ran back into the apartment. The Defendant followed him in where Mr. Kennedy's wife and daughter were located?

8

A.    Um-hum.

Q.    Do you remember that the Defendant then shot the wife in head. Do you remember that?

A     I don't remember - - I don't have those facts right in front of me, but I'm just assuming that that - - that you're accurate that that is what happened. These are horrendous crimes.

Q.    Do you remember when she fell to the ground that he went over and shot her again in the head?

A.    Yes. Okay.

Q.    While the daughter was watching?

A.    Watching, yes.

Q.    When Cedric Edwards finished that, do you remember that he went up there to the husband and he pistol whipped him, caused several skull fractures?

A.     I don't remember that detail, but it doesn't surprise me.

Q.    Do you remember when he had done that - - do you remember Cedric Edwards had already been convicted of manslaughter?

A.    Yes, he had.

Q.    He had been sentenced to 15 years, but he only did half of that term, didn't he?

A.    It was in a northern state, I believe; Indiana or something. I remember the victim of that crime coming and testifying during the case.

Q.    Cedric Edwards did about 7 - and-a-half years. He came to Louisiana. He'd only been out there three months at the time he attacked the Kennedy family, hadn't he?

A.    Yes, that's right.

**Q.    And you testified as a mitigation expert in that case?**

**A.    Yes.**

Q.    Do you recall an individual by the name of Nathaniel Code?

A.    Very, very well, yes.

Q.    He was a serial killer, wasn't he?

A.    He was.

Q.    On three separate occasions he killed a total of eight people, didn't he?

A.    I believe- - I believe he killed eight people. He was convicted, I believe, on five killings, five murders.

Q.    Do you recall the first instance where he stabbed a 25-year old woman, stabbed her nine times in the chest. Then he slashed her throat?

A.    Yes, I believe that's right. He had a signature for his killings. He would bind the victims with cords form lamps and so on.

Q.    Then about a year later he killed four people, including a 15-year-old girl, her mother and two male friends. Do you recall that?

A.    Yes. I think he's killed about eight people.

Q.    In that crime do you remember that with the little girl that he never - - that he nearly severed her head from her body?

A.     I don't remember that directly, but he was - - he's he is a serial killer.

Q.    The last three that he killed, do you remember that he took a grandfather and two

9

young nephews, ages 8 and 12, and he strangled the two boys, then he stabbed the grandfather five times in the chest and seven times in the back. Does that sound familiar to you?

A.    Yes.

Q.    You testified as a mitigation expert in that case?

A.    I testified as a mitigation expert in the case, having advised the defense lawyer that they should not call me because I did not think I could help them. Nonetheless, they called me anyway, and I testified to my findings about Nathaniel Cole. I just told what I had found.

Q.    You recall Patrick Murphy, don't you?

A.    Yes.

Q.    Is that how you came to know Mr. Sanchez?

A.    Yes. He- - Mr. Sanchez was co-counsel in the Patrick Murphy case in Dallas.

Q.    Patrick Murphy was a member of the Texas Seven, wasn't he?

A.    Yes, he was.

Q.    Do you remember what Patrick Murphy was serving time for in the Texas Department of Criminal Justice, Institutional Division?

A.    Without looking at my notes, I think he was involved in a sexual crime. He'd made a sexual attack on a young woman.

Q.    In fact, he had raped a woman at knife point back in 1984, had he not?

A.    Yes, that's correct. That's correct.

Q.    Do you recall Patrick Murphy escaped frm the Kenedy Unit near San Antonio with six other inmates?

A.    From the Connally - -

Q.    I'm sorry. From the Connally Unit in Kenedy, actually.

A.    Yes, the Connally. Yes, he did. He escaped with seven other inmates.

Q.    When they left there, do you remember that they committed an aggravated robbery before they got to Dallas County? You remember that, don't you?

A.    Yes.

Q.    You recall the capital murder in Dallas County, don't' you?

A.    Yes.

Q.    You recall the capital murder in Dallas County, don't you?

A.    Yes. They killed an officer who was being called to a scene where they were robbing a large store, and they killed the police officer.

Q.    Shot him multiple times, didn't they?

A.    Yes.

Q.    After they shot Officer Hawkins- - Aubrey Hawkins was the officer's name, wasn't it?

A.    Yes, Aubrey Hawkins

Q.    After they did that they fled to Colorado, didn't they?

A.    Yes, they did.

Q.    Started attempting to obtain body armor, correct?

A.    Yes. They were - - I believe they were arrested with vests and - - and so on.

**Q.    You testified as a mitigation expert in that case?**

**A.      Yes.**

Q.      .And as an expert on future dangerousness, as well?

A.      Yes

Q.      Dr. Vigen, would you agree with me that when you're rendering opinions as important as you are in this court that it's important to have as much information available as possible?

A.      Yes, I would agree. And seldom do we have all the information. It's very hard to get all the information.

Q.      To exaggerate?

A.      Either exaggerate or minimize, yes.

Q.      That's not uncommon at all for defendants in a case such as this to minimize their participation or their level of activity in a crime, is it?

A.      Very common.

Q.      Very common for them to try to make someone else out to be the villain or make them a scapegoat, isn't it?

A.      Very common, yes.

Q.      That's exactly what this Defendant did in this case, isn't it- -

A.      Yes.

Q.      - - with regards to this crime?

A.      I believe he did, yes.

**Q.      Because when you talked to him, Doctor, about the crime that he committed here, he told you that he had consensual sex with Rachelle Tolleson, didn't he?**

**A.      Yes.**

**Q.      And he also told you that Andrew Tolleson, Rachelle's husband, had participated actively in this crime, didn't he?**

**A.      Yes, he did.**

Q.      You didn't believe that for a moment, did you?

A.      No, I didn't. I didn't believe that.

Q.      He told you that Andrew Tolleson helped him take the body out there to that area where he burned the body, too, didn't he?

A.      Didn't make sense to me.

**Q.      The Defendant has shown a pattern of chronic lying, hasn't he?**

**A.      I would have to agree with you and say yes.**

Q.      He's impulsive, isn't he?

A.      Reactive and impulsive.

Q.      He's got a temper?

A.      Yes.

**Q.      Which at times in the past has been an explosive temper?**

**A.      Yes.**

Q.      He acts without thinking?

A.      And without- - yes. Without- - without planning and so on, yes.

**Q.      Without considering the consequences of this actions?**

**A.      Yes. He has a history of doing that. He doesn't do it all the time, but he does**

11

do that.

Q.    You said- - you said just a few minutes ago that you think that he's been acting out at the jail to try to get attention; is that right?

A.    Yes, sir.

Q.    You're aware of the incident on June the 6th of 2004, aren't you? This was the incident where he was having to be placed on a restraint bed in the infirmary after he had disobeyed orders in his cell?

**A.**    **Right. June 6th, 2004. Failure to stand for head count and disruptive behavior, resisting.**

**Q.**    **Sir, when he spit in the officers' faces, do you think he was just trying to get attention then?**

**A.**    **No. I think he was angry and reactive and disrespectful.**

**Q.**    **When he tried to bite the officers who were trying to tend to him, do you think he was just trying to get attention then?**

**A.**    **No. I think he's angry and acting out his anger.**

Q.    When he used racial slurs against the guards, do you think he was just trying to get attention?

A.    It's taunting behavior, nuisance, aggressive, verbal - - verbal aggressive behavior.

Q.    When the Defendant attacked the inmate by the name of Melvin Johnson on September 22nd, 2004, do you think he was just trying to get attention?

A.    Yes, I believe so.

Q.    Doctor, you said just a few moments ago the Mendoza home was a dysfunctional home. Let me ask you, there's no evidence that there was ever any violence in that home, is there?

