IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| MOISES SANDOVAL MENDOZA, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civ. Act. No. 5:09-cv-00086-RWS |
| | § | ECF |
| LORIE DAVIS, | § | |
| Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |
| | § | |

**RESPONDENT DAVIS'S ANSWER TO FIRST AMENDED PETITION
WITH BRIEF IN SUPPORT**

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*TOMEE M. HEINING
Assistant Attorney General
Criminal Appeals Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400

*Counsel of Record

_____

ATTORNEYS FOR RESPONDENT

_____

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... i

TABLE OF AUTHORITIES ................................................................ iii

RESPONDENT DAVIS'S ANSWER TO FIRST AMENDED PETITION WITH

BRIEF IN SUPPORT ........................................................................... 1

PETITIONER'S ALLEGATIONS ...................................................... 3

STATEMENT REGARDING THE RECORD ................................... 3

STATEMENT OF THE CASE ............................................................ 4

STATEMENT OF THE FACTS .......................................................... 5

   I.   Facts of the Crime. ................................................................. 5

   II.   Evidence Related to Punishment ......................................... 8

     A.   State's evidence .................................................................. 8

     B.   Mendoza's evidence ........................................................ 10

SUMMARY OF THE ARGUMENT ................................................ 14

STANDARD OF REVIEW ............................................................... 15

ARGUMENT ...................................................................................... 19

   I.   Mendoza's IASHC Claims Are Not Cognizable in Federal Court. (Claims

   2 and 5). .......................................................................................... 19

   II.   Mendoza Fails to Present a Substantial IATC Claim Regarding the

   Presentation of Dr. Vigen's Testimony. (Claims 1 and 2) ........................... 21

A.  Mendoza does not present a substantial claim for relief.................. 22

B.  State habeas counsel was not deficient. ............................................ 34

III.  Mendoza's Claim That Trial Counsel Should Have Discovered False Testimony Is Insubstantial and State Habeas Counsel Was Not Deficient for Failing to Pursue These Allegations. (Claims 3, 4, and 5). .......................... 37

A.  *Martinez* does not apply to Mendoza's attempt to raise an unexhausted *Napue* claim. .......................................................................... 39

  1.  *Martinez* does not apply to false-testimony claims........................... 39

  2.  Mendoza cannot prove a *Napue* claim............................................... 41

B.  Mendoza fails to demonstrate a substantial IATC claim for relief.  47

C.  Mendoza fails to prove deficient performance by state habeas counsel. .................................................................................................... 52

CONCLUSION.............................................................................................. 53

CERTIFICATE OF SERVICE......................................................................... 55

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Thaler,* 679 F.3d 312 (5th Cir. 2012) .......................................... 20, 40

*Avila v. Quarterman,* 560 F.3d 299 (5th Cir. 2009) ........................................ 44

*Ayestas v. Stephens*, 817 F.3d 888 (5th Cir. 2016) .......................................... 47

*Blanton v. Quarterman,* 543 F.3d 230 (5th Cir. 2008) ..................................... 50

*Brady v. Maryland,* 373 U.S. 83 (1963) .......................................................... 42

*Buck v. Davis,* 137 S. Ct. 759 (2017) ............................................................... 33

*Canales v. Stephens,* 765 F.3d 551 (5th Cir. 2014) ........................................ 41

*Coleman v. Thompson*, 501 U.S. 722 (1991) .................................. 16, 17, 39, 40

*Crain v. Stephens,* No. 3:15-cv-2476-M-BN, 2015 WL 8165567 (N.D. Tex.,

    Dec. 8, 2015) .................................................................................................. 46

*Dowthitt v. Johnson,* 230 F.3d 733 (5th Cir. 2000) ......................................... 51

*East v. Scott,* 55 F.3d 996 (5th Cir. 1995) ....................................................... 46

*Ex parte Mendoza,* No. 70 (Tex. Crim. App. June 10, 2009) ............................. 4

*Flores v. Stephens,* No. 3:07-CV-0413, 2014 WL 3534989 (N.D. Tex. July 17,

    2014) ............................................................................................................... 20

*Garza v. Stephens,* 738 F.3d 669 (5th Cir. 2013) ............................................ 35

*Gray v. Epps,* 616 F.3d 436 (5th Cir. 2010) ..................................................... 50

*Harrington v. Richter*, 562 U.S. 86 (2011) ..................................... 15, 18, 31, 34

*Herrera v. Collins,* 506 U.S. 390 (1993) .......................................................... 42

*Hill v. Johnson,* 210 F.3d 481 (5th Cir. 2000) ........................................... 44, 46

*Hughes v. Johnson,* 191 F.3d 607 (5th Cir. 1999) ........................................... 43

*In re Sepulvado,* 707 F.3d 550 (5th Cir. 2013) ........................................... 20, 40

*Johnson v. Cockrell,* 306 F.3d 249 (5th Cir. 2002) ........................................... 49

*Jones v. Barnes,* 463 U.S. 745 (1983) ........................................................ 35, 53

*Jones v. Johnson,* 171 F.3d 270 (5th Cir. 1999) ........................................... 17

*Keeney v. Tamayo-Reyes,* 504 U.S. 1 (1992) ...................................................... 17

*Koch v. Puckett,* 907 F.2d 524 (5th Cir. 1990) ........................................... 41, 43

*Kutzner v. Cockrell,* 303 F.3d 333 (5th Cir. 2002) ...................................... 41, 43

*Kyles v. Whitley,* 5 F.3d 806 (5th Cir. 1993) ...................................................... 44

*Kyles v. Whitley,* 514 U.S. 419 (1995) ...................................................... 44

*Lewis v. Thaler,* 701 F.3d 783 (5th Cir. 1997) ............................................... 51

*Martinez v. Ryan,* 132 S. Ct. 1309 (2012) ...................................................passim

*Medellin v. Dretke,* 371 F.3d 270 (5th Cir. 2004) ........................................... 42

*Mendoza v. State,* No. 75 (Tex. Crim. App. Nov. 5, 2008).........................passim

*Mendoza v. Stephens,* 783 F.3d 203 (5th Cir. 2015)...................................... 2, 5

*Mendoza v. Thaler,* No. 5:09-cv-86, 2012 WL 12817334 (E.D. Tex. 2012)........ 8

*Michel v. Louisiana,* 350 U.S. 91 (1955) ...................................................... 22, 35

*Miller-El v. Cockrell,* 537 U.S. 322 (2003) ...................................................... 18

*Moreno v. Dretke,* 450 F.3d 158 (5th Cir. 2006) ........................................... 34

*Muniz v. Johnson,* 132 F.3d 214 (5th Cir. 1998) ........................................... 16

*Murphy v. Johnson,* 205 F.3d 809 (5th Cir. 2000) ........................................... 42

*Napue v. Illinois,* 360 U.S. 264 (1959) ......................................................passim

*Newbury v. Stephens,* 756 F.3d 850 (5th Cir. 2014)...................... 19, 34, 47, 53

*Reed v. Stephens,* 739 F.3d 753 (5th Cir. 2014)................................................ 40

*Rucker v. Norris*, 563 F.3d 766 (8th Cir. 2009) .............................................. 46

*Scheanette v. Quarterman,* 482 F.3d 815 (5th Cir. 2007) .............................. 27

*Schneider v. Estelle,* 552 F.2d 593 (5th Cir. 1977) ......................................... 44

*Segundo v. Davis,* 831 F.3d 345 (5th Cir. 2016)................................... 36, 47, 53

*Sells v. Thaler,* No. SA-08-CA-465-OG, 2012 WL 2562666 (W.D. Tex. June 28, 2012) ............................................................................................................ 40

*Smith v. Robbins,* 528 U.S. 259 (2000) .....................................................passim

*Soria v. Johnson*, 207 F.3d 232 (5th Cir. 2000)............................................... 50

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................passim

*Thompson v. Stephens,* No. , 2014 WL 2765666 (S. D. Tex., June 18, 2014) . 46

*Trevino v. Thaler,* 133 S. Ct. 1911 (2013)......................................... 2, 5, 17, 40

*United States v. Agurs,* 427 U.S. 97 (1976) ........................................ 41, 45, 46

*United States v. Antone,* 603 F.2d 566 (5th Cir. 1979) ................................... 44

*United States v. El-Mezain,* 664 F.3d 467 (5th Cir. 2011).............................. 30

*United States v. Stewart,* 433 F.3d 273 (2nd Cir. 2006) ................................. 45

*Vasquez v. Stephens,* 597 F. App'x 775 (5th Cir. 2015)....................... 35, 36, 40

*Ward v. Whitley,* 21 F.3d 1355 (5th Cir. 1994)................................................ 47

*Wilkerson v. Cain,* 233 F.3d 886 (5th Cir. 2000) .............................................. 42

*Wilkins v. Stephens,* 560 F. App'x 299 (5th Cir. 2014) .................................... 40

*Williams v. Bagley,* 380 F.3d 932 (6th Cir. 2004) ........................................... 46

*Williams v. Taylor,* 529 U.S. 362 (2000) .............................................. 15, 18, 31

## Statutes

28 U.S.C. § 2254 .............................................................................. 1, 15, 16, 20

## Other Authorities

Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) ............... 16

U.S. Const. Amend. VI .......................................................................... 3, 20, 40

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

MOISES SANDOVAL MENDOZA,    §
              Petitioner,    §
                           §
v.                            § Civ. Act. No. 5:09-cv-00086-RWS
                           §         ECF
LORIE DAVIS,           §
Director,               §
Texas Department of Criminal Justice,  §
Correctional Institutions Division,   §
              Respondent.   §
                           §

## RESPONDENT DAVIS'S ANSWER TO FIRST AMENDED PETITION WITH BRIEF IN SUPPORT

Petitioner Moises Sandoval Mendoza was properly convicted and sentenced to death for the brutal capital murder of Rachelle Tolleson. 5 CR[1] 1859-64. Mendoza previously challenged his conviction and sentence in this Court pursuant to 28 U.S.C. § 2254. This Court denied federal habeas relief on September 28, 2012, *see* ECF[1] No. 65, but granted a certificate of appealability (COA) on four claims on December 17, 2012, *see* ECF No. 71.

---

[1]     "CR" refers to the Clerk's Record—the transcript of pleadings and documents filed with the clerk during trial—preceded by volume number and followed by page number.

