IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION


| | | |
|---|---|---|
| MOISES SANDOVAL MENDOZA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:09-cv-86 |
| | § | |
| DIRECTOR, TDCJ-CID, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND
## ORDER OF DISMISSAL

Petitioner Moises Sandoval Mendoza ("Mendoza"), a death row inmate confined in the Texas prison system, filed the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is challenging his capital murder conviction and death sentence imposed by the 401st Judicial District Court of Collin County, Texas, in Cause Number 401-80728-04, in a case styled *The State of Texas vs. Moises Mendoza*. For reasons set forth below, the Court finds that the petition should be denied.

## I. PROCEDURAL HISTORY OF THE CASE

Mendoza was convicted and sentenced to death for the capital murder of Rachel Tolleson, who was killed during the course of an attempted burglary, kidnapping and aggravated sexual assault. Based on the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure Article 37.071, the trial court sentenced Mendoza to death on June 29, 2005. The Texas Court of Criminal Appeals affirmed the conviction. *Mendoza v. State*, No. AP-75213, 2008 WL 4803471 (Tex. Crim. App. Nov. 5, 2008). The Supreme Court denied his petition for a writ of certiorari. *Mendoza v. Texas*, 556 U.S. 1272 (2009).

Following direct appeal, Lydia Brandt was appointed to represent Mendoza for purposes of state habeas corpus proceedings. Brandt filed a habeas petition raising seven claims, including five ineffective assistance of counsel claims. The trial court issued findings of fact and conclusions of law without conducting an evidentiary hearing. The trial court recommended that relief be denied. The Texas Court of Criminal Appeals denied the application based on the findings and conclusions of the trial court and its own review. *Ex parte Mendoza*, No. WR-70211-01, 2009 WL 1617814 (Tex Crim. App. June 10, 2009).

Brandt was subsequently appointed to represent Mendoza in the present habeas corpus proceedings. A petition for a writ of habeas corpus was timely filed on June 2, 2010 (Docket No. 6). An amended petition was filed on January 5, 2011 (Docket No. 23). Mendoza raised the same seven claims that he presented in the state habeas corpus proceedings. The petition was denied. *Mendoza v. Thaler*, No. 5:09cv86, 2012 WL 12817023 (E.D. Tex. Sept. 28, 2012). A certificate of appealability was granted on four of the claims.

Mendoza timely appealed to the United States Court of Appeals for the Fifth Circuit, which stayed the proceedings and remanded the case, in part, solely to appoint supplemental counsel and to consider in the first instance whether he can establish cause for the procedural default of any ineffective assistance of trial counsel claims pursuant to the Supreme Court's recent decisions in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. ___, 133 S. Ct. 1911 (2013), that he may raise, and if so, whether those claims merit relief. *Mendoza v. Stephens*, 783 F.3d 203, 203-04 (5th Cir. 2015). The instruction to appoint supplemental counsel was the product of the Supreme Court's decision in *Christeson v. Roper*, 574 U.S. ___, 135 S. Ct. 891 (2015).

Jeff Haas was appointed as supplemental counsel (Docket No. 76) on May 7, 2015. Pursuant to an order of the Court, Mendoza filed an amended petition for a writ of habeas corpus (Docket No. 86) on November 4, 2016. The State filed an answer (Docket No. 89) on April 3, 2017. Mendoza filed a response (Docket No. 94) on July 13, 2017.

## II. FACTUAL BACKGROUND OF THE CASE

The Texas Court of Criminal Appeals discussed the factual background of the case as follows:

> Sometime after 9:00 p.m. on Wednesday, March 17, 2004, Rachelle Tolleson and her mother Pam O'Neil went to the store to purchase formula and diapers for Tolleson's five-month-old daughter, Avery. Tolleson and Avery visited at the O'Neil home for a short time after returning from the store, but Tolleson did not feel well, had taken medication for a sinus headache, and wanted to be in her own home. Around 10:00 p.m., Tolleson phoned the O'Neils to let them know that she and Avery had arrived home.

> Around the same time that evening, Efren Gamez, [Mendoza], and several friends were having a party. Gamez, [Mendoza], and two young women had purchased two thirty-packs of beer and two forty-ounce cans of beer earlier in the evening. At some point, the women left the party and later called to let Gamez and [Mendoza] know that they were not returning. [Mendoza] became angry, and as he drank more beer, he became more belligerent. Eventually, [Mendoza] said something to two other girls at the party that scared them. [Mendoza] told Gamez that he spoke to the girls in that manner "because he could." [Mendoza] left the party and returned several times, finally leaving for the last time between midnight and 1:00 a.m.

> The following morning, O'Neil went to Tolleson's home as she often did. Although her car was parked in the driveway, Tolleson was not there. A note from the landlord was taped to the screen door, but the wooden back door stood wide open. O'Neil entered the house and noticed that a pillow had been left on the floor between the kitchen and the bedroom. The bedroom was a mess. Papers were strewn across the floor, the night stand was pulled away from the wall, the mattress and box spring were askew, and the headboard was broken and lying against the bed. Avery was on the bed, cold, wet, and alone in the house.

> Alarmed, O'Neil collected Avery and called her husband, who contacted the police. Officer Scott Collins of the Farmersville Police Department responded. Collins

confirmed O'Neil's description of the bedroom—things were thrown everywhere and furniture was out of place. To Collins, it looked as though there had been a fight, or a tornado, in the bedroom. The rest of the house was orderly, and there were no signs of a forced entry.

Farmersville police began interviewing potential witnesses that day. They learned that, on the Friday before her disappearance, Tolleson hosted a party for about fifteen people, including [Mendoza]. During the party, Tolleson spoke with [Mendoza] a few times but told her best friend Megan Kennedy that she wasn't interested in [Mendoza] in "that way."

Police also learned that, on the Saturday before Tolleson's disappearance, Kennedy's boyfriend Tim Holland returned to Tolleson's home with [Mendoza] and Cody Wiltbanks to retrieve his musical instruments, but Tolleson wasn't home, and the doors were locked. While Holland and Wiltbanks went around the house looking for a way in, appellant managed to open the locked back door. After learning this, Collins interviewed [Mendoza], who told Collins that he had last seen Tolleson at the party. Collins noted that [Mendoza] could not sit still and seemed very nervous.

Search parties were organized to look for Tolleson but were unsuccessful. Six days after Tolleson disappeared, James Powell was hunting for arrowheads near Brushy Creek, east of Farmersville. Walking along the creek, he came across a body that had been burned and was lying face down. Through the use of dental records, the body was eventually identified as Tolleson's.

Jerry Farmer, an FBI evidence technician who was one of the first on the scene, noted that tall vegetation had been piled on top of Tolleson's body in an attempt to cover it. Her body was badly burned and had begun to decompose. Fly eggs and maggot activity around her head and neck indicated that she had been there for at least two days. Her skin was charred black in places and seared yellow in others where her flesh had split apart. Most of her hair had been burned away. Scraps of burned clothing clung to her upper torso, but no clothing was found below her waist.

An orange rope was tied around Tolleson's right ankle, and two grommets from a tarp were lying on the back of her left leg and head. Burnt pieces of tarp and skin were found on a path leading to Tolleson's body, indicating that she had been dragged or carried to that spot. A short distance from where the body was discovered, steps led to a dugout under a tall tree where investigators found evidence that something had been burned. Evidence technicians found ashes, firewood, a clump of hair, pieces of tarp and skin, and orange rope like that found tied around Tolleson's ankle.

