IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| MOISES SANDOVAL MENDOZA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:09-cv-00086-RWS |
| | § | |
| DIRECTOR, TDCJ-CID, | § | |
| | § | |
| Respondent. | § | |

## ORDER

Petitioner Moises Sandoval Mendoza ("Mendoza"), a death row inmate confined in the Texas prison system, filed the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.   He challenges his capital murder conviction and death sentence imposed by the 401st Judicial District Court of Collin County, Texas, in *The State of Texas vs. Moises Mendoza,* No. 401-80728-04.   For reasons set forth below, the petition should be **DENIED.**

### I. PROCEDURAL HISTORY

Mendoza was convicted and sentenced to death for the capital murder of Rachel Tolleson, who was killed during the course of an attempted burglary, kidnapping and aggravated sexual assault.   RR 21:195.[1]   Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, the trial court sentenced Mendoza to death on June 29, 2005. RR 25:58.   The Texas Court of Criminal Appeals affirmed the conviction.   *Mendoza v. State*, No.

---

[1] "RR" is the abbreviation for the Reporter's Record, pursuant to TEX. R. APP. PROC. 34.1, which is the trial transcript testimony recorded by the court reporter.   The abbreviation is followed by the volume number before the colon, and the page numbers after the colon.

AP-75213, 2008 WL 4803471 (Tex. Crim. App. Nov. 5, 2008).   The Supreme Court denied his

subsequent petition for a writ of certiorari.   *Mendoza v. Texas*, 556 U.S. 1272 (2009).

Following direct appeal, the state court appointed Lydia Brandt to represent Mendoza in

the state habeas corpus proceedings.   CR 5:1876.[2]   Brandt filed a habeas petition raising seven

claims, including five ineffective assistance of counsel claims.   1 SCHR 4.[3]   The Texas Court of

Criminal Appeals denied the application based on the trial court's findings and conclusions and its

own review.   *Ex parte Mendoza*, No. WR-70211-01, 2009 WL 1617814 (Tex Crim. App. June

10, 2009).

This Court subsequently appointed Brandt to represent Mendoza in the present habeas

corpus proceedings.   Docket No. 3.   With Brandt as counsel, Mendoza filed an amended petition

for a writ of habeas corpus on January 5, 2011.   Docket No. 23.   Mendoza raised the same seven

claims he presented in the state habeas corpus proceedings.   *Id.*   This Court denied the petition

but granted a certificate of appealability on four of the claims.   Docket No. 71.

Mendoza timely appealed to the United States Court of Appeals for the Fifth Circuit, which

stayed the proceedings and remanded the case in part to appoint supplemental counsel and to

consider, in the first instance, whether Mendoza can establish cause for the procedural default of

any ineffective assistance of trial counsel claims pursuant to the Supreme Court's decisions in

*Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), and if so, whether

those claims merit relief.   *Mendoza v. Stephens*, 783 F.3d 203, 203–04 (5th Cir. 2015); *see also*

*Christenson v. Roper*, 574 U.S. 373 (2015).

---

[2] "CR" is the abbreviation for the Clerk's Record, as required by the TEX. R. APP. PROC. 34.1.   It is followed by the volume number before the colon, and the page numbers after the colon.
[3] "SCHR" refers to the state habeas clerk's record, preceded by the volume number and followed by the page number.

The Court appointed Jeff Haas as supplemental counsel on May 7, 2015.   Docket No. 76.
Pursuant to the Court's order, Mendoza filed an amended petition for a writ of habeas corpus on
November 4, 2016.   Docket No. 86.   The State filed an answer on April 3, 2017 (Docket No. 89)
and Mendoza filed a response on July 13, 2017 (Docket No. 94).

## II. FACTUAL BACKGROUND OF THE CASE

The Texas Court of Criminal Appeals discussed the factual background of the case as
follows:

> Sometime after 9:00 p.m. on Wednesday, March 17, 2004, Rachelle Tolleson and
> her mother Pam O'Neil went to the store to purchase formula and diapers for
> Tolleson's five-month-old daughter, Avery.   Tolleson and Avery visited at the
> O'Neil home for a short time after returning from the store, but Tolleson did not
> feel well, had taken medication for a sinus headache, and wanted to be in her own
> home.   Around 10:00 p.m., Tolleson phoned the O'Neils to let them know that she
> and Avery had arrived home.
>
> Around the same time that evening, Efren Gamez, [Mendoza], and several friends
> were having a party.   Gamez, [Mendoza], and two young women had purchased
> two thirty-packs of beer and two forty-ounce cans of beer earlier in the evening.
> At some point, the women left the party and later called to let Gamez and
> [Mendoza] know that they were not returning.   [Mendoza] became angry, and as
> he drank more beer, he became more belligerent.   Eventually, [Mendoza] said
> something to two other girls at the party that scared them.   [Mendoza] told Gamez
> that he spoke to the girls in that manner "because he could."   [Mendoza] left the
> party and returned several times, finally leaving for the last time between midnight
> and 1:00 a.m.
>
> The following morning, O'Neil went to Tolleson's home as she often did.
> Although her car was parked in the driveway, Tolleson was not there.   A note from
> the landlord was taped to the screen door, but the wooden back door stood wide
> open.   O'Neil entered the house and noticed that a pillow had been left on the floor
> between the kitchen and the bedroom.   The bedroom was a mess.   Papers were
> strewn across the floor, the night stand was pulled away from the wall, the mattress
> and box spring were askew, and the headboard was broken and lying against the
> bed.   Avery was on the bed, cold, wet, and alone in the house.
>
> Alarmed, O'Neil collected Avery and called her husband, who contacted the police.
> Officer Scott Collins of the Farmersville Police Department responded.   Collins

confirmed O'Neil's description of the bedroom—things were thrown everywhere and furniture was out of place.  To Collins, it looked as though there had been a fight, or a tornado, in the bedroom.  The rest of the house was orderly, and there were no signs of a forced entry.