A.    I think there was an altercation between Moises and his sister one time where they were fighting, but there was never any violence where any first aid or any medical attention beyond first aid was needed, to my knowledge.

Q.    In some of these homes, for instance, these young people have to witness violence between their parents, correct?

A.    Yes, that happens.

Q.    Some of them have to witness violence between a sibling and a parent or other siblings, correct?

A.    That's correct.

**Q.**    **In a lot of these homes violence is actually used against the young person themselves, correct?**

**A.**    **Yes.**

**Q.**    **That never happened to this Defendant, did it?**

**A.**    **Not to my knowledge.**

Q.    There was never any alcohol abuse inside that home, was there?

A.    Not that I could discover.

Q.    There was no drug abuse in that home, either?

A.    Not that I could discover.

Q.    Would you agree with me that there parents exhibited a good work ethic for all of their children, including the Defendant?

A.    Yes. I think the parents worked very hard to do the very best that they could.

Q.    That's not always true in these types of homes, is it?

A.    No, it's not.

Q.    Provided an opportunity for religious training?

A.    Yes.

Q.    Appeared to have attempted to teach all the children the difference between right and wrong.

A.    Yes.

Q     Supportive?

A.    I think they were supportive.

Q.    Again, these are things that we find absent in a lot of these homes, isn't it?

A.    It's very true. In most of the cases that I have seen in mitigation similar to this, mitigation issues in first degree cases, you will have extensive sexual abuse or extensive violence or extensive sexual abuse or extensive criminal histories, and this family does not any of those factors.

**Q.    Would you agree with me that the Defendant in this particular case had several great role models to pattern his life after?**

**A.    He did. He could have chosen that and patterned his life after his brother, for example, Mario.**

Q.    I mean, Mario- - Mario is very responsible individual, isn't he?

A.    Yes. I think Mario is a responsible individual. He's about 15 years older than Moises, and I think left when Moises was still a young boy. He left for, I believe, the military service when he was 18. Moises would have been 3 or 4 years old and didn't have a lot of time to pattern his behavior over - - after Mario. But Mario tried to offer that when he came back into the family after being away.

Q.    Paul was another good role model, wasn't he?

A.    Yes, he was. And he's done well in his life.

Q.    And in a lot of these homes one of the big problems is that the children, particularly the males, have no good male role model, do they?

A.    Yes. The absence of the fathers is a significant factor in family dysfunction.

Q.    But in this case the Defendant had at least two very good male role models in that home, do they?

A.    Yes. The absence of the fathers is a significant factor in family dysfunction.

Q.    But in this case the Defendant had at least two very good male role models in that home, didn't' he?

A.    Well, both of those - - those men are significantly older than Moises. Mario is sort of a very strict, upright, this is the way you do things. The problem is he really feels that he left too early and that he wishes he had been more of a role model.

**Paul is much more like Mercedes. He's very forgiving. Moises even stole money from him, like, $1,000 or $2,000. Paul really minimized that and wasn't angry about it, wasn't upset about it. Never really confronted Moises over that and sort of let him get away with that.**

But both men, regardless of their personalities styles, I would agree with you are

13

good role models.

Q.     You said that based upon your interviews with the family, your review of the records, that you feel that the Defendant went through a dramatic or drastic change after he started using marijuana during his senior year, is that right?

A.     Yes, sir.

Q.     Well, Dr. Vigen, isn't it true, according to your interviews, the Defendant had been engaging in violent behavior for some time before that, hadn't he?

A.     Um, what are you speaking about particularly?

**Q.     Well, do you remember when you interviewed Mario that Mario provided a history for you? Do you remember that?**

A.     I have it. Just refer me to where you're speaking.

Q.     Mario told you the Defendant got into trouble early in life, didn't he?

A.     Yes.

**Q.     As a child he would hurt other kids, wouldn't he?**

**A.     He was stronger. The import of that is that he was a big kid and that when he would play with other kids he would hurt them. The idea is not that he would intentionally try to hurt them because he was bigger. I didn't get the idea that he was trying to hurt other kids.**

**Q.     Well, your notation says stronger and hurt other kids, correct?**

**A.     Yes, that's what it says, hurt other kids.**

Q.     As a matter of fact, he hurt his sisters too, didn't he?

A.     Yes.

Q.     Ruthie and Elizabeth?

A.     He would pick on them and do this immature behavior, picking on them and hitting them. Yes, that's what Mario's report was.

**Q.     It says pick on and hit them.**

**A.     Yes.**

**Q.     Those were his two sisters?**

A.     Right.

Q.     Mario told you by the age of 3 or 4 he knew there was something strange about the Defendant then.

A.     No. It says 3 or 4 years old he realized he was stronger.

Q.     Okay.

A.     It doesn't mean - - it wasn't "strange". I'm sorry. It's not written well.

Q.     Okay. He knew that the Defendant was impulsive?

A.     Um-hum. Yes. He says - - Mario said he never learned consequences. He would just impulsively do something and think about it later. He - - - he said he was an impulsive kid.

Q.     Right. That's not behavior that he started to show during his senior year in high school, is it?

A.     Oh, no.

**Q.     I mean, that - - he's been exhibiting that since an early age, hasn't he?**

**A.     Yes.**

Q.     He's been getting into trouble at school since an early age?

14

A.    He described him as sort of a hyperactive kid. He said he would have been a good fit for Ritalin, that he was bouncing off the walls.

Q.    Do you remember him saying Moises, always in trouble, talking bac, overactive. And this seemed to increase in middle school, didn't it?

A.    Right.

Q.    So that by the time he got into middle school he was already exhibiting these types of behaviors, wasn't he, Doctor?

A.    Actually, he began, I think, in the - - if you looked at my notes, in the 2nd/3rd grade he took on the role of class clown which is - -

Q.    Doctor, right now I'm trying to focus in on talking back, overactive. My question was : By the time middle school rolled around, this activity was already increasing with the Defendant, wasn't it it?

A.    Yes, that's right. That's what Mario said, yes.

**Q.    And by the time he got out of - 0- to middle school Mario says he's out-of-hand in middle school.**

**A.    Yes. Um-hum.**

Q.    I did understand - - and I've only had just a few moments during the lunch hour to review these records. But the next line appears to say that when the subject was confronted with drugs, school, stealing - - I mean, that's activity that was occurring during school, wasn't it?

A.    During high school, yes. Later - - later than middle school, or high school.

Q.    And the notation is he just couldn't resist impulsive options, could he?

A.    That's what - - yes. That's what he's saying is impulsive and couldn't resist being impulsive.

**Q.    I mean, he has a history of violence towards several people, doesn't he?**

**A.    Well, in terms of fighting with or hitting his sisters and doing that kind of impulsive behavior, if that's what you mean by violence. He was - - he was doing that. That's - - Mario said he was much more impulsive, much more active than Mario's two sons at 6 and 8. Moises was much more of a handful to handle than Mario's two sons.**

**Q.    Do you remember when the Defendant assaulted his own mother in their home?**

**A.    I knew about that, and Mario came and had to control him**.

Q.    Yeah. As a matter of fact, the Defendant at that time was only 15 or 16 years old, wasn't he?

A.    Yes. He was 15 - - 16 at the time.

Q.    Stuck his own mother, correct?

A.    Can you point me to that so I can review - -

Q.    Yes, sir. This appears to be on Page 7. It says 15-16, harder to control.

A.    Yeah. By the time he was 15 and 16 he was being harder to control, and one time he hit his mother. It was the year before graduation, so he would have been 17.

Q.    It says here the mother was so afraid - - she was afraid to go back into her own home because her son had assaulted her in her home.