[1]     "ECF" refers to the Electronic Case Filing system utilized by the Federal District Courts, followed by docket entry number.

While the case was pending in the Fifth Circuit, the Supreme Court decided *Trevino v. Thaler,* 133 S. Ct. 1911 (2013), which held that *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)—holding that the procedural default of a substantial claim of ineffective assistance of trial counsel (IATC) may be excused when the claim was not properly presented at the first opportunity in state court due to the ineffective assistance of state habeas counsel (IASHC)—applies to Texas state habeas proceedings. *See Mendoza v. Stephens,* 783 F.3d 203, 205 (5th Cir. 2015) (Owen, J., concurring). Mendoza moved to stay proceedings in the Fifth Circuit and requested a remand to the district court with instructions to appoint additional federal habeas counsel to investigate the performance of state habeas counsel—who also served as federal habeas counsel—with regard to potential additional IATC claims. *Id.*

The Fifth Circuit stayed those proceedings and remanded this case, in part, with instructions "to appoint supplemental counsel" and "to consider in the first instance whether [Mendoza] can establish cause for the procedural default of any [IATC] claims pursuant to *Martinez* and *Trevino* that he may raise, and if so, whether those claims merit relief." *Id.* at 203-04 (per curiam). This Court appointed supplemental counsel, *see* ECF No. 76, who, after receiving three extensions of time, *see* ECF No. 78-83, filed the instant amended petition, ECF No. 86.

This Court should dismiss Mendoza's amended petition as procedurally barred, deny habeas relief, and deny a COA. Mendoza fails to allege cause or prejudice sufficient to enable this Court to consider the merits of his defaulted claims.

## PETITIONER'S ALLEGATIONS

The Director understands Mendoza to make the following allegations:

1. Trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment by presenting the testimony of Dr. Vigen at the punishment stage of trial.

2. State habeas counsel rendered ineffective assistance on collateral review by failing to raise an IATC claim regarding the presentation of Dr. Mark Vigen's testimony.

3. Trial counsel was ineffective for failing to discover the State's use of potentially false testimony at the punishment phase of trial.

4. Trial counsel rendered ineffective assistance of counsel by failing to interview Melvin Johnson and present his testimony at Mendoza's trial.

5. State habeas counsel rendered ineffective assistance by failing to discover Melvin Johnson and raise an IATC claim regarding his testimony, or discover the State's use of false evidence and present a claim based on it.

ECF No. 86, at 1-2.

## STATEMENT REGARDING THE RECORD

The Director filed a copy of Mendoza's state court record with the Court on March 10, 2011.

## STATEMENT OF THE CASE

Mendoza was indicted for the capital murder of Rachelle Tolleson, who was killed during the course of an attempted burglary, kidnapping, and aggravated sexual assault. 1 CR 20. Mendoza was convicted and sentenced to death in June 2005, by a jury from the 401st Judicial District of Collin County, Texas. 5 CR 1859-64. The Court of Criminal Appeals (CCA) affirmed his conviction and sentence on direct appeal. *Mendoza v. State,* No. 75, 213 (Tex. Crim. App. Nov. 5, 2008), *cert. denied,* 556 U.S. 1272 (2009).

Following direct appeal, Lydia Brandt was appointed to represent Mendoza during his state habeas appeal. Brandt filed a habeas petition raising seven claims, including five IATC claims. *See* SHCR[2] 4-219. The CCA denied state habeas relief on June 10, 2009. *Ex parte Mendoza,* No. 70, 211-01 (Tex. Crim. App. June 10, 2009).

Represented again by Brandt, Mendoza timely filed his federal petition for a writ of habeas corpus on June 2, 2010, ECF No. 6, and filed an amended petition on January 5, 2011, ECF No. 23. Mendoza raised the same seven claims raised on state habeas. As noted, this Court denied federal habeas relief, *see* ECF No. 65, but granted a COA on four claims, *see* ECF No. 71.

---

[2] "SHCR" refers to the Clerk's Record from the state habeas proceeding, preceded by volume number and followed by page number.

Mendoza timely appealed to the Fifth Circuit, which stayed those proceedings and remanded the case, in part, for appointment of "new supplemental counsel," and to consider whether Mendoza can establish cause for the procedural default of any potential IATC claims pursuant to *Martinez* and *Trevino*. The Fifth Circuit retained jurisdiction over the remaining claims. *See Mendoza,* 783 F.3d at 203-04.

## STATEMENT OF THE FACTS

### I.    Facts of the Crime.

This Court previously cited with approval the CCA's recitation of the facts of the crime as follows:

> Sometime after 9:00 p.m. on Wednesday, March 17, 2004, Rachelle Tolleson and her mother Pam O'Neil went to the store to purchase formula and diapers for Tolleson's five-month-old daughter, Avery. Tolleson and Avery visited at the O'Neil home for a short time after returning from the store, but Tolleson did not feel well, had taken medication for a sinus headache, and wanted to be in her own home. Around 10:00 p.m., Tolleson phoned the O'Neils to let them know that she and Avery had arrived home.
>
> Around the same time that evening, Efren Gamez, [Mendoza], and several friends were having a party. Gamez, [Mendoza], and two young women had purchased two thirty-packs of beer and two forty-ounce cans of beer earlier in the evening. At some point, the women left the party and later called to let Gamez and [Mendoza] know that they were not returning. [Mendoza] became angry, and as he drank more beer, he became more belligerent. Eventually, [Mendoza] said something to two other girls at the party that scared them. [Mendoza] told Gamez that he spoke to the girls in that manner "because he could." [Mendoza] left the party and returned several times, finally leaving for the last time between midnight and 1:00 a.m.

The following morning, O'Neil went to Tolleson's home as she often did. Although her car was parked in the driveway, Tolleson was not there. A note from the landlord was taped to the screen door, but the wooden back door stood wide open. O'Neil entered the house and noticed that a pillow had been left on the floor between the kitchen and the bedroom. The bedroom was a mess. Papers were strewn across the floor, the night stand was pulled away from the wall, the mattress and box spring were askew, and the headboard was broken and lying against the bed. Avery was on the bed, cold, wet, and alone in the house.

Alarmed, O'Neil collected Avery and called her husband, who contacted the police. Officer Scott Collins of the Farmersville Police Department responded. Collins confirmed O'Neil's description of the bedroom—things were thrown everywhere and furniture was out of place. To Collins, it looked as though there had been a fight, or a tornado, in the bedroom. The rest of the house was orderly, and there were no signs of a forced entry.

Farmersville police began interviewing potential witnesses that day. They learned that, on the Friday before her disappearance, Tolleson hosted a party for about fifteen people, including [Mendoza]. During the party, Tolleson spoke with [Mendoza] a few times but told her best friend Megan Kennedy that she wasn't interested in [Mendoza] in "that way." Police also learned that, on the Saturday before Tolleson's disappearance, Kennedy's boyfriend Tim Holland returned to Tolleson's home with [Mendoza] and Cody Wiltbanks to retrieve his musical instruments, but Tolleson wasn't home, and the doors were locked. While Holland and Wiltbanks went around the house looking for a way in, [Mendoza] managed to open the locked back door. After learning this, Collins interviewed [Mendoza], who told Collins that he had last seen Tolleson at the party. Collins noted that [Mendoza] could not sit still and seemed very nervous.

Search parties were organized to look for Tolleson but were unsuccessful. Six days after Tolleson disappeared, James Powell was hunting for arrowheads near Brushy Creek, east of Farmersville. Walking along the creek, he came across a body that had been burned and was lying face down. Through the use of

dental records, the body was eventually identified as Tolleson's. Jerry Farmer, an FBI evidence technician who was one of the first on the scene, noted that tall vegetation had been piled on top of Tolleson's body in an attempt to cover it. Her body was badly burned and had begun to decompose. Fly eggs and maggot activity around her head and neck indicated that she had been there for at least two days. Her skin was charred black in places and seared yellow in others where her flesh had split apart. Most of her hair had been burned away. Scraps of burned clothing clung to her upper torso, but no clothing was found below her waist.

An orange rope was tied around Tolleson's right ankle, and two grommets from a tarp were lying on the back of her left leg and head. Burnt pieces of tarp and skin were found on a path leading to Tolleson's body, indicating that she had been dragged or carried to that spot. A short distance from where the body was discovered, steps led to a dugout under a tall tree where investigators found evidence that something had been burned. Evidence technicians found ashes, firewood, a clump of hair, pieces of tarp and skin, and orange rope like that found tied around Tolleson's ankle.

Dr. William Rohr, the medical examiner, testified that Tolleson had sustained a five-inch diameter bruise on her left knee, a smaller bruise on the front of her left thigh, bruises on either side of her tongue, a large amount of hemorrhage deep in her left shoulder, and several bruises on her scalp ranging in diameter from three quarters of an inch to three inches. A deep wound, consistent with injury from a knife, penetrated her neck all the way to her spinal column, and her body had been burned post-mortem. Rohr determined that Tolleson's death was consistent with strangulation or another form of asphyxiation.

After further interviews with potential witnesses, police obtained an arrest warrant for [Mendoza]. Once in custody, [Mendoza] told police that, late Wednesday evening, he had driven by Tolleson's house and had seen a light on. He backed his truck into the driveway and let himself into the house through the back door without knocking. According to [Mendoza], Tolleson left with him to get a pack of cigarettes. [Mendoza] drove "for a little" and then "for no reason" started to choke Tolleson. Tolleson passed out, and [Mendoza] drove to a field behind his home, where he had

sexual intercourse with Tolleson and "choked her again." [Mendoza] then dragged Tolleson out of the truck and into the field, where he choked her until he thought she was dead. To "make sure," he "poked her throat" with a knife. [Mendoza] left Tolleson's body in the field until Monday, after he was first interviewed by police. Scared that Tolleson's body would be found and tied to him, [Mendoza] moved the body to a remote area and burned it, ultimately dragging it to where it was found.

ECF 52 (Report and Recommendation of Magistrate) (hereinafter cited as

*Mendoza v. Thaler,* No. 5:09-cv-86, 2012 WL 12817334, *1-2 (E.D. Tex. 2012))

(citing *Mendoza v. State,* 2008 WL 4803471, at *1-2).