Dr. William Rohr, the medical examiner, testified that Tolleson had sustained a five-inch diameter bruise on her left knee, a smaller bruise on the front of her left thigh, bruises on either side of her tongue, a large amount of hemorrhage deep in her left shoulder, and several bruises on her scalp ranging in diameter from three quarters of an inch to three inches. A deep wound, consistent with injury from a knife, penetrated her neck all the way to her spinal column, and her body had been burned post-mortem. Rohr determined that Tolleson's death was consistent with strangulation or another form of asphyxiation.

After further interviews with potential witnesses, police obtained an arrest warrant for [Mendoza]. Once in custody, [Mendoza] told police that, late Wednesday evening, he had driven by Tolleson's house and had seen a light on. He backed his truck into the driveway and let himself into the house through the back door without knocking. According to [Mendoza], Tolleson left with him to get a pack of cigarettes. [Mendoza] drove "for a little" and then "for no reason" started to choke Tolleson. Tolleson passed out, and [Mendoza] drove to a field behind his home, where he had sexual intercourse with Tolleson and "choked her again." [Mendoza] then dragged Tolleson out of the truck and into the field, where he choked her until he thought she was dead. To "make sure," he "poked her throat" with a knife. [Mendoza] left Tolleson's body in the field until Monday, after he was first interviewed by police. Scared that Tolleson's body would be found and tied to him, [Mendoza] moved the body to a remote area and burned it, ultimately dragging it to where it was found.

*Mendoza*, 2008 WL 4803471, at *1-2.

### III. SUPPLEMENTAL GROUNDS FOR RELIEF

Mendoza brings the following supplemental grounds for relief:

1.      Mendoza alleges, pursuant to *Martinez*, that trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by presenting the testimony of Dr. Mark Vigen during the punishment phase of the trial.

2.      Mendoza alleges that initial post-conviction counsel, pursuant to *Martinez*, rendered ineffective assistance of counsel for failing to raise the issue of trial counsel's ineffectiveness by presenting the testimony of Dr. Mark Vigen.

3.      Mendoza claims that the State of Texas used potentially false testimony at the punishment stage of the trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and trial counsel was ineffective in violation of the Sixth Amendment of the United States Constitution for failing to discover the State's use of false evidence.

4.      Mendoza alleges, pursuant to *Martinez*, that trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by failing to interview Melvin Johnson and presenting his testimony during the trial.

5.      Mendoza alleges, pursuant to *Martinez*, that post-conviction counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by failing to interview Melvin Johnson and by consequently failing to raise the ineffective assistance of trial counsel on collateral review by trial counsel's failure to interview, investigate and present Melvin Johnson's testimony at trial or discover the use of the State's false evidence.

## IV. STANDARD OF REVIEW

The resolution of the amended petition concerns complex procedural issues involving exhaustion of state remedies, procedural defaults and whether Mendoza can overcome the procedural default via *Martinez* and *Trevino*. The analysis of Mendoza's claims should begin with a discussion of the exhaustion requirement. State prisoners bringing petitions for a writ of habeas corpus are required to exhaust their state remedies before proceeding to federal court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). In order to exhaust properly, a state prisoner must "fairly present" all of his claims to the state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). In Texas, all claims must be presented to and ruled upon the merits by the Texas Court of Criminal Appeals. *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985). When a petition includes claims that have been exhausted along with claims that have not been exhausted, it is called a "mixed petition," and historically federal courts in Texas have dismissed the entire petition for failure to exhaust. *See, e.g.*, *Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir. 1978) (en banc).

The exhaustion requirement, however, was profoundly affected by the procedural default doctrine that was announced by the Supreme Court in *Coleman v. Thompson*, 501 U.S. 722 (1991). The Court explained the doctrine as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. As a result of *Coleman*, unexhausted claims in a mixed petition are ordinarily dismissed as procedurally barred. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995). *See also Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Such unexhausted claims are procedurally barred because if a petitioner attempted to exhaust them in state court, they would be barred by Texas abuse-of-the-writ rules. *Fearance*, 56 F.3d at 642. The procedural bar may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Id.* (citing *Coleman*, 501 U.S. at 750-51). Dismissals pursuant to abuse of writ principles have regularly been upheld as a valid state procedural bar foreclosing federal habeas review. *See Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008); *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008), *cert. denied*, 556 U.S. 1239 (2009); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

Mendoza's supplemental claims are unexhausted. Until just recently, the supplemental claims would have undoubtedly been dismissed as procedurally barred. The Supreme Court, however, opened the door slightly for a showing of cause and prejudice to excuse the default in *Martinez* and *Trevino*. In *Martinez*, the Supreme Court answered a question left open in *Coleman*:

"whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." 566 U.S. at 8 (citing *Coleman*, 501 U.S. at 755). The Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 17.

The Supreme Court extended *Martinez* to Texas in *Trevino*. Although Texas does not preclude appellants from raising ineffective assistance of counsel claims on direct appeal, the Court held that the rule in *Martinez* applies because "the Texas procedural system - as a matter of its structure, design, and operation - does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 133 S. Ct. at 1921. The Court left it to the lower courts to determine on remand whether Trevino's claim of ineffective assistance of counsel was substantial and whether his initial state habeas attorney was ineffective. *Id.*

The Fifth Circuit subsequently summarized the rule announced in *Martinez* and *Trevino* as follows:

> To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

*Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2821 (2014). "Conversely, the petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1786 (2014). The Fifth Circuit reaffirmed this basic approach in *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir.), *cert. denied*, 135 S. Ct. 435 (2014). The Fifth Circuit has also reiterated that a federal court is barred from reviewing a procedurally defaulted claim unless a petitioner shows both cause and actual prejudice. *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1760 (2014). To show actual prejudice, a petitioner "must establish not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* (citations omitted) (emphasis in original).

The standard for evaluating ineffective assistance of counsel claims was established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1994). *Strickland* provides a two-pronged standard, and a petitioner bears the burden of proving both prongs. 466 U.S. at 687. Under the first prong, he must show that counsel's performance was deficient. *Id.* To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at

694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697. The *Strickland* standard applies to ineffective assistance of counsel claims in the context of *Martinez* and *Trevino*. *See Martinez*, 566 U.S. at 14.

## V. DISCUSSION AND ANALYSIS

1. **Mendoza alleges, pursuant to *Martinez*, that trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by presenting the testimony of Dr. Mark Vigen during the punishment phase of the trial.**

2. **Mendoza alleges that initial post-conviction counsel, pursuant to *Martinez*, rendered ineffective assistance of counsel for failing to raise the issue of trial counsel's ineffectiveness by presenting the testimony of Dr. Mark Vigen.**

The first two supplemental grounds for relief are related. Mendoza initially argues that trial counsel was ineffective for presenting the testimony of Dr. Mark Vigen. He further argues that initial post-conviction counsel, Lydia Brandt, was ineffective for failing to raise this issue on collateral review.

Mendoza notes that Dr. Vigen was called as an expert witness for the defense. A hearing was conducted before he was permitted to testify before the jury. Dr. Vigen testified that he had conducted an investigation that included interviews with Mendoza. He had prepared a report from his interviews. The report was turned over to the State. The trial court overruled the State's objections to Dr. Vigen and permitted him to testify before the jury.