Farmersville police began interviewing potential witnesses that day.  They learned that, on the Friday before her disappearance, Tolleson hosted a party for about fifteen people, including [Mendoza].  During the party, Tolleson spoke with [Mendoza] a few times but told her best friend Megan Kennedy that she wasn't interested in [Mendoza] in "that way."

Police also learned that, on the Saturday before Tolleson's disappearance, Kennedy's boyfriend Tim Holland returned to Tolleson's home with [Mendoza] and Cody Wiltbanks to retrieve his musical instruments, but Tolleson wasn't home, and the doors were locked.  While Holland and Wiltbanks went around the house looking for a way in, [Mendoza] managed to open the locked back door.  After learning this, Collins interviewed [Mendoza], who told Collins that he had last seen Tolleson at the party.  Collins noted that [Mendoza] could not sit still and seemed very nervous.

Search parties were organized to look for Tolleson but were unsuccessful.  Six days after Tolleson disappeared, James Powell was hunting for arrowheads near Brushy Creek, east of Farmersville.  Walking along the creek, he came across a body that had been burned and was lying face down.  Through the use of dental records, the body was eventually identified as Tolleson's.

Jerry Farmer, an FBI evidence technician who was one of the first on the scene, noted that tall vegetation had been piled on top of Tolleson's body in an attempt to cover it.  Her body was badly burned and had begun to decompose.  Fly eggs and maggot activity around her head and neck indicated that she had been there for at least two days.  Her skin was charred black in places and seared yellow in others where her flesh had split apart.  Most of her hair had been burned away.  Scraps of burned clothing clung to her upper torso, but no clothing was found below her waist.

An orange rope was tied around Tolleson's right ankle, and two grommets from a tarp were lying on the back of her left leg and head.  Burnt pieces of tarp and skin were found on a path leading to Tolleson's body, indicating that she had been dragged or carried to that spot.  A short distance from where the body was discovered, steps led to a dugout under a tall tree where investigators found evidence that something had been burned.  Evidence technicians found ashes, firewood, a clump of hair, pieces of tarp and skin, and orange rope like that found tied around Tolleson's ankle.

Dr. William Rohr, the medical examiner, testified that Tolleson had sustained a five-inch diameter bruise on her left knee, a smaller bruise on the front of her left thigh, bruises on either side of her tongue, a large amount of hemorrhage deep in her left shoulder, and several bruises on her scalp ranging in diameter from three quarters of an inch to three inches.   A deep wound, consistent with injury from a knife, penetrated her neck all the way to her spinal column, and her body had been burned post-mortem. Rohr determined that Tolleson's death was consistent with strangulation or another form of asphyxiation.

After further interviews with potential witnesses, police obtained an arrest warrant for [Mendoza].   Once in custody, [Mendoza] told police that, late Wednesday evening, he had driven by Tolleson's house and had seen a light on.   He backed his truck into the driveway and let himself into the house through the back door without knocking.   According to [Mendoza], Tolleson left with him to get a pack of cigarettes.   [Mendoza] drove "for a little" and then "for no reason" started to choke Tolleson.   Tolleson passed out, and [Mendoza] drove to a field behind his home, where he had sexual intercourse with Tolleson and "choked her again." [Mendoza] then dragged Tolleson out of the truck and into the field, where he choked her until he thought she was dead.   To "make sure," he "poked her throat" with a knife.   [Mendoza] left Tolleson's body in the field until Monday, after he was first interviewed by police.   Scared that Tolleson's body would be found and tied to him, [Mendoza] moved the body to a remote area and burned it, ultimately dragging it to where it was found.

*Mendoza*, 2008 WL 4803471, at *1–2.

### III. SUPPLEMENTAL GROUNDS FOR RELIEF

Mendoza brings the following supplemental grounds for relief:

1.    Mendoza alleges, pursuant to *Martinez*, that trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by presenting the testimony of Dr. Mark Vigen during the punishment phase of the trial.

2.    Mendoza alleges that initial post-conviction counsel, pursuant to *Martinez*, rendered ineffective assistance of counsel for failing to raise the issue of trial counsel's ineffectiveness by presenting the testimony of Dr. Mark Vigen.

3.    Mendoza claims that the State of Texas used potentially false testimony at the punishment stage of the trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and trial counsel was ineffective in violation of the Sixth Amendment of the United States Constitution for failing to discover the State's use of false evidence.

**Page 5 of 28**

4.    Mendoza alleges, pursuant to *Martinez*, that trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by failing to interview Melvin Johnson and presenting his testimony during the trial.

5.    Mendoza alleges, pursuant to *Martinez*, that post-conviction counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by failing to interview Melvin Johnson and by consequently failing to raise the ineffective assistance of trial counsel on collateral review by trial counsel's failure to interview, investigate and present Melvin Johnson's testimony at trial or discover the use of the State's false evidence.

### IV. STANDARD OF REVIEW

Because Mendoza's application for habeas corpus was filed after 1996, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies to his claims. *Lindh v. Murphy*, 521 U.S. 321, 326–29 (1997). Under the AEDPA, a state prisoner seeking to raise claims in a federal petition for habeas corpus ordinarily must fairly present those claims to the state court and thereby exhaust his state remedies. *Ricard v. Connor*, 404 U.S. 270, 275 (1971); *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001).

For properly exhausted claims where the state court denies the claims on the merits, a federal court may only grant relief if a state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, *see* 28 U.S.C. § 2254(d)(1), or the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *see id.* § 2254(d)(2).

Generally, federal courts do not review unexhausted claims unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." *Id.* § 2254(b)(1). Similarly, federal courts do not review

claims that a state court refused to review based on an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 729 (1991).   "If a petitioner fails to exhaust state remedies, but the court to which he would be required to return to meet the exhaustion requirement would now find the claim procedurally barred, then there has been a procedural default for purposes of federal habeas corpus relief." *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).