A.    And Mario said that he - -

15

Q.     I'm sorry. Is that what Mario told you?

**A.     Yes. He said that his mother was afraid to go back into the house. He came over and confronted him, and he - -Mario restrained him, and it says hit him, and he thought that that was one of the times when Mario was high perhaps on marijuana.**

Q.     He's also beaten up Travis Rose, hasn't he?

A.     They got in a fight, yes, that's true.

Q.     He told you that he beat the boy up, correct?

A.     Can you refer me again to where you're speaking?

Q.     He also assaulted Amy Lodhi?

A.     Yes. Can we refer to the notes on that or - -

Q.     I believe - - I'm not sur that I have that at hand. But you remember that he hit her once when she said that she suspected him of flirting or cheating on her?

A.     I remember the incident.

Q.     He admitted that he did push Robert Thorp Ramirez up beside a truck and pulled a knife out on him? Do you remember that?

A.     Yes. He admitted that to me.

Q.     He did that to intimidate Robert Thorp, didn't he?

A.     Yes. That's what he said.

Q.     Do you remember that incidents in high school where he started stealing?

A.     I remember several, yes One - - do you want me to speak about one?

Q.     Was he the football team manger?

A.     I think he was.

Q.     I understood one of the thefts to be one of the football from high school. Do you remember that? Or was that just a notation that he stole from some of the players up there?

**A.     My thought about it, as I remember the notes, are that he was some kind of manager, and there was, like $60 or $50 . Sneakily, very proud of himself, again, he stole only $30 rather than steal all of the money which would make it more obvious that money was gone. He stole just some of the money and very clever - - very proud of himself for that kind of clever maneuver, which I think is pretty adolescent.**

Q.     Well, it was pretty calculating, wasn't it?

A.     Yeah.

**Q.     He gave it a lot of though. Stole form his mother, as well, didn't he?**

**A.     He admitted to me stealing from his mother and stealing from his football team.**

**Q.     Stole from his own sisters, Ruthie and Elizabeth, too, didn't he?**

**A.     And also he stole money from Paul when he - - after he broke the electronic monitor and went on - - went traveling with Amy Lodhi.**

Q.     He talked to you about the incident with Laura Decker, too, didn't he?

A.     Yes.

Q.      He claimed that Laura Decker had consensual sex with him and several other boys there at that party, didn't he?

16

A.  What I remember about it si he - - he admitted to having sex with her when picking her up and sex with her on the videotape. He was called by someone - - this is his version. Called by someone and said, would you like to participate, and he said, sure, yes. And then a whole group of people must have been involved to carry out this sex - - sexual behavior on video.

Q.  And he claimed when he talked with you that Laura Decker was just fine with being videotaped. Do you remember that? She consented to that, as well?

A.  He told me that it was consensual. I don't remember the exact - - his exact words about it.

Q.  And he told you that several other boys had sex with her, as well?

A.  I don't remember that.

Q.  Dr. Vigen, when you expressed some opinions about Texas Department of Corrections, sir, have you ever worked for the Texas Department of Corrections Institutional Divisions?

A.  No, sir. I never have.

Q.  And there is violence that is committed inside the Texas prisons every single month of the year, isn't there?

A.  I would assume - - I would assume that. Let me - - let me just check a note or two.

**Q.  Well, do you need to - - let me - - I'm just asking you. Is there violence that is committed inside the Texas prison systems?**

**A.  Yes.**

**Q.  You'd agree with me the Defendant is - - he's resourceful, isn't he?**

**A.  He's sneaky and resourceful, yes. He's bright.**

**Q.  He's been able to hid things from the guards, hasn't he?**

**A.  Yes.**

**Q.  He takes pleasure in that, doesn't he?**

**A.  Yes.**

**Q.  Do you remember when he told you that he has kind of caught on to the little things and to the routines in jail?**

**A.  Right.**

**Q.  And he thinks it's normal to lie while he's being incarcerated. Do you remember when you asked him if he had been lying, and he just said the normal amount of lying?**

**A.  Yeah.**

**Q.  Do you remember him telling you that?**

**A.  I do, yes.**

**Q.  The Defendant has already proven to us, hasn't he, that in a free society he is a very dangerous individual, isn't he?**

**A.  I think that's  - - the jury has decided that, and I certainly agree with that.**

Q.  Doctor, do you remember on January 31st, 2005, speaking with the Defendant about a certain fantasy that he had?

A.  Yes, I remember. But can you refer me to my notes if you're going to question me about it?

17

Q.    Yes, sir. If you wouldn't mind, if you would just read that to the jury, please.

A.    He got up about 4:00 a.m. the next - -

**Q.    Would you read that to the members of the jury, please?**

**A.    He gathers ten women and seven guys and keeps three people in each four-by-four -by-four cell. He names some of the people; Farukh, Stacie Garica, Amy's mom. All of the girls that lied on him in this case, Stephanie Tucker and his cousin Alex and Amy's two brothers. He hires an Asian woman to feed the people. She had electrolysis because of facial hair. She lives in his house. Two Chinese people abused her, but they are now in prison. The people he is keeping do not know where they are or why. He wears a black mask, and he is very muscular. He never lets them out. He turns the lights on at night so to disorient them. He only harms them if they grab the Chinese woman, and he breaks their arms. His wife and children know about this. He's married to Priscilla.**

**Q.    That's all the questions I have.**


### ON REDIRECT DR. VIGEN TESTIFIED


Q.    Now, you said that the family was dysfunctional, and Mr. Davis gave you certain classic dysfunctional scenarios. Explain to the jury - - and, like, you already have. But do you mean that they were dysfunctional in that the father was never there and there were beatings in the family all the time? Were you explaining that in a psychological dysfunction, the fact that the family was dysfunctional?

A.    If I understand your question, in cases - - people just don't' stand up one day and say, I'm going to molest a child or I'm going to murder somebody today. The roots of this type of behavior generally go back a long ways in people's lives, and in most of the cases that I've seen there are incidents - - there's the criminal history in the family or there's an alcohol and drug instance in the family or there's a mental health issue in the family and a lot of mental health problems and a lot of alcohol and drug problems are familiar and move from one generation to another.

**There are genetic predispositions for this, and these abnormalities cause or contribute to - - there's no one cause for anything, but contribute to aberrant behavior like killing another human being.**

**There's something missing in this case for me as a psychologist. There is none of that there.  There's something I don't know. I can't tell you. From a - - my intuition.**

So in this case, those general factors that Mr. Davis was talking about are just not present, and the family is really on one level trying to work very hard and do their very, very best. On the other level, there is some dysfunction in terms of attachment.

## ANALYSIS

The Defense through their expert,  "opened the door" for the State cross examination, and  presented evidence that the Petitioner has no sense of self, has  superficial remorse, is impulsive  with a violent temper that can't be controlled., is  violent toward his family and others,  is a clever thief, a liar, someone who takes pride in out smarting guards. This  behavior started in Petitioner's early years. In addition, Petitioner has a bizarre fantasy and is an extremely dangerous person.

Also by proffering Dr. Vigen's testimony the  State was able to obtain a copy of notes taken by Dr. Vigen made during interviews with the  Petitioner.  The information in this report would not have been available to the state absent Dr. Vigen's testimony.  These notes contained information that was unknown to the State and would not have been proffered as evidence to the jury absent Dr. Vigen's testimony.  This information  contains reference to the Petitioner's delinquency during his early years, instances of theft both  from family members and as a manager of a football team. Violence toward his mother and  sisters while Petitioner was at a young age.  In particular, the jury was able to hear Petitioner's  fantasy of confining people in a small room where they are in effect sensory deprived and  tortured.