## II.    Evidence Related to Punishment

### A.    State's evidence

The CCA also summarized the facts related to punishment:

The jury heard the facts of the offense: [Mendoza] took Tolleson from her home, leaving behind a five-month-old baby without care or protection. [Mendoza] choked Tolleson to unconsciousness "for no reason," sexually assaulted her, then choked her again with the intention of killing her, and finally stabbed her to make certain she was dead. [Mendoza] left Tolleson's body in a field until he feared authorities would find it and link the murder to him. He moved the body to a desolate area and, while attempting to burn it, he chatted on his cell phone with friends.

Two of [Mendoza's] high school teachers testified that [Mendoza] had been smart, but unmanageable. [Mendoza] was disrespectful to female teachers, lost control, and became very angry at times. [Mendoza's] neighbors testified that they had witnessed [Mendoza] physically attack his mother and sister. [Mendoza] had also stolen money from his brother.

The jury also heard of [Mendoza's] often violent and callous behavior. When Robert Ramirez confronted [Mendoza] about

having put a pill in a girl's drink at a party, [Mendoza] pulled a knife on Ramirez and threatened to stab him in the stomach. At another party, [Mendoza] sexually assaulted [a fourteen-year-old victim] twice, once while a friend videotaped the encounter. [Mendoza] later laughed as the footage of him assaulting [the fourteen-year-old] was shown at a party. When Sarah Benedict repeatedly asked [Mendoza] for a cigarette while the two sat next to each other at another party, he responded by nearly choking her to unconsciousness. He stopped only when two young men pulled him away from Sarah. The jury heard of how [Mendoza] intentionally threw a boy down onto a trampoline and "stomped" on the boy's mouth without any sign of remorse. When two young women disagreed with [Mendoza] about a camping tent, he threatened to cut their throats with a rusty saw.

The State also presented evidence from the complainants from two different aggravated robbery offenses. Melissa Chavez and Nhat Vu testified that [Mendoza] had pulled a gun on them and stolen their cars and belongings. Chavez testified that [Mendoza] attempted to force her into the trunk of the car, and Vu testified that [Mendoza] had driven away taking Vu's friend, Lian Trinh, with him. Officer Scott Kermes of the Plano Police Department testified that [Mendoza] was issued a criminal trespass warning after police responded to a disturbance call regarding threats being made and that a machete was found in [Mendoza's] vehicle. While [Mendoza] was being supervised by the Dallas County probation department and was on electronic monitoring, [Mendoza] cut the monitor from his ankle and stopped reporting to the probation officer.

Finally, the jury heard how [Mendoza] behaved while awaiting trial in the Collin County Jail. [Mendoza] created weapons and refused to take his medication as prescribed. During his recreation time, [Mendoza] subverted the jail's security doors and attacked another prisoner.

*Mendoza v. State,* No. 75, 213, slip op. at 10-12.

## B. Mendoza's evidence

The defense presented testimony from the six members of Mendoza's immediate family—his mother, Mercedes, his father, Concepcion, sisters Elizabeth and Ruthie, and brothers Mario and Paul. Mendoza's family provided testimony regarding their father's injury and inability to work; his resulting depression, suicide attempts, and hospitalizations; and the negative impact this had on the family, and especially on Mendoza. 23 RR[3] 84-91 (Mercedes Mendoza); 23 RR 141-45 (Concepcion Mendoza); 23 RR 167-68, 172-74 (Mario Mendoza); 23 RR 220-24 (Paul Mendoza); 24 RR 92-94 (Elizabeth Palos). The family also testified that Mendoza was sad and depressed when his older brothers and sister left the house. 23 RR 170-72 (Mario); 24 RR 94-95 (Elizabeth). Additional testimony revealed that the younger children—especially Mendoza—got away with a lot more than the older children had been allowed to, and Mendoza had special rules. 23 RR 174-76 (Mario); 23 RR 200 (Ruthie Mendoza). Several family members testified regarding the negative impact Mendoza's cousin, Jorge—who drank and refused to obey family rules—had on Mendoza during the time he stayed with the family, and how they believed Jorge may have molested or sexually assaulted Mendoza. 23 RR 103-08 (Mercedes); 23 RR 146-48 (Concepcion); 23 RR 178-82 (Mario).

---

[3] "RR" refers to the Reporter's Record of the transcribed state trial proceedings.

Also, testimony demonstrated that Mendoza started withdrawing from the family and became depressed and disrespectful when he started dating ex-girlfriend Amy Lodhi and spending time with new friends, who the family believed were bad influences. 23 RR 109-15 (Mercedes); 23 RR 150-51 (Concepcion); 23 RR 176-77, 184-87 (Mario); 23 RR 202-12 (Ruthie); 23 RR 226-31 (Paul); 24 RR 98-100 (Elizabeth). The family also indicated that Mendoza may have started using drugs or alcohol at this time, although few family members were willing to conclusively say he was using alcohol and drugs. 23 RR 108 (Mercedes); 23 RR 150, 157-58 (Concepcion); 23 RR 183-84 (Mario); 23 RR 203 (Ruthie); 23 RR 228 (Paul); 24 RR 97-98 (Elizabeth).

The defense also presented Dr. Vigen as an expert witness. In forming his opinions, Dr. Vigen spent thirteen hours interviewing Mendoza, interviewed Mendoza's immediate family members, and spoke with his high school principal and a teacher. Dr. Vigen also reviewed police reports, witness statements, Mendoza's police confessions, and Mendoza's disciplinary records and medical records from the jail; and reviewed school and work records, Concepcion Mendoza's medical records from his hospitalization for suicide attempts and depression, and Mendoza's mental health records from the same clinic. 24 RR 114-16. From this investigation, Dr. Vigen testified that he formed six opinions regarding Mendoza. First, Mendoza "was an immature, psychologically under-developed adolescent-like man who ha[d] no internal

sense of himself." 24 RR 117-18. Dr. Vigen testified that this immaturity led to attention-seeking behavior, which could explain his bad behavior while incarcerated. 24 RR 119-21. Even though Mendoza was twenty-one years old, the brain is not fully developed until twenty-four or twenty-five years so he was still engaging in adolescent behaviors. 24 RR 132-33.

Second, Dr. Vigen believed Mendoza came from a psychologically dysfunctional family. 24 RR 121. While Dr. Vigen felt Mendoza came from a good family, he explained that Concepcion Mendoza suffered from a major depression early in Mendoza's life that took him away from the family and away from being a strong father figure. 24 RR 121-22, 125. Therefore, the rules that applied to the older children did not apply to Mendoza. 24 RR 122. Additionally, Mendoza's mother taught him to be "sneaky" in that she covered for him, minimized his problems, and took away negative consequences. 24 RR 122. Thus Mendoza never experienced consequences of his negative behavior and had a sense of entitlement. 24 RR 123. Dr. Vigen later expounded that Mendoza did not attach to his father—he did not connect emotionally to him— and thereby failed to develop his father's values. 24 RR 187. Dr Vigen also testified that Concepcion's depressive disorder increased the possibility that Mendoza, as a first-degree relative, was predisposed to alcohol dependency. 24 RR 189-90.

Third, Dr. Vigen believed Mendoza's behavior changed radically for the worse when he started drinking and using marijuana. 24 RR 123. This began when he associated with a new group of friends in high school who accepted him. 24 RR 123. It was during this time that Mendoza committed crimes, spent time in jail, and was placed on the electronic monitor, which he eventually cut off. 24 RR 125. This new peer group also figured into Dr. Vigen's fourth opinion—that Mendoza's new friends lived a depraved, disrespectful, aggressive, drug-and-alcohol lifestyle, and participated in empty sexuality. 24 RR 126.

Fifth, Dr. Vigen opined that the Texas Department of Criminal Justice (TDCJ) has the expertise and capability to house and incarcerate Mendoza in such a manner that he would pose a low or minimum risk of future violence while in prison. 24 RR 127. This opinion was based upon his research on TDCJ, statistical data indicating a low incidence of assaultive behavior against officers, and discussions with S. O. Woods—former assistant director of classifications for TDCJ—as well as Dr. Vigen's own experience working for the Louisiana State Prison at Angola, where violent prisoners are held. 24 RR 127-29.

Finally, Dr. Vigen opined that Mendoza had the potential to develop a sense of self, and a potential for rehabilitation and spiritual conversion in prison. 24 RR 129-30. This opinion derived from the fact that Mendoza did well

and graduated from high school, completed secondary school training for which he received a scholarship, was raised in a devout Catholic family, and even went to confession. 24 RR 130. Also, Mendoza's letters to Dr. Vigen indicated the beginnings of remorse for what he has done. 24 RR 130-31. If Mendoza was in a controlled environment where he experienced consequences for bad behavior and rewards for productive behavior, Dr. Vigen believed there was potential for Mendoza to develop an understanding of what he has done and find some sort of redemption or salvation. 24 RR 131-32.

Additionally, Stacie Garcia testified about Mendoza's remorse over the crime, 23 RR 14-22, and that he was depressed because of his ex-girlfriend, 23 RR 23-25. Father Paul Weinberger testified that Mendoza came to him for confession shortly after the murder, he continued to counsel him after he had been arrested, and he had seen an improvement in his demeanor and attitude. 23 RR 41-42.

## SUMMARY OF THE ARGUMENT

To the extent Mendoza raises stand-alone IASHC claims, (Claims 2 and 5), those claims are not cognizable in federal habeas corpus review. Regarding Mendoza's remaining IATC claims (Claims 1, 3, and 4), he fails to demonstrate a substantial claim for relief, or that state habeas counsel was ineffective for failing to present the claim on state habeas review. And, in Claim 3, Mendoza

actually raises a false-testimony claim, pursuant to *Napue v. Illinois,* 360 U.S. 264 (1959); *Martinez* does not excuse the procedural default of this non-IATC claim. Because Mendoza fails to offer sufficient cause or prejudice to overcome the procedural default of these claims in federal court, this Court should dismiss claims as barred without reaching the merits.

## STANDARD OF REVIEW

Mendoza, confined pursuant to a state-court judgment, is entitled to federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under 28 U.S.C. § 2254(d), a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claims by the state court (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court; or (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting (*Terry*) *Williams v. Taylor,* 529 U.S. 362, 412 (2000)); *see also* 28 U.S.C. § 2254(d).