Dr. Vigen testified before the jury that he had formed opinions about Mendoza. In forming his opinions, he had spent thirteen hours interviewing Mr. Mendoza. He had developed a total of six opinions from his interviews. His first opinion was that Mendoza "was an immature, psychologically under-developed adolescent-like man who has no internal sense of himself. He

10

has no inner -- inner self, no clear inner identity that I can detect." 24 RR 117-18.[1] His second opinion was that Mendoza came "from a psychologically dysfunctional family." 24 RR 121. Third, that Mendoza's "behavior changed radically for the worse when he began smoking marijuana and drinking. He told me that that occurred at senior camp-out, but's it's probably earlier than that." 24 RR 123. Dr. Vigen's fourth opinion was that Mendoza's "new friends . . . lived a -- sort of depraved and disrespectful, aggressive and drug and alcohol lifestyle in which -- what I call empty sexuality was involved." 24 RR 126. His fifth opinion was "that the Texas Department of Criminal Justice has the expertise, has the capability to house and incarcerate [Mendoza] in such a manner that he will be a low or minimum risk for future violence in prison." 24 RR 127. Finally, he thought that Mendoza had the potential to develop a sense of self, and a potential for rehabilitation and spiritual conversion in prison. 24 RR 129-30.

Mendoza complains that Dr. Vigen's testimony "opened the door" for the State to cross-examine him and to present evidence that Mendoza had no sense of self, has superficial remorse, is impulsive with a violent temper that cannot be controlled, is violent toward his family and others, is a clever thief and liar, and takes pride in out-smarting guards. He goes on to complain about Dr. Mendoza's testimony that he began engaging in this behavior at a young age. Evidence was also presented that Mendoza had bizarre fantasies and was an extremely dangerous person.

Mendoza further complains that the State was able to obtain a copy of the notes that Dr. Vigen recorded during his interviews. He asserts that the information contained in the report

---

[1] "RR" refers to the reporter's record of the transcribed testimony during the trial, preceded by the volume number and followed by the page number. "CR" refers to the clerk's record on direct appeal, preceded by the volume number and followed by the page number. "SHCR" refers to the state habeas clerk's record, preceded by the volume number and followed by the page number.

would not have been available to the State absent Dr. Vigen's testimony. The notes contained information that was unknown to the State and would not have been proffered as evidence absent Dr. Vigen's testimony. The information includes reference to Mendoza's delinquency during his early years, instances of theft from both family members and as a manager of a football team. There was evidence of his violence toward his mother and sister at a young age. In particular, the jury was able to hear about Mendoza's fantasy of confining people in a small room where they are sensory deprived and tortured.

Mendoza argues that the only possible benefit provided by Dr. Vigen's testimony was his opinion that Mendoza could arguably grow spiritually and would likely not be a future danger. He argues that this potential beneficial testimony was gutted by the State during cross-examination. He adds that any credibility that Dr. Vigen had was immediately erased when the State was allowed to question him regarding the fact that he had never testified on behalf of the State in a death penalty case and in various instances of particularly heinous murders. It was noted that the State elicited evidence during cross-examination that Dr. Vigen believed that Mendoza was a very dangerous person. Moreover, he had no personal knowledge of the Texas prison system and so his opinion that Mendoza would not be a "future danger" was based only on pure speculation with no basis in fact.

The State noted, in response, that trial counsel explained his mitigation strategy in an affidavit submitted during the state habeas corpus proceedings. A review of counsel's affidavit reveals that counsel gave a great deal of thought in developing a strategy focusing on the testimony of Dr. Vigen. Counsel explained his strategy as follows:

> The defense team made all proper requests for appointment of experts to help develop issues that were important in Mr. Mendoza's defense. Mr. Mendoza was

interviewed about his background and facts of the case. Mr. Vince Gonzalez was appointed as a mitigation expert and the defense team was satisfied with his credentials. Mr. Gonzalez built a good relationship with the defendant and with his family. Mr. Gonzalez, in my presence, constantly reminded the entire family of what information was necessary in order to develop a mitigation case. Furthermore, Mr. Gonzalez found information (such as the father's suicide attempts and Mr. Mendoza's possible sexual abuse by an older cousin), which the family was unwilling to voluntarily disclose. Dr. Vigen was brought onto the defense team because of his past work in prisons and because we decided he would come across well as a "testifying witness" in the case. The defense team was familiar with his abilities and performance on other Capital cases. Dr. Cunningham and Mr. Woods were brought on the team so that we could funnel all their expertise through Dr. Vigen. This strategy was discussed and explained to Moises Mendoza. The Defense team decided early on that we would employ Dr. Vigen as the voice of these experts since he had/could create a great rapport with juries. The defense team, based on negative responses by potential juror questionnaires about defense experts, had decided that we wanted to present our defense through Dr. Vigen because the law allows an expert to rely on what other experts provide to them. Dr. Vigen had the benefit of all the information gathered by all our experts.

* * *

Writ counsel has mischaracterized our punishment argument. Our strategy based on an in-depth investigation of Mr. Mendoza's background, was that he came from a strict family. That Mr. Mendoza's formative years were affected by his father's absence (due to depression and suicide attempts). That the father's inability to be a parent to his son caused Mr. Mendoza to find a destructive crowd that accepted him. This new group of friends indulged in depraved behavior, and this became his new value system (unlike his brothers and sisters). That this new value system led him to where he is today, but that this could be controlled in prison and eventually lead to some redemption in his life. Also an underlying theme was that the jury should spare the defendant's life for the sake of his family.

All strategies and developments had to be weighed against the credible evidence that existed and by the facts relayed to us by Mr. Mendoza.

4 SHCR 1469-71.

Counsel subsequently summed up his strategy as follows:

With all the roles defined we developed and presented to the jury our strategized mitigation as an explanation for his conduct, not an excuse. His family, the dysfunction that followed as to Mr. Mendoza when his father became a shell of his former self, and the value system he took on with his new set of friends.

> Dr. Vigen's dual role did not provide the prosecution with any information it did not already know about and were prepared to present in rebuttal. We had decided that it was better that they hear it explained by our expert than the state's witnesses. Also, it gave Dr. Vigen a more honest position in front of the jury when it could explain the bad with the good.

4 SHCR 1474.

In evaluating the first supplemental ground for relief concerning whether trial counsel was ineffective for calling Dr. Vigen as an expert witness during the punishment phase of the trial, the Court notes that the case law is abundantly clear that "in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983)), *cert. denied*, 537 U.S. 1104 (2003). *See also Woods v. Thaler*, 399 F. App'x 884, 891 (5th Cir. 2010), *cert. denied*, 563 U.S. 991 (2011). "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.8.6, at 133 (1989)). The Supreme Court stressed in *Wiggins* that the "investigation into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence." *Id.* (emphasis in original). The record in the present case reveals that counsel employed a number of experts, including Dr. Vigen, in order to comply with the duty to discover all reasonably available mitigating evidence.

The decision concerning which evidence and witnesses to present to a jury in mitigation is a matter of trial strategy. The Supreme Court explained in *Strickland* that "strategic choices made

after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *See Strickland,* 466 U.S. at 690-91. Federal courts "will not question a counsel's reasonable strategic decisions." *Bower v. Quarterman*, 497 F.3d 459, 470 (5th Cir. 2007), *cert. denied*, 553 U.S. 1006 (2008). In applying *Strickland*, the Fifth Circuit held that "the failure to present a particular argument or evidence is presumed to have been the result of strategic choice." *Taylor v. Maggio*, 727 F.2d 341, 347-48 (5th Cir. 1984). Habeas corpus relief is unavailable if a petitioner fails to overcome the presumption that counsel made sound strategic decisions. *Del Toro v. Quarterman*, 498 F.3d 486, 491 (5th Cir. 2007), *cert. denied*, 552 U.S. 1245 (2008).