As a rule, Texas state courts dismiss as abuse of the writ " 'an applicant for a subsequent writ of habeas corpus rais[ing] issues that existed at the time of his first writ.' " *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (quoting *Ex Parte Barber*, 879 S.W.2d 889, 892 n.1 (Tex. Crim. App. 1994)).   Federal courts in Texas therefore consider unexhausted claims in a federal habeas petition to be procedurally barred, because Texas abuse of the writ rules preclude exhausting those claims in a subsequent state habeas petition. *See Finley*, 243 F.3d at 220; *Fearance*, 56 F.3d at 642.   Texas's abuse of writ principles have regularly been upheld as a valid state procedural bar foreclosing federal habeas review. *Fearance*, 56 F.3d at 642; *see Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008); *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006).

Mendoza brings claims in this petition that were not raised in the state court proceedings below.   Until just recently, the supplemental claims would have undoubtedly been dismissed as procedurally barred by Texas's abuse of the writ principles.   However, the Supreme Court has provided a narrow exception to the procedural default rule, allowing federal review of procedurally barred ineffective assistance of trial counsel claims under certain conditions.

In *Coleman*, the Court provided a narrow exception for federal courts to review procedurally defaulted claims:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

501 U.S. at 750.   *Coleman* instructs, then, that federal courts may excuse procedural default and review procedurally barred claims upon a showing of cause and prejudice.   *Id.*   The Court in *Martinez* then held that petitioners may establish such cause for a procedurally defaulted ineffective assistance of trial counsel claim by establishing ineffective assistance of counsel at an initial-review collateral proceeding.   566 U.S. at 17.   Accordingly, the Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.*

The Supreme Court extended *Martinez* to Texas in *Trevino v. Thaler*.   569 U.S. at 427–428.   Although Texas does not preclude petitioners from raising ineffective assistance of trial counsel claims on direct appeal, the Court held that the rule in *Martinez* applies because "the Texas procedural system—as a matter of its structure, design, and operation—does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal."   *Id.* at 428.

The Fifth Circuit has summarized *Martinez* and *Trevino* as follows:

> To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial

> counsel are "substantial," meaning that he must demonstrate that the claims have some merit, . . . and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application.

*Chanthakoummane v. Stephens*, 816 F.3d 62, 72 (5th Cir. 2016). "The petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Id.* (quoting *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013)).

The Supreme Court set the standard for assessing claims for ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* applies in assessing the performance of both trial counsel and state habeas counsel. *See Martinez*, 566 U.S. at 14.

*Strickland* provides a two-pronged standard, and the petitioner bears the burden of establishing both prongs. 466 U.S. at 687. Under the first prong, he must show that counsel's performance was deficient. *Id.* To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . ." *Id.* at 689 (citations omitted). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that,

under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation and citation omitted).

Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot demonstrate either deficient performance or prejudice; a court need not evaluate both if petitioner makes an insufficient showing as to either. *Id.* at 697.

## V. DISCUSSION AND ANALYSIS

1. **Mendoza alleges, pursuant to *Martinez*, that trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by presenting the testimony of Dr. Mark Vigen during the punishment phase of the trial.**

2. **Mendoza alleges that initial post-conviction counsel, pursuant to *Martinez*, rendered ineffective assistance of counsel for failing to raise the issue of trial counsel's ineffectiveness by presenting the testimony of Dr. Mark Vigen.**

The first two supplemental grounds for relief are related. Mendoza initially argues that trial counsel was ineffective for presenting the testimony of Dr. Mark Vigen. He further argues that state habeas counsel was ineffective for failing to raise this issue on collateral review. Although Petitioner presents these as separate claims for relief, they are best understood as a single claim for ineffective assistance of trial counsel for presenting the testimony of Dr. Vigen. Nevertheless, Mendoza must still prove the ineffectiveness of both trial counsel and state habeas counsel to overcome his procedural default.

Dr. Vigen testified as a mitigation specialist and risk assessment expert.   RR 24:40.   The state court held a hearing before he was permitted to testify before the jury.   *Id.*   Dr. Vigen testified that he conducted an investigation that included interviews with Mendoza, and he prepared a report from his interviews, which was turned over to the state.   *Id.* at 40, 50–58.   The trial court overruled the State's objections to Dr. Vigen and permitted him to testify before the jury.   *Id.* at 87.

According to his testimony, Dr. Vigen spent 13 hours interviewing Mendoza, after which he developed several opinions about Mendoza's personality, life decisions before the crime, future dangerousness and potential for rehabilitation.   *Id.* at 117–30.   His first opinion was that Mendoza was "an immature, psychologically under-developed adolescent-like man who has no internal sense of himself.   He has no inner—inner self, no clear inner identity that I can detect." *Id.* at 117.   Dr. Vigen's second opinion was that Mendoza came from a psychologically dysfunctional family.   *Id.* at 121.   His third opinion was that Mendoza's behavior "changed radically for the worse when he began smoking marijuana and drinking."   *Id.* at 123.   Dr. Vigen's fourth opinion was that Mendoza's "new friends . . . lived a—sort of depraved and disrespectful, aggressive and drug and alcohol lifestyle in which—what I call empty sexuality was involved." *Id.* at 126.   His fifth opinion was "that the Texas Department of Criminal Justice has the expertise, has the capability to house and incarcerate [Mendoza] in such a manner that he will be a low or minimum risk for future violence in prison."   *Id.* at 127.   Finally, he thought that Mendoza had the "potential to develop a sense of self and a potential for rehabilitation and some type of spiritual conversion" in prison.   *Id.* at 129–30.

Mendoza argues that trial counsel's decision to present Dr. Vigen's testimony opened the door to otherwise impermissible cross examination by the State.   Docket No. 86 at 19–20. Mendoza asserts that Dr. Vigen's testimony on cross allowed the State to present harmful evidence, including that Mendoza "has no sense of self, has superficial remorse, is impulsive with a violent temper that can't be controlled, is violent toward his family and others, is a clever thief and liar, . . . takes pride in out-smarting guards," has a "bizarre fantasy" and is an "extremely dangerous person."   *Id.* at 19.