The only possible benefit of Dr. Vigen's testimony, was his opinion that perhaps Petitioner could arguably grow spiritually, and according to Dr. Vigen, Petitioner would likely not be a future danger.  This potentially beneficial testimony was soon gutted by the State during their cross examination.  Petitioner contends that any credibility that Dr. Vigen had was immediately erased when the State was allowed to question Dr. Vigen regarding the fact that he had never testified on behalf of the State in death penalty case and in various instances of

19

particularity heinous murders including the case of the serial murder that he testified for the

defense as a mitigation expert.  In addition, and to emphasize, the State elicited evidence during

the cross examination of Dr. Vigen that he  actually believed that Petitioner is a very dangerous

person. During the examination it became evident that Dr. Vigen had no personal knowledge of

the Texas Prison System and so his opinion that Petitioner would not be a "future danger" was

based only on pure speculation with no basis or fact.

      Numerous Courts have found Ineffective Counsel at both the guilt phase and  penalty

stage of the trial where the Defense either elicited damaging testimony from their own witnesses

or alternatively "opened the door" , to otherwise impermissible cross examination by the State.

In Combs v.

Coyle 205 F3d 269 (6th 2000)   the Court concluded that Petitioner's Counsel provided

Ineffective Assistance of Counsel by calling an expert witness who testified that  Petitioner,

although intoxicated, at the time of the crime, was able to form the intent to commit the crime.

The issue of the  intent to commit the crime was crucial to the defense theory. The Court found

that regardless of whether counsel should have known or instead actually knew that expert's

opinion regarding Petitioner's intent, however, Counsel's decision to put him on the stand was

objectively unreasonable.

      *Stevens v. McBride* 49 F3d 883, 7th Cir. (2006) is closely analogous  to the case at hand.

The Court in *Stevens* found that *Stevens* attorney's investigation and presentation of expert

psychological testimony at this trial amounted to Ineffective Assistance of Counsel.    In

*Stevens*, the Trial Counsel retained a psychologist who interviewed the Defendant.  At the time

the defense counsel instructed the psychologist to evaluate the Defendant but not to write a

report.  Despite this explicit direction, the psychologist wrote a report and sent it to Petitioner's attorney's. The report included numerous statements that were extremely detrimental to *Stevens* case.  Upon receipt of the report, defendants lawyers immediately contacted the psychologist to question why he had disobeyed their instructions.  The psychologist told Trial Counsel, "don't' worry about it, when I take the stand I'm going to be able to turn this all around on them."  After the defendant was convicted.  Trial Counsel presented testimony from the psychologist at the penalty phase.   After the psychologists direct examination, the prosecutor cross examined the psychologist in regard to his written report, which had been provided to the State.

On cross examination, the psychologist volunteered that the defendant had antisocial qualities and sociopath traits.  The Psychologist also testified that the defendant would present a great risk to society.  This is very similar to the case at hand where Dr. Vigen's report was presented to the prosecutor.   True, unlike in *Stevens,  Dr. Vigen* didn't testify Petitioner would be a great risk to society, rather he testified that the Petitioner is a very dangerous individual.

The case of  *Sechrest v. Ignacio* 549 F 3d 789, 9th Cir (2008) is of particular importance. In *Sechrest* which is a pre AEDPA case, a witness who at defense counsel's request was appointed to conduct a psychiatric evaluation of the Defendant.   The Doctor interviewed and evaluated the Defendant and then submitted a report addressed to the Defense counsel marked confidential.  After receiving the report the Defense counsel decided not to cal the doctor as a witness at the penalty phase.  Upon request by the prosecution, Trial Counsel acquiesced to  the prosecution calling the Doctor as a prosecution witness.  The Doctor during the punishment phase testified that he evaluated the defendant at defense counsels request and testified that the defendant was an incurable sociopath, with an extensive criminal record and a history of drug

21

use.

Of particular import is this language from *Sechrest*. In discussing the facts that the

doctors testimony was extremely harmful the State argued that the Doctors testimony was

merely cumulative, and put nothing new before the jurors that they did not already know. The

Court held that the Court  neglected to recognize the significance of the doctors role as a mental

health expert.   As the Supreme Court has explained:

Psychiatrist gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder or behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question... Unlike lay witnesses, who merely describe symptoms they believe might be relevant to the defendant's mental state; psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrist can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.  *Ake v. Oklahoma*[1]

## RIGHT TO COUNSEL

The right to the effective assistance of counsel at trial is a bedrock principle in the

American justice system. It is deemed as an "obvious truth" the idea that any person haled into

---

[1]Other Courts, both State & Federal, have found Ineffective Assistance of Counsel Claims were Counsel elicited damaging testimony from their own experts/witnesses or was other wise inadmissable testimony see *State v. Smith* 712 496 (1986), *State v. Saunders* 958 P.2d  364 (Wash 1998) *State v. Dornbusch*  384 N.W. 2d 682 (1986) *Chatmon v. Unites States* 801 A.2d 92 (2002) , *Ramos v. Lawler* 615 F. Supp. 2d 347, *Robertson v. State* 214 S.W. 3d 665, Combs v. Coye 205 F 3d 269 (6th 2000).

court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is the foundation for the adversary system. Defense counsel tests the prosecution's case to ensure that the proceedings serve the function of adjudicating guilt or innocence, while protecting the rights of the person charged. Effective trial counsel preservers claims to be considered on appeal, and in federal habeas proceedings.  *Gideon v. Wainwright*, 372 U.S. 355 (1063).

The Supreme Court of the United States for years has held that Trial Court's have been given the duty to assure that appointment of counsel to the indigent as such time and under circumstances as to, not preclude the giving of effective aid in the preparation and trial of the case.  see *Powell v. Alabama*, 287 U.S. 45, 71 (1932), *Strickland v. Washington*, 466 U.S. 668 (1984)**.** Indeed where the death penalty is sought, even more stringent obligations of preparation are imposed see *Rompilla v. Beard*, 545 U.S. 374 (2005), *Wiggins v. Smith*, 539 U.S. 510, (2003) which incorporates the ABA Guideline for the appointment and performance of defense counsel in death penalty cases and guidance for courts to use when assessing whether counsel's performance in a capital matter is ineffective.  **Williams  v. Taylor 539 U.S. 262**

Where Ineffective Assistance of Counsel is established in the sentencing phase of a capital proceeding where the death penalty has been invoked, the resulting death penalty must be vacated and a new sentencing proceeding held.

## **STRICKLAND**

The Sixth Amendment requirement of Effective Assistance of Counsel is tested pursuant to the two prong test established by *Strickland*.   It is incumbent upon the defense to demonstrate that both the trial counsel's performance was deficient & and that this deficiency prejudiced the defense of this case.

23

## DEFICIENT PERFORMANCE

With regard to the prong of *Strickland*, from the inquiry the Defendant must show that Counsel's representation fell below an objective standard of reasonableness.  Judicial scrutiny and performance his highly deferential and a fair assessment of attorney performance requires that every effort be made to eliminate distorting effects of high-and-sight  to reconstruct the circumstances of counsel's challenge, conduct and to evaluate the conduct from counsel's perspective at the time *Strickland* 466 U.S. 689.

The Court should judge wether in light of all the circumstances viewed at the time of Counsel's conduct, Counsels "acts or omissions" were outside the wide range of professionally competent assistance. An attorney's performance " will generally be appropriate" for a review in court to assess counsels overall performance throughout the case in order to determine whether the "identified acts or omissions" overcome the presumption that counsel rendered reasonably professional assistance see *Kimmel v. Morrison* 477 U.S. 365 (1986).