This amended petition involves only claims that were *not* adjudicated in state court. Habeas relief is inappropriate for claims that are unexhausted and procedurally defaulted, or claims that were exhausted but dismissed in a

successive state habeas application and, thus, are also procedurally defaulted.

Indeed, under AEDPA,[4] a federal habeas application shall not be granted

unless:

> (A)  the applicant has exhausted the remedies available in the courts of the State; or

> (B)  (i) there is an absence of available State corrective process; or

>       (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). Moreover, a writ may be denied on the merits,

notwithstanding any failure to exhaust available state court remedies. 28

U.S.C. § 2254(b)(2).

To avoid a procedural default of a claim in state court, a petitioner must

assert cause for failing to bring the unexhausted claims in the first state

habeas proceeding and prejudice, or that failure to consider the claim will

result in a "fundamental miscarriage of justice."[5] *See Coleman v. Thompson*,

501 U.S. 722, 749-50 (1991); *see also Jones v. Johnson*, 171 F.3d 270, 277 (5th

---

[4]  Anti-Terrorism and Effective Death Penalty Act of 1996.

[5]  To demonstrate a "fundamental miscarriage of justice," the petitioner must demonstrate actual innocence, *Muniz v. Johnson,* 132 F.3d 214, 221 n.12 (5th Cir. 1998), which Mendoza does not allege in this amended writ. However, in his first federal writ, Mendoza argued that he was actually innocent of capital murder, and thus his conviction and sentence of death violated the Fourteenth Amendment because he lacked the necessary mens rea for conviction of capital murder. ECF No. 23, at 81. This Court adopted the Magistrate's recommendation that the state court's prior rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. ECF No. 52, at 14; ECF No. 64, at 6.

Cir. 1999) (citing *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)). Traditionally, the ineffectiveness of state habeas counsel did not serve as cause to excuse the procedural default of a claim because there is no constitutional right to counsel in state habeas proceedings. *See Coleman*, 501 U.S. at 754-56. However, in *Martinez*, the Supreme Court carved out a limited—and equitable as opposed to constitutional—exception to the general rule that IASHC will not constitute cause to excuse a procedurally defaulted claim. 132 S. Ct. at 1319. The Court held that where state law provides that "initial-review collateral proceedings" are the first place IATC claims may be raised, a petitioner may allege that counsel at the initial-review stage was ineffective. *Id*. at 1318. The Court was careful to emphasize, though, that this rule "does not extend to attorney errors in any proceedings beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance of trial counsel, even though that initial-review collateral proceeding may be deficient for other reasons." *Id*. at 1320. In *Trevino*, the exception created in *Martinez* was extended to all habeas cases, including Texas. 133 S. Ct. at 1921.

To overcome procedural default under *Martinez*, Mendoza must establish not only "cause"—the deficient performance of state habeas counsel—but also "prejudice" by demonstrating the merits of his underlying claims. 132 S. Ct. at 1318-19. The *Martinez* Court specifically noted that "[t]o overcome the default, a prisoner must also demonstrate that the underlying [IATC] claim is

a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

To demonstrate deficient performance, as required under *Strickland v. Washington*, Mendoza must show that counsel's conduct fell beyond the bounds of prevailing, objective professional standards. 466 U.S. 668, 688 (1984). However, there is a presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. "[T]he standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. The question for the reviewing court to ask is whether counsel's performance "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Id.* (citing *Strickland,* 466 U.S. at 690). "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Additionally, to prove prejudice, Mendoza must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Terry*) *Williams*, 529 U.S. at 391 (citing *Strickland*, 466 U.S. at 694). The "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

This *Strickland* standard applies to both IATC and IASHC claims. *See Smith v. Robbins,* 528 U.S. 259, 285 (2000). While Mendoza contends that he

need not show prejudice to prove IASHC, *see* ECF No. 86, at 31-33, controlling Fifth Circuit precedent disagrees. To establish prejudice from state habeas counsel's performance, Mendoza must demonstrate "a reasonable probability that he would have been granted state habeas relief" had he presented the unexhausted claim. *See Newbury v. Stephens,* 756 F.3d 850, 872 (5th Cir. 2014) (To establish IASHC, petitioner must show both that habeas counsel's performance was deficient and that he was prejudiced by habeas counsel's performance, i.e., "there is a reasonable probability that he would have been granted state habeas relief had the evidence been presented in the state habeas proceedings."); *see also Robbins,* 528 U.S. at 285 (petitioner must demonstrate prejudice from appellate counsel's failure to file a claim by demonstrating reasonable probability he would have prevailed on appeal).

## ARGUMENT

### I. Mendoza's IASHC Claims Are Not Cognizable in Federal Court. (Claims 2 and 5).

As an initial matter, Mendoza cites, as independent claims for relief, the ineffectiveness of state habeas counsel for failing to raise an IATC claim regarding the presentation of Dr. Vigen's testimony, for failing to discover Melvin Johnson and raise an IATC claim regarding his testimony, and for failing to discover the State's use of false evidence and present a related claim.

*See* ECF No. 86, at 27-33, 43-45. However, free-standing IASHC claims are not cognizable on federal habeas review.

A free-standing allegation of ineffective assistance of postconviction counsel does not raise a constitutional ground for relief, and no Supreme Court decision has changed that determination. In fact, *Martinez* specifically noted that the decision was an "equitable ruling" and not a "constitutional ruling," 132 S. Ct. at 1319, and reaffirmed that "the ineffectiveness or incompetence of counsel during Federal or State collateral postconviction proceedings shall not be a ground for relief." *Id.* at 1320 (citing 28 U.S.C. § 2254(i)); *see also In re Sepulvado*, 707 F.3d 550, 554 (5th Cir. 2013) ("To the extent that Sepulvado relies on a supposed constitutional right to the effective assistance of post-conviction counsel, he misapprehends the holding and import of *Martinez,* which did not alter our rule that 'the Sixth Amendment does not apply in habeas proceedings.'"); *Adams v. Thaler,* 679 F.3d 312, 316 (5th Cir. 2012) (recognizing *Martinez* was "an 'equitable ruling,' and not a constitutional ruling"); *Flores v. Stephens,* No. 3:07-CV-0413, 2014 WL 3534989, at *11 (N.D. Tex. July 17, 2014) (unpublished) (*Martinez* "did not ultimately recognize . . . a new constitutional right that could support a free-standing claim [to effective assistance of state habeas counsel] in federal habeas proceedings").

"[28 U.S.C.] § 2254(i) precludes [a petitioner] from relying on the ineffectiveness of his postconviction attorney as a 'ground for relief[.]'"

*Martinez,* 132 S. Ct. at 1320. Therefore, to the extent Mendoza attempts to raise a free-standing IASHC claim, that claim is not cognizable on federal habeas review.

## II. Mendoza Fails to Present a Substantial IATC Claim Regarding the Presentation of Dr. Vigen's Testimony. (Claims 1 and 2)

Mendoza alleges that trial counsel performed in an unconstitutionally deficient manner by presenting Dr. Mark Vigen's testimony at the punishment stage of trial. ECF No. 86, at 3-27. Mendoza contends that, while Dr. Vigen provided expert testimony on Mendoza's lack of future dangerousness if sentenced to life in prison, his testimony opened the door to damaging cross-examination by the State, and gave the State access to Dr. Vigen's notes which contained damaging information previously unknown to the State. ECF No. 86, at 19-20.

Mendoza acknowledges that this claim is unexhausted but argues exhaustion should be excused because of the deficient performance of state habeas counsel in failing to raise the claim in the state court. ECF No. 86, at 27-33. As noted, to overcome a procedural default under *Martinez*, Mendoza must establish both the deficient performance of state habeas counsel as cause, and a substantial claim for relief as prejudice. *Martinez,* 132 S. Ct. at 1318-19. Mendoza fails to meet this standard, thus his claim should be dismissed as unexhausted.

**A.   Mendoza does not present a substantial claim for relief.**

To overcome a procedural default under *Martinez,* Mendoza must demonstrate that his underlying IATC claim is substantial, or "has some merit." *Martinez,* 132 S. Ct. at 1318-19. This he fails to do.

To prove deficient performance of trial counsel, Mendoza must demonstrate that counsel's performance "fell below an objective standard of reasonableness," considering all the circumstances. *Strickland,* 466 U.S. at 688. But the reviewing court must avoid second-guessing counsel's assistance after conviction. *Id.* at 689.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland,* 466 U.S. at 689 (citing *Michel v. Louisiana,* 350 U.S. 91, 101 (1955)). Counsel's function "is to make the adversarial testing process work," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Id.*

Mendoza argues that, through Dr. Vigen, the defense opened the door to cross-examination admissions that Mendoza had no sense of self, had superficial remorse, was impulsive with a violent temper that cannot be controlled, was violent towards his family and others, and was a thief, a liar, and someone who takes pride in out-smarting guards. Also, Mendoza's behavior started at an early age, he was an extremely dangerous person, and he had a bizarre fantasy involving imprisoning people. ECF No. 86, at 19. Mendoza argues that trial counsel made the decision to proffer Dr. Vigen's testimony without sufficient investigation and without any reasonable strategic basis. ECF No. 86, at 25. But the record belies Mendoza's assertions.

Trial counsel explained their mitigation strategy through affidavits on state habeas and interrogatories submitted during Mendoza's initial federal habeas proceeding. Specifically:

> Our strategy based on an in-depth investigation of [Mendoza's] background, was that he came from a strict family. That [Mendoza's] formative years were affected by his father's absence (due to depression and suicide attempts). That the father's inability to be a parent to his son caused [Mendoza] to find a destructive crowd that accepted him. This new group of friends indulged in depraved behavior, and this became his new value system (unlike his brothers and sisters). That this new value system led him to where he is today, but that this could be controlled in prison and eventually lead to some redemption in his life.

4 SHCR 1471; *see also* Amend. Pet. Exhibit 4A and 4B,[6] #20; Amend. Pet. Exhibit 5A&B,[7] #4. The ultimate mitigation strategy was to offer an explanation for Mendoza's conduct, not an excuse. 4 SHCR 1474. This strategy was formulated after an "in-depth investigation of [Mendoza's] background." 4 SHCR 1471, 1473-74, 1476; *see also* Amend. Pet. Exhibits 3A and 3B,[8] 4A and 4B, 5A&B, and 6A and 6B.[9]

Dr. Vigen was the focal expert for the defense, 4 SHCR 1470, 1473, and the only expert—for either side—to testify at the punishment phase of trial. Trial counsel made the decision to use only Dr. Vigen as a testifying expert because Dr. Vigen had a good rapport with juries. 4 SHCR 1470, 1473. Furthermore, trial counsel wanted to limit the "parade of experts" before the jury because responses to juror questionnaires indicated a negative reaction to defense experts. 4 SHCR 1470. Other experts assisted Dr. Vigen in developing his opinion, but did not testify. 4 SHCR 1473-75.