In the present case, counsel carefully considered and prepared the strategy that would be used in presenting the case in mitigation. In particular, the decision was made to "employ Dr. Vigen as the voice of these experts since he had/could create a great rapport with juries." 4 SHCR 1470. The Court notes that Dr. Vigen has regularly been employed as an expert witness in death penalty cases. *See, e.g.*, *Robertson v. Davis*, No. 3:13-CV-0728-G, 2017 WL 1178243, at *6 (N.D. Tex. March 30, 2017); *Murphy v. Davis*, No. 3:09-cv-1368-L-BN, 2016 WL 8652347, at *20-21, 23 (N.D. Tex. Nov. 29, 2016); *Cortez v. Director, TDCJ-CID*, No. 4:13cv83, 2016 WL 1228780, at *26-27 (E.D. Tex. March 29, 2016); *Bess v. State*, No. AP-76377, 2013 WL 827479, at *33 (Tex. Crim. App. March 6, 2013); *Lizcano v. State*, No. AP-75,879, 2010 WL 1817772, at *30 (Tex. Crim. App. May 5, 2010). Indeed, Dr. Vigen testified in the present case that he had testified in approximately fifty capital murder cases and worked on over a hundred cases. 24 RR 134. Dr. Vigen has regularly testified about capital offenders being a low risk for violent behavior

in prison. *See, e.g.*, *Cortez*, 2016 WL 1228780, at *27; *Lizcano*, 2010 WL 1817772, at *30. As such, counsel's decision to call Dr. Vigen as an expert witness in the present case was consistent with similar decisions by other defense attorneys in capital murder cases, and counsel's representation in calling Dr. Vigen as an expert witness cannot be characterized as falling "'below an objective standard of reasonableness' as measured by 'prevailing professional norms.'" *Rhoades v. Davis*, 852 F.3d 422, 431-32 (5th Cir. 2017) (citing *Strickland*, 466 U.S. at 687-88).

With respect to Mendoza's complaint that Dr. Vigen's testimony opened the door to damaging testimony, counsel explained that Dr. Vigen "did not provide the prosecution with any information it did not already know about and were prepared to present in rebuttal. We had decided that it was better that they hear it explained by our expert than the state's witnesses. Also it gave Dr. Vigen a more honest position in front of the jury when it could explain the bad with the good." 4 SHCR 1474. The Fifth Circuit has found that "[t]rial counsel's decision to admit these damaging documents before the State was able to introduce them, and soften their potential damage, is a reasonable trial strategy and will not be second guessed." *Coble v. Quarterman*, 496 F.3d 430, 439 (5th Cir. 2007). *See also Garcia v. Director, TDCJ-CID*, 73 F. Supp.3d 693, 793 (E.D. Tex. 2014) (finding that counsel's decision to introduce damaging evidence before the State had the opportunity to do so was reasonable trial strategy).

Overall, Mendoza's first ground for relief concerns trial strategy. Counsel developed a reasonable strategy after a careful consideration of the facts of this case. As such, the strategy to call Dr. Vigen as an expert witness, which included the introduction of unfavorable evidence before the State offered it, was reasonable trial strategy that may not be second guessed by this

Court.   In light of *Strickland*, the Court cannot find that counsel was ineffective for calling Dr. Vigen as an expert witness.

Mendoza's second ground for relief is that initial post-conviction counsel was ineffective for failing to raise the issue of trial counsel's ineffectiveness in presenting the testimony of Dr. Vigen.   In light of the decision that trial counsel was not ineffective for calling Dr. Vigen, the corresponding claim that initial post-conviction counsel was ineffective for failing to raise this issue lacks merit.   Habeas counsel was not required to make frivolous or futile arguments. *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002), *cert. denied*, 538 U.S. 926 (2003); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990). *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) (the "[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.").

The Court further observes that the issue of whether trial counsel was ineffective during the punishment phase of the trial was fully developed during the state habeas corpus proceedings, although Mendoza's grounds for relief during the state habeas corpus proceedings were not specifically worded in terms of ineffective assistance of counsel for calling Dr. Vigen.   State habeas counsel argued that counsel should have obtained a comprehensive psycho-social history (claim 1), counsel failed to adequately investigate and develop crucial mitigating evidence (claim 4), counsel failed to adequately present crucial mitigating evidence (claim 5), and counsel was ineffective for failing to present testimony to support a sentence less than death and to give a favorable opinion concerning Mendoza's risk assessment (claim 7).

Mendoza's state habeas counsel specifically complained that the mitigation investigation was superficial and failed to provide Dr. Vigen with adequate records or direction for his

evaluation to be useful. 1 SHCR 41. State habeas counsel opined that "Dr. Vigen had insufficient knowledge and/or experience to testify persuasively in any of the areas about which he opined." *Id.* at 42. Counsel observed that Dr. Vigen acknowledged that he had never been in the Texas prison system and had not done any studies on future dangerousness. *Id.* at 43. Counsel asserted that Dr. Vigen's "lack of preparation allowed the prosecution to discredit the defense." *Id.* State habeas counsel complained that trial counsel "called Dr. Vigen to testify to a catalog of seemingly unrelated mitigating factors." *Id.* at 47. Complaints were also made about Dr. Vigen's six opinions. *Id.* at 48. State habeas counsel asserts that "Dr. Vigen's testimony made it clear that the mitigation investigation was preliminary and inadequate." *Id.* at 87. State habeas counsel specifically alleged that trial counsel's performance was deficient for using Dr. Vigen as a "future dangerousness" expert. *Id.* at 97. The complaint was made that much of Dr. Vigen's "expert witness testimony was more harmful than helpful to" Mendoza. *Id.* at 114. State habeas counsel complained that trial counsel called Dr. Vigen to present mitigation themes. *Id.* at 115. State habeas counsel finally complained that "trial counsel called Dr. Vigen, who was not qualified and was not able to inform the jury of scientifically sound methodology and empirical data, accompanied by demonstrative exhibits particularized to Mr. Mendoza, that would have guided the jury's discretion in making their decision as to future dangerousness and mitigation." *Id.* at 191-92.

After reviewing the pleadings and evidence accumulated in this case, the state trial court issued findings of fact regarding whether counsel was ineffective during the sentencing phase of the trial, which includes the following findings:

> 24.    The trial record confirms that counsel actively advanced the theory of the case at punishment that they had formulated before trial.

a. Counsel called all six members of [Mendoza's] immediate family to give an account of their father's depression and how [Mendoza] had been negatively influenced by a new group of friends. 23 RR 53-237; 24 RR 88-89.

b. Counsel called psychologist Dr. Mark Vigen to explain how [Mendoza's] father's depression and resulting absence from their home taught [Mendoza] that the strict rules that applied to his older siblings did not apply to him, and that he could get away with things because his mother made excuses for him. Dr. Vigen explained that [Mendoza] had then changed radically for the worse after his association with the depraved peer group. 24 RR 122-30.

37. Before trial, two psychologists, Dr. Mark Vigen and Dr. Mark Cunningham, interviewed [Mendoza]. 24 RR 51, 56.

38. [Mendoza] has produced no evidence from either Dr. Vigen or Dr. Cunningham that they found evidence that [Mendoza] lacked the intent to commit capital murder.

135. Based on statements of Vince Gonzales, Juan Sanchez, Angela Ivory Tucker, and the testimony of Dr. Vigen, it is evident that Dr. Vigen and his assistant Fran Dezendorf interviewed all of [Mendoza's] family members on behalf of the defense team as part of the investigation into [Mendoza's] background and potential mitigation:

a. Vince Gonzales states that Dr. Vigen performed portions of the investigation in [Mendoza's] family and background that Gonzales did not perform himself. State's Writ Exhibit at 1.

b. Dr. Vigen testified at trial that he and assistant Fran Dezendorf interviewed each of the members of [Mendoza's] family. 24 RR 115.

c. Trial counsel confirm that they decided to have Dr. Vigen interview [Mendoza's] family members because they believed his forensic background could assist them in "extracting sensitive information." State's Writ Exhibit at 5.