In addition, Mendoza contends that proffering Dr. Vigen's testimony allowed the State to obtain a copy of notes taken during his interviews with Mendoza.   *Id.*   These notes contained evidence of Mendoza's delinquency, violence towards his mother and sister and fantasies of confining people in small rooms.   *Id.*   Mendoza argues that such information was unknown to the State and would not have been available to the State absent Dr. Vigen's testimony.   *Id.*

Mendoza also argues that the possible benefit of Dr. Vigen's testimony, that he could grow spiritually and would not be a future danger, was gutted during the State's cross examination.   *Id.* Mendoza adds that Dr. Vigen's credibility was immediately erased when the State questioned him regarding the fact that he had never testified on behalf of the State in a death penalty case, including in various instances of particularly heinous murders.   *Id.* at 20.   Mendoza also highlighted Dr. Vigen's testimony on cross that he believed that Mendoza was a very dangerous person, that he had no personal knowledge of the Texas prison system and that his opinion that Mendoza would not be a " 'future danger' was based only on pure speculation with no basis or fact."   *Id.*

Mendoza concludes that trial counsel had no "reasonab[ly] strategic basis" for calling Dr. Vigen and failed to conduct "sufficient investigation or consideration" of the decision to proffer

his testimony.   *Id.* at 25.   Mendoza further noted that the prosecutor relied heavily on Dr. Vigen's testimony in closing on the "future dangerousness" special issue, supporting a finding of prejudice. *Id.* at 27.   With regard to habeas counsel, Mendoza argues that counsel was ineffective for failing to raise the above argument.   *Id.* at 32.   Mendoza recognized that habeas counsel "raise[d] the issue of the preparedness of Dr. Vigen to testify" but argued she did not raise the issue of "whether [t]rial [c]ounsel was [i]neffective by proffering the testimony of Dr. Vigen at all."   *Id.*

Mendoza's claim lacks merit because he fails to demonstrate that habeas counsel was ineffective.   Habeas counsel raised significant concerns regarding trial counsel's selection, preparation and use of Dr. Vigen during the punishment phase of trial.[4]   1 SCHR 41; *see also* Docket No. 86 at 32 (recognizing that state habeas counsel raised the issue of Dr. Vigen's preparedness of testify).   The fact that habeas counsel did not specifically word a ground for relief as "ineffective assistance of trial counsel for presenting the testimony of Dr. Vigen" does not render her counsel ineffective.

State habeas counsel raised four claims asserting ineffective assistance of counsel relating to trial counsel's failure to investigate, develop and present a mitigation defense.   Habeas counsel presented Dr. Vigen's problematic testimony as a symptom of this broader failure to prepare and present an adequate mitigation defense.   1 SCHR 31–59, 87–160, 182–196; *see id.* at 47 (asserting that trial counsel "failed in its duty to construct a persuasive narrative in support of the case for life.   Instead they called Dr. Vigen to testify to a catalog of seemingly unrelated mitigating

---

[4] Mendoza does not argue that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceedings under 28 U.S.C. § 2254(d).   Accordingly, the Court reviews the state court record only for determining whether habeas counsel was constitutionally ineffective.

factors.").   Habeas counsel asserted that the "inadequate mitigation investigation had adverse consequences," including that "expert roles were ambiguous;" Dr. Vigen was "not prepared leaving [Mendoza's] acts unexplained and allowing the prosecution to discredit the defense;" and Dr. Vigen's testimony "aided the prosecution," *id.* at 106–07, 109, 114–15.   Habeas counsel also asserted that trial counsel failed to conduct a "very thorough investigation of [Dr. Vigen] to prepare for his possible vulnerabilities on the stand."   *Id.* at 109, 114.

As Mendoza argues here, habeas counsel stated several times that "much of Dr. Vigen's testimony was more harmful than helpful."   *Id.* at 109, 11415 (citing an affidavit from Toni Knox, a mitigation specialist and arguing that "Dr. Vigen aided the prosecution's case" and his "conclusory opinions . . . shifted the blame to [Mendoza]").   Habeas quoted particularly harmful statements from Dr. Vigen's testimony, many of which are the same statements that Mendoza complains of in this petition.   *See id.* at 56, 117 (quoting an affidavit from Dr. Kessner, a psychologist, who cited Dr. Vigen's testimony and stated that "Dr. Vigen did not provide the jury with the context of the 'depraved sexuality' that characterized the relationship of [Mendoza] and his peer group."); *id.* at 98 (noting that Dr. Vigen was "vague in his description of the Mendoza family as being dysfunctional"); *id.* at 114 (quoting Dr. Vigen's testimony that Mendoza expressed some "initial and somewhat . . . superficial . . . some beginning remorse . . . ."); *id.* at 146 (quoting Dr. Kessner, who discussed Dr. Vigen's testimony that Mendoza was "hyperactive" and "impulsive" as a child as and concluded that Dr. Vigen failed to explain Mendoza's attachment disorder).

One of the "various problems with [Dr. Vigen's] testimony" habeas counsel raised was that "all notes and reports from Dr. Vigen's interviews were available to the [S]tate."   *Id.* at 97–98.

Page **14** of **28**

Habeas counsel asserted that, as a consequence of trial counsel's inadequate investigation, "Dr. Vigen assumed multiple roles . . . .   By utilizing [Dr. Vigen] in this manner, the defense opened up all information obtained from the interviewed family and witnesses to the prosecutor."   *Id.* at 125.

State habeas counsel also argued, as Mendoza argues in this petition, that the State easily discredited Dr. Vigen, erasing any benefit to his testimony.   Because trial counsel failed to adequately prepare Dr. Vigen, the prosecution "discredited the defense, and made them appear 'not equally matched' to the prosecution, 'not very skilled,' and 'not believable.' "   *Id.* at 110. "Dr. Vigen was totally unprepared by experience, training or education, to respond in any meaningful way to prosecutor's comments about future dangerousness" or "to testify persuasively in any of the areas about which he opined." *Id.* at 42, 188; *see id.* at 187 (noting that Dr. Vigen's testimony that Mendoza was a low or minimum risk was "riddled with disclaimers").   Again, habeas counsel specifically cited to portions of Dr. Vigen's testimony, including his testimony that he had not worked for the Texas Department of Corrections and that he hadn't done any studies of future dangerousness.   *Id.* at 187–89.