However, *Strickland* and its progeny also recognize that in order to establish Ineffective Assistance of Counsel claim the defendant must over come a presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  Court's also recognize that even where the acts or omissions are made with respect to strategic choices, such as the adoption of a theory of defense, or decisions about what witnesses to call and what to ask them, etc. this presumption is rebuttable; it is does not immunize such actions or omissions from review for Ineffective Assistance of Counsel Claims**.** This presumption merely establishes a base line assumption that lawyers make sound and reasonable strategic decisions after the groundwork necessary to make them as complete. The  presumption of soundness is overcome where a

24

strategic judgment is shown not to be the product of sufficient investigation see *Strickland*,  466 U.S. at 690-91 which held that strategic choices made after less than a complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation on investigation.

The Court's have held that even where an  investigation to some extent has been conducted, a deficiency in that investigation maybe sufficient to make even strategic choices the basis for finding Ineffective Assistance of Counsel see *Rompilla,* 545 U.S. at 380-81, *Wiggins*, 539 U.S. at 521**,** *Williams v. Taylor*, 529 U.S. at 396.  Circumstances of decisions must be examined for the requisite soundenss in light of these principles.

This  record establishes that Trial Counsel, without sufficient investigation or consideration made the decision to proffer the testimony of Dr. Vigen, allowing him to be subject to cross examination and consequently allow the State to obtain a report of the Doctors, in interviews, witch contained not only additional information which was unknown to the prosecution. This was after the damaging testimony adduced on direct examination.

The record before this Court reflects an absence of any reasonable strategic basis for Trial Counsel's decisions in calling Dr. Vigen.

In addition, failure to anticipate damaging information that the State is likely to adduce in support of a death sentence, even if not elicited from the Defendant's own witnesses, is prejudicial ineffectiveness standing alone.  *Romplilla,* 545 U.S. at 382-90. When it is the Defendant's own witness that provides that own damaging information, it is even more ineffective and prejudicial.

## **PREJUDICE**

25

As for the prejudice prong of the *Strickland* test, the Defendant must show there is a reasonable probability that, but for counsels own professional errors, the result of proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.   But for Trial Counsel's unprofessional errors, of allowing Dr. Vigen to testify and to be cross examined, the State would not have been able to adduce testimony as to the highly damaging testimony regarding the Defendant's delinquency at a young age including attacking his mother and sisters, lying, stealing and cheating.

The Prosecution refereed to Dr. Vigen's testimony in closing argument: RR (V25P24-51)

> So what else is next? What else is left in this escalation of violence? Fulfillment of that fantasy that he had that he talked about in the jail? That he wanted to abduct, hold captive all the females that brought him here today, is that where we're headed?
>
> Because I can. Dr. Vigen looked and searched to try to find someone, something that caused him to do this. He couldn't find it. He said it was missing. Where was it?
>
> If you've got any doubts about the total depravity of this individual's mind, he tells you himself what's in his mind, besides the fantasy of capturing and torturing individuals who have lied and testified in this case.
>
> And you know from Dr. Vigen yesterday that he was preparing another lie. And that other lie was going to implicate and point the finger at this poor man, Andrew Tolleson, who's lost his wife and now has to raise a child by himself. He's the scapegoat. He's the villain. See, there's always someone else to blame in Moises Mendoza's life. One lie after another, upon another, upon another. That's the pattern that you get from this man.
>
> Because you know while he's already in disciplinary segregation, do you remember what Dr. Vigen told you?
> As the doctor told you, this isn't the way it always is.
> We request, one, dates of assault on officer in Collin County jail, assault on other inmate, comb and tin found or any other criminal acts while in jail.

26

Pursuant to 37.071 Section 2 (2)(b)(1) the jury is asked

> "whether there is a probability that the defendant would commit criminal acts of
>
> violence that would constitute a continuing threat to society"

This is commonly called the" future danger" question.  In order for a death sentence to

be assessed all 12 of the jurors must unanimously answer that special issue "yes".  In order for

the special issue to be answered "no" 10 jurors must agree.   If there is one hold out, who fails

to find that the State has proven this issue beyond a reasonable doubt, and thus cannot answer

the question "no" although the other 11 jurors would answer the issue "yes" the fact that this

is an non unanimous jury verdict,  the default is a life sentence.  Therefore all a Defendant has

to do is convince one juror that the State has not met their burden. In order for a life sentence

to be imposed. The State heavily relied upon Dr. Vigens' testimony in support of an

affirmative answer to the "future danger" special issue.  Petitioner contends that there is a

reasonable possibility that absent Dr. Vigen's testimony, one juror would have held out

resulting in a life sentence. [2]

**CLAIM NUMBER TWO: PETITIONER ALLEGES THAT INITIAL POST**

**CONVICTION COUNSEL, PURSUANT TO MARTINEZ, RENDERED**

**INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO RAISE TRIAL**

**COUNSEL'S INEFFECTIVENESS BY PRESENTING THE TESTIMONY OF DR.**

**VIGEN, ON COLLATERAL REVIEW.**

---

[2] Petitioner would point out *Buck v. Stephens* presently pending in the Supreme Court
implicates this issue. In *Buck* the fundamental issue is whether Trial Counsel was ineffective
when he proffered the testimony of a defense psychologist who testified that race is an increased
factor in determining "future danger".

*Maritinez* provides that default of an ineffective assistance of Trial Counsel claim can be excused if  appointed counsel in the initial collateral review proceeding, failed to raise a claim and the claim is a substantial claim. The substantial claim is defined as a claim that has demonstrated "some merit" . The testimony of Dr. Vigen did not assist petitioner but was in fact of great determent to Petitioner. Thereafter State post conviction counsel failed to present this claim to the Texas State Court's and consequently, this claim is unexhausted.

In *Trevino* the Supreme Court recognized that a State post conviction lawyer is held to the same standards as Trial Counsel and consequently *Strickland* applies.

Ms. Brandt, Petitioner's initial and primary post conviction lawyer filed his first federal writ which had numerous claims in regard to the inadequate investigation, preparation of Dr. Vigen, etc. Petitioner contends that Ms. Brandt should have also  alleged Ineffective Assistance of Trial Counsel in regard to even presenting the testimony of Dr. Vigen.

Pursuant to both Texas guidelines and standards for Texas Capital Cases, which is adopted by the State Bar Board of Directors April 21, 2006 and the 2003 Guidelines and Standards for Capital Defense enacted by the American Bar Association require that Habeas Corpus Counsel ..

B.  Duties of Habeas Corpus Counsel

1. General responsibilities

b. Habeas Corpus counsel cannot rely on the previously complied record, but must conduct a thorough and independent investigation. Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. Counsel must not assume

28

that the trial record presents either a complete or accurate picture of the facts and issues in the case.

7. Present Legal Claims

a. Habeas corpus counsel must evaluate each potential claim in light of the near certainty that any claim not presented in the first state application for writ of habeas corpus will be waived or otherwise defeated by defenses such as procedural default or failure to exhaust. For this reason, counsel must be especially sensitive to the need to preserve all potential issues for later review by including them in the first application for writ of habeas corpus.

b. Habeas Corpus counsel should consider every legal claim potentially available, and thoroughly investigate the basis for each potential claim before deciding not to include it int the first state application for writ of habeas corpus.

The responsibility of Habeas Counsel is very clear. Habeas Counsel should do a proper investigation and evaluate and consider any legal claim.   Although, again, Ms. Brandt did file claims re Dr. Vigen, again Petitioner contends he received Ineffective Assistance of Counsel by Ms. Brandt for failing to file a claim regarding Ineffective Assistance of Trial Counsel for allowing the testimony of Dr. Vigen.

Since the question of the competency of Ms. Brandt's representation is governed by *Strickland*,  as stated by *Martinez*.