Dr. Vigen's testimony provided the jury with the only potential explanation for Mendoza's bad behavior. Dr. Vigen testified that Mendoza "was an immature, psychologically under-developed adolescent-like man who ha[d]

---

[6]   Interrogatories and answers of trial counsel Juan Carlos Sanchez.

[7]   Interrogatories and answers of trial counsel Angela Ivory Tucker.

[8]   Interrogatories and answers of investigator Vince Gonzalez.

[9]   Interrogatories and answers of Dr. Mark Vigen.

no internal sense of himself," and this immaturity led to attention-seeking behavior. 24 RR 117-21. Mendoza's brain would not be fully developed until he was twenty-four or twenty-five years old, 24 RR 132-33, suggesting this was temporary condition and, once he reached maturity, he may stop the attention-seeking behaviors. Dr. Vigen next opined that Mendoza comes from a psychologically dysfunctional family. 24 RR 121. Because of his father's depression Mendoza did not have the same strong father figure as his siblings, 24 RR 121-22, 125; he was not subject to the same rules as his siblings, 24 RR 122; and his mother taught him to be "sneaky" by covering for him, minimizing his problems, and taking away negative consequences, 24 RR 122. Also, his father's depressive disorder increased the possibility that Mendoza was predisposed to alcohol dependency. 24 RR 189-90. Finally, Dr. Vigen testified that Mendoza's criminal behavior began around the time he began using alcohol and marijuana and hanging around with a new group of friends. 24 RR 123-25. This new peer group lived a depraved, disrespectful, aggressive, drug-and-alcohol lifestyle, and participated in empty sexuality. 24 RR 126.

But Dr. Vigen also testified that Mendoza would pose a low or minimum risk of future violence while in prison. 24 RR 127. He explained that TDCJ has the expertise and capability to house and incarcerate Mendoza so that he would not be a future-danger risk. 24 RR 127-29. Also, Dr. Vigen opined that Mendoza had the potential to develop a sense of self, and the potential for

rehabilitation and spiritual conversion in prison. 24 RR 129-31. If Mendoza was in a controlled environment where he experienced consequences for bad behavior and rewards for productive behavior, Dr. Vigen believed Mendoza could develop an understanding of what he had done and find some sort of redemption or salvation. 24 RR 131-32.

Trial counsel supported their mitigation defense and Dr. Vigen's testimony with testimony from six members of Mendoza's immediate family who testified about Mendoza's father's depression and how Mendoza had been negatively influenced by his new group of friends. 23 RR 53-237; 24 RR 88-99; *see* 4 SHCR 1776, #24(a). And trial counsel cross-examined members of Mendoza's social group during guilt/innocence about their parties and the availability of drugs and alcohol. 19 RR 189-99, 219-20, 246-47; 22 RR 48-49, 52, 63-66. Dr. Vigen's opinion that Mendoza's showed potential for redemption and salvation was confirmed by testimony from Stacie Garcia that Mendoza felt remorse after the murder, 23 RR 14-22; and Father Weinberger that Mendoza came to him for confession after the murder, and that the priest had continued to counsel Mendoza and had seen improvement in Mendoza's demeanor and attitude. 23 RR 41-42. During closing arguments, trial counsel argued that Mendoza's depression, alcohol and drug abuse, empty sexuality, and unhealthy relationships with his ex-girlfriend and his depraved peer group caused his life to "spiral[] to [the] tragic event" of Rachelle's murder. 25 RR

32-39; 4 SHCR 1776, #24(c). In short, trial counsel developed and presented a compelling mitigation case to jury.

When deciding other IATC claims, the state habeas court and this Court found trial counsel's mitigation strategy reasonable. *See* ECF No. 52, at 15-16, 20-21 (Report and Recommendation of Magistrate); ECF No. 64, at 6-7, 9 (Memorandum Opinion); 4 SHCR 1811-13, ##207-16; 1819, #245; 1826-27, #282; 1835-45. A reasonable strategy should not be second-guessed in hindsight. *Strickland,* 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.") Mendoza does not now suggest an alternative to this strategy or the presentation of Dr. Vigen's testimony.[10] But regardless, while another attorney may have pursued another defense, "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. Deference should be afforded to reasonable, strategic decisions of counsel. *See Scheanette v. Quarterman,* 482 F.3d 815, 820-22 (5th Cir. 2007) (strategic decision to present expert testimony that petitioner exhibited 18.8% chance of committing

---

[10]    In his initial federal habeas application, Mendoza argued that counsel should have presented evidence of an "attachment disorder" and "catathymic homicide." But, as argued by the Director, those theories are not credible and were not supported by the record. ECF No. 39, at 31-49, 114-27.

acts of violence in prison, which State exploited on cross-examination, was reasonable given no other evidence available to rebut State's evidence establishing petitioner was a brutal murderer and serial rapist).

Regarding Mendoza's argument that the State was able to obtain Dr. Vigen's notes containing information that would not have been available absent his testimony, ECF No. 86, at 19, a similar argument has already been rejected. During his initial state and federal writ, Mendoza argued that Dr. Vigen's testimony was more harmful than helpful because, by acting as an investigator and an expert witness, all his notes were made available to the State. ECF No. 34, at 99, 126; *see also* 1 SHCR 386-87 (Affidavit of Toni Knox). But trial counsel explained that Dr. Vigen's "dual role" did not provide the prosecution with any information not already known to it and that the State was prepared to present in rebuttal. 4 SHCR 1474. Trial counsel decided it was better to hear the information explained by their own witness, rather than from the State as rebuttal, and it made Dr. Vigen appear honest in front of the jury when he could explain the bad with the good. 4 SHCR 1474**.** The state habeas court agreed that trial counsel's decision was reasonable. 4 SHCR 1800, #147-148.

This explanation and state-court findings apply to the present claim. Trial counsel knew that Dr. Vigen's notes would be made available to the State but nevertheless made a strategic decision to present Dr. Vigen's testimony

and allow him to explain the bad with the good. Again, Dr. Vigen's testimony was the only expert testimony to explain Mendoza's behavior, and the only testimony rebutting the State's future dangerousness evidence. Mendoza fails to rebut the reasonableness of trial counsel's decision to present Dr. Vigen's testimony, even though the notes would be made available to the State. *See Strickland,* 466 U.S. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.")

Mendoza complains that, from Dr. Vigen's notes, the State learned of Mendoza's delinquency during his early years, including instances of theft from family and as the manager of the football team, instances of violence towards his mother and sister, and Mendoza's fantasy about imprisoning and torturing people. ECF No. 86, at 19. But the jury had already heard, from a State's witness, that Mendoza had physically attacked his mother and sister. 22 RR 38-41. The jury also heard, from Mendoza's teachers that he was unmanageable, disrespectful to women, and had a bad temper. 22 RR 14-19, 28-32; *see also* 22 RR 216. And the jury knew of Mendoza's delinquency at a young age; at the time of the crime, he was only twenty years old, but had an extensive, increasingly violent criminal history. *See Mendoza,* No. 75,213, slip op. at 10-12. Finally, on cross-examination of Mendoza's brother, Paul, the jury heard that Mendoza stole over two-thousand dollars from him. 23 RR 235-37.

This evidence came out before Dr. Vigen testified and before the State had access to his report. Thus, trial counsel's assertion that the State already knew of this evidence and was prepared to use it was correct. *See* 4 SHCR 1474.

While the State may have learned from Dr. Vigen's report that Mendoza stole money from the football team, the jury had already heard he was a thief through his brother Paul's cross-examination, and from the evidence that Mendoza committed at least two aggravated robberies. *See* 22 RR 133-44, 151-58, 165-80. And while the State may not have learned of the imprisonment/torture fantasy without Dr. Vigen's report, this fantasy pales in the comparison to the actual torture and violence he inflicted upon Rachelle Tolleson, or the torture and humiliation of the fourteen-year-old girl that he sexually assaulted and videotaped at a party. *See* 22 RR 209-14, 225-36. Mendoza was simply not prejudiced by the State's discovery and presentation of this cumulative evidence. *Cf. United States v. El-Mezain,* 664 F.3d 467, 526 (5th Cir. 2011) ("It is well established that error in admitting evidence will be found harmless when the evidence is cumulative, meaning that substantial evidence supports the same facts and inferences as those in the erroneously admitted evidence.")

Mendoza also fails to prove prejudice from the State's reliance on Dr. Vigen's testimony in closing arguments to support an affirmative answer to the future dangerousness issue. ECF No. 86, at 26-27. Mendoza contends that

there exists a "reasonable possibility" that, absent Dr. Vigen's testimony, at least one juror would have returned a life sentence. ECF No. 86, at 27. But *Strickland* requires more than just a "possibility;" Mendoza must demonstrate "a reasonable *probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *(Terry) Williams*, 529 U.S. at 391 (citing *Strickland*, 466 U.S. at 694) (emphasis added). "The likelihood of a different result must be substantial, not just conceivable." *Richter,* 562 U.S. at 112.

As noted, trial counsel thoroughly investigated this case and developed and presented a very compelling case for mitigation: Mendoza's bad behavior coincided with his siblings' departure from the home and his father's injury and resulting depression; Mendoza came from a psychologically dysfunctional family and suffered from a lack of attachment to his father; and because of a lack of structure, Mendoza began associating with and sought acceptance from a bad crowd. Also, Mendoza's twenty-year-old brain was not fully developed, and he was engaging in immature, attention-seeking behaviors. Trial counsel supported this defense with Dr. Vigen's expert testimony, as well as testimony from Mendoza's family, and cross-examination of Mendoza's friends. During closing arguments, trial counsel argued their strategy to the jury, asking them to spare Mendoza's life.