136. Both trial counsel and Vince Gonzales are consistent about various roles each member of the defense would play, especially in regard to conducting interviews with [Mendoza's] family. [Mendoza] has offered no evidence from Dr. Vigen that he was unclear about his role.

137.     Toni Knox complains that the mitigation specialist should have conducted interviews with the family to investigate mitigation issues and then provide Dr. Vigen and a number of other experts with a social history.   *See* Application at 110. But just because [Mendoza's] defense team delegated responsibilities differently does not establish that Dr. Vigen or any other defense team member was confused or unclear about their role.

145.     Dr. Vigen's role in the investigation did not make notes available to the State that the defense team otherwise could have been withheld.   Even if the mitigation specialist had conducted the family interviews and interviews with [Mendoza], the mitigation specialist would have shared these interview notes with Dr. Vigen to use as a basis for his opinion, and consequently the State still would have had access to the interview notes since the expert had relied upon them for his opinion.   *See* Tex. R. Evid. 705.

146.     [Mendoza] also has not established that Dr. Vigen and his assistant Fran Dezendorf would not have interviewed the family themselves and generated the same notes, even if the mitigation specialist had also conducted his own initial family interviews.

147.     Trial counsel state that they preferred that Dr. Vigen be the one to explain negative facts for the defense instead of the State's witnesses.   State's Writ Exhibit 1 at 6. Counsel also believed that if Dr. Vigen could acknowledge both the good and bad, he would seem more credible in the jury's eyes.   *See* State's Writ Exhibit 1 at 6.

148.     Counsel's decision to have Dr. Vigen in a position where he could testify about all of the facts, including those that were unhelpful to the defense, was a reasonable decision and a strategy that the Court has seen other capable criminal defense attorneys adopt in other cases.

165.     [Mendoza] and Toni Knox complain that trial counsel inadequately prepared Dr. Vigen to testify, and they point to his vague description of the Mendoza family as being dysfunctional and suggest his vagueness is due to oversight or a lack of a compiled report on [Mendoza's] social history.   *See* Application at 84.

166.     Without any further development elsewhere in the application, [Mendoza] repeats Toni Knox's bare accusation "It appears that the defense had not done a very thorough investigation of their expert witness to prepare for his possible vulnerabilities on the stand."   [Mendoza's] Writ Exhibit I at 31; Application at 95. This ground of ineffective assistance of counsel is procedurally barred due to inadequate pleading.   It is not the Court's duty to scour the record in search of facts supporting his and his witness's conclusory allegation.   [Mendoza] never asserts what he believes were Dr. Vigen's vulnerabilities.   [Mendoza] bears the burden of clearly pleading every element of his claim, including how counsel's alleged

deficiency contributed to his conviction or sentence, and this he has failed to do. *See Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985).

167.   In any case, [Mendoza] offers no evidence that counsel failed to investigate Dr. Vigen's vulnerabilities or that better investigation would have resulted in a different outcome for the defense.

168.   Moreover, Dr. Vigen's testimony about the dynamics of the Mendoza family dysfunction is no evidence of inadequate preparation by counsel since his testimony was appropriately specific.   Dr. Vigen explained that the once strong, strict father that [Mendoza's] older siblings knew withdrew from the family emotionally, and that his mother - in an effort to protect him - minimized problems and made up excuses for him.   24 RR 122.   As a result, [Mendoza] failed to connect emotionally with his father, and instead of adopting the family's value system, he learned that he was exempt from rules others had to follow.   24 RR 122, 187.

169.   [Mendoza] has not established that there was anything further to discover that Dr. Vigen could have been more specific about to convince the jury that [Mendoza's] family was truly dysfunctional.

172.   [Mendoza] has offered no direct evidence in support of his claim that Dr. Vigen did not have adequate records or documentation concerning [Mendoza's] mother and father.   *See* Application at 111.   This allegation is unreferenced and unsupported by any evidence and devoid of any specific pleadings as to what records or information he lacked about [Mendoza's] mother and father that would have made a difference.

173.   [Mendoza] has not shown that the lack of a social history report or any other records, reports, or documentation is the reason for any lack of specificity in Dr. Vigen's testimony.

174.   [Mendoza] has not met his burden of proving that if counsel had prepared a social history that was identical to the one Toni Knox compiled that Dr. Vigen would have testified in more detail.

175.   [Mendoza] has produced no evidence of specific examples of dysfunction that would have made a difference in the outcome of the proceedings even if counsel had discovered such examples and Dr. Vigen testified about them in front of the jury.

189.   Trial counsel state that Dr. Vigen was able to "basically extract the same information [ ] which Toni Knox was able to obtain."   State's Writ Exhibit 1 at 5. Because [Mendoza] has not presented evidence of any specific, credible fact or

event in [Mendoza's] background that counsel failed to uncover, the Court finds counsel's statement is true.

192. [Mendoza] has offered no evidence in support of Toni Knox's unfounded allegation that Dr. Vigen was unaware of information concerning Concepcion Mendoza's lawsuit against Decker Foods or that he was unable to consider that information in analyzing the dynamics of the Mendoza family. *See* [Mendoza's] Writ Exhibit I at 13; Application at 91.

196. In light of Dr. Vigen's knowledge of the names of the providers, the dates of treatment, and the length and extent of Concepcion Mendoza's medical and mental health records, the Court finds it credible that he did actually review these records.

212. Trial counsel brought both S. O. Woods and Dr. Mark Cunningham on the defense team so that they could funnel all their expertise through Dr. Vigen. State's Exhibit 1 at 2.

213. By having Dr. Vigen as the voice of these experts, counsel intentionally avoided putting on a "parade of experts" and positioned themselves to benefit from Dr. Vigen's "great rapport with juries." State's Exhibit 1 at 2.

214. Dr. Vigen testified, over the State's objection, that TDCJ had the capacity to prevent [Mendoza] from being a future danger. 24 RR 84-88.

215. At trial, this Court found that Dr. Vigen was qualified to give an opinion on future dangerousness. 24 RR 84-88.

217. Dr. Vigen testified that "people just don't stand up one day and say, . . . [']I'm going to murder somebody today.['] The roots of this type of behavior generally go back a long ways in people's lives, and in most of the cases that I've seen there are incidents - there's the criminal history in the family or there's an alcohol and drug instance in the family or there's a lot of mental health issue [sic] in the family. . . . and these abnormalities cause or contribute to . . . aberrant behavior like killing another human being. There's something missing in this case for me as a psychologist. There is none of that there. There's something I don't know. I can't tell you. From a - my intuition." 24 RR 187.

218. The Court understands the above testimony as an expression of Dr. Vigen's belief that when human beings do something so heinous as to intentionally take the life of another, there is always some past event or experience that must have contributed, that there is some explanation for the unthinkable. And that therefore, since he did not find any such event or experience in [Mendoza's] history, it must be because it has not yet been uncovered.

219.     The fact that Dr. Vigen did not find that past event or experience which could give him solace is not evidence of trial counsel's inadequacies or the inadequacies of their investigation. A far more persuasive explanation is that Dr. Vigen's underlying premise is not true - that sometimes there is nothing in a murder's background to help explain what he did. In this instance, there was nothing missing because there is simply nothing to find in [Mendoza's] background to explain his killing, rape, and kidnapping of Rachelle Tolleson.