State habeas counsel went so far as to suggest that, had trial counsel conducted a proper mitigation investigation, Dr. Vigen would not have been called to testify in the manner he did, or even at all.   *Id.* at 97 ("Defense counsel's performance was deficient because [of]: . . . problems with the choice and strategy of selecting expert(s)[, including] . . . [p]roblems with Dr. Vigen as a " 'future dangerousness' expert witness."); *see id.* at 108 (quoting mitigation specialist Toni Knox, who opined that it was "unclear" why Dr. Vigen was retained).   Counsel particularly emphasized that "[i]f the mitigation specialist had compiled a complete social history and identified mitigation

themes, ***Dr. Vigen would not have been hired 'to furnish opinions' with no direction."*** *Id*. at 108 (emphasis in original).   Habeas counsel argued that Dr. Vigen was unqualified to testify in the manner that trial counsel presented him, and that there were other "more qualified experts" to testify as to future dangerousness.   *Id.* at 97, 123; *see id.* at 182 ("Dr. Cunningham was better qualified than Dr. Vigen to testify as to risk assessment, and to Texas prison life."); *id.* at 186 ("Dr. Vigen was not qualified to provide a risk assessment opinion about Mr. Mendoza.").

State habeas counsel also argued that the failure to present an adequate mitigation defense, of which Dr. Vigen's testimony was but a part, was presumptively prejudicial.   *Id.* at 62, 130.   In support, counsel provided two juror attestations specifically referencing Dr. Vigen's testimony as playing a significant role in their decision.   *Id.* at 58 ("Juror John Comer attests: . . . "***[T]he defense called a psychiatrist who*** did not really help their case, and in fact only ***helped the DA because he could not explain why the defendant did what he did, in terms of mental factors.***") (emphasis in original); *see id.* at 59 ("Juror Marsha Schmoll attests: . . . ***The defense expert said that the defendant was a 'victim of circumstance' but I was not convinced***.") (emphasis in original); *id.* at 58 (asserting that that Dr. Vigen's testimony caused prejudice because his failure to explain Mendoza's actions left the jury's only choice as "a vote for death.").

The record amply reflects that habeas counsel thoroughly raised issues relating to trial counsel's selection, preparation and presentation of Dr. Vigen, including the concerns Mendoza raises in this petition.

The state trial court's findings further inform this decision.   After reviewing the pleadings and evidence accumulated in this case, the state trial court issued findings of fact related to Mendoza's arguments here.   These findings of fact include: (1) Dr. Vigen's role in the

investigation did not make notes available to the State that the defense team otherwise could have withheld; (2) counsel believed that if Dr. Vigen could acknowledge both the good and bad facts he would seem more credible in the jury's eyes; (3) counsel decision to have Dr. Vigen testify about all facts, including those that were unhelpful to the defense, was a reasonable decision and a strategy the trial court had seen other capable criminal defense attorneys adopt; (4) there is no evidence that a better investigation into Dr. Vigen's vulnerabilities would have resulted in a different outcome for the defense; (5) counsel positioned Dr. Vigen as a voice of the experts to avoid putting on a "parade of experts" and to benefit from Dr. Vigen's "great report with juries;" and (5) at trial, the court concluded that Dr. Vigen was qualified to give an opinion on future dangerousness.   4 SCHR 1800, 1803, 1811–12.

The state trial court went on to issue the following conclusions of law regarding trial counsel's decision to present Dr. Vigen's testimony:

- [Mendoza] has not met his burden of establishing that counsel was deficient as evidenced by testimony of Dr. Vigen.  [Mendoza] complains with the advantage of hindsight that Dr. Vigen's testimony "aided the prosecution." . . . .  But Dr. Vigen's willingess to acknowledge that [Mendoza's] remorse was "somewhat . . . superficial" and that mitigating circumstances present in other capital murder cases are not present in [Mendoza's] history could very well have made him seem more objective and thus more credible in the eyes of the jury.   Moreover, [Mendoza] has not articulated exactly what counsel should have done differently to prepare Dr. Vigen so that he would not have testified as he did.  Nor has [Mendoza] demonstrated that the results of the proceedings would have been any different without Dr. Vigen's concessions.

- An expert relying on the opinions of other experts, Dr. Vigen was qualified based on his consultation with S. O. Woods to testify that TDCJ had the capacity to prevent [Mendoza] from being a future danger.

- [Mendoza] has not established that counsel was deficient for calling Dr. Vigen to give an opinion on [Mendoza's] future dangerousness.

- [Mendoza] has also not rebutted the presumption that counsel's decision to call Dr. Vigen to testify on future dangerousness was within the wide range of professional reasonable assistance.

- An expert may rely on the opinions of other experts if such information is reasonably relied upon by those in the field.  *See* TEX. R. EVID. 703.  Dr. Vigen was qualified, based on his own experience and training and his consultations with S. O. Woods and Dr. Cunningham, to testify that TDCJ had the capacity to prevent [Mendoza] from being a future danger.

4 SCHR 1836, 1848.

The state court specifically found that petitioner "ha[d] not demonstrated that trial counsel was deficient for 'calling Dr Vigen to given opinion on Mendoza's future dangerousness' " or that "counsel was deficient as evidenced by the harmful testimony of Dr. Vigen."  4 SCHR 1836–48. The record makes clear that, although not employing the same wording that Mendoza uses in this federal petition, habeas counsel raised substantial arguments relating to trial counsel's selection, preparation and use of Dr. Vigen.  Habeas counsel was therefore not ineffective for failing to specifically argue that trial counsel was ineffective for calling Dr. Vigen.