## **STRICKLAND**

*Martinez/Trevino* held that Ineffective Assistance of Initial State Habeas Counsel

29

could potentially be  an excuse to a procedural bar to Federal Review. These cases hold that

*Strickland* applies to the determination of whether initial State Habeas Counsel was

Ineffective,  these decisions do not give the Court's any guidance as exactly how to apply

*Strickland* to the issue of Ineffective Assistance of Counsel of post conviction counsel. For

decades the issue of the State Habeas Counsel effectiveness was Constitutionally irrelevant,

due to the fact that there is no Constitutional right to effective assistance of counsel on

collateral review.  Consequently, the issue of what constitutes the wide range of professionally

competent assistance of post conviction counsel has not received significant attention.


## DEFICIENT PERFORMANCE OF POST CONVICTION COUNSEL

The Court in *Leberry v. Howerton* 583 F. App'x 497, 502  6th Cir. (2014)seems to

suggest that post conviction counsel renders deficient performance if he fails to raise a Trial

Counsels Ineffective Assistance Claim and that claim is substantial i.e. has some merit.  See

also *Sheridan v. Curley* No. 10, 3987, 2015 U.S. District. LEXIS 32406 at 13 (E.D.PA  MAR

16,2015) which held that post conviction counsel's failure to raise a claim resulting in that

claim being procedurally defaulted  in federal habeas, that failure becomes deficient

performance if the defaulted claim is substantial.   It is undisputed that post conviction counsel

did not raise the claim of Ineffective Assistance of Trial Counsel by allowing Dr. Vigen to

testify.  Consequently, that claim was ordinarily would  be procedurally barred. However, if

Petitioner shows that that claim is substantial i.e. has some merit, then Petitioner contends that

he has met the first prong of *Strickland.*

## PREJUDICE OF POST CONVICTION COUNSEL

According to Allen L. Bohenrt, an author of  Hofstra  Law Review Volume 43 Page 991  the issue of how to assess  prejudice from post conviction counsel's deficient performance should present which should be a simple inquiry. Because the  *Martines/Trevino* context is not a Constitutional question, conventional notions of *Strickland* prejudice should be inapplicable; indeed they are doctrinal  mumbjo at best and functionally unworkable. And yet, to date, the Federal Courts have found his part of the *Martinez/Trevino* analysis amongst the most vexing.

Hofstra  Law Review states that the 9th. Cir.  in *Detrich v. Ryans* 740 F3d 1237 9th Cir. (2013)  and en banc court touched on what must shown to satisfy  *Martinez/Trevino* element**.** (Two) a four  judge plurality concluded that prejudice " from post conviction counsels failures could be shown by establishing that the substantial claim will not be heard on the merits".[3]

However, there are courts, that apply the usual *Strickland* prejudice showing i.e. a Petitioner must show a reasonable probability that the result would have been different if post conviction counsel had highlighted Trial Counsel's deficient performance. [4]

The Hofstra Law Review Article opines that if  the application of the usual *Strickland*

---

[3]Citing Hofstra Law Review Volume 43 at 9, 46,  the  6th Cir. ordered the district court on remand to consider,  in the course of determining "acutal prejudice"  from the *Martinez* cause whether the particular Ineffective Assistance of Counsel claims defaulted by *Leberry* are sufficiently substantial to overcome the default Id. The Court's qualification of substantial suggests the Court found the default Ineffective Assistance of Counsel claims substantial enough that being denied any meaningful review of the claims because his post conviction Counsel failed to raise them in State Courts prejudice *Leberry* enough to meet *Martinez* requirements.

[4] Counsel for Petitioner has found no 5th Circuit cases directly on point that discuss prejudice in  a Martinez/Trevino situation.

standards  is applicable in the *Martinez/Trevino* context, it unfaithful to both *Strickland* itself and to *Maritinez*. *Strickland* asks whether there is a reasonable probability of a different outcome but for counsel's failures. With the ultimate focus of inquiry being the fundamental fairness of the proceeding in question, and whether the results of the particular proceeding is unreliable to have a breakdown in the adversarial process when counsel performs deficiently.

As referred to Hofstra  Law Review, *Martinez/Trevino* created an avenue by which a prisoner could over come a procedural default of a claim violation of a Constitutional right, therefore, ensuring a meaningful opportunity to obtain a meaningful merits review of a Constitutional claim.  That understanding, leads  inexorably to the following conclusion; Ineffective Assistance of post conviction counsel can be demonstrated in *Martinez/Trevino* if Counsel failed to properly and fully raise a claim that was substantial, depriving the prisoner of any meaningful chance to litigate the claim on the merits. If post conviction counsel failed to raise a substantial claim, that  is analogous to the deficient performance element under the traditional *Strickland analysis*  and the deprivation of any meaningful opportunity for the investigation or factual development, leading to deprivation of any chance for a meaningful merits review of the substantial claim is analogous to the prejudice element under *Strickland.*

Petitioner would contend that this is exactly the situation at hand.  Although post conviction counsel did raise the issue of the preparedness of Dr. Vigen to testify, in her original petition she did not  raise the issue of whether Trial Counsel was Ineffective by proffering the testimony of Dr. Vigen at all.

Petitioner contends that this is a substantial claim, i.e. has some merit,  and thus as previously stated, deficient performance has been shown.   Petitioner would also contend that

due to the failure to present this substantial claim, Petitioner has lost the opportunity for a meaningful review of this claim i.e. prejudice exists.

**CLAIM NUMBER THREE: PETITIONER CLAIMS THAT THE STATE OF TEXAS USED POTENTIALLY FALSE TESTIMONY AT THE PUNISHMENT STAGE OF HIS TRIAL IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT OF THE UNITED STATES CONSTITUTION AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO DISCOVER THIS FALSE TESTIMONY.**

During the Punishment Phase the State offered the testimony of Robert Hinton, a jailer, who testified as follows: **RR (V 25  P220- 237 )**

> Q.    Sir, would you please tell us your full name.
>
> A.    My name is Robert D. Hinton
>
> Q.    Mr. Hinton, how are you employed?
>
> A.    I'm employed by the Collin County Sheriff's Office as a detention officer.
>
> Q.    Sir, I want to direct your attention back to September 22nd, 2004. At that time, what were your assignments?
>
> A.    At that particular time I was a pod officer in the special housing unit at the detention facility.
>
> Q.    So you were in Special Housing Unit Number 5-A, correct?
>
> A.    Yes, sir.
>
> Q.    Sir, on that day was the Defendant being housed in that

33

particular SHU?

A.    Yes, sir. He was being housed on the disciplinary segregation
side in Cell Number 11.

Q.    When an individual is housed in the disciplinary segregation
unit, does that mean that he's in a single cell?

A.    Yes, sir.

Q.    Are his activities restricted in any ways?

A.    Yes sir. He's locked down 23 hours a day. On that particular
side, that's for disciplinary segregation. That's for individuals
who have broken the jail rules. They're limited to a cell and
some reading material.

Q.    When a prisoner such as the Defendant is in that unit, you said
he's locked down 23 hours a day. Is he entitled to one hour of
recreation?

A.    Yes, sir.

Q.    Where does a - - where did the Defendant recreate that day?

A.    If its' daylight and weather permitting, we allow them onto the
rec yard, which consists of a room about as big as this
courtroom with a basketball net and a basketball.

Q.    If there only one inmate out there in the yard at a time if they're
in the disciplinary suggestion or administrative segregation?

A.    It depends upon their status, sir. If they're a keep-away-from-all

34

it's out there by themselves.

Q.     Was the Defendant a keep-away-from-all on that date?

A.     Yes, sir.

Q.     And sometime around 5:35 was the Defendant released from his

cell to go out into the recreational yard?