Dr. Vigen offered the only expert testimony at the punishment phase trial, the only possible explanation for Mendoza's behavior, and the only evidence that Mendoza would not present a future danger to society if incarcerated for life. While the State made several brief references to Dr. Vigen's testimony during closing argument, *see* 25 RR 21, 25, 44-45, 47, the State's closing focused predominantly on the facts of the murder, Mendoza's escalating criminal behavior prior to the murder, and his potential for future dangerousness. *See* 25 RR 20-28, 40-50. This evidence included the assault of his mother and sister over the car keys, the robbery of three college students with what they thought was a gun, the sexual assault and humiliation of a fourteen-year-old girl, and the attempted strangulation of another girl because she asked for a cigarette. 22 RR 38-44, 46-48, 132-34, 152-57, 209-14, 232-34; 23 RR 214; 24 RR 162-63. Mendoza also threatened to stab an acquaintance in the stomach after the acquaintance confronted him about putting a pill in a girl's drink, intentionally threw a boy down onto a trampoline and "stomped" on his mouth without any sign of remorse, and, when two young women disagreed with Mendoza about a camping tent, he threatened to cut their throats with a rusty saw. 19 RR 170-73, 212-14; 22 RR 59-62, 214-16. He murdered Tolleson shortly after this last incident.

In addition, the jury heard that, while on probation in Dallas County, Mendoza cut the electronic monitor from his ankle and stopped reporting to

the probation officer. Also, while awaiting trial in the Collin County Jail, Mendoza created weapons and refused to take his prescribed medication. And during his recreation time, Mendoza subverted the jail's security doors and attacked another prisoner. *Mendoza,* No. 75,213, slip op. at 10-12. While Dr. Vigen was cross-examined on the fact that Mendoza was impulsive, had a violent temper, was violent towards his family and others, was a liar, and that his behavior started early in life, these facts were already apparent from the evidence presented at trial. Without Dr. Vigen's expert testimony, the jury would be left with no explanation for why Mendoza became a violent killer, nor would the jury have any evidence suggesting he would not present a future danger if incarcerated for life. Given the brutal facts of the crime, and the evidence of Mendoza's increasingly violent behavior and lack of respect for authority, there is no reasonable likelihood that the jury's verdict would have been different had the defense not presented Dr. Vigen's testimony.[11]

---

[11] Mendoza's cursory reference to the now-decided *Buck v. Davis,* 137 S. Ct. 759 (2017), is unpersuasive. *See* ECF No. 86, at 27 n.2. In *Buck,* after concluding that the Fifth Circuit applied an overly-burdensome standard for granting COA, the Supreme Court went on to conclude that Buck suffered prejudice from his counsel's presentation of expert testimony suggesting race was a negative factor to consider in deciding the future dangerousness issue. 137 S. Ct. at 775-77. The Court reasoned that Buck's prior violent acts occurred outside prison and within the context of his romantic relationships with women; thus, from this evidence, a jury could conclude that a death sentence was unwarranted because he would have no romantic relationships with women in prison. *Id.* at 776. But because the color of Buck's skin would never change and, according to Buck's expert, that "immutable characteristic" carried an increased probability of future violence, the Court could not agree with the lower court that the introduction of race had no impact on the jury's determination.

## B. State habeas counsel was not deficient.

Mendoza argues that state habeas counsel rendered ineffective assistance by failing to raise this IATC claim during state proceedings. ECF No. 86, at 27-32. Appellate counsel's effectiveness is measured by the same *Strickland* standard applied to trial counsel: whether the performance was objectively reasonable and whether any deficient performance prejudiced the proceeding—that is, whether there was a reasonable probability that the petitioner would have won on appeal. *Robbins,* 528 U.S. at 285; *Moreno v. Dretke,* 450 F.3d 158, 168 (5th Cir. 2006). Once again, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter,* 562 U.S. at 112.

For the reasons already discussed, there is no reasonable likelihood that, had appellate counsel raised this claim, Mendoza would have won on appeal; the claim is meritless. He thus cannot demonstrate that state habeas counsel was ineffective for failing to raise this claim or that he suffered prejudice. *See Newbury,* 756 F.3d at 872 (To establish IASHC, petitioner must show both that habeas counsel's performance was deficient and that he was prejudiced by habeas counsel's performance, i.e., "there is a reasonable probability that he

---

*See id.* at 776-77. Buck's case involves the extraordinary circumstance of invited racial discrimination. This expert testimony was not at all comparable to Dr. Vigen's testimony conceding potentially-damaging testimony that was substantially similar to the evidence already presented at trial.

would have been granted state habeas relief had the evidence been presented in the state habeas proceedings."); *see also Garza v. Stephens,* 738 F.3d 669, 676 (5th Cir. 2013) (affirming conclusion that, because IATC claim was meritless, state habeas counsel not ineffective for failing to raise it in first state proceeding); *Vasquez v. Stephens,* 597 F. App'x 775, 780 (5th Cir. 2015) (unpublished) (no deficient performance of habeas counsel where proposed IATC claims are without merit). For this reason, his IASHC claim fails.

Furthermore, as Mendoza admits, state habeas counsel raised numerous claims regarding trial counsel's inadequate investigation and preparation of Dr. Vigen. ECF No. 86, at 28, 32. Mendoza fails to demonstrate that the now-proposed claim was *more* meritorious or worthy of appellate review than those actually raised. As stated above, deference is owed to the strategic decisions of trial counsel and Mendoza fails to overcome the "strong presumption" that counsel's performance amounted to "sound trial strategy." *Strickland,* 466 U.S. 689 (citing *Michel,* 350 U.S. at 101). The same deference is owed the strategic decisions of state habeas counsel in deciding which claims to raise. *See Jones v. Barnes,* 463 U.S. 745, 751-54 (1983) (an experienced appellate attorney knows importance of winnowing out weaker arguments in favor of key issues, focusing on strongest issues for appeal; no duty to raise every colorable issue on appeal). State habeas counsel is not ineffective for failing to raise meritless

claims. *Segundo v. Davis,* 831 F.3d 345, 350-51 (5th Cir. 2016), *petition for cert. filed* (No. 16-6622).

And even if the claim was indeed nonfrivolous, Mendoza must still demonstrate that the issue "was clearly stronger than issues that counsel did present." *Robbins,* 528 U.S. at 288*; Vasquez,* 597 F. App'x at 780. State habeas counsel recognized a potential claim regarding Dr. Vigen's testimony. Habeas counsel thoroughly investigated and briefed those claims, presenting expert testimony in support. In federal court, she was permitted to expand the record with interrogatories and answers from trial counsel, the mitigation investigator, and Dr. Vigen himself. Her efforts were thorough but ultimately unpersuasive. Mendoza fails to demonstrate that this now-proposed claim is stronger than those already presented.

For the foregoing reasons, Mendoza fails to demonstrate a substantial claim for relief or the deficient performance of state habeas counsel, as required by *Martinez.* Therefore, he cannot overcome the procedural bar of this claim, and this Court is precluded from considering the merits of the claim or granting federal habeas relief.

## III. Mendoza's Claim That Trial Counsel Should Have Discovered False Testimony Is Insubstantial and State Habeas Counsel Was Not Deficient for Failing to Pursue These Allegations. (Claims 3, 4, and 5).

In three related claims Mendoza argues that (1) the State used potentially false testimony at the punishment phase of trial, and trial counsel was ineffective for failing to uncover it, ECF No. 86, at 33-39; (2) trial counsel rendered ineffective assistance by failing to interview Melvin Johnson and present his testimony at Mendoza's trial, *id.* at 39-43; and (3) state habeas counsel rendered ineffective assistance by failing to interview Melvin Johnson and raise an IATC claim regarding his potential testimony, or discover the State's use of false evidence and present a claim based on that testimony, *id.* at 43-45.

As it pertains to all three claims, Mendoza alleges the State's rebuttal witness, Officer Robert Hinton, a detention officer with the Collin County Sheriff's Department, may have testified falsely at the punishment phase of trial. ECF No. 86, at 36-37.[12] Officer Hinton testified that, while Mendoza was in a segregated recreation yard by himself, another inmate—Melvin Johnson— was released from his cell to finish mopping the day room. 24 RR 229-30. Hinton observed Mendoza reenter the special housing unit (SHU) door, which

---

[12]   Habeas counsel will not state with any certainty that Hinton testified falsely. ECF No. 86, at 38.

should have been locked, approach Johnson in an aggressive fashion, and engage in a fist fight with Johnson. 24 RR 230. Mendoza ignored Hinton's orders to stop fighting. 24 RR 230-31. According to Hinton, Mendoza was the aggressor and received a written disciplinary report. 24 RR 231-33.

Mendoza now offers an affidavit from Melvin Johnson. *See* ECF No. 86-1, Exhibit A. According to this affidavit, Johnson, who is presently a TDCJ inmate, was previously incarcerated in the Collin County Jail at the same time as Mendoza. Johnson asserted that, if he had been contacted, he would have testified to the following information. Mendoza was not well-liked by either guards or inmates, he "continually" used racial slurs and had a bad attitude, and, due to the nature of his offense, he was confined to the SHU. Johnson was also confined to SHU because of a disciplinary problem. One day, when Mendoza was heading toward the recreation yard, Johnson asserted that, "for some reason" his cell door was opened; he asserted, "I figured what the guards wanted and I exited my cell and started a fight with [Mendoza]." Johnson stated that he was the aggressor and that Mendoza defended himself but did not fight back. That night, Johnson stated, he received an extra tray of food as "a bonus" for fighting Mendoza and, "[a]lthough no one ever spoke to me about this incident, I am sure that the guards had planned this situation." *See id.*

Because Johnson's affidavit conflicts with Hinton's testimony, Mendoza alleges that either Hinton or Johnson is lying, thus Mendoza's due process

rights may have been violated by the presentation of false testimony. ECF No. 86, at 37. Further, trial counsel was ineffective for failing to interview Johnson and use his testimony at trial, *id.* at 39-41, and state habeas counsel was similarly ineffective for failing to interview Johnson and raise these issues on appeal, *id.* at 43. However, Mendoza fails to demonstrate a substantial IATC claim or that state habeas counsel was ineffective for failing to raise Claims 3 and 4 on appeal. Furthermore, *Martinez* does not serve as cause to excuse the procedural default of the false-testimony claim actually raised as Claim 3. Therefore, this Court should dismiss both claims as procedurally defaulted.[13]

### A. *Martinez* does not apply to Mendoza's attempt to raise an unexhausted *Napue* claim.

Despite two cursory assertions that trial counsel was ineffective for failing to interview Melvin Johnson and uncover evidence of Hinton's possibly false testimony, *see* ECF No. 86, at 33, 39, Claim 3 clearly asserts a due process false-testimony claim. This claim is unexhausted and procedurally barred, but *Martinez* does not excuse the default.