265.     Trial counsel brought Dr. Cunningham on the defense team so that Dr. Cunningham could consult with Dr. Vigen and provide him with expertise that Dr. Vigen could relate to the jury. State's Writ Exhibit 1 at 2, 6.

271.     Dr. Vigen was qualified to convey Dr. Cunningham's knowledge and expertise on future dangerousness to the jury. At the time, the two experts were publishing an article together reviewing the scholarship on death-row inmates. *See* Dr. Vigen resume, Applicant's Writ Exhibit I, Attachment A-1, Bates stamp 213; Mark D. Cunningham & Mark P. Vigen, "Death Row Inmate Characteristics, Adjustment, and Confinement: a Critical Review of the Literature." 20 BEHAV. SCI. & L. 191 (2002)

272.     Dr. Vigen testified about [Mendoza's] low or minimum risk for future violence in the prison system, in part because of the penitentiary's capability to incarcerate him. 24 RR 127. Dr. Vigen also conveyed Dr. Cunningham and Dr. Sorensen's information about the low rates of violence in prison in a common-sense way. 24 RR 178.

4 SHCR 1776, 1778, 1798-99, 1800, 1803-04, 1809, 1810, 1812-13, 1823-24.

The state trial court went on to issue the following conclusions of law regarding allegations

of ineffective assistance of trial counsel as they relate to Dr. Vigen:

348.     [Mendoza] has neither overcome the presumption of reasonable professional assistance nor established that counsel was deficient for relying on Dr. Vigen to help conduct the mitigation investigation. *See Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005) (finding that criticisms in hindsight did not rebut presumption of reasonable professional assistance).

351.     [Mendoza] has not met his burden of establishing that counsel was deficient as evidenced by testimony of Dr. Vigen. [Mendoza] complains with the advantage of hindsight that Dr. Vigen's testimony "aided the prosecution." Application at 100. But Dr. Vigen's willingess to acknowledge that [Mendoza's] remorse was "somewhat . . . superficial" and that mitigating circumstances present in other capital murder cases are not present in [Mendoza's] history could very well have

made him seem more objective and thus more credible in the eyes of the jury. Moreover, [Mendoza] has not articulated exactly what counsel should have done differently to prepare Dr. Vigen so that he would not have testified as he did. Nor has [Mendoza] demonstrated that the results of the proceedings would have been any different without Dr. Vigen's concessions. *See Strickland*, 466 U.S. at 693-94.

352. An expert relying on the opinions of other experts, Dr. Vigen was qualified based on his consultation with S. O. Woods to testify that TDCJ had the capacity to prevent [Mendoza] from being a future danger. *See* TEX. R. EVID. 703.

370. [Mendoza] does not allege, much less prove, that Dr. Vigen would have changed his testimony or psychological evaluation if he had known more about [Mendoza's] maternal uncle's mental health history.

424. [Mendoza] has not established that counsel was deficient for calling Dr. Vigen to give an opinion on [Mendoza's] future dangerousness. *See Strickland*, 466 U.S. at 693-94.

425. [Mendoza] has also not rebutted the presumption that counsel's decision to call Dr. Vigen to testify on future dangerousness was within the wide range of professional reasonable assistance. *See Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005).

426. An expert may rely on the opinions of other experts if such information is reasonably relied upon by those in the field. *See* TEX. R. EVID. 703. Dr. Vigen was qualified, based on his own experience and training and his consultations with S. O. Woods and Dr. Cunningham, to testify that TDCJ had the capacity to prevent [Mendoza] from being a future danger.

4 SHCR 1836, 1839, 1848.

The record is abundantly clear that initial state habeas counsel repeatedly alleged that trial counsel was ineffective for calling Dr. Vigen as an expert witness during the punishment phase of the trial. This is the case even though the exact wording employed by initial state habeas counsel did not specifically state that trial counsel was ineffective for calling Dr. Vigen as a witness. Moreover, the findings of fact and conclusions of law make it clear that initial state habeas counsel had, in fact, challenged trial counsel's decision to present the testimony of Dr. Vigen during the

24

punishment phase of the trial. The issue of whether trial counsel was ineffective for calling Dr. Vigen as an expert witness was front and center in the state habeas corpus proceedings, and the state trial court found that trial counsel's representation was not deficient for calling Dr. Vigen as an expert witness. The Texas Court of Criminal Appeals subsequently denied the application for a writ of habeas corpus on the findings and conclusions of the trial court and its own review. *Mendoza*, 2009 WL 1617814.

In the present supplemental habeas proceedings, Mendoza has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

The precise issue before the Court with respect to the first two supplemental grounds for relief is not, however, whether Mendoza has overcome the requirements of § 2254(d). Instead, consistent with *Martinez* and *Trevino*, the issue before the Court is whether he has shown that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *Preyor*, 536 F. App'x at 421. For reasons heretofore explained, the Court is of the opinion, and so finds, that Mendoza has not satisfied either requirement in order to overcome the procedural default. Nonetheless, to the extent that Mendoza's supplemental ineffective assistance of counsel claims overlap with claims that were actually raised by initial state habeas counsel, he has not satisfied the requirements of § 2254(d). Mendoza has not shown that he is entitled to relief on his first two supplemental claims.

3. Mendoza claims that the State of Texas used potentially false testimony at the punishment stage of the trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and trial counsel was ineffective in violation of the Sixth Amendment of the United States Constitution for failing to discover the State's use of false evidence.

4. Mendoza alleges, pursuant to *Martinez*, that trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by failing to interview Melvin Johnson and presenting his testimony during the trial.

5. Mendoza alleges, pursuant to *Martinez*, that post-conviction counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by failing to interview Melvin Johnson and by consequently failing to raise the ineffective assistance of trial counsel on collateral review by trial counsel's failure to interview, investigate and present Melvin Johnson's testimony at trial or discover the use of the State's false evidence.

Mendoza's final three supplemental grounds for relief are related. All three claims relate to the State's rebuttal witness, Officer Robert Hinton, a detention officer with the Collin County Sheriff's Department, who *may* have testified falsely during the punishment phase of the trial regarding an incident involving Mendoza and Melvin Johnson, another inmate. Supplemental habeas counsel acknowledges that Mendoza "cannot allege with certainty that the testimony propounded by Officer Hinton was indeed false. Rather at best all he can show is that potentially it *may* be false." See Amended petition (Docket No. 86), page 38 (emphasis added). In the third ground for relief, Mendoza claims that the State of Texas *may* have used false testimony and that trial counsel was ineffective for failing to discover the State's use of false testimony. In the fourth ground for relief, Mendoza argues that trial counsel was ineffective for failing to interview inmate Johnson and presenting his testimony at trial. In the fifth ground for relief, Mendoza argues that post-conviction counsel was ineffective for failing to interview inmate Johnson and failing to raise an ineffective assistance of trial counsel claim.

Officer Hinton testified that he was working as a detention officer in the Collin County detention facility on September 22, 2004. 24 RR 221. He testified that he observed Mendoza go into a segregated recreation yard by himself. *Id.* at 229. From his vantage point, he believed that the door had closed behind Mendoza, and that he was in the recreation yard. *Id.* He then observed that another inmate, Melvin Johnson, was released from his cell to finish mopping and sweeping the dayroom on the segregation side. *Id.* at 230. Hinton testified that he observed Mendoza re-enter the housing unit, which prompted him to order Mendoza to return to the recreation yard. *Id.* Mendoza, however, walked up the stairs towards Johnson, and a "fist fight broke out." *Id.* He stated that inmate Johnson "took a defensive posture and was blocking the swings and returning them, too." *Id.* at 231. Mendoza was disciplined as a result of the incident. *Id.* at 233.