Mendoza's failure to establish that state habeas counsel was ineffective is sufficient, on its own, to warrant denial of his first two grounds for relief.  *See Chanthakoummane*, 816 F.3d at 62. However, petitioner also failed to demonstrate that the underlying ineffective assistance of trial counsel claim has merit.

A review of counsel's affidavit reveals that trial counsel gave a great deal of thought in developing a strategy focusing on the testimony of Dr. Vigen.   Trial counsel explained his strategy as follows:

Dr. Vigen was brought onto the defense team because of his past work in prisons and because we decided he would come across well as a "testifying witness" in the case.   The defense team was familiar with his abilities and performance on other Capital cases.   Dr. Cunningham and Mr. Woods were brought on the team so that

we could funnel all their expertise through Dr. Vigen.   This strategy was discussed and explained to Moises Mendoza.   The Defense team decided early on that we would employ Dr. Vigen as the voice of these experts since he had/could create a great rapport with juries. The defense team, based on negative responses by potential juror questionnaires about defense experts, had decided that we wanted to present our defense through Dr. Vigen because the law allows an expert to rely on what other experts provide to them.   Dr. Vigen had the benefit of all the information gathered by all our experts.

* * *

With all the roles defined we developed and presented to the jury our strategized mitigation as an explanation for his conduct, not an excuse.   His family, the dysfunction that followed as to Mr. Mendoza when his father became a shell of his former self, and the value system he took on with his new set of friends.

Dr. Vigen's dual role did not provide the prosecution with any information it did not already know about and were prepared to present in rebuttal.   We had decided that it was better that they hear it explained by our expert than the state's witnesses. Also, it gave Dr. Vigen a more honest position in front of the jury when it could explain the bad with the good.

4 SCHR 1469–74.

"[I]n the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances."   *Neal v. Puckett*, 286 F.3d 230, 236–37 (5th Cir. 2002).   The decision concerning which evidence and witnesses to present to a jury in mitigation is a matter of trial strategy and federal courts "will not question a counsel's reasonable strategic decisions." *Bower v. Quarterman*, 497 F.3d 459, 470–73 (5th Cir. 2007).

Mendoza's first ground for relief concerns trial strategy, and habeas relief is unavailable if a petitioner fails to overcome the presumption that counsel made sound strategic decisions.   *Del Toro v. Quarterman*, 498 F.3d 486, 491 (5th Cir. 2007).   Counsel explained his strategy in selecting Dr. Vigen as the voice of the experts.   4 SCHR 1469.   Counsel developed a reasonable

strategy to call Dr. Vigen, based on his experience in other capital cases and because he had/could create great rapport with juries.  *Id.* at 1469–70.   In light of *Strickland*, the Court cannot find that counsel was ineffective for calling Dr. Vigen as an expert witness.

Mendoza has not shown that either habeas counsel or trial counsel was ineffective as it relates to Dr. Vigen's testimony.   Because Mendoza has failed to establish cause to excuse the procedural default of this claim, his first ground for relief is **DENIED.**

> **3.** **Mendoza claims that the State of Texas used potentially false testimony at the punishment stage of the trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and trial counsel was ineffective in violation of the Sixth Amendment of the United States Constitution for failing to discover the State's use of false evidence.**

> **4.** **Mendoza alleges, pursuant to *Martinez*, that trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by failing to interview Melvin Johnson and presenting his testimony during the trial.**

> **5.** **Mendoza alleges, pursuant to *Martinez*, that post-conviction counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution by failing to interview Melvin Johnson and by consequently failing to raise the ineffective assistance of trial counsel on collateral review by trial counsel's failure to interview, investigate and present Melvin Johnson's testimony at trial or discover the use of the State's false evidence.**

Mendoza's final three supplemental grounds for relief are also related.   All three claims relate to the State's rebuttal witness, Officer Robert Hinton, a detention officer with the Collin County Sheriff's Department.   Mendoza alleges that during the punishment phase of the trial, Officer Hinton may have testified falsely about an incident involving Mendoza and another inmate, Melvin Johnson.

Officer Hinton testified that he was working as a detention officer in the Collin County detention facility on September 22, 2004.   RR 24:220–21.   He observed Mendoza go into a

**Page 20 of 28**

segregated recreation yard by himself. *Id.* at 229. He then observed that the other inmate, Mr.

Johnson, was released from his cell to finish mopping and sweeping the dayroom on the

segregation side. *Id.* at 230. Officer Hinton testified that he observed Mendoza re-enter the

housing unit, walk up the stairs towards Mr. Johnson, and "a fist fight broke out." *Id.* Officer

Hinton testified that Mendoza "approached in an aggressive fashion, and that Mr. Johnson "took

a defensive posture and was blocking the swings and returning them, too." *Id.* at 230–31.

Mendoza was disciplined as a result of the incident. *Id.* at 233.

Supplemental habeas counsel interviewed Mr. Johnson, who provided the following

affidavit regarding the incident:

> My name in Melvin Jermaine Johnson, I am presently [a]n inmate in the Wynne
> Unit in the Texas Department of Corrections. In 2004, I was incarcerated in the
> Collin County Jail where I came into contact with Moises Mendoza. Moises
> Mendoza was not very well liked by other inmates and the guards. Mr. Mendoza
> would continually use racial slurs and had a bad attitude. Due to the nature of Mr.
> Mendoza's offense he was confined to what is called the SHU, the special housing
> unit. On one occasion, due to a disciplinary problem, I was placed in the SHU
> also. While confined in the SHU inmates were allowed one hour a day to recreate.
> Mr. Mendoza would recreate by himself. As Mr. Mendoza was heading toward
> the rec yard, my cell[] was rolled. What this means is for some reason, my cell
> door was opened. This can only happen by a guard opening the door. As soon as
> the door opened, I figured what the guards wanted and I exited my cell and started
> a fight with Mr. Mendoza. I was definitely the aggressor. Mr. Mendoza was
> defending himself, but wasn't fighting back. After a short period of time, guards
> arrived and broke the fight up. That night I received an extra tray of food which I
> figured was a bonus for my actions in fighting Mr. Mendoza. Although, no one
> ever spoke to me about this incident, I am sure that the guards had planned this
> situation. I was told that there was trial testimony that Mr. Mendoza was in the
> rec yard when I was allowed to exit my cell to finish mopping the floor in the day
> room and Mr. Mendoza attacked me, this testimony is patently false. I have never
> been contacted until recently by anyone in regards to the facts of this situation, but
> had I been so contacted, I would have testified at trial as to what really happened
> on that occasion which is what I have stated in this affidavit.