Q.     So he was by himself. He then goes through the door out into

the recreation yard. And, again, he's by himself, correct?

A.     Correct.

Q.     And the rules were that the inmate was supposed to close the

door behind him when he went into the rec yard, correct?

A.     Correct. And that would lock it making it secure.

Q.     Did you, in fact, see the Defendant go out into the recreation

yard?

A.     I did see him go into the recreation yard.

Q.     And from that control room would you have - - would you have

the ability to watch an inmate at all times?

A.     Yes. It's a 360 - degree view.

Q.     And after - - after he actually exited the SHU and went out into

the recreation yard, did you believe that the door was leading

out to that yard had been completely closed and was locked?

A.     From my advantage point I believed the door had been closed,

35

and he was actually in the rec yard.

Q.     Sir, afer the Defendant went out into the rec yard was another

       inmate released into the interior portion of the SHU?

A.     Yes. Inmate Johnson was released from his cell, which was 19

       on the segregation side, to finish mopping and sweeping the day

       room on the segregation side.

Q.     Sir, sometime afer Inmate Johnson came out into the SHU, did

       you see the Defendant re-enter the SHU from the recreation

       yard?

A.     Yes, sir.

Q.     Had you ordered him back into the SHU?

A.     Yes, sir - - no, sir. I mean, I ordered him back into the recreation

       yard at that point.

Q.     All right. Well, did he obey your orders and stay in the

       recreation yard or did he come into the interior parts of the

       SHU?

A.     He continued up to the base of the stairs where Inmate Johnson

       was.

Q.     And when he came up there to where Inmate Johnson was, what

       did you witness?

**A.     A fist fight broke out. Inmate Mendoza approached in an**

       **aggressive fashion. Inmate Johnson held his ground and**

36

took up a defensive action.

Q.      So that I understand then, of the two individuals of what

        you witnessed, who was the aggressor in that ?

A.      Inmate Mendoza.

Q.      Had Inmate Johnson made any moves toward Inmate

        Mendoza at that time?

A.      No, sir.


Present Counsel for the Petitioner was able to interview Melvin Johnson, the inmate

who Petitioner allegedly assaulted in September of 2004, and obtained an affidavit form him

which is attached to this Amended Petition as Exhibit "A".

As is evident, officer Hinton's testimony is in direct conflict to Mr. Johnson's

affidavit.   One of these individuals gave a rendition of the events which if not perjury, is

patently false.  Petitioner contends that potentially his due process rights under *Napua and

Giglio* may have been violated by the admission of false testimony at the punishment stage of

this trial.

To demonstrate a Due Process Violation based upon a States knowing use of false or

misleading evidence, Petitioner must show that (1) the evidence was false; and (2) the

evidence was material; and (3) the State knew that the evidence was false see *Nobles v.*

*Johnson* 127 F3d 409 5th Cir. (1997) citing *Giglio* 405 U.S. at 153, 154. *Alcorta v. Texas* 355

U.S. 28 (1957)

37

The Court's have held that false testimony is not paramount to perjury. It is also undisputed that the burden of showing that there is a due process violation rest on the Petitioner.  Addressing the three prongs of *Giglio*:

**Prong One**: Was the evidence presented by Officer Hinton false? Candidly,  Counsel for Petitioner cannot allege with certainty that the testimony propounded by Officer Hinton was indeed false. Rather at best all he can show is that potentially it may be false. Counsel for the Petitioner will be requesting an Evidentiary Hearing and Motion for Discovery to determine whether or not there are potentially any other witnesses or evidence who may shed a light on what actually occurred some  twelve (12) years after the fact.  No doubt, however, there is an  factual dispute as to what actually occurred in the SHU in September, 2004.

**Prong Two:** Was the testimony material?  The Court's have held that there are different standards of materiality which applied to Brady Claims and Due Process Claims such as the one raised here.  Under *Brady* evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would be different.

For a Due Process Violation the test of materiality is if there is any reasonable likelihood that the false testimony could have affected the juries verdict." This is a much lower threshold than the materiality  test of a Brady Claim.

**Prong Three:** The State knew that the evidence was false.

Petitioner is not contending that the prosecutors actually knew that this evidence was false i.e. if it was. However, Petitioner need not prove that the prosecution actually knew this evidence was false, rather as a Court in the *United States v. Antoine* 603 F2nd 566 5th Cir.

(1979) held that indeed Petitioner need not prove that the prosecution had actual knowledge of Officer Hinton's false testimony.   There is no doubt that Officer Hinton was employed as Collin County Law Enforcement Officer.  Consequently, any false testimony provided by him is imputed to the prosecution.  Had Trial Counsel interviewed Melvin Johnson, he would have learned of the inconsistencies by the two witnesses who could have conducted further discovery to determine if there were other witnesses to the events in question or any documentation that might shed light on this issue.  Petitioner contends that by failing to conduct a proper investigation, Petitioner received Ineffective Assistance of Counsel pursuant to *Strickland* and the deficient performance by Trial Counsel's failure to so investigate and prejudice results therefore.

Petitioner realizes that this claim is fact intensive and is not fully developed.  Petitioner will be filing a Motion for an Evidentiary Hearing & Discovery to determine if there are any witnesses or evidence twelve (12) years afer the fact to clarify this situation.


**CLAIM NUMBER FOUR: PETITIONER , PURSUANT TO MARTINEZ, ALLEGES THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL  BY FAILING TO INTERVIEW MELVIN JOHNSON AND PRESENTING HIS TESTIMONY AT THE TRIAL OF THIS CAUSE.**

Pursuant to his affidavit, Melvin Johnson, who states that he was never contacted by anyone regarding this incident until very recently. He was not contacted by any member of the defense team, nor was he contacted by any state prosecutors. However, Mr. Johnson's name was known and the defense team was aware or should have been aware of both Officer

Hinton's and Melvin Johnson's  testimony, yet, inexplicable no one bothered to investigate the situation and interview Mr. Johnson.

It theoretically could have been a strategic choice, that Trial Counsel knew that Melvin Johnson was incarcerated in the Collin County Jail and  made a strategic decision not to call Mr. Johnson to testify due to credibility issues. However, that potential strategic decision  begs the question. As previously discussed a strategic decision is awarded a presumption of reasonableness only made after a reasonable investigation.  In this case, there was no investigation made.

Counsel for Petitioner has communicated with   both Juan Sanchez, Lead Trial Attorney, and Lydia Brant, Post Conviction Counsel. Mr. Sanchez advised Counsel for the Petitioner that he did not nor was he aware of any member of the defense team who actually interviewed Mr. Johnson. Ms. Brandt could not recall if she ever spoke to Melvin Johnson.


## DEFICIENT PERFORMANCE

Pursuant to the ABA Guidelines for the representation in death cases, *and Wiggins,* and  Trial Counsel is obligated to fully investigate the facts and circumstances of the case. This includes interviewing witnesses. Although Trial Counsel was aware of the situation that Officer Hinton testified to, Trial Counsel made no effort to actually interview Melvin Johnson

Trial Counsel contends that this constitutes deficient performance.  Other Courts have held that the failure to investigate & perhaps proffer the testimony of witnesses constitutes Ineffective Assistance of Counsel.  In *Miller v. Dretke* 420 F3d. 365 5h Cir. (2005) Counsel was ineffective by failing to interview and call Defendant's   doctor as a witness when the

defendant"s  mental and emotional problems were in issue.