### 1. *Martinez* does not apply to false-testimony claims.

*Martinez* does not extend to claims that do not allege IATC. *See Martinez,* 132 S. Ct. at 1319 ("*Coleman* held that an attorney's negligence in a

---

[13]     As argued in Section I, free-standing IASHC claims, as raised in Claim 5, are not cognizable in federal habeas review.

postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at trial."); *Trevino,* 133 S. Ct. at 1918-21 (confining analysis to ineffective-assistance-of-trial-counsel claims); *see also Vasquez,* 597 F. App'x at 778 (declining to extend *Martinez* to "claims [that] do not pertain to the ineffectiveness of counsel"); *Wilkins v. Stephens,* 560 F. App'x 299, 306 n.44 (5th Cir. 2014) (unpublished) (claim alleging denial of right to a public trial under the Sixth Amendment does not fall within scope of *Martinez* or *Trevino* and is procedurally barred); *Reed v. Stephens,* 739 F.3d 753, 778 n.16 (5th Cir. 2014) (declining to extend *Martinez* to ineffective assistance of *appellate* counsel claim); *In re Sepulvado,* 707 F.3d at 554 & n.8 (recognizing *Martinez* created "narrow exception" for IATC claims); *Adams v. Thaler,* 679 F.3d 312, 316 (5th Cir. 2012) (noting that *Martinez* recognized "a narrow exception" to *Coleman*, allowing the inadequate assistance of state habeas counsel to serve as cause to excuse default of ineffective-assistance-of-*trial*-counsel claim); *Sells v. Thaler,* No. SA-08-CA-465-OG, 2012 WL 2562666, at *26 (W.D. Tex. June 28, 2012) (*Martinez* not applicable because petitioner did not present IATC claim). Mendoza cannot circumvent the procedural default of this obvious *Napue* claim by simply asserting IATC. Especially when he also raises a separate IATC claim on the same facts. *See* Section III(B), infra. The

*Napue* claim remains unexhausted and procedurally barred and should not be considered by this Court.

### 2. Mendoza cannot prove a *Napue* claim.

Regardless, Mendoza fails to demonstrate a substantial claim because he cannot show the existence of any materially false testimony or that the State was even aware of such testimony. The prosecution may not knowingly present false testimony or allow false testimony to go uncorrected. *Napue,* 360 U.S. at 269. To prove a due process violation the petitioner must demonstrate (1) that the testimony in question was actually false, (2) that the prosecutor knew it was false, and (3) that the testimony was material. *Canales v. Stephens,* 765 F.3d 551, 573 (5th Cir. 2014). Perjured testimony is material only when there is a reasonable likelihood that the false testimony could have affected the outcome of trial. *United States v. Agurs,* 427 U.S. 97, 103 (1976); *Canales,* 765 F.3d at 573.

Johnson's affidavit does not establish that Hinton testified falsely. It is not enough that a witness's testimony is challenged by another witness. *Kutzner v. Cockrell,* 303 F.3d 333, 337 (5th Cir. 2002). Johnson's affidavit establishes a potential credibility issue, but does not demonstrate that Hinton testified falsely. *Koch v. Puckett,* 907 F.2d 524, 531 (5th Cir. 1990). Indeed, Johnson—a criminal and "disciplinary problem" while confined in the county jail—is far less credible than a law-enforcement officer. And because Johnson

was a "disciplinary problem," he likely has motive to discredit the sheriff's department by suggesting they orchestrated a fight and then lied about it at trial. At the very least, an affidavit given twelve years after the events it describes is highly suspect. The Court should view last-minute affidavits with "'a degree of skepticism' because '[i]t seems that, when a prisoner's life is at stake, he often can find someone new to vouch for him.'" *Wilkerson v. Cain,* 233 F.3d 886, 893 (5th Cir. 2000) (Garza, J., concurring) (quoting *Herrera v. Collins,* 506 U.S. 390, 423 (1993)). Even now, habeas counsel will not state with any certainty that Johnson is telling the truth or that Hinton testified falsely. ECF No. 86, at 38.

Furthermore, Johnson's accusation that, "for some reason" his cell door was opened, that he "figured what the guards wanted" and engaged in a fight with Mendoza, and, that "[a]lthough no one ever spoke to me about his incident, I am sure that the guards had planned this situation," *see* ECF No. 86-1, do not demonstrate that Hinton committed perjury. Johnson merely speculates that some unnamed guards wanted him to fight Mendoza. His speculation is not evidence. *See Medellin v. Dretke,* 371 F.3d 270, 281 (5th Cir. 2004) ("An applicant's speculation about the suppression of exculpatory evidence is an insufficient basis to support a *Brady* [*v. Maryland,* 373 U.S. 83 (1963)] claim."); *Murphy v. Johnson,* 205 F.3d 809, 814 (5th Cir. 2000) ("Allegations that are merely 'conclusionary' or speculative cannot support a

*Brady* claim.") (citing *Hughes v. Johnson,* 191 F.3d 607, 629 (5th Cir. 1999));

*Koch,* 907 F.3d at 531 (conclusory allegations do not establish a valid due

process claim).

And Johnson does not suggest that Hinton was one of these unnamed

guards. In fact, Hinton testified that he was not inside the control room where

the doors can be unlocked and he could not tell if the doors were secured that

day, 24 RR 222-24, 228-29, 232, 234; and he did not know what was said

between the two inmates that may have instigated the fight, 24 RR 235. Hinton

testified to what he observed. Johnson's accusations, even if true, do not render

Hinton's testimony regarding his own observations deliberately false.

Johnson's affidavit also does not establish that the State was aware of

any falsity. The Fifth Circuit holds that due process is not implicated by the

State's introduction of false or perjured testimony unless the State actually

knows or believes the testimony to be false or perjured. *Kutzner,* 303 F.3d at

337. Apart from failing to prove Hinton's testimony was false, Mendoza fails to

demonstrate that the State had any reason to doubt the veracity of Hinton's

testimony or the disciplinary report Hinton filed against Mendoza after the

incident. Indeed, Mendoza does not contend that the prosecutor actually knew

the testimony was false but suggests knowledge of the falsity should be

imputed to the State because Hinton was a Collin County Law Enforcement

Officer. ECF No. 86, at 38-39. But Hinton is not a member of the prosecution

team so that knowledge of an alleged falsity should be imputed to the prosecutors.

Traditionally, the prosecution team includes investigative and prosecutorial personnel who have worked on the case and thereby contributed to the prosecutorial effort. *See Avila v. Quarterman,* 560 F.3d 299, 307-08 (5th Cir. 2009); *Kyles v. Whitley,* 5 F.3d 806, 831 (5th Cir. 1993) (King, J., dissenting), *rev'd* on materiality, *Kyles v. Whitley,* 514 U.S. 419 (1995); *United States v. Antone,* 603 F.2d 566, 569 (5th Cir. 1979); *Schneider v. Estelle,* 552 F.2d 593, 595 (5th Cir. 1977) (if law enforcement agent suborns perjury for use at trial, constitutional due process claim is not defeated because prosecutor was not personally aware of "this prosecutorial activity"). The relevant question is whether Hinton played a role in the prosecution. *Avila,* 560 F.3d at 308. Hinton was a jailer and ultimately a witness at trial regarding an incident he observed at the jail. But no evidence suggests that he was involved in the investigation and preparation of the capital murder trial. Merely testifying for the State does not transform a witness into a member of the prosecutorial team. *See id.* ("[M]erely testifying as an expert witness for the State does not necessarily transfer an expert witness into an 'arm of the state.'") (citing *Hill v. Johnson,* 210 F.3d 481, 488-89 (5th Cir. 2000)). Because Hinton was not a "fully functioning member of the prosecution team," his knowledge should not

be imputed to the prosecution. *Id.* at 308-09 (citing *United States v. Stewart,* 433 F.3d 273, 297-99 (2nd Cir. 2006)).

But, even if Hinton's testimony was false and such falsity is imputed the prosecution, there is no reasonable likelihood that it affected the outcome of this trial. *Agurs,* 427 U.S. at 103. If trial counsel had used Johnson to discredit Hinton's testimony that Mendoza was the aggressor in the fight—and the jury actually believed Johnson over Hinton—the jury would still have heard Johnson's damaging testimony that Mendoza was not well-liked by guards or inmates, "continually" used racial slurs, and had a bad attitude. *See* ECF No. 86-1.

And even if Hinton's testimony had been excluded all together, the evidence that Mendoza started a fight in prison was a small part of the State's future dangerousness case. The jury heard other evidence of Mendoza's refusal to comply with authority. Specifically, while on probation, Mendoza cut off his ankle monitor and stopped reporting to his probation officer; and, while awaiting trial in the Collin County Jail, Mendoza created weapons and refused to take his prescribed medication. The jury also heard the brutal and callous facts of the crime; evidence of Mendoza's escalating violent and criminal behavior towards his family, friends, and strangers; and evidence that Mendoza was unmanageable, had a temper, and was disrespectful to teachers. *See Mendoza,* No. 75,213, slip op. at 10-12; Statement of the Facts, Section

II(A). Given this evidence in support of the jury's determination on future dangerousness, there is no reasonable likelihood that the allegedly false testimony could have affected the outcome of trial. *Agurs,* 427 U.S. at 103.

Even if *Martinez* could excuse the procedural default of this claim, Mendoza fails to demonstrate that any witness testified falsely, that the State knew of any false testimony, or that any alleged false testimony would have had a material impact on the outcome of his trial. For this reason, Mendoza fails to demonstrate a substantial claim for relief.