Supplemental habeas counsel states that he was able to interview Melvin Johnson, who provided the following affidavit regarding the incident:

> My name in Melvin Jermaine Johnson, I am presently [a]n inmate in the Wynne Unit in the Texas Department of Corrections. In 2004, I was incarcerated in the Collin County Jail where I came into contact with Moises Mendoza. Moises Mendoza was not very well liked by other inmates and the guards. Mr. Mendoza would continually use racial slurs and had a bad attitude. Due to the nature of Mr. Mendoza's offense he was confined to what is called the SHU, the special housing unit. On one occasion, due to a disciplinary problem, I was placed in the SHU also. While confined in the SHU inmates were allowed one hour a day to recreate. Mr. Mendoza would recreate by himself. As Mr. Mendoza was heading toward the rec yard, my cell[] was rolled. What this means is for some reason, my cell door was opened. This can only happen by a guard opening the door. As soon as the door opened, I figured what the guards wanted and I exited my cell and started a fight with Mr. Mendoza. I was definitely the aggressor. Mr. Mendoza was defending himself, but wasn't fighting back. After a short period of time, guards arrived and broke the fight up. That night I received an extra tray of food which I figured was a bonus for my actions in fighting Mr. Mendoza. Although, no one ever spoke to me about this incident, I am sure that the guards had planned this situation. I was told that there was trial testimony that Mr. Mendoza was in the

rec yard when I was allowed to exit my cell to finish mopping the floor in the day room and Mr. Mendoza attacked me, this testimony is patently false.   I have never been contacted until recently by anyone in regards to the facts of this situation, but had I been so contacted, I would have testified at trial as to what really happened on that occasion which is what I have stated in this affidavit.

Amended petition (Docket No. 86), Exhibit A.   The affidavit was signed on November 2, 2016.

Mendoza appropriately observes that Hinton and Johnson have given two conflicting rendition of events, and that potentially his due process rights were violated by the admission of false testimony.

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citations omitted).   Moreover, the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (citations omitted).  "[T]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Id.* (citations omitted).   The Fifth Circuit applied the standards set forth in *Napue* and *Giglio* in *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir.), *cert. denied*, 536 U.S. 978 (2002).   A petitioner must prove that the prosecution knowingly presented or failed to correct materially false testimony during trial.  *Id.* at 337.   Due process is not implicated by the prosecutions's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements.  *Id.*  Perjury is not established by mere contradictory testimony from witnesses, inconsistencies within a witness' testimony and conflicts between reports, written statements and the trial testimony of prosecution

witnesses.  *Koch*, 907 F.2d at 531.  To prove a due process violation, a petitioner must demonstrate: (1) that the testimony in question was actually false, (2) that the State knew it was false, and (3) that the testimony was material.  *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996).  Perjured testimony is material only when there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.  *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Canales*, 765 F.3d at 573.

In the present case, Mendoza has not satisfied his burden of showing a violation of his due process rights under *Napue* and *Giglio*.  He acknowledges that he can only say that Officer Hinton *may* have testified falsely.  As such, he can only say that potentially his due process rights under *Napue* and *Giglio* were violated.  Johnson's affidavit does not establish that Hinton testified falsely.  It is not enough that a witness' testimony is challenged by another witness.  *Kutzner*, 303 F.3d at 337.  At best, Johnson's affidavit establishes a credibility issue, but it does not demonstrate that Hinton testified falsely.  *Koch*, 907 F.2d at 531.  The State appropriately observes that courts should view last-minute affidavits with "'a degree of skepticism' because '[i]t seems that, when a prisoner's life is at stake, he often can find someone new to vouch for him.'" *Wilkerson v. Cain*, 233 F.3d 886, 893 (5th Cir. 2000) (Garza, J., concurring) (quoting *Herrera v. Collins*, 506 U.S. 390, 423 (1993)).  In addition to the foregoing, assuming *arguendo* that Hinton's testimony was false, Mendoza has not provided any evidence showing that the prosecutor was aware that Hinton's testimony was false or that the testimony was material.  He has not satisfied the three-pronged test in order to show a due process violation based on the State's knowing use of false evidence.

The State also appropriately notes, in response, that the issue before the Court at this juncture is whether Mendoza is entitled to relief based on ineffective assistance of counsel in light of *Martinez* and *Trevino*. To the extent that Mendoza is seeking relief based directly on *Napue* and *Giglio*, neither the Supreme Court nor the Fifth Circuit have extended the holdings in *Martinez* and *Trevino*. *Davila v. Davis*, 582 U.S. ___, 137 S. Ct. 2058, 2065 (2017) (declining to extend "*Martinez* to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel"); *Martinez*, 566 U.S. at 15 ("*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review proceedings for claims of ineffective assistance at trial."); *Prystash v. Davis*, 854 F.3d 830, 836 (5th Cir. 2017) (declining to extend *Martinez/Trevino* to claims that could have been raised on direct appeal); *Reed*, 739 F.3d at 778 n.16 (declining to extend *Martinez* to ineffective assistance of appellate counsel claims); *Wilkins v. Stephens*, 560 F. App'x 299, 306 n.44 (5th Cir. 2014) (claim alleging denial of right to a public trial under the Sixth Amendment "does not fall within the scope of *Martinez* or *Trevino* and is therefore procedurally barred"). *Martinez* and *Trevino* do not provide a basis for relief based on a due process claim under *Napue* and *Giglio*.

As a second part of claim number three, Mendoza attempts to link the *Napue/Giglio* claim to *Martinez/Trevino* by arguing that trial counsel was ineffective for failing to discover the State's use of false evidence. It is noted once again, however, that he failed to establish that Hinton's testimony was actually false; thus, he cannot show that counsel was ineffective for failing to discover that the State engaged in the use of false evidence.

Despite the foregoing, Mendoza attempts to satisfy *Martinez/Trevino* by claiming that trial counsel was ineffective for failing to interview Melvin Johnson and presenting his testimony at trial (Claim Four) and that initial post-conviction counsel was ineffective for failing to interview Melvin Johnson and then failing to raise an ineffective assistance of trial counsel claim on collateral review by trial counsel's failure to interview, investigate and present Melvin Johnson's testimony at trial or discover the use of the State's false evidence (Claim Five). In support of claims four and five, Mendoza notes that Johnson states that he was never contacted by anyone until just recently. Mendoza asserts that Johnson was not contacted by any member of the defense team, nor was he contacted by any state prosecutor. He argues that Johnson's name was known and the defense team was aware or should have been aware of both Officer Hinton's testimony and Johnson's testimony, but no one bothered to investigate the situation and interview Johnson. Mendoza's supplemental habeas counsel states that he has communicated with lead trial counsel and initial post-conviction counsel about this matter. Lead trial counsel states that he was not aware of any member of the defense team who actually interviewed Johnson. Initial state habeas counsel likewise states that she does not recall if she ever spoke to Johnson.

The State's response initially notes that Mendoza does not prove that members of the defense team did not interview or attempt to interview Johnson, or that state habeas counsel did not interview or attempt to interview Johnson. Mendoza asserts only that he has communicated with lead trial counsel, who was not aware of any member of the defense team who interviewed Johnson, and initial state habeas counsel, who did not recall speaking to Johnson. The State characterizes Mendoza's statement as hearsay and insufficient proof that no member of the defense team, at any stage, investigated or attempted to investigate this witness.