Docket No. 86, Ex. A. Mr. Johnson signed the affidavit on November 2, 2016.

In the third ground for relief, Mendoza claims that the State may have used false testimony through Officer Hinton in violation of his due process rights, and that trial counsel was ineffective for failing to discover the State's use of false testimony.  *Id.* at 33.   Mendoza acknowledges that he "cannot allege with certainty that the testimony propounded by Officer Hinton was indeed false," but requests an evidentiary hearing and discovery to determine if there are any witnesses or evidence "to clarify this situation."  *Id.* at 39.   In the fourth ground for relief, Mendoza argues that trial counsel was ineffective for failing to interview Mr. Johnson and present his testimony at trial.  *Id.*   In the fifth ground for relief, Mendoza argues that state habeas counsel was likewise ineffective for failing to interview Mr. Johnson and failing to raise these two ineffective assistance of trial counsel claims.  *Id.* at 43.

The precise issue before the Court with respect to the last three supplemental grounds for relief is whether Mendoza can satisfy the requirements of *Martinez* and *Trevino*.   Although Mendoza asserts three independent claims for relief, these claims are best understood as a single claim for relief, alleging trial counsel's ineffective assistance of counsel for failing to discover and object to the State's use of false testimony, or failing to interview Mr. Johnson and present his testimony at trial.[5]   To the extent Mendoza is seeking relief based on the State's alleged use of false testimony under *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and *Giglio v. United States*, 405 U.S. 150, 153 (1972), neither the Supreme Court nor the Fifth Circuit have extended the holdings in *Martinez* and *Trevino* to such a claim.   *Martinez*, 566 U.S. at 15 ("*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains

---

[5] Although the claim is not spelled out as such, the Court is entitled to infer that Mendoza raises the *Napue/Giglio* argument to assert that trial counsel was ineffective for failing to object to the introduction of the allegedly false evidence.  *Mack v. United States*, No. EP-03-CA-330-H, 2005 WL 8149257, at *10 (W.D. Tex. 2005).

true except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at trial."); *Prystash v. Davis*, 854 F.3d 830, 836 (5th Cir. 2017) (declining to extend *Martinez/Trevino* to claims that could have been raised on direct appeal); *Wilkins v. Stephens*, 560 F. App'x 299, 306 n.44 (5th Cir. 2014) (claim alleging denial of right to a public trial under the Sixth Amendment "does not fall within the scope of *Martinez* or *Trevino* and is therefore procedurally barred").

Nevertheless, the elements of *Napue* and *Giglio* are relevant for purposes of evaluating whether trial counsel was ineffective for failing to discover the alleged false evidence and object to its admission at trial.   A conviction obtained through the use of false evidence violates the Fourteenth Amendment.   *Napue*, 360 U.S. at 269*; Giglio*, 405 U.S. at 153–54*; Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002).   To prove a due process violation, a petitioner must demonstrate: (1) that the testimony in question was actually false; (2) that the State knew it was false; and (3) that the testimony was material.   *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996).   Perjured testimony is material when there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.   *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Canales*, 765 F.3d at 573.

Mendoza argues that trial counsel was ineffective for failing to interview Mr. Johnson and discover the false evidence.   To be sure, trial counsel's failure to investigate the alleged incident is concerning.   Although Mr. Johnson's affidavit alone does not demonstrate that Officer Hinton's testimony was in fact false, an interview with Mr. Johnson may have led to the discovery of additional evidence either demonstrating such falsity.   *See Kutzner*, 303 F.3d at 337 ("[I]t is not enough that the testimony is challenged by another witness . . . .").   Alternatively, trial counsel

could have interviewed Mr. Johnson and called him to testify in an effort to discredit Officer Hinton's account.   *See Beltran v. Cockrell*, 294 F.3d 730, 734 (5th Cir. 2002) (holding the failure to impeach a witness with evidence that had "significant exculpatory value" amounted to ineffective assistance of counsel).

Generally, federal courts do not question trial counsel's decision not to call a particular witness, as this is considered a matter of trial strategy, and trial counsel may have had a reasonable justification for not presenting Mr. Johnson's testimony.   *Bower*, 497 F.3d at 470–73; *see Wilkerson v. Cain*, 233 F.3d 886, 892 (5th Cir. 2000) ("[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy.")   However, the decision not to call a witness without even interviewing the witness is particularly suspect. *Miller v. Dretke*, 420 F.3d 356, 362 (5th Cir. 2005) (holding trial counsel ineffective where counsel decided not to call a witness "without even speaking to them" and offered no tactical or strategic explanation for such a decision).   This is especially so here, where Mendoza presented Mr. Johnson's affidavit, demonstrating that Mr. Johnson may have been willing to testify and that his testimony would have benefitted Mendoza's defense.   *See id.* at 361 ("To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of trial.").

However, even if trial counsel's failure to interview Mr. Johnson fell below an objective standard of reasonableness, Mendoza's claim fails because he cannot demonstrate that the officer's testimony was material, for purposes of a *Napue/Giglio* claim, or that the failure to object to the testimony or call Mr. Johnson to testify was prejudicial.

False testimony violates due process only when it is material, meaning that there is a "reasonable likelihood that the false testimony affected the judgment of the jury." *Canales*, 765 F.3d at 573; *United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir. 1997) (defining materiality in terms of a "reasonable probability of a different outcome.") (internal quotations omitted).   Even setting aside Officer Hinton's testimony, the jury heard substantial evidence regarding Mendoza's future dangerousness.   In addition to the details of the crime of which Mendoza was convicted— an attempted burglary, kidnapping, sexual assault and murder—the jury heard evidence of Mendoza's childhood delinquency, including violence against teachers; Mendoza's violence against his family; additional acts of violence, and in particular violence against women, including threats to kill, robberies, attempted kidnappings and sexual assault; that Mendoza cut off his electronic monitoring anklet while released from Dallas County jail on bond; that Mendoza violated prison regulations, including making multiple homemade shanks; and Mendoza's violence against detention officers.   RR 22:13–30, 38–41, 23:126–28, 45–48, 57–70, 130–43, 147–61, 191–92, 199–205, 210–17, 225–37, 24:174, 223–49.

In light of all this testimony, Mendoza has not demonstrated that there is any reasonable likelihood that Officer Hinton's testimony could have affected the judgment of the jury.   *See Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir. 1998) (holding that expert's misleading testimony on future dangerousness was not material in jury's verdict supporting death sentence, where petitioner had been convicted of brutal rape and strangulation of an elderly woman, and additional evidence at sentencing showed petitioner raped his 10-year-old stepdaughter, had a lengthy criminal history and repeatedly escaped incarceration); *see also Devoe v Davis*, 717 F. App'x 419, 425 (5th Cir. 2018) (holding allegedly false testimony immaterial to verdict supporting death

sentence where jury heard evidence that petitioner murdered a pair of teenage girls and four other people, and that petitioner had a violent background, including convictions for assault, child endangerment and harassment); *Perez v. Quarterman*, No. A-09-CA-081, 2011 WL 6959946, at *13 (W.D. Tex. Dec. 29, 2011) (finding that "in light of the extraordinary violent nature of the offense on trial and the punishment phase testimony from the victim's family members," petitioner failed to show that the false testimony "played a crucial, critical, and highly significant role" in the punishment phase at trial).

Petitioner argues that the State relied on Officer Hinton's testimony in his closing argument, demonstrating that the testimony was material and prejudicial.  Although petitioner correctly notes that the State referenced the alleged assault in the closing, the prosecutor briefly mentioned the assault only after laying out Mendoza's lengthy violent and criminal history in extensive detail.  Moreover, the alleged assault was discussed as one in a series of Mendoza's prison violations, which included the creation of homemade shanks and an assault on detention officers.  RR 25:44–45.

Because Mendoza has not shown that Officer Hinton's testimony was material, he cannot demonstrate that trial counsel was constitutionally ineffective for failing to discover and object to the introduction of false evidence.  *See McCray v. Caldwell*, No. 15-1912, 2016 WL 8737477, at *9 (E.D. La. Aug. 24, 2016) ("Because [petitioner] has not shown that the arguments he contends counsel should have raised on appeal had any basis in law or fact, he cannot show that his appellate counsel was constitutionally ineffective for failing to raise the claims on direct appeal.").  An evidentiary hearing is not warranted where, even assuming the hearing would establish the

existence of false evidence, Mendoza has not shown that such false evidence was material. *Puckett v. Epps*, 615 F. Supp. 2d 494, 528–29 (S.D. Miss. 2009)

Because Mendoza has not established that Officer Hinton's testimony was material under *Napue/Giglio*, he cannot demonstrate that the failure to object to the testimony or call Mr. Johnson was prejudicial, as required to demonstrate ineffective assistance of counsel.  The prejudice standard under is more onerous than the materiality standard under *Napue/Giglio*.  *Cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (holding that petitioner's failure to satisfy the "materiality" prong under *Brady* necessarily fails to establish prejudice excusing procedural default); *Coulson v. Johnson*, No. 01-20083, 2001 WL 1013186, at *9 (5th Cir. Aug. 7, 2001) (holding that the materiality standard under *Giglio* is "considerably less onerous" than the materiality prong under *Brady*).

Further, it is unclear whether testimony from Mr. Johnson would have effectively rebutted the Officer Hinton's testimony.  Mr. Johnson's potential testimony was "double-edged."  Any benefit Mendoza might have reaped from discrediting Hinton's testimony that Mendoza was the aggressor in a fight is outweighed by the potentially negative testimony Mr. Johnson may have given.  According to his affidavit, Mr. Johnson stated that Mendoza was not well-liked by either guards or inmates, he "continually" used racial slurs, and he had a bad attitude.  "[D]ouble-edged evidence cannot support a showing of prejudice under *Strickland*."  *Reed v. Vannoy*, 703 F. App'x 264, 270 (5th Cir. 2017) (citing *Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000)); *see also Gray v. Epps*, 616 F.3d 436, 449 (5th Cir. 2010).

Because Mendoza has not adequately alleged ineffective assistance of trial counsel, the Court need not examine whether habeas counsel was likewise ineffective.  State habeas counsel

is not ineffective nor is a petitioner prejudiced for failing to raise meritless claims.   *Segundo v. Davis*, 831 F.3d 345, 350–51 (5th Cir. 2016).

In sum, Mendoza has not established cause to overcome the procedural default.   He has not satisfied his burden of showing that (1) his underlying claim of ineffective assistance of trial counsel is substantial, or (2) his initial state habeas counsel was ineffective in failing to present that claim in his first state habeas application.   *Chanthakoummane*, 816 F.3d at 72.   Mendoza's third, fourth, and fifth claims for relief are therefore **DENIED**.

## VI. CONCLUSION

Having carefully considered Mendoza's amended petition following remand by the Fifth Circuit, the Court is of the opinion that Mendoza has not shown cause to overcome his procedural default of these ineffective assistance of trial counsel claims in state court.   Therefore, Mendoza fails to meet the exception under *Martinez* and *Trevino* that would allow this Court to consider whether such ineffective assistance of counsel claims merit relief.   It is accordingly

**ORDERED** that the amended petition for a writ of habeas corpus is **DENIED.**   It is further

**ORDERED** that Mendoza's request for an evidentiary hearing is **DENIED**.

**So ORDERED and SIGNED this 14th day of November, 2019.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

Page **28** of **28**