The 5th Circuit held "why Counsel may have made reasonable tactical decisions based on the information that he had at the time, our review must focus on whether the information he possessed would have led a reasonable attorney to investigate further".  In *Smith v. Dretke* 417 F3d 438 5th Cir. 205 Counsel was ineffective in a murder case when he failed to prepare and present evidence of self defense. The Petitioner had identified four witnesses to Counsel. Counsel did not interview said witnesses or call them to cooberate or call them to testify to cooberate Petitioner's testimony concerning the victims history of violence..  See also *White v. Roper* 416 F 3d  728 8th Cir. (2005) , *Harris v. Cot* 365 F3d 552 7th Cir. (2004) Counsel was ineffective in a capital case for failing to interview the living victim who is the only eye witness to the crime. In failing to consult with a ballistic expert. The Petitioner in that case had a history of confessing to crimes that he did not commit, and his confession was inconsistent with the victims statement. In addition, a ballistic expert would have testified that the crime scene was consistent with the surviving victims statement and inconsistent with the Defendant's condition.  *Anderson v. Johnson* 338 F3d 382 5th Cir. (2003) Counsel was ineffective in a burglary case by failing to interview and present the testimony of an eye witness who had testified in the Defendant's behalf.   The Court also found that Counsel's failure to investigate was not a reasonable  decision.

## PREJUDICE

Pursuant to Strickland, for the prejudice prong of the Strickland Test the Defendant must show that there is a reasonable probability that but for Counsel's unprofessional errors the result of the proceeding would have been different.  A reasonable probability is a

probability sufficient to undermine confidence in the outcome.  The prejudice prong focuses

on the question "what if counsel's deficient performance renders the result of the trial

unreliable or the proceeding fundamentally unfair".  Lockhart v. Fretwell 506 U.S. 364 (1993).

Pursuant to Texas Law, under T.C.C.P. Article 37.071, the jury answers special issues.

During closing arguments, the State emphasized this, as evidence that the future danger issue

should be answered yes.  In addition, the State also used this evidence in the cross

examination of Dr. Vigen. A reading of the trial record would show that there is reasonable

probability that absent this evidence or in the alternative, the testimony of Melvin Johnson that

he actually was the instigator of this fight and it was not Petitioner undermines this outcome.

Counsel for Petitioner would contend that the State heavily relied upon the allegation

that Petitioner attacked Melvin Johnson as evidence pursuant to Article 37.071 regarding the

future danger issue. In addition, the prosecution used this incident to cross examine Dr. Vigen

when he testified at the punishment stage.  RR (V 25 P174)

> Q.     Well, do you think Inmate Johnson thought it was a nuisance when this
>        man came up from behind and attacked him?

Again, the State relied on the alleged assault of Melvin Johnson in their closing

argument in support of a finding of future danger. RR(V25P45 & 46)

> Does it stop there? No. You know that the comes out of that rec yard, and he
> runs right up there as the aggressor toward Melvin Johnson and starts a fight
> with Melvin Johnson. This wasn't something where we had people agreeing to
> meet out on Main Street at high noon. He charges Melvin Johnson and starts
> to assault him. And sure, Melvin Johnson decides he's going to defend
> himself out there from this man's attack.
>
> The evidence is overwhelming on Special Issue Number 1 that this man will
> be a future threat to society wherever he may be, and he has shown you that as
> clearly as he can possibly show you.

Looking at the record as a whole, and arguments of Counsel, Petitioner contends that there is a reasonably likelihood that the false testimony or the testimony of Melvin Johnson could have affected the juries verdict, i.e. the future danger issue, It can not be said that at least one of the jurors  would have failed to answer yes to the "future danger" special issue.

**CLAIM NUMBER FIVE: PETITIONER, PURSUANT TO MARTINEZ, ALSO ALLEGES THAT POST CONVICTION COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL BY FAILING TO INTERVIEW MELVIN JOHNSON AND BY CONSEQUENTLY FAILING TO RAISE THE ISSUE OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ON COLLATERAL REVIEW BY TRIAL COUNSEL'S FAILURE TO INTERVIEW, INVESTIGATE, AND PRESENT MELVIN JOHNSON'S TESTIMONY AT TRIAL AND DISCOVER THE USE OF THE STATE'S FALSE TESTIMONY.**

**DEFICIENT PERFORMANCE & PREJUDICE**

As previously stated in regard to Claim No. Two, Petitioner contends that pursuant to the *Martinez/Trevino* holding that *Strickland* applies to post conviction Counsel, the fact that a substantial claim was not presented to the State Court and thus has been  procedurally defaulted, constitutes deficient performance.

In addition, if as a result of this deficient performance  a substantial claim is foreclosed from meaningful review,  constitutes prejudice. Petitioner contends that post conviction counsel should have interviewed Melvin Johnson pursuant to ABA Guidelines for

43

Habeas representation and discovered the crux of the Melvin Johnson's testimony and by failing to raise this issue in State Court there was deficient performance. Since there would be no opportunity for meaningful review on this claim, this deficient performance is prejudicial.

### *MARTINEZ/TREVINO EXCUSES ANY PROCEDURAL DEFAULT*

Under Martinez/Trevino a procedural default can be excused when; One the underlying, defaulted, claim was "substantial" which means it has some merit.. Two; there was inadequate counsel- absence of court appointed counsel or Ineffective Assistance of Counsel during the initial review collateral proceeding. Three; "if State collateral review proceeding was the Initial review proceeding to the underlying, defaulted claim and four; state laws is a mater of structure, design and operation does not allow most defendants a meaningful opportunity to develop and present and Ineffective Assistance of Counsel claim or to receive a meaningful review of the merits of that Ineffective Assistance of Counsel on direct appeal.

The last two prongs are of unimportance since *Trevino* held that *Martinez* applied to Texas and consequently, the third and fourth prong are automatically satisfied Thus in order for  *Martinez* /*Trevino* to excuse the procedural bar,  Petitioner has to show (1) that the underlying defaulted claim is substantial and; (2) received Ineffective Assistance of Counsel during the Initial collateral review  proceeding.

 Petitioner contends that both of these elements have been met and consequently, the claims raised in this amended Petition are excused from the procedural bar by *Martinez/Trevino*.

44

## **PRAYER FOR RELIEF**

WHEREFORE Petitioner, Moises Mendoza, by and through Counsel hereby respectfully prays this Honorable Court (1) grant an Evidentiary Hearing on these claims, with the right to present witnesses, testimony and other evidence as well as argument of Counsel.  See *Townsend v. Sane* 372 U.S. 293 (1963); (2) set aside his death sentence or in the alternative grant Petitioner a new sentencing hearing; (3) grant him such other further relief as the court deems just and proper or to which he may otherwise be entitled;(4) commend the warden to bring him before the Court at a time and place specified and take such action on the amendment petition for writ of habeas corpus as the court deems appropriate.

Respectfully submitted,

_____/s/_____

Jeff L. Haas
Attorney at Law
Texas Bar No. 08659600
100 East Ferguson, Suite 908
Tyler, Texas 75702
903-593-8338
903-593-8330 (fax)
jhaas@tyler.net
Attorney for Petitioner
Moises Sandoval Mendoza

## **VERIFICATION**

Under penalty of perjury, I hereby declare that all the factual allegations made herein are true and accurate except for those allegations made upon information and belief. This the 3rd day of November, 2016.

_____/s/_____

Jeff L. Haas


**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing Amended Petition for a Writ of Habeas Corpus

through the Court's CM/ECF system, which will provide electronic notification of the filing

to counsel for all parties on this 3rd day of November, 2016.

1. Tomee.Heining@_texasattoneygeneral.gov


_____/s/_____
JEFF L. HAAS
Jeff L. Haas
Attorney at Law
Texas Bar No. 08659600
100 East Ferguson, Suite 908
Tyler, Texas 75702
903-593-8338
903-593-8330 (fax)
jhaas@tyler.net
Attorney for Petitioner
Moises Sandoval Mendoza