And because Mendoza cannot overcome any procedural bar of this *Napue* claim, or even demonstrate the existence of a potential claim for relief, this Court should deny any forthcoming request for discovery or an evidentiary hearing. *See* ECF No. 86, at 39. *See Rucker v. Norris*, 563 F.3d 766, 771 (8th Cir. 2009) ("As Rucker's federal claim is procedurally barred because it was not raised in the state courts, he cannot satisfy [good cause]."); *Williams v. Bagley,* 380 F.3d 932, 975 (6th Cir. 2004); *Crain v. Stephens,* No. 3:15-cv-2476-M-BN, 2015 WL 8165567, *2 (N.D. Tex., Dec. 8, 2015) (unpublished) (citing *Rucker* and *Williams)*; *Thompson v. Stephens,* No. , 2014 WL 2765666, *2 (S. D. Tex., June 18, 2014) (Citing *Rucker,* "A petitioner cannot show good cause if a federal court cannot reach the merits of the disputed claims."); *see also Hill,* 210 F.3d at 490 (citing *East v. Scott,* 55 F.3d 996, 1003 (5th Cir. 1995)) ("'Mere speculative and conclusory allegations that the [State] might have known

about [the alleged impeachment material] are not . . . sufficient to entitle [a petitioner] to discovery...."'); *Ward v. Whitley,* 21 F.3d 1355, 1367 (5th Cir. 1994) (conclusory allegations are not enough to warrant discovery under Rule 6; petitioner must set forth specific allegations of fact). Furthermore, the Fifth Circuit holds that *Martinez* does not entitle petitioners to an evidentiary hearing in federal court in order to develop a claim. *See Segundo,* 831 F.3d at 351; *Newbury,* 756 F.3d at 868-71 (rejecting petitioner's claim that he was owed resources to develop facts in support of IATC claim under *Martinez*); *see also Ayestas v. Stephens*, 817 F.3d 888, 896 (5th Cir. 2016) (per curiam), *cert. granted in part*, 2017 WL 1199473 (U.S. Apr. 3, 2017) (district court did not abuse its discretion in declining to authorize a mitigation specialist prior to determining viability of claim under *Martinez*).

## B. Mendoza fails to demonstrate a substantial IATC claim for relief.

Mendoza argues that, although trial counsel was clearly aware of Johnson's name and of Officer Hinton's potential testimony, no one bothered to investigate or interview Johnson prior to trial. ECF No. 86, at 39-40. But Mendoza cannot demonstrate that trial counsel was ineffective for failing to interview Melvin Johnson or present his testimony at trial.

As an initial matter, Mendoza does not prove that no one on the defense team actually interviewed or attempted to interview Johnson, or that state

habeas counsel did not interview or attempt to interview Johnson. Mendoza asserts only that he "has communicated" with trial counsel Juan Sanchez, who was not aware of any member of the defense team who interviewed Johnson, and postconviction counsel Lydia Brandt, who could not recall speaking to Johnson. *See* ECF No. 86, at 40. This hearsay assertion is insufficient proof that no member of the defense team, at any stage, investigated or attempted to investigate this witness.

Regardless, trial counsel's failure to interview Johnson does not establish that counsel did not investigate this incident. Trial counsel's cross-examination of Hinton reveals that he clearly had access to the disciplinary report filed after this incident, and that he was prepared to question Hinton about it at trial. Trial counsel examined Hinton, first addressing any suggestion that Mendoza may have manipulated the security doors so that he could regain access to the SHU. Counsel established that Hinton did not know for sure that Mendoza actually left the pod and closed the door behind him, Hinton only assumed that he did. Also, Hinton was not inside the control room and thus could not tell if the door had been closed securely; it was possible someone had made a mistake. 24 RR 233-35.

Trial counsel cross-examined Hinton on the possibility that Johnson may have instigated the fight, establishing that Hinton did not know what may have transpired between Mendoza and Johnson prior to the fight, and that,

from his vantage point, Hinton did not know if there was any name-calling, shouting, or racial epithets being said prior to the fight. 24 RR 235. And while Hinton saw Mendoza hit Johnson, Hinton admitted that both parties were fighting in a "flurry of fists," and that both parties were asked if they wanted to press charges against the other. 24 RR 234-35. Both signed an "affidavit of non-prosecution" indicating they did not want to file charges. 24 RR 235-36. Trial counsel was clearly prepared to address Officer Hinton's testimony.

Furthermore, if Johnson's assertions are true—that Johnson started the fight and Mendoza merely defended himself—then Mendoza could have told counsel that the disciplinary report unfairly labeled him as the aggressor and that Hinton's testimony was not accurate. Mendoza does not now suggest that he did tell trial counsel this information but trial counsel failed to investigate. And trial counsel's cross-examination of Officer Hinton does not indicate that Mendoza told counsel that Johnson started the fight. Rather, counsel's cross-examination suggests Johnson provoked Mendoza into attacking him by calling him names and racial slurs, and that the fight was mutually aggressive. *See* 24 RR 233-36. Trial counsel is not ineffective for not discovering information that Mendoza could have but did not disclose. *See Johnson v. Cockrell*, 306 F.3d 249, 252-53 (5th Cir. 2002) (The Fifth Circuit "has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail to disclose."); *Blanton v.*

*Quarterman,* 543 F.3d 230, 239 (5th Cir. 2008) (trial counsel could not have uncovered abuse-of-inhalant evidence where neither petitioner nor his family mentioned it); *Soria v. Johnson*, 207 F.3d 232, 250-51 (5th Cir. 2000) (no deficient performance where, despite encouragement, petitioner and family failed to reveal evidence of past behavior and family background).

Regardless, Mendoza suffered no prejudice from trial counsel's failure to uncover Johnson's testimony. As argued above, there is no reasonable probability that the outcome of the trial would have been different had Johnson testified in a manner consistent with his affidavit. First, it is unlikely the jury would deem Johnson—a criminal and "disciplinary problem"—more credible than a detention officer. And because Johnson was a "disciplinary problem," he likely had motive to discredit the sheriff's department by suggesting they orchestrated a fight and then lied about it at trial. Even now, habeas counsel will not state with any certainty that Johnson is telling the truth or that Hinton testified falsely. ECF No. 86, at 38.

Second, Johnson's potential testimony was "double-edged." Any benefit Mendoza might reap from discrediting Hinton's testimony that Mendoza was the aggressor in a fight was outweighed by the negative things Johnson could have said. Namely, Mendoza was not well-liked by either guards or inmates, he "continually" used racial slurs, and he had a bad attitude. *See Gray v. Epps,* 616 F.3d 436, 449 (5th Cir. 2010); *Dowthitt v. Johnson,* 230 F.3d 733, 745 (5th

Cir. 2000), *overruled on other grounds, Lewis v. Thaler,* 701 F.3d 783, 790 (5th Cir. 1997) (no reasonable probability that outcome would have been different because evidence double-edged in nature). This testimony would cut against Mendoza's claim that he would not present a future danger to society if sentenced to life in prison.

And finally, even if trial counsel had been able to discredit Hinton's testimony that Mendoza was the aggressor in a jailhouse fight, as described in the Statement of the Facts, Section II(A), and discussed in Section III(A)(2) above, the evidence still weighed heavily in favor of the jury's punishment sentence. Specifically, the jury heard the brutal and callous facts of the crime; evidence of Mendoza's escalating violent and criminal behavior towards his family, friends, and strangers; evidence that Mendoza was unmanageable, had a temper, and was disrespectful to teachers; evidence that, while on probation, Mendoza cut off his ankle monitor and stopped reporting to his probation officer; and finally, while awaiting trial in the Collin County Jail, evidence that Mendoza created weapons and refused to take his prescribed medication. *See Mendoza,* No. 75,213, slip op. at 10-12.

Given Johnson's credibility problems and the double-edged nature of his potential testimony, it is unlikely that any reasonable attorney would have presented this testimony, even if counsel had known about it. But regardless,

there is no reasonable probability of a different result had trial counsel interviewed Johnson prior to trial.

## C. Mendoza fails to prove deficient performance by state habeas counsel.

Any failure by state habeas counsel to raise on appeal an IATC claim regarding trial counsel's lack of investigation into Melvin Johnson was not deficient. As with trial counsel, Mendoza could have told state habeas counsel that Officer Hinton committed perjury and this issue was worthy of appellate investigation or review. Mendoza makes no assertion that he did. Without notice from Mendoza, and given the effective and thorough cross-examination performed by trial counsel on Officer Hinton, state habeas counsel had little reason to question the veracity of Officer Hinton's testimony or trial counsel's preparation for this witness.

Mendoza fails to demonstrate that these IATC and *Napue* claims were *more* meritorious or worthy of appellate review than the claims actually raised during state habeas. Indeed, Mendoza fails to prove Officer Hinton's testimony was false or that trial counsel should have suspected it was false. And no reasonable counsel would have presented Johnson's testimony to counter Officer Hinton because Johnson lacked credibility and any potential good would be outweighed by the harm that could result from his testimony. Finally, trial counsel effectively prepared for and cross-examined Hinton without the

need for Johnson. Deference is owed the strategic decisions of state habeas counsel in deciding which claims to raise. *Barnes,* 463 U.S. at 751-54. State habeas counsel is not ineffective nor is the petitioner prejudiced, for failing to raise meritless claims. *Segundo,* 831 F.3d at 350-51.

Finally, because there exists no reasonable probability that an IATC or *Napue* claim would have been successful on appeal, Mendoza cannot prove prejudice from state habeas counsel's failure to raise these claims. *Robbins,* 528 U.S. at 285; *Newbury,* 756 F.3d at 872. Because Mendoza cannot demonstrate the ineffectiveness of state habeas counsel, he fails to overcome the procedural default of any claim. Therefore, his unexhausted claims should be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should deny habeas corpus relief with prejudice, deny COA on all claims, and deny any additional evidentiary development in federal court.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General

for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division


/s/ Tomee M. Heining

_____
\*Attorney in charge                    \*TOMEE M. HEINING
Assistant Attorney General
Texas Bar No. 24007052
Office of the Attorney General
Criminal Appeals Division
P. O. Box 12548, Capitol Station
Austin, Texas  78711-2548

tomee.heining@oag.texas.gov
Telephone: (512) 936-1600
Telecopier: (512) 320-8132

ATTORNEYS FOR RESPONDENT

# CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2017, I electronically filed the foregoing document with the clerk of the court for the United States District Court, Eastern District of Texas, using the electronic filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means: Jeff L. Haas.

/s/ Tomee M. Heining
_____
TOMEE M. HEINING
Criminal Appeals Division