Regardless of whether trial counsel or initial state habeas counsel failed to interview Johnson, trial counsel's cross-examination of Hinton reveals that he was clearly prepared to cross-examine him. Trial counsel started his cross-examination by having Hinton identify the jail incident report. 24 RR 234. Hinton acknowledged that his report stated that it appeared that Mendoza had left the housing pod, but he could not say for sure. *Id.* at 235. Hinton acknowledged he did not know what had previously been said between Johnson and Mendoza. *Id.* He admitted that he did not know if there was name-calling or shouting or racial epitaphs or anything like that. *Id.* Hinton testified that he saw Johnson hit Mendoza and that there "was a flurry of fists from both sides." *Id.* Hinton testified that he asked Mendoza if he wanted to file charges, and both inmates signed an affidavit of non-prosecution indicating that they did not want to file charges. *Id.* at 236.

The State also appropriately observes that it is unknown what Mendoza actually told trial counsel about the matter. There is nothing suggesting that Mendoza told counsel information about this matter that counsel failed to investigate. Nonetheless, counsel's cross-examination suggests Johnson provoked Mendoza into attacking him by calling him names and racial slurs and that the fight was mutually aggressive. Trial counsel was not ineffective for not discovering information that Mendoza could have but did not disclose. *See Johnson*, 306 F.3d at 252-53 (The Fifth Circuit "has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail to disclose."); *Blanton v. Quarterman*, 543 F.3d 230, 239 (5th Cir. 2008) (trial counsel could not have uncovered abuse-of-inhalant evidence where neither petitioner nor his family mentioned it), *cert. denied*, 556 U.S. 1240 (2009); *Soria v. Johnson*, 207 F.3d 232, 250-51 (5th Cir.) (no deficient performance where, despite encouragement,

petitioner and family failed to reveal evidence of past behavior and family), *cert. denied*, 530 U.S. 1286 (2000).

Assuming *arguendo* that trial counsel's representation was deficient for failing to interview Johnson, Mendoza is not entitled to relief because he has not shown prejudice. There is no reasonable probability that the outcome of the trial would have been different if trial counsel had interviewed Johnson and Johnson had testified in a manner consistent with his affidavit. It is unlikely that the jury would have deemed Johnson, a criminal and a disciplinary problem confined in segregation, more credible that a detention officer. Moreover, because Johnson was a "disciplinary problem," he likely had motive to discredit the sheriff's department by suggesting they orchestrated a fight and then lied about it at trial. The State appropriately observes that even now counsel cannot state with any certainty that Johnson is telling the truth or that Hinton testified falsely.

The Court further notes that Johnson's potential testimony was "double-edged." Any benefit Mendoza might have reaped from discrediting Hinton's testimony that Mendoza was the aggressor in a fight was outweighed by the negative things Johnson would have said. Namely, Mendoza was not well-liked by either guards or inmates, he "continually" used racial slurs, and he had a bad attitude. The Fifth Circuit recently reiterated that it has held that "double-edged evidence cannot support a showing of prejudice under *Strickland*." *Reed v. Vannoy*, 703 F. App'x 264, 270 (5th Cir. 2017) (citing *Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000)). *See also Matthews v. Davis*, 665 F. App'x 315, 319 (5th Cir. 2016) (trial counsel's failure to investigate and introduce evidence was not prejudicial because it would be double-edged); *Gray v. Epps*, 616 F.3d 436, 449 (5th Cir. 2010) (petitioner could not show prejudice because much of the new

evidence was double-edged and could be interpreted as aggravating), *cert. denied*, 563 U.S. 905 (2011).

Finally, even if trial counsel could have discredited Hinton's testimony that Mendoza was the aggressor in the fight, Mendoza cannot show that he was prejudiced in the ultimate outcome of the case. The jury heard testimony about the brutal and callous facts of the crime; evidence of Mendoza's escalating violent and criminal behavior towards family, friends, and strangers; evidence that Mendoza was unmanageable, had a temper, and was disrespectful to teachers; evidence that, while on probation, Mendoza cut off his ankle monitor and stopped reporting to his probation officer; and finally, while awaiting trial in the Collin County detention facility, evidence that Mendoza created weapons and refused to take his prescribed medication.

In sum, Mendoza has not shown a substantial claim of ineffective assistance of trial counsel in order to overcome the procedural default.

Mendoza's final claim concerns ineffective assistance of initial post-conviction counsel. More specifically, initial post-conviction counsel was purportedly ineffective for failing to interview Melvin Johnson and then failing to raise an ineffective assistance of trial counsel claim on collateral review by trial counsel's failure to interview, investigate and present Melvin Johnson's testimony at trial or discover the use of the State's false evidence. For the most part, the analysis of the fifth supplemental claim is comparable to the analysis of Mendoza's fourth supplemental claim.

As with his claims regarding trial counsel, Mendoza could have told state habeas counsel that Officer Hinton committed perjury and that this issue was worthy of an investigation or review. There is nothing suggesting that Mendoza told initial state habeas counsel anything about this

matter and that state habeas counsel failed to follow-up on such information. Once again, the record reveals that trial counsel had a copy of the jail incident report and that he effectively cross-examined Hinton with it. Without notice from Mendoza, and given the effective and thorough cross-examination of Hinton by trial counsel, state habeas counsel had little reason to question the veracity of Officer Hinton's testimony or trial counsel's preparation for this witness.

Overall, Mendoza has not shown that his *Napue* claim or corresponding ineffective assistance of counsel claims have merit. He has not shown that Officer Hinton's testimony was false or that trial counsel should have suspected that it was false. He has not shown that trial counsel's representation fell below an objective standard of reasonableness in failing to present Johnson's testimony to counter Officer Hinton because Johnson lacked credibility and any potential good from his testimony would have been outweighed by the harm that would have resulted from his testimony. Deference is owed to the strategic decisions of state habeas counsel in deciding which claims to raise. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). State habeas counsel is not ineffective nor is a petitioner prejudiced for failing to raise meritless claims. *Segundo v. Davis*, 831 F.3d 345, 350-51 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1068 (2017).

Finally, the precise issue before the Court with respect to the last three supplemental grounds for relief is whether Mendoza can satisfy the requirements of *Martinez* and *Trevino*. He has not satisfied his burden of showing that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *Preyor*, 536 F. App'x at 421. For reasons heretofore explained, the Court is of the opinion, and so finds, that Mendoza has not

satisfied either requirement in order to overcome the procedural default with respect to supplemental claims three, four and five.

## VI. CONCLUSION

Having carefully considered the claim remanded by the Fifth Circuit, the Court is of the opinion, and so finds, that Mendoza has not shown that he is entitled to federal habeas corpus relief and his petition should be denied.

## VII. CERTIFICATE OF APPEALABILITY

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, ___ U.S. ___, 137 S. Ct. 759, 773 (2017). Instead, under 28 U.S.C. § 2253(c)(1), he must first obtain a certificate of appealability ("COA") from a circuit justice or judge. *Id.* Although Mendoza has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To make a substantial showing, the petitioner need only show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327

(2003). The Supreme Court recently emphasized that the COA inquiry "is not coextensive with merits analysis" and "should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Buck*, ___ U.S. at ___, 137 S. Ct. at 773 (quoting *Miller-El*, 537 U.S. at 336). Moreover, "[w]hen the district court denied relief on procedural grounds, the petitioner seeking a COA must further show that 'jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Rhoades*, 852 F.3d at 427 (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 140-41 (2012)).

In this case, reasonable jurists could not debate the denial of Mendoza's § 2254 supplemental grounds for relief on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. Accordingly, the Court finds that Mendoza is not entitled to a certificate of appealability as to his supplemental grounds for relief. It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice. It is further

**ORDERED** that a certificate of appealability is **DENIED**. It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

**SIGNED this 23rd day of April, 2019.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE